IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS      PLAINTIFF

VS      CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9      DEFENDANTS

---

ZOOM DEPOSITION OF APRIL MEGGS

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On August 5, 2020

At 12:32 p.m.

REPORTED BY: SHARRON F. ALLEN, CSR, RPR
CSR NO. 1144

APPEARANCES:

JAMES D. WAIDE III, ESQUIRE
RACHEL PIERCE WAIDE, ESQUIRE
Waide & Associates, P.A.
Post Office Box 1357
Tupelo, Mississippi 38802

     REPRESENTING THE PLAINTIFF

TIMOTHY M. PEEPLES, ESQUIRE
Daniel Coker Horton & Bell, P.A.
Post Office Box 1396
Oxford, Mississippi 38655

     REPRESENTING MTC & JESSE WILLIAMS

DAVID LONG-DANIELS, ESQUIRE
Greenberg Traurig, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305

ELIZABETH ROSS HADLEY, ESQUIRE
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

     REPRESENTING MHM HEALTH PROFESSIONALS, D/B/A
     CENTURION PROFESSIONALS

ALSO PRESENT: DR. AMY WOODS

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

3

TABLE OF CONTENTS

| | Page |
|---|---|
| Style | 1 |
| Appearances | 2 |
| Table of Contents | 3 |
| Examination by Mr. Waide | 5 |
| Examination by Mr. Peeples | 75 |
| Further Examination by Mr. Waide | 102 |
| Exhibit 22 - 10/12/16 Offer Letter | 110 |
| Exhibit 23 - 6/25/19 Memo of Dr. Woods | 110 |
| Exhibit 24 - 4/28/19 E-mail Owens/Woods | 110 |
| Exhibit 25 - E-Mail Williams/Woods Re: Kelly | 110 |
| Exhibit 26 - 8/27/18 E-Mail williamson/woods | 110 |
| Exhibit 27 - Excerpt of Interrogatories | 110 |
| Exhibit 28 - 4/17/19 E-Mail String Meggs/Harless | 110 |
| Exhibit 29 - 4/17/19 E-Mail Haraway/Harless | 110 |
| Exhibit 30 - Involuntary Termination Report | 110 |
| Exhibit 31 - Personnel Change Notice | 110 |
| Exhibit 32 - 6/25/19 Memo of Dr. Woods | 110 |
| Exhibit 33 - 7/30/19 E-Mail Huff/Meggs | 110 |
| Exhibit 34 - Cover of Employee Handbook | 110 |
| Exhibit 35 - Page from Employee Handbook | 110 |
| Exhibit 36 - 6/18/19 E-Mail Day/Meggs | 110 |
| Exhibit 37 - Redacted Medical Record | 110 |

---

4

| | Page |
|---|---|
| Exhibit 38 - Redacted Medical Record | 110 |
| Exhibit 39 - Redacted Medical Record | 110 |
| Exhibit 40 - Redacted Medical Record | 110 |
| Exhibit 41 - Redacted Medical Record | 110 |
| Exhibit 42 - Redacted Medical Record | 110 |
| Exhibit 43 - Redacted Medical Record | 110 |
| Exhibit 44 - Amendment Two MDOC/Centurion | 110 |
| Deposition Concluded | 110 |
| Certificate of Deponent | 111 |
| Corrections Page | 112 |
| Certificate of Court Reporter | 113 |

EXHIBIT A

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

5

1  APRIL MEGGS,
2  having first been duly sworn, was examined and
3  testified as follows:
4       EXAMINATION
5  BY MR. WAIDE:
6       Q.  Would you state your name, please,
7  ma'am.
8       A.  My name is April Lynette Meggs.
9       Q.  Ms. Meggs, physically where are you
10 right now?
11      A.  I'm in my regional office in Jackson,
12 Mississippi.
13      Q.  Is anybody there with you?
14      A.  No, sir.
15      Q.  You're in the room by yourself?
16      A.  Yes, sir.
17      Q.  Ms. Meggs, my reception is probably bad
18 on this computer and I'm not seeing you, but it
19 looks like -- do you have -- do you have a mask
20 on?
21      A.  No, I don't.  I mean, all --
22      Q.  I just can't see you.
23      A.  I don't know how to fix it, but, yeah,
24 this is all I have.
25      Q.  Okay.  I'm sorry.  I just couldn't -- I

6

1  see you -- when you moved up, I could see your
2  face.
3       So is Jackson, Mississippi, your
4  regular office?  Is that where you have your
5  office?
6       A.  Yes.  It's 111 East Capitol Street.
7       Q.  Who has -- what other employees of MHM
8  Health Professionals have offices there besides
9  yourself?
10      A.  The regional DON, the IT manager.  I
11 have three administrative assistants, but
12 they're all working from home, working remote at
13 this current time.
14      Q.  Because of the coronavirus?
15      A.  Yes, sir.
16      Q.  Where are you from?  Where's your home?
17      A.  I live in Richton, Mississippi, but I'm
18 from Beaumont, Mississippi, which is about
19 18 miles apart.
20      Q.  I'm sorry.  From where?  Houma?
21      A.  Richton, Mississippi, is where I live
22 currently, but I'm from Beaumont, Mississippi,
23 originally, Perry County.
24      Q.  Okay.  Thank you, ma'am.
25           What is your job with MHM Health

7

1  Professionals?
2       A.  I'm the vice president of operations.
3       Q.  Did you know Dr. Amy Woods when she was
4  there?
5       A.  Yes, sir.
6       Q.  Did you -- of course, you weren't
7  on-site, so you wouldn't have any opportunity to
8  observe her work, I would assume.  Am I right or
9  wrong?
10      A.  You're correct.
11      Q.  In your capacity as director of
12 operations, are you over the medical staff up at
13 the Marshall County Correctional Facility?
14      A.  Yes, sir, I'm over the staff in the
15 state in conjunction with clinical leadership
16 from Dr. Clayton Ramsue.
17      Q.  All right.  Dr. Ramsue -- you say in
18 conjunction with him.  Y'all are both over the
19 medical staff, basically?
20      A.  Yeah.  Actually, the doctors are --
21 they report to him; he's their direct
22 supervisor.  And if anything goes any further, I
23 mean, I'm over operations if there's a problem.
24      Q.  Is there anything in the policies or
25 procedures of your company that requires that

8

1  you give high quality of care to the prisoners?
2       A.  Are you asking if that's spelled out in
3  the contract or --
4       Q.  Well, I've looked at the contract and
5  don't really see anything regarding that; it may
6  be in there.  But I'm just talking about any
7  company policies.  If you know about it in the
8  contract, you can answer that.  Is there
9  anything there in company policy that says that
10 you're to provide as good a quality care and
11 medical care as you can?  Is there anything like
12 that in your company policies?
13      A.  I'm not familiar with anything directly
14 in the policy.  I think it's understood that you
15 provide quality care.
16      Q.  Do you understand there's a general
17 legal requirement to take -- to provide adequate
18 medical care to any prisoner with serious
19 medical needs?  Do you understand that?
20           MR. LONG-DANIELS:  Objection to form.
21 BY MR. WAIDE:
22      Q.  Did you understand my question?
23      A.  No, I didn't.
24      Q.  All right.  Just as a matter of general
25 knowledge, do you understand that any facility

13

1 receive it this morning, over 100 pages. And it
2 was pretty late in the morning, about maybe
3 10ish.
4     Q. Did you understand, though, that his
5 deposition was about the circumstances under
6 which Dr. Woods lost her job? Did you
7 understand that's what it concerned?
8     A. It had other things in it, so I don't
9 know if it was just about her losing her job. I
10 saw patient care was mentioned in the blob that
11 I read.
12     Q. You're talking about patient care? I
13 see.
14     Well, first of all, do you know whether
15 or not Dr. Woods was concerned about patient
16 care?
17     A. I don't know how to answer that. I
18 would hope that she was concerned about patient
19 care.
20     Q. All right. Are you aware, at least,
21 from some e-mails that you're getting that she
22 was concerned about a lack of security at the
23 prison in Marshall County?
24     A. To my knowledge --
25     MR. LONG-DANIELS: Objection to form.

14

1     A. To my knowledge -- to my knowledge, I
2 only recall one e-mail that was sent to me, and
3 it was not by Dr. Woods; it was sent by Hunter
4 Williamson.
5 BY MR. WAIDE:
6     Q. By Hunter Williams? Williamson?
7     A. Yes.
8     Q. All right. Mr. Williamson had worked
9 for y'all as -- was he a registered nurse? Am I
10 correct about that?
11     A. He was the health service
12 administrator.
13     Q. And he had expressed some concern about
14 what?
15     A. He sent one e-mail that there was low
16 security at Marshall County on one particular
17 night, and he had talked with the warden about
18 that. It was sent to me basically for
19 need-to-know information.
20     Q. Well, am I correct that, in order for a
21 patient to see a physician, there has to be
22 security? Correct?
23     A. That's correct.
24     Q. So a concern about security would also
25 impact patient care, would it not?

15

1     MR. LONG-DANIELS: Object to the
2 form.
3     You can answer.
4     A. The particular e-mail that I received
5 spoke on night shift. It did not concern day
6 shift. There is usually no doctors there at
7 night to see patients.
8 BY MR. WAIDE:
9     Q. Here's my question. This is just a
10 general question. Since you have to have
11 security in order for an inmate to see a doctor,
12 then a lack of security would impact patient
13 care, would it not?
14     MR. LONG-DANIELS: Objection to form.
15     A. Yes. If you have a lack of security,
16 it could impact patient care.
17 BY MR. WAIDE:
18     Q. All right. So -- now, you have -- your
19 company has a separate contract with a
20 company -- I mean with the state from the
21 company that's running the prison facility.
22 Right? Y'all have separate contracts with the
23 state?
24     A. Yes.
25     Q. As vice president of operations, would

16

1 you be the people -- would you be the -- strike
2 that.
3     Who would be the person that would deal
4 with the -- with the prison authorities, the
5 people running the jail? Would that be you, or
6 would that be somebody else?
7     A. At the facility level, it would be the
8 HSA.
9     Q. All right. So do you agree with me
10 that, in taking care of the medical needs of
11 prisoners, that it would be your company's duty
12 to notify the prison authorities if they thought
13 there was inadequate security there?
14     A. Yes.
15     MR. LONG-DANIELS: Objection to form.
16     A. By the chain of command.
17 BY MR. WAIDE:
18     Q. All right. At any point -- well, you
19 say the HSA. Would it be the HSA on the scene
20 that should notify the prison authorities of the
21 lack of security, or would that be you? Who
22 should do that?
23     A. That would be the HSA at the facility.
24     Q. All right. I think the HSA while
25 Dr. Woods was employed was Travis Day. Correct?

17

```
 1         A.   It was Hunter Williamson and then
 2   followed by Travis Day.
 3         Q.   All right.  Let's stop.
 4              To your knowledge, do you know whether
 5   or not Travis Day ever expressed any concerns
 6   about the lack of security to the prison
 7   authorities?
 8         A.   To my knowledge, no.
 9         Q.   And you say you think Hunter Williamson
10   did on one occasion?
11         A.   Hunter Williamson sent an e-mail -- my
12   testimony is he sent an e-mail to me that there
13   was a lack of security at night that -- followed
14   by a pill pass, and that he would be speaking
15   with Warden Williams concerning that incident.
16         Q.   What do you know as the vice president
17   of operations -- what do you know, what do you
18   have knowledge of that your company has done to
19   try to assure that there was enough security
20   there to see to it that the doctors were able to
21   see patients so as to treat their serious
22   medical needs?  What has your company done to
23   assure that that be done?
24              MR. LONG-DANIELS:  Objection to form.
25         A.   That would be related to the HSA at the
```

18

```
 1   facility.  If there were some issues or
 2   concerns, they would report that to the warden
 3   or security; and if that wasn't handled, then it
 4   would fall to me.  To my knowledge, to date I
 5   have not had anything to fall to me related to
 6   no security at that facility during Travis Day's
 7   time.  The only time I have is Hunter
 8   Williamson's e-mail.
 9   BY MR. WAIDE:
10         Q.   You were not -- are you saying that you
11   were not -- whoever the HSA was at the relevant
12   time, whoever it was never did tell you that
13   there was a shortage of security so that there
14   was a problem in patients coming to their
15   appointments?  Nobody ever notified you of that?
16         A.   No.  There was no notification of
17   problems or concerns.  There were notification
18   of plans in the event that security was
19   jeopardized and us not having security in the
20   facilities.
21         Q.   Well, first of all, you agree with me
22   that, if there's a lack of security -- if that
23   exists, there's not enough security officers so
24   that they can't bring the patients over to see
25   the doctors, I think you agree with me that that
```

19

```
 1   would be an issue that you would be concerned
 2   about.  Correct?
 3              MR. LONG-DANIELS:  Objection to form.
 4         A.   Yes.  I would be -- I would be
 5   concerned if there was not enough security.
 6   BY MR. WAIDE:
 7         Q.   Other than the -- and the reason you'd
 8   be concerned is because that would impact the
 9   ability of your company to take care of the
10   serious medical needs of prisoners.  Correct?
11   That's the reason you'd be concerned?
12              MR. LONG-DANIELS:  Objection to form.
13            Same objection.
14   BY MR. WAIDE:
15         Q.   Am I correct?
16         A.   Correct.
17         Q.   And to your knowledge, the only time
18   you were ever notified or anytime your HSA ever
19   made an issue out of a lack of security so that
20   the prisoners could be brought for medical care
21   was one e-mail by a former HSA, Mr. Williamson.
22   Am I correct?
23         A.   To my recollection, yes.
24         Q.   All right.  You said that you saw --
25   you believe you saw the deposition or some of
```

20

```
 1   the deposition of Warden Williams?
 2         A.   What I stated was I received it this
 3   morning, and I haven't had time to go through
 4   it.  I have glimpsed it.  I did see his name,
 5   Warden Williams' name, and some questions being
 6   answered.  I can't tell you exactly what was
 7   asked.  I just remember skimming it because I
 8   received it the latter part of the morning at
 9   10:00.
10         Q.   Do you know -- do you know whether or
11   not he stated or he testified in that
12   deposition -- from what you remember, do you
13   remember whether or not he testified in there
14   about a shortage of security and inability to
15   get security officers up there?
16         A.   No, I don't recall that.
17         Q.   Do you know, as vice president of
18   operations, whether there was -- in the spring
19   of 2019 there was a shortage of security
20   officers so that there weren't enough security
21   officers sometimes to be able to take the
22   prisoners over to see the doctors?  Are you
23   aware of that?
24              MR. LONG-DANIELS:  Objection to form.
25         A.   No, I'm not aware of that.
```

81

```
 1      A.   She's with the office of medical
 2  compliance.  She is our next go-to, Centurion
 3  being the vendor.  She's over the medical
 4  contract for the state of Mississippi.
 5      Q.   So that's an option that Centurion has.
 6  If they're not satisfied with the way things are
 7  being run in the prison, that prisoners, for
 8  example, aren't getting back to be seen, you can
 9  go to the Mississippi Department of Corrections
10  or the Dr. Perry that you just mentioned?
11      A.   Yes.
12      Q.   Did you ever have to do that between,
13  let's say, March and June 2019?
14      A.   I can't truthfully say.  That's been
15  over a -- I mean, that's been a little while.
16  So I would say, if there was an issue that
17  arises, yes.  I have the same protocol
18  regardless.  I do report that, but I don't know
19  with that date frame --
20      Q.   Sure.
21      A.   -- who all I spoke to during that date
22  frame.
23      Q.   You just don't remember one way or the
24  other?
25      A.   I don't remember, yeah.  But if it
```

82

```
 1  happened, I'm sure I would have reached out.
 2      Q.   Okay.  Do you remember any concerns
 3  raised by Dr. Woods or Travis Day that would
 4  have led you to take that kind of step?
 5      A.   No.  Yeah, I don't recall anything
 6  being brought to me by Dr. Woods.  I don't
 7  recall anything being brought to me by Travis
 8  Day related to something I needed to elevate
 9  through the DOC.
10      Q.   And you mentioned the term "chain of
11  command" when Mr. Waide was asking you
12  questions.  Is that something that Centurion
13  relies upon, the chain of command?
14      A.   Absolutely.
15      Q.   And does Centurion expect its employees
16  to follow the chain of command?
17      A.   Absolutely.
18      Q.   You said, when you received this e-mail
19  that's marked as Exhibit 35 -- it's the e-mail
20  from Travis, the June 18, 2019, e-mail --
21      A.   Yes.
22      Q.   -- I think you said that raised some
23  red flags for you.
24      A.   Yes.  And I could have been traveling.
25  I'm trying to find it now because I just took it
```

83

```
 1  out for some reason.  Yes.  The way it -- it
 2  raised some red flags because of the way it was
 3  written.  And when he said it caused him a great
 4  alarm because in the warden meeting he made
 5  reference to a state rep driving through the
 6  parking lot.  So those were just the key -- the
 7  nuggets that I pulled out, and I forwarded that
 8  on to our HR business partner.
 9      Q.   Right.  And what are the red flags?
10  That's a term you used.  What red flags went off
11  in your mind when you saw that e-mail?
12      A.   I thought chain of command immediately,
13  but what I saw was he's making reference that he
14  sat in a meeting the day before and that
15  Dr. Woods was at the nurse's station and she
16  mentioned she had conversation with a state rep
17  who lived in Marshall County, something going
18  on; and then further when he stated that there
19  was -- she also stated former Deputy Warden Doty
20  used to be at odds because she would call the
21  state rep about things that went on at Marshall
22  County when Doty was there.  Those were the
23  things that kind of raised red flags to me, so
24  that's why I forwarded it on to the HR business
25  partner.
```

84

```
 1      Q.   Right.  And you wanted Ms. Huff and her
 2  department to get involved as well, I assume?
 3      A.   Usually when I send her stuff, it's
 4  just a FYI just in case something comes of it,
 5  not so much as far as an investigation, just
 6  basically that these are some allegations that
 7  have been raised.  And shortly thereafter -- I
 8  don't know if I was traveling, because I don't
 9  remember that block of time.  I think he alluded
10  that it was seven days before or six days before
11  the clearance was pulled.  I don't have anything
12  for that block.
13      Q.   Right.  And I haven't seen any e-mails
14  either, and I think you've said you don't recall
15  any as we sit here during that week period, give
16  or take.
17      A.   Right.
18      Q.   Do you recall during the -- between the
19  time you received Hunter's e-mail and the time
20  that you received the notification that the
21  clearance had been pulled, do you recall
22  speaking to Travis about the e-mail or the
23  situation?
24      A.   I believe Travis called me, and he
25  verbally stated all these things and said that
```