IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS                                    PLAINTIFF

VS                    CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9                                   DEFENDANTS

---

ZOOM DEPOSITION OF JESSE WILLIAMS

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On August 3, 2020

At 12:31 p.m.

REPORTED BY:   SHARRON F. ALLEN, CSR, RPR
               CSR NO. 1144

APPEARANCES:

JAMES D. WAIDE III, ESQUIRE
RACHEL PIERCE WAIDE, ESQUIRE
Waide & Associates, P.A.
Post Office Box 1357
Tupelo, Mississippi 38802

        REPRESENTING THE PLAINTIFF

TIMOTHY M. PEEPLES, ESQUIRE
Daniel Coker Horton & Bell, P.A.
Post Office Box 1396
Oxford, Mississippi 38655

        REPRESENTING MTC & JESSE WILLIAMS

DAVID LONG-DANIELS, ESQUIRE
Greenberg Traurig, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305

ELIZABETH ROSS HADLEY, ESQUIRE
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

        REPRESENTING MHM HEALTH PROFESSIONALS, D/B/A
        CENTURION PROFESSIONALS

ALSO PRESENT:  DR. AMY WOODS

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

3

TABLE OF CONTENTS

Style ................................................ 1
Appearances .......................................... 2
Table of Contents .................................... 3
Examination by Mr. Waide ............................. 5
Examination by Mr. Long-Daniels ..................... 104
Further Examination by Mr. Waide .................... 123

    Exhibit 1 - E-mail String Regarding Clearance and
        MCCF Medical Report ......................... 127
    Exhibit 2 - Excerpt from Amended Complaint ...... 127
    Exhibit 3 - E-mail String Day/Williams Regarding
        Six or Ten Inmates in Medical ............... 127
    Exhibit 4 - E-mail String Meggs/Williams/Day
        Regarding Six or Ten Inmates in Medical ..... 127
    Exhibit 5 - E-Mail Williams/Woods Re: Kelly ..... 127
    Exhibit 6 - E-Mail Proposed Clinic Schedule ..... 127
    Exhibit 7 - 5/9/19 Directive from Williams ...... 127
    Exhibit 8 - Employee of the Year Nomination ..... 127
    Exhibit 9 - Article on Centurion Termination .... 127
    Exhibit 10 - E-mail About Missed Appointments ... 127
    Exhibit 11 - 4/25/19 Statement of E. Mason ...... 127
    Exhibit 12 - 4/25/19 Statement of N. McKinney ... 127
    Exhibit 13 - 2/1/19 E-Mail Marshall/Woods ....... 127
    Exhibit 14 - 7/13/18 E-Mail Woods/Marshall ...... 127

---

4

    Exhibit 15 - 11/30/18 E-Mail Marshall/Woods ..... 127
    Exhibit 16 - 11/27/18 E-Mail Woods/Marshall ..... 127
    Exhibit 17 - 3/20/19 E-Mail Marshall/Woods ...... 127
    Exhibit 18 - 12/12/18 E-Mail Williamson/Meggs ... 127
    Exhibit 19 - 12/12/18 E-Mail Woods/Williamson ... 127
    Exhibit 20 - 6/26/19 E-Mail Williams ............ 127
    Exhibit 21 - 7/1/16 MDOC/Centurion Agreement .... 127
Deposition Concluded ................................ 127
Certificate of Deponent ............................. 128
Corrections Page .................................... 129
Certificate of Court Reporter ....................... 130

EXHIBIT B

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

5

                    JESSE WILLIAMS,
having first been duly sworn, was examined and
testified as follows:
                    EXAMINATION
BY MR. WAIDE:
    Q.   Sir, would you state your name, please.
    A.   Jesse Williams.
    Q.   What city do you live in, Mr. Williams?
    A.   Memphis, Tennessee.
    Q.   Have you ever lived in Mississippi?
    A.   No, sir.
    Q.   Where do you consider your home to be?
    A.   Florida.
    Q.   Is that where you were born?
    A.   No, sir.
    Q.   What state were you born in?
    A.   Ohio.
    Q.   Where are you employed?
    A.   MTC.
    Q.   When did you start doing corrections work? What year?
    A.   Let's see.  1989.
    Q.   Other than corrections work, have you ever had any law enforcement experience?
    A.   Just corrections.

6

    Q.   Sir?
    A.   Corrections only.
    Q.   What is your educational level?
    A.   B.A.
    Q.   From where?
    A.   Bluffton University.
         COURT REPORTER:  What university?
         THE WITNESS:  Bluffton University.
BY MR. WAIDE:
    Q.   I'm sorry, I didn't understand you. I'm hard of hearing, though. Can you say that one more time.
    A.   Bluffton University.
    Q.   Can you spell that for me?
    A.   B-L-U-F-F-T-O-N.
    Q.   What state is that in?
    A.   Ohio.
    Q.   And what's your degree in?
    A.   Recreation management.
    Q.   When did you go to work for MTC?
    A.   2019, March.
    Q.   Where were you employed immediately before that?
    A.   A company called PAE.
    Q.   Is that a corrections company also?

7

    A.   No, sir.
    Q.   What is that?
    A.   It's a company that deals with overseas deployments.
    Q.   How long did you work for that company?
    A.   About four years.
    Q.   Why did you leave?
    A.   To come back to the states.
    Q.   What nation were you working in?
    A.   Afghanistan.
    Q.   Have you ever been in the military?
    A.   No, sir.
    Q.   Have you ever been discharged from any job?
    A.   No, sir.
    Q.   Other than Dr. Amy Woods, have you ever revoked a security clearance of any employee at a correctional institution?
    A.   Yes, sir.
    Q.   Can you tell me who and for what reasons?
    A.   Various individuals for various reasons.
    Q.   All right.  I understand possession of contraband would be one, for example. Let's

8

leave the individuals off and just give me the reasons.
    A.   Various reasons.  It could be contraband. It could be violation of contract. A plethora of reasons over my career.
    Q.   All right.  When you revoked the security clearances, have they always related to security in some way?
    A.   Prison operations.
    Q.   So is the answer they wouldn't necessarily mean -- you would revoke a security clearance even though the person had not made any breach of security?
    A.   You're calling it a security clearance. We usually call it a authorization for entrance, allowing the person to come in and out of the facility. And, again, over the years I've done it for a plethora of different reasons.
    Q.   Give us some of the reasons. Give us an example of what you've revoked it for. Just give me specific facts on you revoked it on such and such occasion for doing what.
    A.   Someone could bring in some contraband found on them that would not allow them to come into the institution. That would be a reason.

13

1  company's policies to make the final decision to
2  revoke her security clearance?
3      A.   Yes, sir.
4      Q.   Did you confer with anybody from
5  Centurion before you made the decision to revoke
6  her security clearance?
7      A.   I notified -- I talked with Travis Day
8  from Centurion, and then also had a conversation
9  with April Meggs as well.
10     Q.   What was Ms. Meggs' position?
11     A.   I don't quite remember her exact
12 position, but I know she's in a supervisory role
13 at a pretty high level.
14     Q.   All right.  So am I correct in saying,
15 then, that before you revoked the security
16 clearance, you had the approval of both Ms. --
17 and correct me if I'm wrong -- did you have the
18 approval of both Ms. Meggs and of Travis Day?
19     A.   Not approval --
20         MR. LONG-DANIELS:  Objection to form.
21         MR. PEEPLES:  Go ahead.  You can
22    answer.
23     A.   They're not in my chain.  It was a
24 conversation I had with Mr. Day, and then I
25 followed up with a call to inform Ms. Meggs of

14

1  the direction I was going.
2  BY MR. WAIDE:
3      Q.   Did you tell Ms. Meggs why you were
4  making the decision?
5      A.   Yes, sir.
6      Q.   I'm seeing an e-mail -- and we'll go
7  through that in a minute -- but do you recall
8  telling her anything about why you were making
9  the decision other than what's in the e-mail?
10     A.   What was in the e-mail we discussed,
11 along with some other information that I had as
12 well I discussed with her.
13     Q.   All right.  Well, let's start with
14 other information.
15         Well, first of all, where did your
16 information come from other than Travis Day?
17     A.   I had had prior conversation pertaining
18 to information coming out of the institution
19 through folks from Centurion and from the
20 assistant director of the Mississippi Department
21 of Corrections.
22     Q.   Who is that?
23     A.   That was Mr. Jerry Williams, who was
24 the assistant director at that time.
25     Q.   Had you discussed with Mr. Jerry -- Mr.

15

1  Jerry Williams is a state employee of the
2  Department of Corrections?
3      A.   That would be correct, sir.
4      Q.   Had you discussed with Mr. Williams
5  that you were going to revoke the security
6  clearance of Dr. Woods?
7      A.   I had made notification to him, as well
8  when I did with Ms. Meggs and my folks as well.
9      Q.   What reason did you give Mr. Williams
10 for revoking the security clearance?
11     A.   My discomfort of some of the
12 information that had been given to me pertaining
13 to information of the facility going outside of
14 the facility to individuals pertaining to prison
15 operations.
16     Q.   All right.  Did your information, the
17 information that you received that you based
18 your decision on, did it come from anybody other
19 than Travis Day?
20     A.   Correct, it did.
21     Q.   Who else did it come from?  Who else
22 gave you information other than Travis Day?
23     A.   Again, Mr. Jerry Williams and I had had
24 conversation about this particular situation.
25     Q.   But what I want to know is by giving

16

1  you information, what information did
2  Mr. Williams furnish to you?  What did
3  Mr. Williams tell you that she had done wrong?
4      A.   We had dialogue about information
5  pertaining to the operation of the Marshall
6  County Correctional Facility being given to
7  individuals outside of the facility, if you
8  will, and had an understanding that that
9  information was being given to those individuals
10 from individuals in the medical department from
11 Centurion.
12     Q.   Here's my question:  What is it that
13 Mr. Williams told you -- I don't need, you know,
14 "we had discussions," but just tell me what
15 Mr. Williams told you that had been done wrong.
16 What did he tell you that Dr. Woods has done
17 that's wrong?
18     A.   He stated to me that information
19 pertaining to, again, institutional operations
20 in terms of security numbers, various things
21 within the institution that is, again, in line
22 with prison operations, was being shared with
23 individuals outside of our facility.
24     Q.   When did Mr. Williams tell you that?
25     A.   The exact date I do not remember.

17

1  Q. Was it before or after you wrote the
2  e-mail where you said her security clearance is
3  terminated?
4  A. It was before.
5  Q. How long before?
6  A. The exact time table I wouldn't know,
7  but I know for sure it was months before.
8  Q. Where is Mr. Williams located?
9  A. He's retired, to my understanding, with
10 MDOC.
11 Q. No. Where was he located physically at
12 that time? Where was his office?
13 A. My understanding: It was in Jackson,
14 Mississippi.
15 Q. Did Mr. Williams tell you how he knew
16 in Jackson what Dr. Woods was doing up in
17 Marshall County?
18 A. Said to me that he had had dialogue
19 with some individuals that gave him that
20 information.
21 Q. Did he identify who they were?
22 A. Yes.
23 Q. All right. Who did he say they were?
24 A. I might mess the name up, so forgive me
25 if I do, but Representative Kinkade.

18

1  Q. Okay. So Williams told you that she
2  had conversations with Representative Kinkade.
3  A. Correct.
4  Q. What's the relationship between
5  Representative Kinkade and Mr. Williams?
6  A. That I'm not real sure of, but I make
7  the assumption, with his position, that he would
8  have to have had meetings and dialogue and
9  conversations with him over various things
10 within MDOC.
11 Q. All right. Did you talk to
12 Mr. Kinkade?
13 A. No, sir, I did not.
14 Q. Mr. Kinkade is a chairman of a
15 corrections committee in the Mississippi State
16 House of Representatives, is he not?
17 A. That would be true to my knowledge.
18 Q. Do you agree that it is appropriate and
19 lawful for a state representative to have
20 knowledge of the prison operations of any prison
21 being operated by a contractor for the State of
22 Mississippi?
23 A. They would have a working knowledge,
24 yes.
25 Q. In other words, a state representative

19

1  should know and should try to find out at least
2  about whether a company such as your company is
3  doing a good job. Correct?
4  A. That would be fair.
5  Q. Would that also be true of
6  Mr. Williams?
7  A. That would be fair.
8  Q. And so what -- well, first of all, did
9  you know -- you only came, if I remember, in
10 March of 2019 --
11 A. Correct.
12 Q. -- to Marshall County?
13 A. Correct, sir.
14 Q. Did you ever know Mr. Day before that?
15 A. No, sir.
16 Q. So how did you know Mr. Day was telling
17 you the truth when he made the statements that
18 he made to you?
19 A. The information that Mr. Day gave me
20 coincided with the previous information that I
21 had months ago from Mr. Williams.
22 Q. All right. We've been furnished
23 discovery, and we haven't seen any written
24 documents from Mr. Williams. Do you have such
25 documents?

20

1  A. I do not, sir.
2  Q. Do such documents exist?
3  A. To my knowledge, I don't know.
4  Q. Well, did you write any documents to
5  him?
6  A. No, sir, not pertaining to this
7  situation that I can recall.
8  Q. Did he write any to you?
9  A. Not that I can recall pertaining to
10 this situation.
11 Q. Did he call you on the phone and tell
12 you that -- was it on the phone that he called
13 you and he said Dr. Woods is talking to a member
14 of the state legislature?
15 A. We had verbal conversation once in
16 pub- -- face to face, if my memory serves me
17 correct, and again via phone.
18 Q. Did all the conversations concern the
19 claim that she was talking to a state
20 legislature, Representative Kinkade?
21 A. Jerry Williams and I had various
22 conversations on many things, but we had one or
23 two conversations pertaining to information
24 coming from the medical department about prison
25 operations at Marshall.

21

1  Q.  Here's my question, sir: Other than
2  the fact that, according to you, Mr. Williams
3  said "Amy Woods has been talking to
4  Representative Kinkade about some things going
5  on in the prison," did you have any
6  conversations with him about anything else that
7  she was doing other than talking to this state
8  representative?
9     A.  Not to my knowledge, no.
10        MR. LONG-DANIELS: Objection to form.
11 BY MR. WAIDE:
12    Q.  Now, do you understand that it's the
13 right under the First Amendment of the United
14 States Constitution, or would you understand
15 that it was the right of any citizen of the
16 state of Mississippi to talk to a member of the
17 legislature about a matter of concern to the
18 citizen?
19        MR. LONG-DANIELS: Objection to form.
20        MR. PEEPLES: Objection.
21 BY MR. WAIDE:
22    Q.  I'm sorry, I didn't understand your
23 answer.
24        MR. PEEPLES: I objected to --
25

22

1  BY MR. WAIDE:
2     Q.  You're looking at your counsel. Don't
3  look at your counsel. Talk to me.
4        MR. PEEPLES: He's waiting for you to
5    finish -- let us finish talking, then. He
6    was waiting.
7        MR. WAIDE: We don't need -- you're
8    not supposed to confer with your counsel
9    during your deposition.
10       MR. PEEPLES: He's not. He's waiting
11   for you to quit talking over him, and he's
12   looking to me to finish my objection. You
13   keep talking over the witness.
14       I object to the form. I think David
15   did as well.
16       MR. LONG-DANIELS: I did object.
17       MR. PEEPLES: Now Mr. Williams can
18   answer.
19       THE WITNESS: What was the question
20   again?
21 BY MR. WAIDE:
22    Q.  Did you understand that it's the right
23 of every citizen -- in fact, the duty of every
24 citizen -- to talk to a legislator on any matter
25 of public concern, any legitimate public

23

1  concern? That's the right of every citizen of
2  the United States, isn't it, sir?
3        MR. PEEPLES: Objection to form.
4     A.  Yes, I understand.
5  BY MR. WAIDE:
6     Q.  You understand that?
7     A.  Um-hum, yes.
8     Q.  Your answer is yes. All right.
9        And so if it's the right of every
10 citizen to talk to a legislator on a matter of
11 public concern, what problem did you have with
12 Ms. Woods talking to the legislator?
13    A.  The problem that I had was prison
14 operations being discussed in that form with
15 those types of individuals. There's a time and
16 a place and a way that should have manifested
17 itself, and my understanding it did not. So
18 that's the problem that I had.
19    Q.  All right. Say that again now. Are
20 you saying a citizen can only talk to a
21 legislator in a certain form and a certain
22 place?
23    A.  No, sir. I think the question you
24 asked me was what's the problem, the concern
25 that I had.

24

1     Q.  Yeah. What is -- I'm sorry.
2     A.  The problem that I.had --
3        MR. LONG-DANIELS: Please let him
4    answer the question.
5  BY MR. WAIDE:
6     Q.  Go ahead.
7     A.  The problem that I had was that
8  information of prison operations, specific
9  prison operational things being shared with that
10 individual from -- in that form posed that to be
11 a problem for me.
12    Q.  All right. Sir, do you believe that a
13 member of the legislature has a right to know
14 about prison operations at a private prison
15 that's contracted with the state to house
16 inmates? Do you think a member of the
17 legislature has a right to know that?
18    A.  Yes, sir, I do.
19    Q.  Do you believe that -- what was
20 Mr. Jerry Williams' position?
21    A.  I call him the assistant director, but
22 I think it was a deputy institutional
23 commissioner was the exact title.
24    Q.  Well, he worked for the Mississippi
25 Department of Corrections in some fashion.

25

1  Correct?
2     A.    Correct, yes.
3     Q.    And the state legislature regulates the
4  State Department of Corrections, do they not?
5     A.    Yes, sir.
6     Q.    Do you think that it's a legitimate
7  public interest and concern that a member of the
8  legislature be allowed to communicate with a
9  member of the Mississippi Department of
10 Corrections?
11    A.    I have no problem with that.
12    Q.    The only thing that you had a problem
13 with -- your problem was that Ms. Woods talked
14 to the state legislator?
15    A.    No, sir, that's not what I said.
16    Q.    All right. Well, tell me what you
17 said. What is the problem you had with
18 Ms. Woods -- I'm sorry -- with Dr. Woods in
19 talking to the -- you had some problem besides
20 the mere fact that she talked -- according to
21 you, that she talked to Dr. Woods [sic]. What
22 is that problem?
23    A.    I have zero problem with Dr. Woods. I
24 have a problem with information pertaining to
25 prison operations going outside of the facility

26

1  in the manner in which it did.
2     Q.    Well, what manner do you think it ought
3  to go outside the facility?
4     A.    It's a way, the chain of command that
5  should have been followed in my mind.
6     Q.    All right. Had you not in the past had
7  any conversations with Dr. Woods about y'all's
8  shortage of security and not being able to get
9  prisoners over to see her? Had you not had
10 problems with her about that?
11         MR. LONG-DANIELS: Objection to form.
12 BY MR. WAIDE:
13    Q.    Let me start that over. Had Dr. Woods
14 not told you that she was concerned about not
15 getting the prisoners over to see her for
16 medical care? Had she not told you that?
17    A.    She's voiced that opinion before, yes.
18    Q.    So that's what you had a problem with.
19    A.    No, sir, not at all.
20    Q.    Well, is that not the same thing she
21 told the state -- that you believe she told the
22 state legislator?
23    A.    That's part of some of the things that
24 I believe she said to the state legislator.
25    Q.    But you don't have a problem with her

27

1  telling the state legislator, then, about the
2  fact that y'all had inadequate security up there
3  and, as a result, y'all weren't getting
4  prisoners over for medical attention. You
5  didn't have a problem with that?
6     A.    I have a problem with that type of
7  vernacular of prison operations being discussed
8  outside the facility.
9     Q.    In other words, you don't think the
10 state legislator should be able to learn that a
11 doctor up there who's providing medical
12 treatment for prisoners is concerned about the
13 lack of security so that she could get the
14 prisoners over to see her? You don't think she
15 should be able to tell the legislator about
16 that?
17         MR. PEEPLES: Object to the form.
18         MR. LONG-DANIELS: Form.
19         MR. PEEPLES: You can answer.
20    A.    I have -- again, I have no problem with
21 the legislator learning and knowing any of that.
22 Again, my problem comes down to how the
23 information was given because it's a -- it's
24 problematic as you deal with prison operations.
25

28

1  BY MR. WAIDE:
2     Q.    I need to know specifically what you're
3  talking about. How should she have told the
4  legislator about it?
5     A.    She has a chain of command she could
6  have followed through the company which she
7  works with.
8     Q.    All right. So in answer to the
9  question, she should not have directly talked to
10 the legislator?
11    A.    Your question was how should she have
12 done it. My answer is she should have gone
13 through her chain of command.
14    Q.    Well, the legislator was not in her
15 chain of command. Correct?
16    A.    Not to my knowledge, she is not.
17    Q.    Therefore, she should not have talked
18 to a member of the legislature.
19    A.    That's her choice. I'm just telling
20 you how I feel and the way I viewed it.
21    Q.    And that's the reason you took her
22 security clearance away. Correct?
23    A.    The security -- the authorization for
24 entrance was pulled because of prison operations
25 and information being given to folks outside of

29

1  the facility.
2      Q.  Who did she give it to other than the
3  legislator in your opinion?
4      A.  That's all the information that I have.
5      Q.  All right. So, then, it's your opinion
6  that she should not have talked to the
7  legislator.
8      A.  No, sir --
9          MR. LONG-DANIELS: Objection to form.
10     A.  -- that's not what I'm saying.
11 BY MR. WAIDE:
12     Q.  Sir?
13     A.  No, sir, that's not what --
14     Q.  Your counsel was saying something. I
15 didn't hear what your counsel said.
16         MR. PEEPLES: I didn't say anything.
17     David objected to the form of your
18     question. I didn't say anything. He
19     looked at me to ask if he could answer. I
20     told him to go ahead.
21     A.  No, sir. My problem is just, again,
22 prison operation information being distributed
23 outside of the institution.
24 BY MR. WAIDE:
25     Q.  Well, specifically, all you've told us

30

1  so far is she talked to a legislator. Do you
2  have anybody else that you can tell us that she
3  talked to other than a legislator?
4      A.  To my knowledge, no.
5      Q.  All right. Did she do anything wrong
6  in your opinion by talking to the legislator?
7      A.  My problem -- her talking to the
8  legislator is her right. My problem comes down
9  to information with the prison operations being
10 given out. That becomes my issue.
11     Q.  All right. She could talk to the
12 legislator but could not talk to the legislator
13 about prison operations. Is that right?
14         MR. LONG-DANIELS: Objection to form.
15     A.  What she talks to the legislature
16 about, that's her business. If it pertains to
17 the prison operation of the Marshall County
18 Correctional Facility, then it becomes a
19 different issue.
20 BY MR. WAIDE:
21     Q.  All right. So that your problem with
22 her is that she talked to a legislator about
23 prison operations.
24     A.  I have zero problem again with
25 Dr. Woods. I have a problem with what took

31

1  place.
2      Q.  Let's look at the exhibit, and we'll
3  see what took place. Let's look at Defendant
4  Exhibit 1.
5      A.  (Reviews document)
6      Q.  This is a letter that you got from
7  Travis Day. Correct?
8      A.  Correct.
9      Q.  And you first met Travis Day when you
10 came to work at Marshall County Correctional
11 Facility, I believe?
12     A.  Yes, sir.
13     Q.  Isn't it true, sir, that Dr. Woods told
14 you that in fact she had not ever talked to this
15 state legislator?
16         MR. LONG-DANIELS: Objection to form.
17 BY MR. WAIDE:
18     Q.  Didn't she tell you that?
19     A.  I don't recall, nor do I remember that.
20     Q.  Well, let's look at it. It says -- and
21 you describe what she's talking about, which is
22 "something that's" -- third line -- "something
23 that's been going on with security, such as not
24 having enough staff to bring patients."
25         Do you see that?

32

1      A.  It's on this one here?
2          MR. PEEPLES: The third line.
3          MR. WAIDE: The third line.
4          MR. LONG-DANIELS: Page 1, Jim?
5          MR. WAIDE: Yeah, page 1.
6      A.  (Reviews document) Okay, I see it.
7  Yes.
8  BY MR. WAIDE:
9      Q.  So according to what you said in this
10 e-mail, what she talked about was "something
11 going on with security, such as not having staff
12 to bring patients." That's what you said.
13         MR. LONG-DANIELS: Objection.
14     A.  No, that's not what I said. This is
15 from Travis Day.
16 BY MR. WAIDE:
17     Q.  I'm sorry. That's what Travis Day told
18 you.
19     A.  In the e-mail. This is from Travis Day
20 to April Meggs. Yes, same e-mail I received.
21     Q.  All right. So you do have a problem
22 with that if she -- if Travis Day is telling the
23 truth there, you have a problem with that?
24     A.  No, sir. No, I don't with what Travis
25 Day put here.

33

1   Q.  Okay.  She said the representative
2   drove through the parking lot, and the
3   representative had an issue with the number of
4   cars or trucks.  That's something that she told
5   Day.
6   A.  According to Mr. Day.
7   Q.  Do you have a problem with that?
8   A.  No.  I have no problem with anything
9   that's in this e-mail.
10  Q.  Okay, you have no problem with anything
11  in this e-mail, which is she's been going --
12  "something's going on with the security, such as
13  not having enough staff to bring patients."
14      That's talking about bringing patients
15  to medical.  Correct?
16  A.  I would assume that by who the author
17  of the e-mail is.  I don't know if this e-mail
18  is referencing something that happened in June
19  or something that happened prior to that.
20  Q.  All right.  And then, according to Day,
21  Dr. Woods stated that this representative had
22  driven through the parking lot and noted a lack
23  of cars in the parking lot.  Right?
24  A.  According to Mr. Day, correct.
25  Q.  Would that cause any problem for you if

34

1   a member of the state legislature drove through
2   there and determined there wasn't any staff
3   members working?
4   A.  Just because you drive through the
5   parking lot doesn't mean that there's no staff
6   members working.  I have many staff members who
7   commute to work and car pool together.  The
8   unfortunate reality is where some of my staff
9   live at, I also have staff that walk to work.
10  So just because you see a number of cars in the
11  parking lot does not dictate the number of staff
12  we have on that shift.
13  Q.  This is Representative Kinkade?  Do you
14  know now who the legislator was?
15  A.  Yeah.  To my knowledge from what I'm
16  understanding it to be, he.
17  Q.  Do you have to report -- you or
18  somebody at your office -- have to report either
19  to the legislature or the State Department of
20  Corrections about the number of staff members
21  that you have working?
22  A.  Yes.
23  Q.  Do y'all do that in written form?
24  A.  Yes, we do.
25  Q.  How often do you do it?

35

1   A.  We do that -- it's more than one
2   report.  Some things we send weekly; some things
3   we send monthly; some things we send quarterly.
4   Q.  In 2019, say from the time you started
5   to work until Dr. Woods was fired, you have
6   records of where you sent those reports to the
7   legislature and to the State Department of
8   Corrections?
9   A.  I don't believe we sent anything to the
10  legislature.  We send everything that we have to
11  the Mississippi Department of Corrections and
12  also to our corporate office with MTC.
13  Q.  Do you still have those records that
14  you send to the State Department of Corrections?
15  A.  I'm sure we do, yes, sir.
16      MR. WAIDE:  We're going to request a
17   copy of those be provided as part of
18   discovery.
19  BY MR. WAIDE:
20  Q.  Were y'all understaffed in early 2019,
21  between April and June 2019?
22  A.  Yeah.  I got there March.  April to
23  June, yeah, we were not fully -- we were not
24  fully staffed.  Excuse me.
25  Q.  Had anybody other than Dr. Woods -- I

36

1   take it Dr. Woods had complained to you about
2   not being able to get the patients over to her,
3   had she not?
4   A.  Dr. Woods had made it be clear in a
5   very respectful manner in terms of wanting to
6   see patients and some challenges with our
7   security in getting them over there, et cetera.
8   Q.  All right.  Had anybody else from
9   Centurion other than Dr. Woods ever expressed
10  any concerns along that line?
11  A.  Travis Day and I had consistent
12  conversations about operations in terms of
13  seeing patients, the best way of doing such,
14  putting some things in place that could help us
15  to see more patients in a safe and secure
16  manner.
17  Q.  So Dr. Woods -- I mean Travis Day was
18  making the same complaints, then, that Dr. Woods
19  was making?
20  A.  Travis never made any complaints to me.
21  We had dialogue about how we could work together
22  to get as many patients over to medical to be
23  seen in a safe and secure manner.
24  Q.  All right.  Other than Dr. Woods -- is
25  she the only one, then, that would make what you

41

1  Dr. Woods denied it or not. Am I correct?
2      A.   I didn't hear the last part, sir. I'm
3  sorry.
4      Q.   When you had your meeting with
5  Dr. Woods and told her that you were canceling
6  her security clearance, is it true or not true
7  that she told you at the time "I never did even
8  talk to this state legislator"?
9      A.   I believe she may have said that she
10 did not talk to the state legislator.
11     Q.   And did you tell her you didn't believe
12 her?
13     A.   I think I told her I respected what she
14 said but chose to go a different -- chose to go
15 a different path.
16     Q.   Do you agree in general that a citizen
17 of the United States has the right to bring to a
18 member of the legislature a belief that -- if
19 she believes that the staff is shortsighted
20 [sic] so that safety is a concern and so that
21 getting prisoners to medical attention is
22 concerned, do you believe a citizen of the
23 United States has the right under the free
24 speech provision of the United States
25 Constitution to talk to a legislator and let the

42

1  legislator know about those concerns?
2           MR. LONG-DANIELS:  Objection to the
3      form.
4      A.   Again, as stated before, I do believe
5  an individual has the right to do such.
6  BY MR. WAIDE:
7      Q.   And you believe that's their right
8  under the United States Constitution?
9           MR. PEEPLES:  Object to the form.
10     You've asked him that at least a dozen
11     times already.
12          MR. WAIDE:  And he still hasn't
13     answered.
14          MR. PEEPLES:  He has answered.
15 BY MR. WAIDE:
16     Q.   What's the answer?
17     A.   Again, I believe the individual has the
18 right to do such.
19     Q.   Is there anything else in Exhibit 1
20 that concerns you other than what you just
21 pointed out about the state representative
22 driving through the parking lot and counting the
23 cars?  Anything else that concerns you there?
24     A.   The first paragraph pertaining to going
25 through security and looking at numbers, not

43

1  allowing us to have patients being brought to
2  the medical area.
3      Q.   So you didn't want her telling the
4  state representative that y'all weren't bringing
5  patients to the medical area?  You didn't want
6  her telling him that?
7      A.   My problem is any prison operational
8  information being shared with folk outside the
9  facility becomes problematic.
10     Q.   Sir, isn't it true that y'all work for
11 the state of Mississippi, for the legislature of
12 the state of Mississippi?
13          MR. PEEPLES:  Objection.
14     A.   We work for MTC, Management & Training
15 Corporation.  We have a contract with the
16 Mississippi Department of Corrections.
17 BY MR. WAIDE:
18     Q.   Yes, sir.  And you're answerable to the
19 State Department of Corrections, aren't you,
20 sir?
21     A.   Yes, sir.
22     Q.   Is the State Department of Corrections
23 not entitled to know how you're running the
24 prison and whether you're having adequate
25 security or not?

44

1      A.   Predicated upon the reports that we
2  send weekly, monthly, and quarterly, they know
3  our numbers.
4      Q.   Well, assuming you tell the truth in
5  the reports, they know your numbers.  Correct?
6           MR. LONG-DANIELS:  Objection.
7      A.   As we do tell the truth, with our
8  numbers, they have the reports.
9  BY MR. WAIDE:
10     Q.   All right.  Had the State Department of
11 Corrections -- is Mr. Williams the person you
12 dealt with?
13     A.   He was one of the individuals that I
14 dealt with.
15     Q.   Had he ever expressed concerns to you
16 about your lack of staff?
17     A.   We had dialogue with our numbers, as
18 every institution across the state of
19 Mississippi is challenged with the same issue in
20 terms of recruiting and keeping the numbers up.
21     Q.   Is that the reason -- in your opinion
22 as a corrections person, is that the reason we
23 have so many reports in the news media about
24 prisoners and guards being assaulted in the
25 state prisons?  Is that the reason you have that

45

1 problem?
2    A.  Again, I can only speak on the Marshall
3 County Correctional Facility, sir.
4    Q.  Well, I think I saw in the news reports
5 y'all had in either April or May a guard who was
6 assaulted at the Marshall County Correctional
7 Facility and pretty seriously injured, did you
8 not?
9    A.  Yes, we did.
10    Q.  Was that because of lack of security?
11    A.  No, sir. That was because the
12 individual, unfortunately, violated our policies
13 and ended up getting hurt.
14    Q.  Up to this point have you told us every
15 reason -- well, look on the second document on
16 Exhibit 1. It's Bates No. 37. If you would
17 pull that out.
18        MR. PEEPLES: Exhibit 1?
19        MR. WAIDE: Exhibit 1, Bates No. 37,
20   yeah.
21 BY MR. WAIDE:
22    Q.  It's under Exhibit 1. It's the second
23 page of Exhibit 1.
24    A.  (Reviews document) Okay.
25

46

1    Q.  I'm reading: "Please be advised that
2 effective June 26, 2019, Dr. Woods no longer has
3 gate clearance to enter the facility."
4       Do you see that?
5    A.  Yes.
6    Q.  Have you already told us all the
7 reasons you revoked her gate clearance to enter
8 the facility, or are there other reasons?
9    A.  No, that would be it.
10    Q.  You've already covered it already.
11 Correct?
12    A.  Yeah. Again, that's dealing with what
13 I deal with as sharing prison operations at the
14 Marshall County Correctional Facility with folks
15 outside of the facility.
16    Q.  Well, specifically what you're talking
17 about is talking to a legislator about staff
18 shortages at the Marshall County Correctional
19 Facility.
20    A.  I'm dealing with prison operations
21 being shared with folks who shouldn't have been
22 shared with.
23    Q.  Meaning the state legislator, because
24 you don't have any knowledge she shared it with
25 anybody else.

47

1    A.  Okay.
2    Q.  Is that correct?
3    A.  That would be correct.
4    Q.  Have you ever talked to this state
5 legislator about your staff shortage?
6    A.  No, I have not.
7    Q.  Did you not feel it was necessary to
8 straighten him out on his coming up there and
9 counting those cars as not being an accurate way
10 of determining it?
11    A.  Nope, not at all.
12    Q.  You don't consider yourself to be
13 answerable to the state legislature?
14    A.  I consider myself to be answerable to
15 those individuals that I'm supposed to be
16 answered to, sir.
17    Q.  Who is that?
18    A.  I have zero problem talking to the
19 state representative. I've made calls to him
20 before with no return call.
21    Q.  Before you sent -- this is dated
22 June 26, 2019. Do you have any documents
23 showing that you had inquired or made
24 arrangements about having some doctor to take
25 Dr. Woods' place before you sent this e-mail on

48

1 June 26, 2019?
2    A.  Written documents, no; verbal
3 communication with Mr. Travis Day. We talked
4 about coverage that they would have. And my
5 dialogue with him -- and of course with April --
6 talked about, predicated upon their contract,
7 they're responsible for making sure that we have
8 adequate coverage.
9    Q.  All right. Am I taking it, then,
10 before you sent this on June 26, you asked
11 Travis Day in April, "Do y'all have somebody
12 else you can send down here if I revoke her
13 clearance?"
14        MR. LONG-DANIELS: Objection to form.
15    A.  We had dialogue about what I was going
16 to do, and then we also talked about their
17 responsibility of making sure we're adequately
18 covered predicated upon their contract.
19 BY MR. WAIDE:
20    Q.  Who did they tell you they had who
21 could cover it?
22    A.  I want to say a nurse practitioner that
23 they also throughout the months. We've had I
24 want to say at least two or three different
25 doctors come through for long periods of time

73

BY MR. WAIDE:
Q. It's Exhibit 2, then. If you'll look at Exhibit 2 that's here.
A. (Reviews document)
Q. Look at Exhibit 2. This is a part -- it's just a couple of examples of people with serious medical needs that's discussed in the complaint that I want to ask what you know about them.
A. The one on April, I had just got there.
Q. Just read them to yourself. Just read the first one to yourself, and I'll ask you some questions about it.
A. (Continues to review document) April 25th, I just got there in March, so this one I don't even recall on the 25th of April.
Q. Well, you say you don't recall it. You're reading it now. You've been served with -- have you ever read the second amended complaint that's been filed in this case, to your knowledge?
A. I don't believe so.
Q. All right. I'm going to read a part of it to you, and it says here "Nurse Practitioner Traci Cox and Dr. Woods gave the order for the

74

inmate" -- the inmate is not identified here, but he's an inmate who's been sexually assaulted -- and it says they "gave the order for the inmate to be taken off-site for . . . medical purposes. The MTC security staff declined to take the inmate to the emergency room at Baptist Memorial Hospital at the time; they finally did so the next day."
Do you know whether that's true or not?
A. Not without going through documentation, no, sir, I don't.
Q. Do you agree with me that that would be a violation of your duties to take care of the serious medical needs of prisoners if you refused to take a patient who had been sexually assaulted outside the facility to the Baptist Memorial Hospital if the doctor thought that the patient needed that treatment, needed to go to that facility?
A. I could not make a -- I could not agree or disagree with you at this point without going back and taking a look at the record to see what all entailed at that time and date.
Q. Well, let's just assume for the sake of argument there's a prisoner here who's been

75

sexually assaulted, and let's assume that the medical doctor, Dr. Woods, says this prisoner needs to be taken to the Baptist Memorial Hospital, and he says he's been sexually assaulted, specifically raped. Do you agree or disagree that if you refuse to take a prisoner immediately out to the Baptist Memorial Hospital that you would be neglecting your serious medical needs?
MR. PEEPLES: Object to the form.
A. Well, let's assume in your scenario that staffing numbers and everything else being what they may would determine what we could do. We always take -- we always put our offenders first and foremost, their medical needs, but we also deal with making sure that we're doing things in a secure manner that keeps everyone safe.
BY MR. WAIDE:
Q. So it may be -- it may be -- it could have been that this -- this could be true, that this prisoner did not get taken, and the reason would be because y'all didn't have enough security staff to take him. Correct?
A. No, sir. My answer was predicated upon

76

your assumption and your scenario. My answer to this particular date of this situation of April 25th is I would have to go back and take a look at our records and see what all entailed. I'm going by what someone wrote versus what I'm reading that took place that day.
Q. All right. This next one refers to a patient -- this is right before Dr. Woods was fired. Happened either June 21st or June 22nd, and this patient had his ear bitten off. Do you see that?
A. Yes, I see what it says.
Q. Do you see that?
A. Yes, sir.
Q. And it says Dr. Woods and Nurse Stepp were wanting to take this prisoner to the University of Mississippi Medical Center, and Captain Steve [sic] Rodgers, an employee of MTC, said they didn't have enough staff to transport the prisoner. Do you know anything about that?
A. Not without going back and looking at records, sir.
Q. Do you remember Dr. Woods -- you don't remember a prisoner whose ear had been bitten off and Dr. Woods was wanting to take the

77

```
1   prisoner to University Medical Center?
2       A.   That doesn't recall -- I'm not saying
3   that it did not happen; I just don't recall it
4   at all that I can remember from that time in
5   June.
6       Q.   Well, that would seem to me to be --
7   you've only been there a short time.  You've
8   only been there about three months or so, and
9   here's two incidents where one prisoner has been
10  sexually assaulted and another prisoner has had
11  his ear bitten off, and you don't have any
12  recollection of either case?
13      A.   I don't have the information in front
14  of me to determine what is being written on this
15  paper is adequate.  I don't have those -- I
16  don't have that information in front of me, sir.
17      Q.   All right.  Exhibit 3 pertains to a
18  discussion that you had had concerning -- well,
19  look at Exhibit 3.  It's more than one page.
20  Look through Exhibit 3.
21      A.   (Reviews document)
22      Q.   This incident in Exhibit 3 originates
23  with a request by Dr. Woods that she be allowed
24  to see ten patients at a time instead of just
25  six.  Do you see that?
```

78

```
1       A.   Yes.
2       Q.   And you ultimately said, no, we're not
3   going to do that?
4       A.   Correct.
5       Q.   What do you remember about it other
6   than that?
7       A.   We had a lot of times in our medical
8   department what I call "a bag of Skittles."  I
9   had minimum level inmates to maximum level
10  inmates back there at the same time.  Not good
11  prison operations and extremely bad security
12  measures to be able to do so.  So some of the
13  meetings that we would have would deal with
14  having proper security -- excuse me -- having
15  proper inmates back there that are the same
16  security level, not having close security
17  inmates back there with minimum level inmates or
18  medium level back there with maximum security
19  inmates.  And we would deal with things such as
20  the foot doctor may be there, the dentist may be
21  there, the nurses want to see inmates for sick
22  call, and they're all calling inmates up that
23  you want back there.  I've got five or six,
24  seven, ten inmates of different security levels
25  at the same time.  That's never good.
```

79

```
1        So until we had a better understanding
2   and a better practice of having the right type
3   of security offenders there at the right time
4   together, I was not comfortable having ten
5   inmates back there instead of six.
6       Q.   Was that for security reasons?
7       A.   That was for security reasons, sir.
8       Q.   If you had adequate staff, if you had
9   enough staff to where you could adequately staff
10  supervising ten inmates at various security
11  levels, then there wouldn't have been any
12  problem with what Dr. Woods was requesting.  Am
13  I correct?
14           MR. PEEPLES:  Object to form.
15      A.   No, you're incorrect, sir.  And the
16  reason why is you don't mix security levels
17  inside of a prison like there.  Not for two,
18  ten, or six offenders.  So the security was
19  not -- the security was not about the number of
20  officers; it was security for everyone so you
21  can try to minimize individuals from being hurt
22  because you have guys back there of different
23  security levels, minimum up through maximum.
24  BY MR. WAIDE:
25      Q.   Why was Dr. Woods wanting ten patients
```

80

```
1   back there at a time?  Do you know?
2       A.   I would make the assumption she would
3   want to see more offenders, which I get,
4   especially when you have other principals
5   there -- foot doctor, dental folks -- and I get
6   it.  I understand it wholeheartedly; you're
7   paying those folks.  But we also have to be safe
8   in making sure we have folks not just calling
9   offenders up of different security levels to be
10  seen by medical personnel.  That becomes a
11  security breach -- again, not by the number of
12  staff you have, by the number of inmates you
13  have there of different security levels.
14      Q.   Are you sure, sir -- do you remember
15  for a fact that Dr. Woods was not requesting ten
16  inmates of the same security level?
17      A.   To my knowledge, one of the reasons
18  that this and other memos that I authored was
19  because of the mixing that we continued to see
20  of different security level offenders within the
21  medical department.
22      Q.   Do you have any document where you ever
23  explained that to Dr. Woods?
24      A.   I have a document, I believe, that
25  talked about the number of offenders that should
```

81

1  be back there and not mixing different levels
2  together.
3     Q.  All right.
4        MR. WAIDE:  Would you hand that to
5     the court reporter and ask her to make
6     that an exhibit to the deposition.  That
7     would be Exhibit No. --
8        MR. PEEPLES:  I think it's already.
9     I remember seeing it.
10       MR. WAIDE:  -- No. 22.  We'll mark it
11    No. 22, whatever document he's referring
12    to.  If you'll give it to the court
13    reporter, she can make it an exhibit.  You
14    say you have it, so let's put it in.
15       Could you mark that Exhibit 22.
16       MR. PEEPLES:  She's not -- she's not
17    in here.
18       COURT REPORTER:  If he will e-mail
19    that to me, I will --
20       MR. PEEPLES:  I'll e=mail it to her.
21    I can't hand it to her.
22       MR. WAIDE:  Oh, I see what you're
23    saying.  I see what you're saying.  Sorry.
24       MR. LONG-DANIELS:  Do you have the
25    Bates number?

82

1        MR. PEEPLES:  If you tell me how to
2     do it, I'll do it, but I don't think I
3     can.
4        MR. WAIDE:  All right.  Maybe we can
5     send it over by carrier pigeon or
6     something.
7        Give it to your counsel and he'll
8     send it to her.
9        MR. PEEPLES:  We produced it.  It's
10    MTC68.  I believe it was just produced
11    last week, Jim, and you may have it, but
12    I'll send it to Ms. Allen as an exhibit.
13       (DOCUMENT PREVIOUSLY MARKED AS EXHIBIT 7)
14 BY MR. WAIDE:
15    Q.  Did you ever get involved personally in
16 why particular prisoners would be sent to
17 medical?  Did you ever get involved in that
18 personally?
19    A.  I would from time to time because I'm
20 on the compound a lot, would see offenders; and
21 if I think someone should be seen by medical, I
22 would normally call the HSA and say, "Hey, if
23 you get a chance, if you have it, see Offender
24 X" for various reasons.  But, you know, I've
25 done that on more than a few occasions.

83

1     Q.  Do you remember an offender named
2  Kelly, about you getting into Kelly's medical
3  treatment?
4     A.  What about Kelly?  I don't even know.
5     Q.  That's my question.  Do you remember
6  getting involved in "Why is Kelly being taken to
7  medical?"  Do you remember getting into that?
8  Exhibit 5.  You should have Exhibit 5 there
9  before you.
10    A.  (Reviews document) Yeah, this offender
11 seriously assaulted one of my officers back in
12 medical.  And so in running an investigation, I
13 wanted some questions answered to me that dealt
14 with the investigation.
15    Q.  And you wanted to know why Kelly was in
16 medical?  Did you see Kelly in the medical?  Did
17 you see him there?
18    A.  My question was one of many that I
19 asked of her and several other individuals as I
20 was fact-finding information pertaining to the
21 investigation of a serious assault of staff.
22    Q.  All right.  In Exhibit 5 you want to
23 know why he was there and asked some other
24 questions about him, and she answered your
25 questions.  Right?

84

1     A.  Correct.
2     Q.  And she said he -- look at page 2 of
3  Exhibit 5.  She said because Kelly had
4  complaints of chest pain, was dehydrated, and
5  had an abnormally elevated heart rate?
6     A.  Correct.
7     Q.  That's why she said he was there.  Do
8  you think those were not sufficient reasons to
9  have him in medical?
10    A.  I never said that it wasn't.  I was
11 just, again, fact-finding.  She's not the only
12 individual that I asked these type of questions
13 to pertaining to an investigatory process of a
14 physical assault of a staff member.  There was
15 no HSA there also at the time, so she was pretty
16 much -- my words -- the liaison between -- for
17 medical for Centurion.  If there was an HSA
18 there, she would have been -- those questions
19 would have been addressed to that individual and
20 not to Dr. Woods.
21    Q.  All right.  Turn to Exhibit 6.
22    A.  (Witness complies)
23    Q.  You see Exhibit 6?
24    A.  Yes.
25    Q.  The substance of this is where somebody

101

1 their employees, sir.
2     MR. WAIDE: Give me just a minute to
3       look at my notes.
4             (OFF THE RECORD)
5 BY MR. WAIDE:
6     Q. Sir, you earlier said you have a B.A.
7 in recreational management. Had you ever had
8 any training -- had your company ever given you
9 any specific training telling you that you're
10 under a duty to make sure that the prisoners'
11 serious medical needs are taken care of? Did
12 they give you any training to that effect?
13     A. Every place that I've worked at that
14 involved prison operations, making sure that
15 adequate medical and mental health services to
16 offenders was always one of our major
17 stakeholds.
18     Q. Have you received in your training --
19 at every prison you've ever went to, have you
20 received training that it's -- that you are
21 legally required to not be willfully indifferent
22 to the serious medical needs of prisoners? Have
23 you received training to that effect?
24     A. We've had training throughout my career
25 that helps us to understand that.

102

1     Q. So you understood -- ever since you've
2 been in corrections, you've had training to the
3 effect that you're under a duty to make certain
4 that the serious medical needs of prisoners are
5 taken care of. Am I correct?
6     MR. LONG-DANIELS: Objection to form.
7 BY MR. WAIDE:
8     Q. I'm correct?
9     A. Correct.
10     Q. I heard somewhere that you're a
11 minister. Is that correct?
12     A. Yes, I was, sir.
13     Q. Do you preach anywhere now?
14     A. No, sir. That was back in the state of
15 Ohio.
16     Q. All right. When you talked with the
17 representative of Centurion concerning your plan
18 to revoke Dr. Woods' security clearance, did
19 anybody at Centurion ever say to you, "We're
20 concerned about the level of medical care the
21 prisoners are going to get if you let -- keep
22 Dr. Woods out of your prison"? Did anybody from
23 Centurion ever express any concern like that to
24 you?
25     MR. LONG-DANIELS: Object to form.

103

1     A. No, sir. I was -- I was made assured
2 that the level and the quality of care that had
3 been ongoing at Marshall from Centurion will
4 continue.
5 BY MR. WAIDE:
6     Q. And who assured you of that?
7     A. My conversations with Travis Day was
8 major in that, and, also, I felt that same
9 assurance in my conversations with Ms. Meggs
10 also.
11     Q. Both of them assured you that they
12 would be able to give adequate medical care
13 without her being there. Am I correct?
14     A. They would continue to give adequate
15 medical care.
16     Q. Are you the one that brought that up,
17 or did they bring it up, about making sure --
18     A. I'm sorry, sir.
19     Q. Are you the one that asked them, "Can
20 you provided adequate medical care?" or did they
21 bring it up to you and say, "Don't worry about
22 it. We can provide adequate medical care if you
23 want to get rid of her"?
24     MR. LONG-DANIELS: Objection to form.
25     A. I'm not quite sure who brought it up; I

104

1 just know it was part of the dialogue that we
2 had.
3 BY MR. WAIDE:
4     Q. But you don't have any e-mails or
5 anything in writing documenting that, do you?
6     A. Not that I recall. I remember my
7 conversation with Ms. Meggs was via telephone
8 and then face to face with Mr. Day.
9     MR. WAIDE: Okay. I don't believe I
10     have anything else, but there may be
11     somebody else that may have some
12     questions.
13             EXAMINATION
14 BY MR. LONG-DANIELS:
15     Q. I want to thank you for being here
16 today.
17     A. You're welcome, sir. Thank you.
18     Q. I want to direct your attention back to
19 Exhibit 11 that Mr. Waide . . .
20     MR. PEEPLES: What number did you
21     say, David? 11?
22     MR. LONG-DANIELS: Exhibit 11.
23 BY MR. LONG-DANIELS:
24     Q. Before we get there, let me ask some
25 preliminary questions.

105

1  It was your decision to revoke
2 Ms. Woods' access to the security compound.
3 Correct?
4    A.  Yes, sir.
5    Q.  And that was your decision and yours
6 alone. Correct?
7    A.  It was, indeed, my decision; and I did
8 confer through my chain of command with my
9 regional vice president, and I also had --
10    Q.  Go ahead. I'm sorry.
11    A.  I'm sorry. I also had dialogue with
12 Centurion folks, being Travis Day and April
13 Meggs, before making the final decision. And,
14 again, not to say is it okay with them, to
15 inform them of the direction in which I was
16 going.
17    Q.  In other words, you decided, and then
18 you told them. Correct?
19        MR. WAIDE: Object to the form as
20    leading.
21        MR. LONG-DANIELS: I'm allowed to
22    lead. He's not my witness.
23 BY MR. LONG-DANIELS:
24    Q.  Warden, you made the decision, and you
25 told them of your decision. Correct?

106

1        MR. WAIDE: Object to form. It's
2    leading.
3        MR. PEEPLES: I thought we weren't
4    going to object to anything but the form.
5 BY MR. LONG-DANIELS:
6    Q.  You can answer.
7        MR. PEEPLES: You can answer.
8    A.  Yes. I made the decision and had
9 dialogue with them in terms of which direction
10 we were going to go, yes, sir.
11 BY MR. LONG-DANIELS:
12    Q.  You actually are the voice of the
13 prison. Right?
14    A.  Correct, sir.
15    Q.  It's your call to decide about the
16 security of all the persons in your charge as
17 well as the inmates. Right?
18    A.  Yes, sir.
19        MR. WAIDE: Object to form. Leading.
20 BY MR. LONG-DANIELS:
21    Q.  I assume that that's a very important
22 decision that you have to make on a daily basis.
23 Correct?
24        MR. WAIDE: Object to the form as
25    leading.

107

1    A.  Yes, sir.
2 BY MR. LONG-DANIELS:
3    Q.  All of the folks there that are in your
4 charge includes the inmates too. Correct?
5    A.  Yes, sir.
6    Q.  The decisions about whether to allow
7 someone to go off-site is a very important
8 decision. Right?
9        MR. WAIDE: Object to form. Leading.
10 BY MR. LONG-DANIELS:
11    Q.  Go ahead. You can answer.
12    A.  Yes, sir. You have to entail that
13 you're having a convicted felon go out to the
14 hospital with Jane and Joe Taxpayer. You want
15 to make sure there's adequate security for the
16 offender. You want to make sure that everyone
17 is safe, including your staff and Joe and Jane
18 Public, so it is a very serious one.
19    Q.  And when you made that decision, you
20 have to consider all of the resources you have
21 at your disposal. Right?
22    A.  Correct, sir.
23    Q.  If you take two officers and send them
24 downtown, that's two less security officers in
25 your prison. Right?

108

1    A.  Correct. If it's a minimum or medium
2 level offender, it would be two officers. If
3 it's a close security or any high level
4 security, it would be two -- three officers,
5 because you'll have two officers, and then
6 you'll have the chase vehicle.
7    Q.  Are you also concerned about sending a
8 person off late at night?
9    A.  Very much so.
10    Q.  Tell us in your own words why you're
11 concerned about that.
12    A.  Day or night, both are concerning to
13 me. You're looking at a man who doesn't sleep
14 much or well at all, but it's the career that I
15 chose. At night, just because of the cover of
16 night, if you know anything about various things
17 that have happened throughout our country with
18 corrections, folk have been ambushed on security
19 or transportation details. So that's why it's
20 so important that we keep to a minimum who knows
21 what inmate is leaving to go where.
22        So with these things called cell phones
23 and folk making connections with folk, we have
24 an A and a B or a primary and a secondary
25 security route every place that we go; but it's

109

```
 1   difficult to do that when you leave the facility
 2   to go up to town, up the street to the local
 3   hospital in Holly Springs where it's kind of the
 4   only way to get there unless you're going
 5   through somebody's yard. So those things become
 6   factors that I deal with every day. An inmate
 7   going in a paramedic, it's an emergency, it's a
 8   right-now thing, no brainer. But if it's some
 9   things that we -- to me it's never a problem to
10   ask questions of why are we doing that now?
11   Could it be in the morning? Not saying --
12   automatically saying you squash that detail, but
13   it's good practice to ask questions.
14        Q.   Because you're concerned about --
15   you're concerned about somehow the inmate
16   getting word to his friends or fellow gang
17   members or whomever that he's on his way to the
18   hospital, and it would not be difficult for his
19   friends to figure out what route he's on.
20   Right?
21        A.   Correct.
22        Q.   And you only have two officers with
23   him. If there's a gang of five waiting on him,
24   they don't stand a chance, do they?
25        A.   Correct, sir.
```

110

```
 1        Q.   Your job is not just violence, though,
 2   of inmates; it's violence, security of your
 3   officers and the public. Right?
 4        A.   Very much so, sir.
 5        Q.   You guys have pretty violent people in
 6   your prison?
 7        A.   Yes, sir.
 8             MR. WAIDE:  Object to the form.  It's
 9        leading.
10   BY MR. LONG-DANIELS:
11        Q.   Tell us the most violent level of
12   prisoner that you have there.
13        A.   Well, I have zero inmate at my facility
14   that are there for jaywalking. I can assure you
15   of such. Some of the most violent inmates that
16   I have are what we call "long-term segregation
17   offenders" or maximum security offenders. Some
18   of these offenders are housed in Mississippi
19   Department of Corrections at Marshall for
20   violent crimes -- murder, rape, ag murder,
21   burglary -- but they are classified as long-term
22   segregation offenders because, while they've
23   been incarcerated, they've seriously assaulted
24   staff or other offenders. That has raised their
25   security level from medium or close to long-term
```

111

```
 1   segregation because of their behavior while
 2   inside of the facility on top of the very
 3   violent behavior that they took on to come into
 4   the facility from the onset.
 5        Q.   You have people who did some very bad
 6   things who came to prison, and then once they
 7   got to prison, they did some very bad things to
 8   others?
 9        A.   Correct, sir.
10        Q.   And those people are housed in
11   long-term segregated facilities?
12        A.   Yes, sir.
13        Q.   They ain't the average American
14   citizen; they're in there for a reason.
15        A.   Yes, sir.
16        Q.   And when you segregate somebody in a
17   prison from the other inmates, they have to be
18   really bad, don't they?
19        A.   We segregate you predicated upon your
20   behavior.
21        Q.   Yes, sir. And you have seen the
22   evidence of some of the violence of some of
23   these inmates, haven't you?
24        A.   Very much so, sir.
25        Q.   Tell us about an attack on one of your
```

112

```
 1   security guards in one of these settings.
 2        A.   Ms. Burgess -- mother, grandmother,
 3   been in an institution double-digit years, loved
 4   by all -- and I really mean that -- but she made
 5   a mistake. It was back in medical, and we had a
 6   long-term segregation offender housed in
 7   medical. And he said he wanted some water or
 8   some ice. And my policy is you should have two
 9   security-trained employees and a supervisor with
10   you to open up the cell door of a long-term
11   segregation offender. That was violated. She
12   opened up the door, and the offender tried to do
13   some serious harm to her to include to sexually
14   assault her. Just a horrific situation.
15             I've been doing this for 30 years, and
16   that's probably one that I'll never forget and
17   looking her husband in the face and talking with
18   him when he asked me, "How did you allow this to
19   happen to my wife? How does this happen?"
20             Thank God that Ms. Burgess is good and
21   she's come back to work, but those situations,
22   when you go through them, you have a new normal.
23   You don't return to the way you were.
24        Q.   Was Dr. Woods present when this
25   happened to that officer?
```

```
                                                    117
 1   happened two days after I got here," that means
 2   it's the 18th of April. Right?
 3        A.   Yes, sir.
 4        Q.   How long is the 18th of April from the
 5   25th of April?
 6        A.   Seven days.
 7        Q.   Then he says he got raped a day or two
 8   before coming to the medical facility. Would
 9   that make any difference?
10        A.   We would still follow our protocols
11   with our Prison Rape Elimination Act policy and
12   walk through that. And what I mean by that,
13   sir, is my deputy warden does an outstanding job
14   as that liaison for me dealing with the Prison
15   Rape Elimination Act, and we will follow that
16   process.
17        Q.   So you have a security expert assigned
18   to deal with issues of rape like this, don't
19   you?
20        A.   I have -- my deputy warden and my
21   investigator play an enormous role in that,
22   along with what medical does also.
23        Q.   Now, I know you haven't had a chance to
24   look at these medical records, but the medical
25   records say there were no injuries and that it
```

```
                                                    118
 1   was dry in the rectal area.
 2             MS. HADLEY: (Indiscernible)
 3             MR. LONG-DANIELS: I couldn't hear
 4        that.
 5             MR. WAIDE: In any event, I object to
 6        the form. Counsel is testifying instead
 7        of letting the witness testify.
 8             MR. LONG-DANIELS: We've seen a lot
 9        of that today. We're going to move
10        forward.
11   BY MR. LONG-DANIELS:
12        Q.   If the medical record says that his
13   rectal area was dry and did not show any
14   tearing, bruising, or fluid, would that impact
15   your decision about --
16        A.   Yes, sir.
17             MR. WAIDE: Object to the form
18        because counsel is telling the witness
19        what the medical records say. The witness
20        is not being allowed to testify.
21   BY MR. LONG-DANIELS:
22        Q.   You can answer.
23        A.   Yes, sir, it would be a factor in my
24   decision. I would talk with medical, talk with
25   my PREA folks as well, so we could, (A),
```

```
                                                    119
 1   document everything the way that it should be,
 2   but those would be determining factors that will
 3   help me in making my decision.
 4        Q.   All right. I'm a former soldier, and
 5   I'm used to Zulu time. It appears to me that
 6   the time of service on this record is 2103.
 7   Could you tell us in layman's terms what time of
 8   the night that is?
 9        A.   It was 2003? See, I'm a nonmilitary
10   guy.
11        Q.   You have 24 hours in a day. And if
12   you're at hour 20- --
13        A.   So it's 8:00?
14        Q.   Right.
15        A.   Almost 9?
16        Q.   Yes.
17        A.   Every prison I go to, I change from
18   military time to regular time because it messes
19   me up.
20        Q.   And you did send this young man out to
21   be evaluated, didn't you?
22        A.   I don't have that in front of me in
23   terms of what the final was in my packet, but if
24   you're saying you have the documentation that
25   shows that we sent him out the next day or
```

```
                                                    120
 1   something.
 2        Q.   In fact, he -- at least Exhibit 11 --
 3   Exhibit 12 -- it appears that he left the very
 4   next morning.
 5        A.   (Reviews document)
 6        Q.   It says ". . . ER transfer and informed
 7   me trip will be scheduled for AM" on 4/26.
 8             MR. PEEPLES: Where are you looking
 9        at?
10             MR. LONG-DANIELS: Exhibit 11, about
11        three lines from the bottom.
12        A.   AM on 4/26.
13   BY MR. LONG-DANIELS:
14        Q.   Yeah.
15        A.   It says.
16        Q.   That's the next morning, isn't it?
17        A.   Yes, sir.
18        Q.   Again, your job is to balance security
19   as well as the health and well-being of the
20   inmates?
21             MR. WAIDE: Object to leading.
22        A.   Yes, sir, that would be correct to your
23   question, sir.
24   BY MR. LONG-DANIELS:
25        Q.   Just for clarity: You made the
```