2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS                                    PLAINTIFF

VS                    CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9                                   DEFENDANTS

---

ZOOM DEPOSITION OF TRAVIS DAY

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom videoconferencing

On August 30, 2020

At 8:15 a.m.

REPORTED BY:  SHARRON F. ALLEN, CSR, RPR
              CSR NO. 1144

APPEARANCES:

JAMES D. WAIDE III, ESQUIRE
RACHEL PIERCE WAIDE, ESQUIRE
Waide & Associates, P.A.
Post Office Box 1357
Tupelo, Mississippi 38802

            REPRESENTING THE PLAINTIFF

TIMOTHY M. PEEPLES, ESQUIRE
Daniel Coker Horton & Bell, P.A.
Post Office Box 1396
Oxford, Mississippi 38655

            REPRESENTING MTC & JESSE WILLIAMS

DAVID LONG-DANIELS, ESQUIRE
JACOB R. DEAN, ESQUIRE
Greenberg Traurig, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305

ELIZABETH ROSS HADLEY, ESQUIRE
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

            REPRESENTING MHM HEALTH PROFESSIONALS, D/B/A
            CENTURION PROFESSIONALS

LOUIS H. WATSON, ESQUIRE
Watson & Norris, PLLC
1880 Lakeland Drive, Suite G
Jackson, Mississippi 39216

            REPRESENTING TRAVIS DAY

ALSO PRESENT:  DR. AMY WOODS

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

3

TABLE OF CONTENTS

Style ................................................  1
Appearances .........................................  2
Table of Contents ...................................  3
Examination by Mr. Waide ............................  5
Examination by Mr. Long-Daniels ..................... 31
Examination by Mr. Peeples ,,,,,,,,,,,,,,,,,,,,,,,,,, 33
Further Examination by Mr. Waide .................... 43
Further Examination by Mr. Long-Daniels ............. 53
Continuing Examination by Mr. Waide ................. 55
Deposition Concluded ................................ 58
Certificate of Deponent ............................. 59
Corrections Page .................................... 60
Certificate of Court Reporter ....................... 61

**EXHIBIT**
**C**
tabbies

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

4

                        TRAVIS DAY,

having first been duly sworn, was examined and

testified as follows:

                        EXAMINATION

BY MR. WAIDE:

     Q.  Mr. Day, can you hear me?

     A.  Yes, sir.

     Q.  Mr. Day, can you hear me?

     A.  Yes, sir, I can.

     Q.  Okay.  We've been having some sound

problems, but we'll just start and go slow, and

I'll try to let you know if I'm not hearing what

you're saying.

     A.  Okay.

          MR. WAIDE:  Sharron, do you want to

     call the roll and make sure everybody's

     here?

          COURT REPORTER:  Yes.  We have

     Mr. Long-Daniels; Mr. Peeples; Mr. & Mrs.

     Waide; Dr. Woods; the witness, Mr. Day;

     Elizabeth Hadley; Jacob Dean; and Louis

     Watson.

          MR. LONG-DANIELS:  Who is Louis

     Watson?

          MR. WATSON:  I'm Mr. Day's attorney.

5

1    MR. LONG-DANIELS: Oh. Well,
2    welcome. Are you in Mississippi too?
3        MR. WATSON: Yes, I am.
4        MR. LONG-DANIELS: Well, good. I
5    like to see people in Mississippi.
6    They're good people.
7        MR. WAIDE: Well, it depends on who
8    you ask.
9        MS. WAIDE: I like to think so.
10   BY MR. WAIDE:
11       Q. Mr. Day, are you ready to begin your
12   deposition?
13       A. I am.
14       Q. Would you state your name, please, sir.
15       A. Travis Day.
16       Q. What is your mailing address, Mr. Day?
17       A. 4507 Lyons Run Circle, Apartment T2,
18   Owings Mills, Maryland.
19       MS. WAIDE: Y'all, we can only hear
20       about every second word that Mr. Day says.
21       I don't know what is happening with our
22       audio. Is anyone else having that same
23       trouble?
24       MR. LONG-DANIELS: No. I hear every
25       word.

6

1        MS. HADLEY: I hear just fine.
2        MS. WAIDE: I'm going to do the only
3    thing I know to do technically, which is
4    start over. So let me leave y'all for one
5    minute and then come right back.
6        MR. LONG-DANIELS: Okay.
7            (OFF THE RECORD)
8    BY MR. WAIDE:
9        Q. Mr. Day, the court reporter may have
10   already gotten this, but we didn't hear it.
11   Would you give us your mailing address again,
12   please, sir.
13       A. 4507 Lyons Run Circle, Apartment T2,
14   Owings Mills, Maryland.
15       Q. Where are you employed today, Mr. Day?
16       A. At Frontier Medical.
17       Q. What is that?
18       A. It's a correctional company,
19   correctional healthcare company.
20       Q. Do you do the same type of work there
21   that you did --
22       A. I do.
23       Q. -- when you worked in Marshall County,
24   Mississippi?
25       A. I do.

7

1        Q. All right, sir. Am I correct in saying
2    that you were hired in Marshall County,
3    Mississippi, to work for Centurion around May of
4    2019?
5        A. Yes, sir.
6        Q. And what was your job?
7        A. I was the health services
8    administrator.
9        Q. What did that consist of? What were
10   your duties?
11       A. I ran the day-to-day activities as a
12   liaison between the company and the client,
13   which is MTC, scheduling nurses or the nursing
14   staff, things like that.
15       Q. All right. You were the liaison with
16   MTC. Is MTC the company that operated the
17   prison in Marshall County?
18       A. Correct.
19       Q. When you were hired, were you given any
20   instructions about the importance of maintaining
21   a good relationship with MTC? Did you feel that
22   was part of your job duties?
23       A. You said was I given something?
24       Q. Yes, sir. Did the company instruct --
25   did any superiors instruct you when you were

8

1    hired to maintain a good relationship with MTC?
2        A. Yes, sir.
3        Q. They did?
4        A. Yes, sir.
5        Q. And did you try to do that? Did you
6    try to maintain a good relationship with MTC?
7        A. I like to think I did.
8        Q. All right. And how did you go about
9    doing that, having a good relationship with
10   them?
11       A. Just by developing relationships,
12   getting to understand how they, you know, did
13   things there, what their expectations of us were
14   as a medical group.
15       Q. Did you feel like, in doing your job,
16   that you should refrain from being harsh with
17   them or criticizing them? Did you feel like
18   that's the way you should carry out your job
19   duties?
20       MR. LONG-DANIELS: Object to the
21       form.
22       A. No, sir.
23   BY MR. WAIDE:
24       Q. I'm sorry?
25       MR. LONG-DANIELS: Same objection.

9

1 You can answer, Mr. Day.

2 A. I would say no, I didn't feel like I

3 needed to refrain from being harsh with them.

4 BY MR. WAIDE:

5 Q. All right.  What about Dr. Woods?  What

6 was your relationship with her?

7 A. It was strictly a working relationship.

8 She was the medical director; I was the health

9 services administrator, and our goal would be to

10 work together to see how we could be most

11 efficient in the prison.

12 Q. Did you ever hear her making any

13 statements concerning failure of MTC to get

14 prisoners over for medical treatment in a timely

15 fashion?

16 A. I wouldn't necessarily call it a

17 failure, but she complained about different

18 staffing things.

19 Q. All right.  Are you talking about

20 staffing things by whom?  By MTC?

21 A. MTC.

22 Q. If you would -- you only worked with

23 her for a short time, less than two months, if

24 I'm not mistaken.  Right?

25 A. That's correct.

10

1 Q. During the less than two months that

2 you worked with her, just tell us, as best you

3 can, what you can remember her saying concerning

4 getting prisoners over to see her for medical

5 treatment.  What can you remember her saying

6 about it?

7 A. Well, she had issues, say, with the

8 time frame in which inmates were, you know,

9 being brought down.  I guess it was taking too

10 long to get inmates or get patients.

11 Q. How often would you -- now, you were

12 only there -- well, say on a weekly basis, how

13 often would you hear her make statements like

14 that?

15 A. I can't put a gauge on it.

16 Q. Could it have been as much as two or

17 three times a week you would hear her make

18 statements like that?

19 MR. LONG-DANIELS:  Objection.  Object

20 to the form.

21 BY MR. WAIDE:

22 Q. Do you understand my question?

23 MR. LONG-DANIELS:  You can answer,

24 Mr. Day, subject to my objection.

25 A. I'm saying I can't gauge a number of

11

1 times per week.

2 BY MR. WAIDE:

3 Q. My question was could it have been as

4 many as two or three times a week that she would

5 make complaints like that?

6 MR. LONG-DANIELS:  Objection to form.

7 A. Yeah, I don't want to . . .  Yeah.

8 BY MR. WAIDE:

9 Q. Okay.  What, if anything, did you do in

10 regard to her statements about that?

11 A. Well, of course you always want to find

12 out, you know, what's going on, if there's

13 anything else going on in the prison that's

14 keeping or prohibiting, you know, custody from

15 bringing inmates down to medical.

16 Q. Did you have -- well, first of all, she

17 was the -- was she one of two medical doctors

18 that were on staff while you were there, or was

19 she the only medical doctor that was on staff?

20 A. When I initially got there, she was the

21 only medical doctor.

22 Q. So far as determining, then, whether a

23 prisoner had a serious medical need, would she

24 be the only person that was on the grounds there

25 at -- or strike that.

12

1 would she be the most qualified person

2 that was on the grounds there at Marshall County

3 to determine whether a prisoner had a serious

4 medical need?

5 MR. LONG-DANIELS:  Objection to form.

6 A. Well, she was the medical director, so

7 she would be, yes, the senior person on ground

8 to make that decision.

9 BY MR. WAIDE:

10 Q. All right.  So in order to determine

11 whether a prisoner had a serious medical need,

12 it would be necessary for the prisoners to be

13 brought over to her clinic or her facility there

14 on the Marshall County Correctional Facility

15 grounds, would it not?

16 MR. LONG-DANIELS:  Objection to form.

17 A. Just -- well, short of an emergency,

18 yes.

19 BY MR. WAIDE:

20 Q. Okay.  How much experience have you had

21 dealing with prisoners?  How many years'

22 experience have you had dealing with prisoners?

23 A. About 11 years.

24 Q. Do you agree that sometimes they'll

25 fabricate their claims about their injury?  Does

13

1  that happen from time to time?
2      A.  Yes, sir.
3      Q.  So would you agree that, in order to
4  determine whether a prisoner really has a
5  serious medical need, it would be necessary for
6  the prisoner to be assessed by a trained medical
7  person? Would you agree with that?
8      A.  Yes, sir.
9      Q.  Okay. You earlier indicated, if I
10 understand it right, that you thought, from the
11 instructions you received and from what you
12 thought, that you should maintain a good
13 relationship with the people at MTC. Am I
14 correct?
15     A.  Yes, sir.
16     Q.  In the short time you were there, did
17 you have regular meetings with the warden,
18 warden Williams?
19     A.  I went to regular warden's meetings.
20     Q.  Okay. were you the only representative
21 of Centurion that went to those meetings, or
22 would anybody else have come with you from
23 Centurion?
24     A.  Just me.
25     Q.  So you would be the sole representative

14

1  in dealing with the warden at his meetings. Am
2  I correct?
3      A.  Correct.
4      Q.  Let's leave aside for a minute any
5  statements that Dr. Woods might have had about
6  not timely getting prisoners over. Did you have
7  any problems with Dr. Woods other than that?
8  Did you and she have any disagreements or
9  problems whereby you didn't like her for any
10 reason?
11     A.  No, sir.
12         MR. LONG-DANIELS:  Objection to form,
13     and specifically to the preamble.
14 BY MR. WAIDE:
15     Q.  Let me rephrase the question.
16         How did you feel about the statements
17 Dr. Woods was making about failing to timely
18 bring prisoners over? How did you feel about
19 that?
20     A.  I really didn't feel any type of way.
21 That's -- you know, that's what she thought. My
22 job is to take her concerns and address them
23 with custody, so it's not -- I didn't have a
24 personal feeling towards it.
25     Q.  I'm sorry. Address them with whom?

15

1  whom did you address them with?
2      A.  Custody staff.
3      Q.  You mean the MTC people?
4      A.  Yes, sir.
5      Q.  Okay. So you did take her concerns and
6  address them with the MTC staff?
7      A.  Yes, sir.
8      Q.  Do you remember specifically who you
9  talked to about her concerns with the MTC staff?
10     A.  So anytime I had an issue whereby, you
11 know, we believed that it was taking a while for
12 us to get a patient, I would always start with
13 the dorm sergeant, whomever that would be, and
14 then escalate it to a shift captain or the
15 facility's major or chief of security.
16     Q.  Did you ever talk to warden williams
17 himself about it?
18     A.  You mean about the timeliness of
19 patients?
20     Q.  Yeah, about the timeliness of getting
21 patients over for medical treatment.
22     A.  Yes, sir.
23     Q.  You did?
24     A.  Yes, sir.
25     Q.  what was his reaction when you talked

16

1  to him about it?
2      A.  I don't recall. It's been over a year.
3  I don't recall his exact reaction.
4      Q.  All right. Had he ever expressed or
5  made any statements to you about the need to
6  make sure that things going on at the prison
7  stayed within the prison, did not go to
8  outsiders? Had he ever made any statements like
9  that to you?
10         MR. LONG-DANIELS:  Objection to form.
11         THE WITNESS:  I'm sorry. Was
12     somebody saying something?
13         MR. LONG-DANIELS:  That was my
14     objection. You can answer, please.
15         THE WITNESS:  I'm sorry, Mr. Waide.
16     Can you repeat the question?
17 BY MR. WAIDE:
18     Q.  My question was: Did Warden williams
19 ever make any statements to you about what
20 Dr. Woods was doing concerning her complaints or
21 whether she was taking matters to outsiders, was
22 taking prison matters to outsiders? Did warden
23 williams ever say anything to you about that?
24     A.  No, sir.
25     Q.  All right. I don't think we sent you

33

1  do your job.  Correct?
2      A.  Yes, sir.
3      Q.  And if your security clearance was
4  revoked, that employment agreement required
5  that you no longer enter that facility.  Right?
6      A.  Correct.
7      Q.  And that was the sum total of your
8  agreement, wasn't it?
9      A.  Yes, sir.
10     Q.  You were hired to do that facility and
11  that facility alone.  Right?
12     A.  Correct.
13     Q.  All right.
14         MR. LONG-DANIELS:  That's all I have.
15              EXAMINATION
16  BY MR. PEEPLES:
17     Q.  Mr. Day, I'm Tim Peeples.  I represent
18  MTC.  Just a few follow-up questions.
19         You had mentioned statements that
20  Dr. Woods had made to you from time to time
21  about the MTC staff not getting patients back to
22  medical in what she thought was a timely
23  fashion.  Right?
24     A.  Correct.
25

34

1      Q.  Did she have any complaints about you,
2  about your role as HSA?
3      A.  Not to my knowledge.
4      Q.  She never expressed to you that she
5  didn't like what you were doing.
6      A.  No, sir.
7      Q.  Did she ever express to you that she
8  thought you were too friendly with the MTC staff
9  or the warden?
10         MR. LONG-DANIELS:  Objection to form.
11     A.  No, sir.
12  BY MR. PEEPLES:
13     Q.  Okay.  Did she have any complaints
14  about Centurion in general, or was it just --
15  well, let me rephrase that.
16         Did she have any complaints that you
17  were aware of regarding Centurion?
18     A.  Not that I'm aware.
19     Q.  Okay.  Now, the e-mail that Mr. Waide
20  read to you, you have a general memory of
21  sending that e-mail.  Correct?
22     A.  Yes, sir.
23     Q.  And you had actually originally sent
24  the e-mail up the chain at Centurion to
25  Ms. Meggs and -- that may have been -- yeah, to

35

1  Ms. Meggs.  Correct?  Do you remember that?
2      A.  Yes, sir.
3      Q.  And then subsequently you forwarded
4  that same e-mail to the warden.  Do you remember
5  that?
6      A.  Yes.
7      Q.  Okay.  Had you had a conversation with
8  the warden that led up to you sending that
9  e-mail to Ms. Meggs?
10     A.  No.
11     Q.  Okay.  What was it that led you to send
12  the e-mail to Ms. Meggs?  What brought that
13  about?
14     A.  Well, like I said, it's part of my duty
15  as the administrator there to send it up my
16  chain of command; and they can do with it, you
17  know, whatever they do with it.
18     Q.  Okay.  And I guess that was maybe a bad
19  question, but just as sort of a
20  foundational-type question:  Did you hear
21  Dr. Woods state that she had spoken to the state
22  representative?
23     A.  Yes, sir.
24     Q.  Okay.  And other than just -- you
25  remember that.  Do you remember any details

36

1  about what she said?
2      A.  Something along the lines of them being
3  friends.  I don't remember the exact words, but
4  I know she made reference to knowing him, them
5  being friends and, you know, something about
6  that's what happens when you know people.  That
7  was the general sense of, you know, what I
8  remember her saying.
9      Q.  Well, they're friends, and you can
10  speak about a number of things, but was the
11  substance of what you heard that she was
12  discussing with the state representative what
13  was going on in the jail?
14     A.  I know -- like I said, I remember the
15  parking lot; the cars, you know, in the parking
16  lot.
17     Q.  But you don't remember any other
18  details beyond that?
19     A.  No, no.
20     Q.  Did anyone from Centurion -- well, was
21  the e-mail that you sent to Ms. Meggs, was that
22  the first report that you had made up the chain
23  about what you had heard Dr. Woods say?
24     A.  Yes.
25     Q.  You didn't call or send another e-mail?

37

1 There's nothing else out there that you
2 communicated to Ms. Meggs before this e-mail?
3     A.   Not to my knowledge.  Like I said,
4 Ms. Meggs and I, we communicated often.  We
5 communicated about a number of things, so . . .
6 Like I said, to my knowledge, this is the only
7 e-mail concerning that.
8     Q.   Okay.  Did Ms. Meggs contact you by
9 phone or e-mail after she received your e-mail?
10     A.   I don't recall.
11     Q.   Do you remember anyone from Centurion
12 asking you about what was in your e-mail?
13     A.   No, I don't.
14     Q.   Okay.  And you told me that the only --
15 well, you didn't have a discussion with the
16 warden that you remember before you forwarded
17 this e-mail to him.  Is that fair?
18     A.   Correct.
19     Q.   Okay.  But you were involved in the
20 meeting where the warden met with Dr. Woods.
21 Correct?
22     A.   Correct.
23     Q.   Okay.  And you explained at the meeting
24 he advised her that her clearance was being
25 pulled.  Right?

38

1     A.   Correct.
2     Q.   And your response, as you testified,
3 was that you sort of anticipated that there
4 would be, I guess, an additional conversation,
5 further conversation, something along those
6 lines?
7     A.   Yes.
8     Q.   Did you express to the warden, you
9 know, "Look, I thought -- I didn't really think
10 that you were going to pull her clearance.  I
11 thought maybe we would have a discussion"?  Did
12 you express that to him?
13     A.   No.
14     Q.   Did you ever express to him -- I think
15 the term you used was "knee-jerk reaction."  Did
16 you ever express to him, "This is sort of a
17 knee-jerk reaction.  I think this is an
18 overreaction"?  Did you ever express that to
19 him?
20     A.   No.
21     Q.   Did you ever express that to anyone at
22 Centurion?
23     A.   No.
24     Q.   Did you ever tell him, "Look, what I've
25 actually told you about what I heard is not

39

1 true"?  Did you ever say that "what I told you
2 about Dr. Woods' statements is not true"?
3     A.   No, sir.
4     Q.   Did you ever tell him, like, "Well,
5 maybe I'm wrong about this.  Maybe she didn't
6 really say that"?  Did you ever say anything
7 like that to the warden?
8     A.   No, sir.
9     Q.   Okay.  And do you stand by what you
10 reported to the warden as being truthful today?
11     A.   Yes, sir.
12         MR. LONG-DANIELS:  Objection to form.
13 BY MR. PEEPLES:
14     Q.   You've described your relationship with
15 Dr. Woods as a working relationship.  Is that a
16 fair way to describe it?
17     A.   Yes, sir.
18     Q.   Are you aware of any animosity that she
19 had towards you?
20     A.   No, sir.
21     Q.   Did you have any animosity at all
22 towards her?
23     A.   No, sir.
24     Q.   You guys didn't work very long
25 together.  Right?

40

1     A.   Correct.
2     Q.   She's not -- you're not aware of her
3 ever criticizing you.  There's no confrontations
4 you guys had, nothing like that.  Correct?
5     A.   No, sir.
6     Q.   Did you have any reason to make up some
7 statement by Dr. Woods?
8     A.   No, sir.
9     Q.   Did you ever talk to the state rep?
10     A.   No, sir.
11     Q.   Did you know the identity of the state
12 rep that was referenced in your e-mail?
13     A.   No.
14     Q.   Did you ever talk with anyone at --
15 Jerry Williams or anyone else with MDOC about
16 Dr. Woods' statements or her clearance being
17 pulled?
18     A.   No, sir.
19         Wait.  I'm sorry.  There was an
20 investigator who did call me.  I don't recall
21 his name.  But there was an -- and I don't know
22 if he was with MDOC.  I do know he was
23 investigating with the state, so . . .
24     Q.   And that obviously occurred after
25 Dr. Woods' clearance was pulled?

41

1  A.  Correct.

2  Q.  And do you remember -- what were you

3  asked?

4  A.  I don't recall exactly what he asked

5  me.  I don't recall.

6  Q.  Were you asked if you overheard

7  statements by Dr. Woods about speaking to the

8  state representative?

9  A.  I don't recall what he asked me.

10  Q.  It was just a -- was it a phone call

11  with this individual?

12  A.  Yes, sir.

13  Q.  No e-mail communications that you're

14  aware of?

15  A.  I don't remember us e-mailing.  If

16  there were, it was very minimal.

17  Q.  That's the only -- I would say -- state

18  official that you remember speaking to about

19  this whole situation?

20  A.  Correct.

21  Q.  How was Dr. Woods to work with?

22  A.  For the short time that I worked with

23  her, I mean, I had no issues with her.

24  Q.  Do you have medical training in your

25  background?

42

1  A.  I do.

2  Q.  What particular training do you have?

3  A.  I was an Army medic, and I was a

4  paramedic -- EMT rather -- and I had about a

5  year and a half's worth of nursing school.

6  Q.  But you described your role was more of

7  a liaison-type role where you're trying to work

8  out whatever issues there may be between medical

9  and correctional staff.  Is that a good way to

10  put it?

11  A.  Yes, sir.

12  Q.  Whether it's getting patients back for

13  treatment or whatever it may be.  Right?

14  A.  Yes, sir.

15  Q.  Okay.  Did you feel like the warden was

16  responsive when you would address issues with

17  him?

18  A.  Yes, sir.

19  Q.  Did he ever have any complaints about

20  Dr. Woods?

21  A.  Not to me, no, sir.

22  Q.  Any criticisms of Dr. Woods by the

23  warden?

24  A.  No, sir.

25  Q.  Did you have any impression that he

43

1  was, you know, quote, out to get her or anything

2  like that?

3  A.  No, sir.

4  Q.  Did you have any further discussions

5  with the warden after Dr. Woods' clearance was

6  revoked about the clearance being revoked?

7  A.  No, sir.

8  MR. PEEPLES:  That's all I have.

9  Thank you, Mr. Day.

10  MR. WAIDE:  I have just a little

11  follow-up.

12  David, did you something?

13  MR. LONG-DANIELS:  No.  Go ahead,

14  please.

15  FURTHER EXAMINATION

16  BY MR. WAIDE:

17  Q.  Counsel just asked you about the warden

18  being "out to get her."  To your knowledge, do

19  you know of anything that the warden would have

20  had against her other than the fact that she

21  talked to a state legislator -- or his belief

22  that she talked to a state legislator concerning

23  staff shortages which, in her opinion, were

24  jeopardizing medical care?  Do you know of

25  anything else that the warden could have had

44

1  against her?

2  A.  I don't know necessarily against her.

3  I do remember talking to the warden concerning

4  some items that were purchased and given to

5  inmates.  I actually talked with April Meggs

6  about it as well.  But, again, I don't know

7  that, you know, it was necessarily against her.

8  Q.  All right.  Are you saying -- are you

9  talking about some items that were found in your

10  office after she had left?  Is that what you're

11  talking about?

12  A.  Correct.

13  Q.  All right.  Well, those occurrences

14  wouldn't have had anything -- well, strike that.

15  To your knowledge, did the warden know

16  anything about the allegation that she was

17  giving items to inmates before she was fired?

18  A.  It's my recollection that, when I asked

19  Dr. Woods about them, she said that the warden

20  knew.  When I asked the warden, the warden said

21  he had no idea.

22  Q.  Warden Williams had only been there a

23  short time.  Correct?

24  MR. LONG-DANIELS:  Objection to form.

25  A.  Correct.