```
 1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                     OXFORD DIVISION

 3

 4

 5   DR. AMY R. WOODS                         PLAINTIFF

 6

 7   v.            CIVIL ACTION NO.: 3:19-00234-NBB-RP

 8

 9   MHM HEALTH PROFESSIONALS, LLC
     D/B/A CENTURION PROFESSIONALS,
10   MANAGEMENT & TRAINING CORPORATION,
     JESSE WILLIAMS, INDIVIDUALLY,
11   AND JOHN DOES 1-9,                      DEFENDANTS

12

13

14

15         VIDEOTAPED DEPOSITION OF DR. AMY WOODS

16

17

18

19    Taken at the instance of the Defendant at Waide &
        Associates, P.A., 332 N. Spring Street, Tupelo,
20   Mississippi on Monday, June 22, 2020, beginning at
                         10:11 a.m.
21

22

23

24         LORI W. BUSICK, CVR-S, CCR #1677

25   Job #31830
```

EXHIBIT D

Page 18

1  Q.  Okay.  Fifteen to 20.
2  A.  And that's a guess.  That's hard to say.
3  Q.  That's fine.
4      Did you talk with him when you ran into
5  him --
6  A.  Sure.
7  Q.  -- these 15 to 20 times?
8  A.  Sure.
9  Q.  What did y'all talk about?
10 A.  Most of the times that I'd seen him, it
11 was prior to my job at the facility.  He helped us
12 with a nonprofit that I used to run.
13 Q.  Okay.
14 A.  He has a business that we would order
15 things from, like a T-shirt printing business.  So
16 in that capacity.  More through that nonprofit is
17 where I did have interaction with him.  I had very
18 little interaction with Mr. Kincaid while I was
19 actually employed by Centurion.
20 Q.  Well, let's talk about the nonprofit.
21 A.  Sure.
22 Q.  Tell me the name of the nonprofit?
23 A.  Hearts & Hands Ministries.
24 Q.  Okay.  Tell me what Hearts & Hands does.
25 A.  So Hearts & Hands is a Outreach located in

Page 19

1  Byhalia, which is in Marshall County.
2  Q.  Yes, ma'am.
3  A.  Serve food and clothing to needy people is
4  basically what it provides in the community.
5  Q.  Okay.
6  A.  I'm no longer affiliated with it but I
7  helped start it.  And so during that start-up
8  process I think we printed some T-shirts, sold
9  T-shirts, that kind of thing.  We gave out backpacks
10 to kids in our community.  We ordered backpacks
11 through Mr. Kincaid's business.  And so, it was more
12 on that level that I had interaction with him versus
13 his role as a representative.
14 Q.  So he sold you T-shirts that you would in
15 turn sell to raise money for the ministry?
16 A.  So the Hearts & Hands bought T-shirts
17 though his business Champion Awards, I believe is
18 what it's called.
19 Q.  How long did y'all by T-shirts through --
20 A.  I think it was a one-time thing.  It was
21 like an initial startup.  We ordered some T-shirts
22 printed and volunteers wore the T-shirts like at
23 different events and that type of thing.
24 Q.  Did you run into him any more after you
25 bought the T-shirts from him?

Page 20

1  A.  I believe I saw him at a restaurant maybe
2  one night.  Said hello, spoke casually.
3  Q.  Sure.
4  A.  At, it was Marshall's Steak House I
5  believe is where I saw him.  And I can't recall any
6  other specific time that I remember seeing him.  He
7  bought -- I sold -- I had some stools for sale and
8  he bought those from me, like a bar stool.
9  Q.  What did he buy your stools for?
10 A.  I guess to put in his house; I'm not sure.
11 Q.  They were household kind of stools?
12 A.  Yeah.  Yeah.  Like something that you
13 would sell.  I think I had posted maybe on Facebook
14 or Marketplace that I was selling them.
15 Q.  Those were your stools --
16 A.  Sure.
17 Q.  -- that you had at your home?
18 A.  Sure.  Personal, like a personal sale and
19 picked those up.  And now, I believe that was before
20 I was even working at the prison.  I believe all
21 that occurred before I was employed.  I had very
22 little contact with Mr. Kincaid during my time of
23 employment.  He did come to the facility and tour
24 after I first started there as the head of
25 Correctional Committee with a group.  I'm going to

Page 21

1  say that was in 2017, because I had not been at the
2  facility for a long time.  And I remember he did
3  come on site to the facility for a tour.
4  Q.  You said hello?
5  A.  And I spoke casually to him there.  There
6  was no private conversation there.
7  Q.  Okay.  So would it be accurate to say that
8  you've known Mr. Kincaid, Representative Kincaid for
9  a number of years?
10 A.  Several years.
11 Q.  And in fact, several years even before you
12 came to work for --
13 A.  Correct.
14 Q.  -- MHM?
15 A.  Correct.
16 Q.  You had at least one conversation with him
17 while you worked for MHM while --
18 A.  At the facility.
19 Q.  The time he toured the facility?
20 A.  Sure.  Sure.
21 Q.  Have you had any other conversation with
22 him before then?  Either before or after then about
23 the MHM facility or about the prison itself?
24 A.  The only other conversation I had with him
25 was after I was fired.

Page 66

1  Q.  Oh, okay.
2  A.  You know, so you go through -- when you
3  come into Marshall County you go through
4  administrative offices first.
5  Q.  Right.
6  A.  Then you pass by like the lunchroom area
7  snack/break area.
8  Q.  Yes, ma'am.
9  A.  And then it veers off.  You can, if you
10 take one route it will take you around to the
11 medical unit.
12 Q.  Okay.
13 A.  And some other offices and things that I
14 think the administration uses.
15     And then after that, but if you keep going
16 straight there's a, you know, a big typical gate
17 like you see that moves back and forth, opens by
18 central control.  Then there's a long catwalk that's
19 kind of -- you walk down and then that's the housing
20 unit where all the inmate housing is.
21 Q.  And is Delta 4 separated from the other
22 inmate housing?
23 A.  It's in that.
24 Q.  It's in that?
25 A.  It's not really separate.

Page 67

1  Q.  It's just a special part --
2  A.  Yes.
3  Q.  -- of that facility?
4  A.  Correct.
5  Q.  Okay.  Let me ask about these other --
6     You say on your oath you didn't talk to
7  Mr. Kincaid, representative --
8  A.  About staffing numbers, no.
9  Q.  About anything --
10 A.  No.
11 Q.  -- relating to the prison?
12 A.  Correct.
13 Q.  And the other representatives, you didn't
14 talk to any of them?
15 A.  I did not.  Not about anything related to
16 the prison.  I volunteered as Doctor of The Day at
17 some point at the capital through the State Medical
18 Association.  And, you know, you -- generally one of
19 your representatives introduces you.
20 Q.  Yes, ma'am.
21 A.  And Kevin Blackwell introduced me --
22 Q.  Yes, ma'am.
23 A.  -- the day that I was there.
24 Q.  Did you encourage any of the other
25 personnel at MHM to talk to their representatives?

Page 68

1  A.  I didn't encourage them to.  The people
2  that contacted the representatives did that on their
3  own.
4  Q.  Did you discourage them?
5  A.  No.
6  Q.  Did you tell them they shouldn't be doing
7  that?
8  A.  I didn't.
9  Q.  Did you think they should be doing it?
10 A.  I think if they wanted to do that that was
11 well within their rights.
12 Q.  There is a chain of command at MHM, isn't
13 there?
14 A.  I'm sure.  Yes, sir.
15 Q.  And you're supposed to use that when you
16 have complaints, aren't you?
17 A.  I'm sure.  Yes, sir.
18 Q.  And there's an escalation policy where
19 you're supposed to escalate problems that are not
20 solved to that policy?
21 A.  Okay.  I'm sure that there is, yes.
22 Q.  And then there's a 1-800 number, right?
23 A.  I wasn't aware of that, but...
24 Q.  It's in the handbook?
25 A.  I know a lot of companies have that.  I

Page 69

1  mean, yes, some kind of number you can call with a
2  complaint that hasn't been resolved.
3  Q.  Have you seen the handbook before?
4  A.  I'm sure when I started it was given to
5  me.
6  Q.  Yes, ma'am.  And the reason companies have
7  those policies is so that you can have multiple ways
8  to communicate a problem, right?
9  A.  Right.
10 Q.  And that's designed to let the company
11 deal with its problems first, right?
12 A.  I'm sure.
13 Q.  And if you jump over and talk to other
14 folks you don't give the company a chance, do you,
15 to fix the problem?
16 A.  Right.
17 Q.  So it's important that you follow that,
18 right?
19 A.  Yes.
20 Q.  You said earlier that getting patients to
21 medical was more difficult after the violent
22 incidents.  Tell me what you mean by that.
23 A.  So the whole time that I worked there, it
24 was always difficult to get patients to medical.
25 Q.  Meaning a specific type patient or all

Page 254

1  call their name, no.
2  Q. Would you be able to identify them by
3  rank? I mean, are they correctional officers?
4  A. Correctional officers. Definitely
5  correctional officers, not higher level security.
6  Q. Not a captain or major or even maybe a --
7  or lieutenants? I don't know if you're familiar
8  with all the different ranks?
9  A. Right. They were correctional officers.
10 And I know I -- when he initially came, when he
11 first started working at the facility, I know every
12 day -- like I saw him leaving in the car with one.
13 Because he would -- they would often leave at the
14 same time I was leaving the facility. And so I did
15 see him leaving in a car with a correctional officer
16 who was also doing -- who was new to the facility
17 and was doing training, MDOC training, like I
18 indicated the first week we have to do. I saw him
19 leaving with one of the new officers every day.
20 Because she asked me one day if he was coming out
21 behind of the facility. And, you know, it struck me
22 as a little bit unusual.
23 Q. Did you believe that they were, this
24 Travis and this woman were seeing each other
25 romantically?

Page 255

1  A. I didn't necessarily believe it. I didn't
2  know.
3  Q. Right. As you told David, he had only
4  been there a little while. It's just something you
5  had never seen done before?
6  A. Right. I just thought it a little bit
7  unusual.
8  Q. Did you report -- I think you told him you
9  didn't --
10 A. I didn't.
11 Q. -- report that to anybody?
12 A. I didn't.
13 Q. Just weren't there long enough to --
14 A. I didn't really -- and you know a lot of
15 times, if you don't see something that you're clear
16 that you know what's going on, it's not necessarily,
17 until you have more information to probably report
18 it to anybody. I just remarked that, you know, I
19 remember thinking that's just a little bit unusual
20 because he's our health services administrator and
21 he spends a lot of time with the security staff.
22 Q. And you said you felt your impression of
23 Travis Day was that he was more focused on the
24 relationship with security rather than focusing on
25 the medical; is that fair?

Page 256

1  A. Sure. Yes, that's fair.
2  Q. And you -- your expectation of someone of
3  that HSA role, would be to focus more on the
4  medical?
5  A. Right. I think you have to -- you do have
6  to do the liaison role and I understand that that's
7  part of it. To build bridges with security and that
8  is very important. It seemed more of a priority for
9  him to keep -- to make security happy versus
10 ensuring that, for example, when we had an
11 optometrist there eight hours a month, that we need
12 to get those patients to medical that need to see an
13 optometrist.
14 Q. The HSA, in your mind, needs to be
15 aggressive, if needed, to get patients back there to
16 see you?
17 A. Yes.
18 Q. Or do whatever -- I think your phrase was,
19 do whatever it takes to get the patients back for us
20 to see them?
21 A. Right. You've got to go to bat. You've
22 got to go -- you've got to -- like security has a
23 lot of things going on. They are responsible for
24 making sure inmates get fed and showered and rec
25 time and this. So we got to get -- but we are, too.

Page 257

1  I mean, we have to get them. And so HSAs, one of
2  the primary roles is to get the inmates to medical
3  for the care that they need and advocate.
4  Q. Did you ever complain to anyone higher up
5  about Mr. Day for any reason?
6  A. No.
7  Q. You didn't report up the chain that he --
8  that your perception was that he was more focused
9  on, frankly, hanging out with the female
10 correctional officers than --
11 A. No. I mean, I feel like if I had been
12 there any more length of time, I would have. Yes,
13 it would have come to that if I was still there, you
14 know, and the behavior continued. You know,
15 sometimes it good to sit back and just watch for a
16 little while and see what's going on. We didn't
17 work together long enough for me to really have to
18 go to anybody about him, frankly.
19 Q. Did you ever tell Travis, threaten him or
20 ever give him the impression you were on the cusps
21 of reporting him?
22 A. Not that I'm aware of, no.
23 Q. And you didn't reach out -- well, did you
24 ever reach out to Dr. Ramsue about any issues you
25 were having with the warden? Meaning, did you ever