2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS     PLAINTIFF

VS     CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9     DEFENDANTS

---

ZOOM DEPOSITION OF JERRY WILLIAMS

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On September 21, 2020

At 11:05 a.m.

REPORTED BY: SHARRON F. ALLEN, CSR, RPR
CSR NO. 1144

APPEARANCES:

JAMES D. WAIDE III, ESQUIRE
RACHEL PIERCE WAIDE, ESQUIRE
Waide & Associates, P.A.
Post Office Box 1357
Tupelo, Mississippi 38802

REPRESENTING THE PLAINTIFF

TIMOTHY M. PEEPLES, ESQUIRE
Daniel Coker Horton & Bell, P.A.
Post Office Box 1396
Oxford, Mississippi 38655

REPRESENTING MTC & JESSE WILLIAMS

DAVID LONG-DANIELS, ESQUIRE
JACOB R. DEAN, ESQUIRE
Greenberg Traurig, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305

ELIZABETH ROSS HADLEY, ESQUIRE
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

REPRESENTING MHM HEALTH PROFESSIONALS, D/B/A
CENTURION PROFESSIONALS

ALSO PRESENT: DR. AMY WOODS

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

3

TABLE OF CONTENTS

Style .................................................... 1
Appearances .............................................. 2
Table of Contents ........................................ 3
Examination by Mr. Waide ................................. 4
Examination by Mr. Peeples ,,,,,........................ 42
Examination by Mr. Dean.................................. 49
Further Examination by Mr. Waide ........................ 52
Deposition Concluded .................................... 53
Certificate of Court Reporter ........................... 54

EXHIBIT E

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

4

                JERRY WILLIAMS,
having first been duly sworn, was examined and
testified as follows:
                EXAMINATION
BY MR. WAIDE:
    Q.   Mr. Williams, this is Jim Waide. How are you, sir?
    A.   I'm doing fine. How are you?
    Q.   Good.
        I called you about a week ago, and we talked briefly. Do you recall that? I think it was about a week ago.
    A.   Yes, sir.
    Q.   Okay. I'm representing Dr. Amy Woods. My wife, Rachel, is here with me. You may not be able to see her.
    A.   Okay.
    Q.   Mr. Williams, are you retired from the Mississippi Department of Corrections?
    A.   I am, effective January 15th of 2020.
    Q.   This past January?
    A.   Yes, sir.
    Q.   How long did you work for the Mississippi Department of Corrections?
    A.   A little over 25 years.

13

1  that ban withdrawn if requested.
2      Q.  All right.  Did the Department of
3  Corrections have any policy instructing the
4  contractors on what grounds they could keep
5  people off the prison property?
6      A.  I'm not sure about that either.
7      Q.  Is the Amy Woods case the only case
8  that you're aware of where the reason for a
9  person being banned was having talked to a state
10  legislator?
11      A.  That --
12          MR. DEAN:  Objection.
13      A.  I don't know if that -- do I need to
14  answer it?
15  BY MR. WAIDE:
16      Q.  Well, if you know the answer, you do.
17      A.  Well, I don't know the answer to that
18  one.
19      Q.  Am I correct in saying that you do not
20  know whether the state gave the prisons any
21  guidelines or what grounds they could use to ban
22  a person from coming onto prison property?
23      A.  There is some guidelines as relates to
24  the operation.  You have visitation policies;
25  you have -- any time you violate policies or

14

1  perhaps, you know, not follow the rules and
2  regulations set by the agency, I think that's
3  statute.  And I'm going to take a shot at
4  quoting it.  It's 47-3-93.  It's a statute
5  that's posted at the front gate of each
6  institution, as well as your private and
7  regional facilities.  I think it's 47-5-193.
8      Q.  Do you -- I think you've already
9  answered that.  I think your answer was you
10  don't know whether there's any special policy
11  that would alert contractors or employees that
12  they cannot talk to a state legislator other
13  than the general policy that you can't talk to
14  outsiders.  Am I correct about that?
15      A.  Yes, sir.  That's the only one that I'm
16  aware of.  There might be some others.  I've
17  done got a little rusty.  If you had asked me
18  that about a year or so ago, I might have been
19  able to answer it.
20      Q.  All right, sir.  Was there an occasion
21  when a state representative, whose last name is
22  Kinkade -- I think his first name is Bill.  He's
23  a member of the state legislature.  And my
24  understanding is he was chairman of the
25  corrections committee or one of the corrections

15

1  committees of the legislature.  -- contacted you
2  concerning Amy Woods?
3      A.  Yes, sir.
4          MR. DEAN:  Objection to form.
5  BY MR. WAIDE:
6      Q.  All right.  She left -- I'm going to
7  tell you she left in June of 2019; you left in
8  January of 2020.  Bearing those dates in mind,
9  about when would you say Representative Kinkade
10  contacted you?
11      A.  I can't -- I can't recall.  It was
12  during that time frame.  And it was out of some
13  concerns -- do you want to talk about, you know,
14  what the discussion was?
15      Q.  Yes, sir.  I want to talk all about
16  Representative Kinkade and his contact with you
17  and what he said and what you said.  Just tell
18  me the whole story.
19      A.  Well, pretty much it was a -- he
20  contacted me because the nurse, I'm assuming,
21  had contacted him to let him know that she had
22  been banned from the facility.  He asked was it
23  any way that she could come back to the
24  facility.  He and I -- and, actually, he was
25  reaching out to help her.  I said, "Of course."

16

1  I said, "What could happen is that she would
2  need to meet with the warden of MTC to sit down
3  and talk about, you know, confidentiality as
4  relates to overall operation of the facility."
5  And I said, "Once the warden lifts the ban, the
6  ban letter from her file, and it's deleted out
7  of Offender Tracking, she could come back to the
8  facility."
9          But I talked with the warden.  He said
10  that she didn't call, nor did he call back.  The
11  ban letter was left there.  But he was willing
12  to allow her to come back to work.  That's why I
13  didn't understand, you know, what happened or
14  what went wrong because it just kind of went
15  silent.
16      Q.  Now, you referred to a nurse.  Were you
17  talking about Dr. Amy Woods, the medical doctor?
18      A.  Yes.
19      Q.  All right.  I think you said "nurse,"
20  but we're --
21      A.  Okay.
22      Q.  -- you remember it being --
23      A.  Yeah, okay.  I've never met her.  And
24  if I recall, I think that's -- the warden might
25  have thought that she was a nurse.  I'm not

17

1 sure.
2 Q. All right. Did she -- to your
3 knowledge, did the person banned, whoever it
4 was -- I think we're having a little technical
5 problem again.
6 A. Right. We're good. I'm trying to find
7 something. This phone is going to die. Just
8 bear with me.
9 (OFF THE RECORD)
10 THE WITNESS: Okay. I think we're
11 good now.
12 BY MR. WAIDE:
13 Q. If I understood what you said, either
14 Dr. Woods or somebody on her behalf, maybe
15 somebody speaking for her, contacted you and
16 asked for her to be allowed to come back. Is
17 that what you're saying?
18 A. Yes, sir.
19 Q. And do you remember -- and who did you
20 say contacted you?
21 A. It was Representative Bill Kinkade.
22 Q. All right. Let me take an earlier date
23 and ask whether Representative Kinkade had ever
24 contacted you concerning staff shortages at the
25 Marshall County facility --

18

1 A. Yes, sir.
2 Q. -- or anything like that. He had?
3 A. Yes, sir.
4 Q. Let's go back to that earlier occasion.
5 How much time elapsed between the first time he
6 contacted you and then the time you got
7 contacted about her being allowed to come back?
8 A. It might have been a few -- several
9 months. I'm not sure. I can't put a total time
10 frame on it, but it was several months.
11 Q. Let's go back to the earlier occasion.
12 First of all, in your capacity as
13 deputy commissioner, did you deal with
14 Representative Kinkade on prison matters in
15 general, keep him informed and things like that?
16 A. Yes, sir.
17 Q. Would he call and ask you questions
18 about prison operations? Would he keep up with
19 what was going on in the prisons, in other
20 words?
21 MR. DEAN: Object to form.
22 BY MR. WAIDE:
23 Q. Are you able to hear me? I think we're
24 fading out again.
25 A. Hold on. Okay. Go ahead. I gotcha.

19

1 Q. My question was: Just in general,
2 would you be in touch with Representative
3 Kinkade from time to time about prison
4 operations? And I think you've said yes. Am I
5 correct?
6 A. Yes, sir.
7 Q. What kinds of things, for example,
8 would Representative Kinkade call you about?
9 A. You know, we were doing -- he'd call
10 about the shakedowns. Just anything that was
11 dealing with the facility and discuss, you know,
12 issues as it relates to, you know, staff
13 shortage. That wasn't just at Marshall. It's
14 all across the state, though. You know,
15 arrange, you know, meetings. So, you know, he
16 and I talked all the time.
17 Q. I see. And did you think it was your
18 responsibility to tell him -- to answer his
19 questions and tell him about what was going on
20 when he would ask those questions?
21 A. Yes, sir. Yes, sir. We have that open
22 door transparency. Not just with him; that was
23 with any legislator.
24 Q. And why would y'all talk openly to the
25 legislature even though you had a

20

1 confidentiality policy? Why would you do that?
2 MR. PEEPLES: Object to the form.
3 You can answer.
4 BY MR. WAIDE:
5 Q. My question was: Since you had a
6 confidentiality policy, why would you talk
7 openly with members of the legislature?
8 A. Because the policy addressed the
9 details in the policy. I wouldn't sit there,
10 unless I had permission from the commissioner,
11 and talk about the overall operation of security
12 with, you know, outside -- you know, with
13 everything going on, outside the commissioner's
14 approval at least. But that's not something we
15 just discussed, you know, openly with
16 legislators.
17 Q. Let me see if I understand. Without
18 the approval of the commissioner, you would not
19 openly discuss with the legislators what was
20 going on with security at the prison?
21 A. I would discuss --
22 MR. DEAN: Object to form.
23 A. I would discuss issues if questioned.
24 If they questioned me about it, I would discuss
25 the issues. But as far as, like, going into

25

1  employees. That falls on the contractor that
2  the agency contracted with, so I don't have that
3  authority.
4      Q.  All right.
5      A.  Nor did I make the recommendation.
6      Q.  Did you tell the warden that whoever
7  had talked to the representative should have her
8  security clearance revoked? She shouldn't be
9  allowed back on the premises?
10     A.  No.
11     Q.  Y'all didn't have any discussion like
12 that?
13     A.  No.
14     Q.  Am I correct?
15     A.  I advised the warden to have a meeting
16 with the nurse -- because that's what I assumed
17 then. And Representative Kinkade wanted to meet
18 with him as well. He said he tried to set up a
19 meeting but was unable to do so.
20     Q.  The warden said he tried to set up a
21 meeting with whom?
22     A.  I think Representative Kinkade, along
23 with the nurse.
24     Q.  To the best of your knowledge, you told
25 him it was a nurse you were talking about as

26

1  opposed to a doctor?
2      A.  Right. Right. I didn't know it was a
3  doctor, like I say. You know, I kept -- that's
4  why I keep referring to whomever contacted
5  Representative Kinkade, that it was a nurse.
6  Maybe he shared that it was a doctor, but I
7  thought the warden told me that he had reached
8  out to a nurse, so . . .
9      Q.  You say the warden told you that he had
10 reached out to a nurse about it? Is that your
11 testimony?
12     A.  The nurse that -- yeah, reached out to
13 a nurse that worked in the -- in the -- in that
14 clinic.
15     Q.  And what else did he tell you about it
16 other than he reached out to her?
17     A.  That he didn't get a response back from
18 Representative Kinkade, along with the nurse.
19     Q.  Did you ever report back to
20 Representative Kinkade that you talked to the
21 warden?
22     A.  I did.
23     Q.  And what did you tell Representative
24 Kinkade?
25     A.  That I provided his number to the

27

1  warden and the warden was going to call him to
2  try to set up a meeting.
3      Q.  What did he say about there being a
4  staff shortage when you brought to his attention
5  there were complaints from the representative
6  about the staff shortage? What did he say about
7  that?
8      A.  Oh, that's an issue that was shared
9  across the state. He didn't really say anything
10 because we all knew it was a staff shortage.
11     Q.  All right. Now, the prison, MTC, is
12 the entity that has to bring the prisoners over
13 for medical care. Am I correct?
14     A.  Yes, sir.
15     Q.  So would a staff shortage, then,
16 reasonably affect the ability of prisoners to
17 get timely medical care?
18     A.  Yes, sir.
19         MR. DEAN: Object to form.
20 BY MR. WAIDE:
21     Q.  I'm sorry. Go ahead.
22         In your opinion, would staff shortage
23 have any effect on the ability of prisoners to
24 obtain prompt medical care?
25         MR. DEAN: Same objection.

28

1      A.  Yes, sir.
2  BY MR. WAIDE:
3      Q.  Did Warden Williams say there was
4  anything he could do about the staff shortage,
5  or what did he say? Or is this just a statewide
6  problem that couldn't anything be done about it?
7  What did he say about it?
8      A.  Yeah. Well, one thing, that's an
9  inmate right, so he would have to do something
10 about it. That's an inmate right to be provided
11 with medical care. So even if he had to escort
12 somebody back for medical care, then that was
13 his responsibility. So, you know, staff
14 shortage, it can contribute to it, but when it
15 comes to rights, you have to do what you have to
16 do, you know, to keep the orderly running of the
17 facility.
18     Q.  To your knowledge, around this time --
19 we're talking about the same time frame, the
20 last six months of 2000- -- well, let's say the
21 last six months of 2019 and on into 2020 -- did
22 anybody from Centurion ever contact you and say
23 that -- complain to you that they weren't
24 getting prisoners over in time for medical
25 treatment, that there was a problem with the

37

```
1    BY MR. WAIDE:
2        Q.  And why was that?  Why was
3    Representative Kinkade wanting the person to
4    keep working?
5            MR. DEAN:  Object to form.
6        A.  I'm assuming because that individual
7    had contacted him and requested help.
8    BY MR. WAIDE:
9        Q.  Was the staff shortage still going on
10   when you left in January 2020, or had it been
11   alleviated by that time?
12       A.  It was still ongoing statewide.
13           MR. WAIDE:  Let me take just a
14       minute.  I've got some notes I need to
15       look at to see if I've got anything else I
16       need to ask you.
17              (OFF THE RECORD)
18   BY MR. WAIDE:
19       Q.  Do you recall an incident at the
20   Marshall County facility concerning alleged
21   sexual harassment by a physician employed up
22   there sometime after June of 2019?  Do you
23   remember that happening?
24           MR. DEAN:  Object to form.
25
```

38

```
1    BY MR. WAIDE:
2        Q.  Did you understand?  The objection is
3    just for the record.  Do you recall that
4    happening?
5        A.  No, sir.  It wasn't brought to my
6    attention.
7        Q.  All right, sir.  In connection with
8    your dealings with Centurion, the medical
9    provider, did you understand your relationship
10   with them to be such that they should bring to
11   your attention any problems they were having in
12   affording medical care?
13       A.  Yes, sir.
14       Q.  You may have already answered this, but
15   did Warden Williams ever make any statement to
16   you or explanation to you about why what you
17   thought to be the nurse did not get reemployed?
18   Did he ever --
19       A.  No, sir, not that I recall.
20       Q.  -- make any statement --
21       A.  Not that I recall.  The only thing he
22   was trying to follow up to have a meeting, as we
23   discussed, you know, confidentiality and the use
24   of the chain of command.
25       Q.  I thought you under- -- I might be
```

39

```
1    mistaken, but I thought you said earlier that it
2    was to consider both confidentiality and the
3    staff shortage.  It was to be both subjects.
4    Did I understand you --
5        A.  The chain of command would include all
6    of that.  You know, if you utilize the chain of
7    command, if there was problems with staff
8    shortages, then it would have been discussed
9    with him.
10       Q.  Do you remember whether he told you
11   that the nurse or the doctor, whoever it was,
12   did not show up to the meeting that he was
13   trying to arrange?
14       A.  Yes, sir.
15       Q.  He told you that?
16       A.  Yes, sir.  He said, actually, he left
17   several messages for Representative Kinkade, and
18   no one called him back.
19       Q.  What about the nurse or the doctor
20   you're talking about?  Did he indicate whether
21   she failed to show up also?
22       A.  I'm not sure.  I'm not sure about that.
23   I don't recall him telling me that.  I know he
24   said he tried to make contact with
25   Representative Kinkade to set up a meeting with
```

40

```
1    he and the nurse -- or doctor -- and no one ever
2    returned his calls.
3        Q.  Did he ever tell you in advance that he
4    was going to fire the nurse or the doctor that
5    was involved?  Did he ever tell you that?
6            MR. PEEPLES:  Object to the form.
7        A.  Not that I recall.  Because I think he
8    works for MTC, and that's a contract employee
9    with Centurion.
10   BY MR. WAIDE:
11       Q.  Oh, I'm sorry.  I misphrased that.
12           Did he ever tell you he was going to
13   ban the person from the prison facility?  Did he
14   ever tell you that?
15           MR. DEAN:  Object to form.
16       A.  Yes, sir.  He did the letter.
17   BY MR. WAIDE:
18       Q.  I'm sorry.  I didn't understand you.
19       A.  Yes, sir.  That's the ban letter that
20   he did.  I was aware of that, that he was doing
21   it.
22       Q.  Yes, sir.  And did you understand it
23   was because he had talked to Representative
24   Kinkade?  I mean this person had talked --
25       A.  No, sir.  No.  He advised that he did
```

41

 1  not talk with him.
 2      Q.  I understand, but did he ever talk to
 3  you verbally and tell you why he was banning
 4  this person from the facility?
 5      A.  I'm assuming because the meeting wasn't
 6  held to discuss the issues that were involved.
 7      Q.  I see.  Did he ever tell you that this
 8  person had been giving him a hard time about not
 9  getting security over with the prisoners for
10  medical care?
11          MR. DEAN:  Object to form.
12      A.  As far as I recall, he said that was
13  never introduced to him.
14          MR. WAIDE:  Let me take just a second
15      and look at my notes, and I may be done.
16              (OFF THE RECORD)
17  BY MR. WAIDE:
18      Q.  During your discussions with Warden
19  Williams, did he ever tell you that a person
20  from Centurion, Travis Day or some
21  representative of Centurion, is the person that
22  had brought to his attention the fact that this
23  nurse, as you believe, was talking to a state
24  representative?
25      A.  Not that I recall.

42

 1      Q.  Did you happen to know Travis Day?  Do
 2  you know who that is?
 3      A.  No, sir.
 4          MR. WAIDE:  I believe that's all that
 5      I have.  Thank you very much, sir.  Some
 6      of the other attorneys may have questions
 7      for you.
 8          MR. DEAN:  Tim, why don't you go
 9      ahead.
10              EXAMINATION
11  BY MR. PEEPLES:
12      Q.  Mr. Williams, Tim Peeples.  How are you
13  doing today?
14      A.  I'm fine.  How are you?
15      Q.  Doing well.
16          I represent MTC.  Just a couple of
17  follow-up questions.
18          You used the term "nurse" during your
19  deposition.  You don't know if the individual
20  that Representative Kinkade was telling you
21  about is a doctor or a nurse, do you?
22      A.  I don't.  I don't.
23      Q.  It could be a doctor.  You just don't
24  know.
25      A.  Right, right.  Like I say, he and I,

43

 1  from what I recall, we kept using the term
 2  "nurse."
 3      Q.  And the reason that's important is the
 4  plaintiff in this lawsuit, Dr. Amy Woods, is a
 5  doctor.
 6          Was the person that Representative
 7  Kinkade was asking you about, is that the person
 8  that he -- well, let me back up.
 9          Representative Kinkade, you testified,
10  called you and said, "Someone from medical has
11  been contacting me about issues within the
12  correctional facility."  Is that right?
13      A.  Correct.
14      Q.  Okay.  And that is the same person, is
15  it not, that he was talking about when he called
16  you in June 2019 to say, "Hey, can you do
17  something to help me get this person back into
18  the facility"?
19      A.  Correct.
20      Q.  Okay.  And you just don't know what
21  that -- it could have been a nurse assistant; it
22  could have been an RN; it could have been a
23  doctor.  You just don't know one way or the
24  other.  Is that fair?
25      A.  Right.  Right.  I'm assuming that

44

 1  that's the individual.  I don't know if he used
 2  the term "nurse" or I understood a nurse, but I
 3  just recall he and I talking about a nurse.
 4      Q.  You knew it was someone in medical.
 5      A.  Right.  It was someone in medical.
 6      Q.  And do you remember when State Rep
 7  Kinkade called you in June 2019, did he ever use
 8  the name "Amy Woods"?
 9      A.  I don't recall that name.
10      Q.  Okay.
11      A.  He might have.  Like I say, I just
12  don't recall the name.
13      Q.  Did he call you -- did the state rep
14  ask you about anyone besides this one single
15  person who had been removed from the facility?
16      A.  No.
17      Q.  It was just one person.  Right?
18      A.  Right.
19      Q.  And you understood that the warden had
20  offered to meet with the state representative
21  and Dr. Woods to sort of hash out these issues.
22  Right?
23      A.  I know this person from medical had
24  called Kinkade.  I have to, you know, go back to
25  that because, like I say, I don't know

45

```
 1  Dr. Woods.
 2      Q.  Right.  Okay.  You understood that the
 3  warden was willing to meet with the state rep
 4  and whoever the person was from medical to sort
 5  of iron out whatever went on.  Right?
 6      A.  Correct.
 7      Q.  And you understood that he had reached
 8  out to the state rep but didn't get a return
 9  call.  Is that correct?
10      A.  Correct.
11      Q.  Do you remember April Meggs contacting
12  you about the individual from medical being
13  banned from the facility?
14      A.  Yes, sir.  Yes, sir.
15      Q.  And what was your discussion with
16  Ms. Meggs?
17      A.  That the warden was trying to make
18  contact with her to address those issues.  And
19  pretty much I advised her that Representative
20  Kinkade had contacted me and that there was
21  supposed to be a meeting held with the both of
22  them.
23      Q.  Did you tell her that you understood
24  this person in medical was sharing information
25  outside the facility?
```

46

```
 1      A.  Correct.
 2      Q.  And Mr. Waide asked you a bunch of
 3  questions about this policy.  The policy is
 4  don't share confidential information outside the
 5  facility.  Is that what the policy says?
 6      A.  Well, that's paraphrasing.  I'm not
 7  sure all the details, but it addresses many
 8  issues as it relates to confidentiality that all
 9  contract employees, as well as state employees,
10  have to sign that they acknowledge those rules,
11  which includes the dos and don'ts.
12      Q.  And that would include people in
13  medical.  Correct?
14      A.  Yes, sir.
15      Q.  And that would -- theoretically, that
16  would include this person we're talking about,
17  whatever this person's name is.  Right?
18      A.  Correct.
19      Q.  That policy doesn't say "By the way,
20  you can disregard this policy as long as it is a
21  state representative."  Does it say that?
22      A.  I don't think so.  I'm not sure.
23      Q.  It doesn't carve out a special
24  exception for a certain category of people that
25  you can go talk to.  It says "Do not share" --
```

47

```
 1  to paraphrase -- "confidential information
 2  outside the facility."  Right?
 3      A.  If I recall correctly.  Like I say
 4  again, it won't be -- it won't be in those exact
 5  words.  You know, we're paraphrasing.  But it
 6  will address the issues and concerns as they
 7  relate to maintaining confidentiality.
 8      Q.  And like you said, that's not the
 9  specific language, but that's the gist of it,
10  "Don't share confidential information outside
11  this facility."
12      A.  Correct.
13      Q.  Okay.  They're also trained --
14  individuals that work in medical in these
15  prisons, they're also trained about chain of
16  command, are they not?
17      A.  They are.  Supposed to be.
18      Q.  Right, supposed to be.  Theoretically,
19  this person would have received that training.
20  Right?
21      A.  Correct.
22      Q.  And you're not aware from your
23  discussions with anyone on this case of the
24  doctor going to the warden -- or this person
25  going to the warden and sharing concerns that
```

48

```
 1  she had?
 2      A.  I think I lost you.
 3      Q.  Yeah.  I'll wait until you --
 4      A.  Can you hear me?
 5      Q.  I can sort of hear you.
 6          MR. PEEPLES:  We're just going to
 7      carry on if that's okay with everybody.
 8      We can't see you, Mr. Williams, but if you
 9      can hear us, that's fine.
10          MR. LONG-DANIELS:  I think we lost
11      him.
12          (BRIEF INTERRUPTION)
13          THE WITNESS:  Can you hear me?
14  BY MR. WAIDE:
15      Q.  Okay.  Let me back up.  Mr. Williams,
16  are you aware from your discussions with the
17  warden or anyone else of this person from
18  medical going to the warden to share the
19  concerns that she had?
20      A.  No, sir.  Like I said, that was the
21  issue.  You know, I just wanted to bring some
22  awareness that, you know, that's the chain of
23  command.
24      Q.  Okay.  And it wasn't your decision --
25  you told Mr. Waide it wasn't your decision about
```