# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

| | | |
|---|---|---|
| DR. AMY R. WOODS, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 3:19-00234-NBB-RP |
| | ) | |
| MHM HEALTH | ) | |
| PROFESSIONALS, LLC D/B/A | ) | |
| CENTURION PROFESSIONALS, | ) | |
| MANAGEMENT & TRAINING | ) | |
| CORPORATION, JESSE | ) | |
| WILLIAMS, INDIVIDUALLY, | ) | |
| AND JOHN DOES 1-9, | ) | |
| | ) | |
| DEFENDANTS. | | |

## DEFENDANT MHM HEALTH PROFESSIONALS, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

I.     PROCEDURAL BACKGROUND ........................................................................ 2

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 3

    A.    MHMHP Employs Individuals to Provide Medical Care to State Prisoners
        Incarcerated at Marshall County Correctional Facility ............................... 3

    B.    Woods Signs Offer Letter Acknowledging Her Employment Is (1) At-Will
        and (2) Contingent on Her Ability to Obtain and Maintain Facility Access ......... 4

    C.    Woods Meets with Warden Williams After He Is Informed That She
        Shared Information About Internal Matters with a State Representative ............... 5

    D.    Warden Williams Revokes Woods's Facility Access ................................. 7

    E.    Woods's Employment Is Terminated .................................................... 7

III.   SUMMARY JUDGMENT STANDARD OF REVIEW ..................................... 8

IV.    SUMMARY JUDGMENT SHOULD BE GRANTED AS TO ALL CLAIMS ............... 9

    A.    The Wrongful Termination Claim Should Be Dismissed ...................................... 9

        1.    Woods Concedes That MHMHP Did Not Ask Her to Commit a
            Crime .................................................................................... 12

        2.    Woods Was Not Asked, nor Did She Refuse, to Commit a Crime ......... 13

        3.    The Wrongful Termination Claim Fails for Lack of Causation ............... 17

    B.    The First Amendment Claim Fails as a Matter of Law ...................................... 19

        1.    Whether Woods Shared Information With Rep. Kinkade is Not
            Material .................................................................................. 21

        2.    Woods's Termination is Not Fairly Attributable to Mississippi ............... 22

            a.    Employing and Terminating Woods Is Not a Public
                Function ........................................................................ 22

            b.    Terminating Woods's Employment was Not Joint Action ........... 23

            c.    The Termination Does Not Satisfy the State Compulsion
                Test .............................................................................. 24

    C.    The Civil Conspiracy Claim Should Be Dismissed .......................................... 26

V.     CONCLUSION ............................................................................................ 27

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Allocco v. City of Coral Gables*,
    221 F. Supp. 2d 1317 (S.D. Fla. 2002) ..................................................................22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...............................................................................................9, 22

*Arenas v. Calhoun*,
    922 F.3d 616 (5th Cir. 2019) ....................................................................................15

*Barnes v. Lehman*,
    861 F.2d 1383 (5th Cir. 1988) ..................................................................................25

*Bass v. Parkwood Hosp.*,
    180 F.3d 234 (5th Cir. 1999) ....................................................................................24

*Beattie v. Madison Cty. Sch. Dist.*,
    254 F.3d 595 (5th Cir. 2001) ....................................................................................20

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ..................................................................................................24

*Caleb v. Grier*,
    598 F. App'x 227 (5th Cir. 2015) .............................................................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................................8

*Cornish v. Corr. Servs. Corp.*,
    402 F.3d 545 (5th Cir. 2005) ...............................................................19, 20, 23, 24

*Crawford v. Bannum Place*,
    556 F. App'x 279 (5th Cir. 2014) .............................................................................17

*Dancer v. Bryce Corp.*,
    No. 1:04CV306-D-D, 2006 U.S. Dist. LEXIS 16955 (N.D. Miss. Apr. 4,
    2006) .........................................................................................................................12

*Dennis v. Sparks*,
    449 U.S. 24 (1980)....................................................................................................23

*Dismuke v. City of Indianola*,
    No. 01-60475, 2002 U.S. App. LEXIS 29643 (5th Cir. 2002) .................................17

*Doe v. Steward Health Care Sys. LLC*,
    No. 4:18-CV-00394, 2018 U.S. Dist. LEXIS 152247 (S.D. Tex. July 31, 2018)....................20

*Doe v. United States*,
    831 F.3d 309 (5th Cir. 2016) ....................................................................................20

*Flagg Bros., Inc. v. Brooks*,
    436 U.S. 149 (1978)..................................................................................................22

*George v. Pac.-CSC Work Furlough*,
    91 F.3d 1227 (9th Cir. 1996) ......................................................................................25

*Gibson v. Rich*,
    44 F.3d 274 (5th Cir. 1995) ........................................................................................21

*Hall v. Smith*,
    497 F. App'x 366 (5th Cir. 2012) ...............................................................................20

*Heffernan v. City of Paterso*n,
    578 U.S. ___, 136 S. Ct. 1412 (2016).........................................................................21

*Hernandez v. Terrones*,
    397 F. App'x 954 (5th Cir. 2010) .................................................................................8

*Hicks v. Martinrea Auto. Structures United States*,
    No. 1:19-CV-191-SA-DAS, 2020 U.S. Dist. LEXIS 191572 (N.D. Miss. Sep.
    23, 2020) ...............................................................................................................11, 17

*Jones v. City of Faith Prison Ministries*,
    No. 05-1675, 2006 U.S. Dist. LEXIS 105311 (W.D. La. Mar. 6, 2006) ................22

*Jones v. Diamond*,
    594 F.2d 997 (5th Cir. 1979) ......................................................................................13

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) (en banc) ........................................................................9

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).......................................................................................................8

*Mendoza v. Lynaugh*,
    989 F.2d 191 (5th Cir. 1993) ................................................................................15, 16

*MultiPlan, Inc. v. Holland*,
    937 F.3d 487 (5th Cir. 2019) ......................................................................................26

*Nicholson v. Rotech Healthcare, Inc.*,
    No. 1:06cv15, 2007 U.S. Dist. LEXIS 40496, 2007 WL 1657412 (N.D. Miss.
    June 4, 2007)................................................................................................................18

*Olivas v. Corr. Corp. of Am.*,
    408 F. Supp. 2d 251 (N.D. Tex. 2006) .......................................................................16

*Polacek v. Kemper Cty.*,
    739 F. Supp. 2d 948 (S.D. Miss. 2010).......................................................................23

*Rayburn v. Hogue*,
    241 F.3d 1341 (11th Cir. 2001) ..................................................................................19

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982).....................................................................................................20

*Richard v. Hoechst Celanese Chem. Group, Inc.*,
    355 F.3d 345 (5th Cir. 2003), *cert. denied* 543 U.S. 917 (2004)..........................19, 22

*Schuh v. Town of Plantersville*,
    No. 1:13CV101-SA-DAS, 2014 U.S. Dist. LEXIS 117174 (N.D. Miss. Aug.
    22, 2014) ...........................................................................................................................18

*Senter v. Cingular Wireless, LLC*,
    228 F. App'x 505 (5th Cir. 2007) ..................................................................................12

*Simmons v. Pac. Bells, L.L.C*,
    787 F. App'x 837 (5th Cir. 2019) ..................................................................................11

*Swindol v. Aurora Flight Scis. Corp.*,
    805 F.3d 516 (5th Cir. 2015) .........................................................................................12

*Topalian v. Ehrman*,
    954 F.2d 1125 (5th Cir. 1992) .........................................................................................9

*United States v. Lanier*,
    520 U.S. 259 (1997).......................................................................................................14

*United States v. Moore*,
    708 F.3d 639 (5th Cir. 2013) .........................................................................................14

*United States v. Sipe*,
    388 F.3d 471 (5th Cir. 2004) .........................................................................................14

*United States v. Williams*,
    343 F.3d 423 (5th Cir. 2003) .........................................................................................14

*Uzomba v. Univ. Health Sys.*,
    558 F. App'x 474 (5th Cir. 2014) ..................................................................................15

*West v. Atkins*,
    487 U.S. 42 (1988).........................................................................................................19

*Wheeler v. BL Dev. Corp.*,
    415 F.3d 399 (5th Cir. 2005) .........................................................................................13

**State Cases**

*Bradley v. Kelley Bros. Contractors*,
    117 So. 3d 331 (Miss. Ct. App. 2013) ..........................................................................26

*Buchanan v. Ameristar Casino Vicksburg, Inc.*,
    852 So. 2d 25 (Miss. 2003)............................................................................................12

*Empiregas, Inc. of Kosciusko v. Bain*,
    599 So. 2d 971 (Miss. 1992) .........................................................................................10

*Harris v. Miss. Valley State Univ.*,
    873 So. 2d 970 (Miss. 2004)..........................................................................................26

*Hust v. Forrest Gen. Hosp.*,
    762 So. 2d 298 (Miss. 2000)..........................................................................................17

*McArn v. Allied Bruce-Terminix Co.*,
    626 So. 2d 603 (Miss. 1993)..........................................................................................10

*Obene v. Jackson State Univ.*,
    233 So. 3d 872 (Miss. App. 2017) ........................................................................13

*Perry v. Sears Roebuck and Co.*,
    508 So. 2d 1086 (Miss. 1987) ..........................................................................10

*Rex Distrib. Co. v. Anheuser-Busch, LLC*,
    271 So. 3d 445 (Miss. 2019) ............................................................................26

*S. Farm Bureau Life Ins. Co. v. Thomas*,
    299 So. 3d 752 (Miss. 2020) ............................................................................16

*S. Health Corp. of Hous. v. Crausby*,
    174 So. 3d 916 (Miss. Ct. App. 2015) ............................................................26

*Senseney v. Miss. Power Co.*,
    914 So. 2d 1225 (Miss. App. 2005) ................................................................12

*Slatery v. N.E. Miss. Contract Procurement*,
    747 So. 2d 257 (Miss. 1999) ............................................................................10

*Swindol v. Aurora Flight Scis. Corp.*,
    194 So. 3d 847 (Miss. 2016) ..........................................................10, 11, 12, 17

## Federal Statutes

18 U.S.C. § 242 ..................................................................................................13, 14

42 U.S.C. § 1983 ......................................................................................................19

## State Statutes

Miss. Code Ann. § 45-9-55(1) ................................................................................10

Miss. Code Ann. § 47-1-27 ......................................................................................13

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................8

**DEFENDANT MHM HEALTH PROFESSIONALS, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dr. Amy R. Woods ("Woods") sues her former employer MHM Health Professionals, LLC ("MHMHP") for three causes of action: wrongful termination, violation of her First Amendment rights, and civil conspiracy. As outlined below, Woods's claims do not withstand judicial scrutiny and are the equivalent of attempting to fit a square peg in a round hole. The undisputed facts and circumstances of her termination support none of the three claims.

When Woods began her employment with MHMHP, she acknowledged two things: first, that she was an at-will employee, and second, that her continued employment was contingent on her maintaining security clearance at her assigned prison facility, Marshall County Correctional Facility ("MCCF"). It is undisputed that MCCF's warden, Defendant Jesse Williams, revoked Woods's security clearance. This prevented Woods from entering her assigned prison facility. Consequently, she could not provide medical care to prisoners or supervise nurses and other medical staff. In other words, Woods could not perform the work she was hired to do. MHMHP terminated Woods's employment pursuant to her employment agreement—a perfectly legal and non-retaliatory action.

Woods's termination falls within the broad category of employment discharges for which Mississippi law provides no cause of action. Woods's wide-ranging, loosely defined, and constantly evolving theories of liability offer no path to defeat summary judgment. All three claims leveled against MHMHP lack the requisite evidentiary support to survive summary judgment.

The wrongful termination claim—an extremely narrow cause of action—suffers from several fatal defects, most notably that Woods admits that she was never asked by anyone employed by MHMHP to commit a crime. The First Amendment claim fails for the simple

1

reason that MHMHP is a private employer not subject to § 1983 claims, and even assuming Woods's employment ended because she allegedly exercised her rights under the First Amendment—which it did not—Woods cannot show that her termination is fairly attributable to the State of Mississippi because it is undisputed that the State of Mississippi played no role in the termination.

Woods's civil conspiracy claim likewise fails because (1) her termination was not unlawful and (2) the uncontroverted evidence reveals that no one and no entity—not MHMHP, not Defendant Management & Training Corporation, and not Warden Williams—conspired to terminate her employment.

As is more fully explained below, a jury is unnecessary to resolve any material factual disputes. Summary judgment should be granted on each claim because the undisputed evidence reveals that each of Woods's claims against MHMHP fails as a matter of law.

## I.    PROCEDURAL BACKGROUND

On September 18, 2019, Plaintiff Dr. Amy R. Woods filed suit against Centurion of Mississippi, LLC, Management & Training Corporation ("MTC"), Jesse Williams, individually, and John Does 1-9. [Dkt. 1-1]. The suit alleged four counts: termination in violation of Mississippi public policy; civil conspiracy; tortious interference with employment; and intentional infliction of emotional distress. *Id.* All non-fictitious defendants later removed the case to the United States District Court for the Northern District of Mississippi based on diversity jurisdiction. *See* [Dkt. 1 & 2]. Centurion of Mississippi, LLC moved to dismiss, arguing that it did not employ Woods—MHMHP did. *See* [Dkt. 10 & 11]. Woods successfully obtained leave to file a first amended complaint in which she substituted MHMHP for Centurion of Mississippi, LLC. *See* [Dkt. 18]. MHMHP moved to dismiss the first amended complaint. [Dkt.

23 & 24]. It later moved to stay discovery pending the Court's resolution of the motion to dismiss. [Dkt. 35 & 36]. Before the Court ruled on the motion to dismiss, Woods sought and obtained leave to file a second amended complaint. *See* [Dkt. 44 (motion for leave) & 53 (order granting motion for leave)]. Thereafter, Woods filed a second amended complaint on March 13. [Dkt. 55]. MHMHP moved to withdraw its motion to stay discovery and filed an answer to the second amended complaint. [Dkt. 56 & 61].

Approximately five months later Woods sought and obtained leave to file a third amended complaint. [Dkt. 106, 107, & 108]. The third amended complaint added a First Amendment claim and eliminated the intentional infliction of emotional distress claim because Woods "concede[d] that she [could not] prevail" on that claim. [Dkt. 106 at ¶ 7].

## II. <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

### A. MHMHP Employs Individuals to Provide Medical Care to State Prisoners Incarcerated at Marshall County Correctional Facility

Since its founding in 1981, MHM Services, Inc., directly and through its subsidiaries, has provided health services in institutional settings, including correctional facilities. Exhibit A, MHMHP Employee Handbook at MHMHP 000090. MHMHP, a subsidiary of MHM Services, Inc., provides staffing of healthcare employees and employs personnel in Mississippi for this purpose. *Id.*

In July 2016, the Mississippi Department of Corrections ("MDOC") and Centurion of Mississippi, LLC entered into a contract under which Centurion of Mississippi, LLC would provide medical, dental, pharmacy, and mental health care services for inmates in several Mississippi correctional facilities, including MCCF. *See* Exhibit B, Agreement Between the State of Mississippi Department of Corrections and Centurion of Mississippi, LLC for Onsite Inmate Health Services. Pursuant to this contract, MHMHP employees provide medical services to

inmates incarcerated at MCCF. Exhibit C, Deposition of Kristie Huff ("K. Huff Dep.") at 6:14-7:19.

State prisoners convicted of violent crimes—including murder, rape, and burglary—are incarcerated at MCCF. Exhibit D, Deposition of Beverly McMullen ("B. McMullen Dep.") 6:20-21; Exhibit E, Deposition of Warden Jesse Williams ("Warden Williams Dep.") 110:17-22. MCCF is operated by a private prison company, MTC. MTC contracts with the State of Mississippi. Exhibit D, B. McMullen Dep. at 6:19-20. At the time of Woods's termination, Warden Williams served as the Warden. Warden Williams is employed by MTC. Exhibit E, Warden Williams Dep. at 5:18-19.

### B. Woods Signs Offer Letter Acknowledging Her Employment Is (1) At-Will and (2) Contingent on Her Ability to Obtain and *Maintain* Facility Access

Woods accepted an offer of employment from MHMHP on October 16, 2016. Exhibit F, Woods Offer Letter. The two-page offer letter included an entire section entitled "AT WILL EMPLOYMENT." *Id.* at MHMHP 000053. This section provided, among other things, that the "employment is on an at-will basis, which means you have the right to terminate your employment at any time for any reason, and we have that same right." *Id.* at MHMHP 000054. And it also required Woods to "obtain and maintain facility access privileges at the correctional facility to which you are assigned, which is granted and may be revoked by the client in its sole discretion." *Id.* Woods signed that she both read and accepted the terms of the offer letter. *Id.*

The at-will nature of Woods's employment and the requirement that she both obtain and maintain facility access privileges were also stated elsewhere. The employee handbook provided that "Your employment is on an at-will basis, which means you have the right to terminate your employment at any time for any reason, and we have that same right." Exhibit A at MHMHP 000090. It also provided that as "a requirement of working on this MHM[HP] program, you are

4

required to obtain and maintain facility access privileges at the correctional facility to which you are assigned . . . ." *Id*. Woods testified that she was certain that the employee handbook was given to her when she began in 2016. Exhibit G, Deposition of Dr. Amy Woods ("Woods Dep.") at 69:4-5. Woods's offer letter stated explicitly that "Loss of access privileges . . . will result in termination of your employment with MHM[HP]." Exhibit F at MHMHP 000054.

### C. Woods Meets with Warden Williams After He Is Informed That She Shared Information About Internal Matters with a State Representative

On June 18, 2019, MHMHP's Health Services Administrator at MCCF, Travis Day, sent April Meggs, MHMHP's Vice President of Operations for Mississippi, an email. In the email, which he subsequently forwarded to Warden Williams, Day recounted an interaction he recently had with Woods. Day wrote that:

> Last week Thursday or Friday I was having a conversation with Dr. Woods at the nurse's station when she mentioned that she has had conversation with the state rep. who lives here in Marshal[l]county about something's [sic] that have been going on with security, such as not having enough staff to bring patients. She stated that the rep. drove through the parking lot once before and he had an issue with the number of cars or lack of cars in the parking lot.

> On yesterday during the Warden's meeting he made reference to the state rep driving through the parking lot counting cars. This caused me great alarm as I knew Dr. Woods had just made this statement to me about knowing the state rep, and that he lived In Marshal[l] County and that he drove through the parking lot after she talked to him about what she didn't like here. She also stated that she and former Deputy Warden Doty used to be at odds because she would call the state rep about things that went on at MCCF when Doty was here.

Exhibit H, Email from Travis Day to April Meggs dated 6/18/19. Day anticipated that by forwarding the email to Warden Williams he would provoke "a conversation between [him], the warden, Dr. Woods, and [his] supervisor . . . ." Exhibit I, Deposition of Travis Day ("T. Day Dep.") at 24:20-21. Day did not testify that he hoped Woods would be terminated. In fact, Day "did not wish to see Dr. Woods's employment terminated." Exhibit J, T. Day Sworn Statement at

¶ 22. He described the Warden's decision revoking Woods's security clearance as "a knee-jerk reaction . . . ." Exhibit I, T. Day Dep. at 25:19.

At some point prior to receiving this email from Day, Warden Williams had a conversation with then-MDOC Deputy Commissioner of Institutions Jerry Williams in which Jerry Williams told him that information was "being given to individuals outside of the facility, if you will, and had an understanding that that information was being given to those individuals from individuals in the medical department . . . ." Exhibit E, Warden Williams Dep. at 16:6-11.

The state representative Day identified is Representative Bill Kinkade. *See* Exhibit G, Woods Dep. at 16:21-22. Rep. Kinkade's district includes Marshall County and parts of DeSoto County. *Id.* at 16:24-17:1. At the time, Rep. Kinkade served as Chairman of the House Corrections Committee. *Id.* at 116:8-9. Woods knew him "peripherally." *Id.* at 17:8. Rep. Kinkade acknowledged that he knows Woods and that he knows her husband and father-in-law particularly well. Exhibit K, Representative Bill Kinkade Deposition ("Rep. Kinkade Dep.") at 10:8-21. Woods "make[s] it a point to know all the legislators where [she] live[s]." Exhibit G, Woods Dep. at 116:8-9.

Seven days after Day sent the email—on June 25—Woods, Day, Warden Williams, and Deputy Warden Beverly McMullen met in Warden Williams's office. *Id.* at 215:23-216:7. During the meeting, Warden Williams told Woods he did not feel comfortable with her coming in and out of the facility. *Id.* at 82:3-5. Following the meeting, Woods drafted the following statement recounting the meeting:

> Warden Williams stated that he "had it on good authority" that I had shared information about MTC staffing numbers with people outside of the facility. He referenced talking about the numbers of cars in the parking lot and talking about numbers of patients in the medical department.

6

I informed Warden Williams that this was false information. At no time have I ever shared MTC staffing numbers with anyone outside of MCCF.

Warden Williams stated that he did not feel comfortable with me coming in and out of his facility . . . .

Exhibit L, Woods Statement dated 6/25/19.

### D. Warden Williams Revokes Woods's Facility Access

Warden Williams testified that he had a problem with "prison operations being discussed outside the facility." Exhibit E, Warden Williams Dep. at 27:7-8. Warden Williams stated that it would be "problematic," *id.* at 27:24, for information concerning MCCF, which incarcerated "very dangerous" prisoners, to be shared with the public. *Id.* at 113:22-23. In other words, Warden Williams did not want information concerning inmates shared with outside individuals because that could potentially compromise security. *Id.* at 122:3-18. Warden Williams also had a problem with Woods not following the proper chain of command. *Id.* at 26:4-5.

Warden Williams revoked Woods's security clearance "because of prison operations [] information being given to folks outside of the facility." *Id.* at 28:23-29:1. In an email dated June 26, 2019, Warden Williams wrote Day that "effective June 26, 2019 Dr. Woods no longer has gate clearance to enter the facility." Exhibit M, Email from Warden Williams to Travis Day dated 6/26/19. Warden Williams testified that the decision to revoke Woods's security clearance was his decision alone. Exhibit E, Warden Williams Dep. at 105:5-7. And he did not solicit either Meggs' or Day's approval regarding his decision to revoke Woods's security clearance. *Id.* at 105:13-16.

### E. Woods's Employment Is Terminated

After Warden Williams revoked Woods's security clearance, Meggs waited several days to see if Warden Williams would reconsider his decision. Exhibit N, A. Meggs Sworn Statement

at ¶ 13. After he did not, Meggs approved Woods's termination. *Id.* at ¶ 15; *see* Exhibit O, Woods's Termination Approval. Woods's termination became effective June 28, 2019. The MHMHP involuntary termination report stated the reason for Woods's termination was that " … her security clearance had bee[n] revoked."

After her termination, MHMHP's Statewide Medical Director, Dr. Clayton Ramsue, assisted Woods with obtaining another job by offering her a positive recommendation. Exhibit P, Deposition of Dr. Clayton Ramsue Dep. ("C. Ramsue Dep.") at 45:9-17.

### III.    SUMMARY JUDGMENT STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses." *Hernandez v. Terrones*, 397 F. App'x 954, 962 (5th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

On a motion for summary judgment, the movant has the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. If the movant makes such a showing, the burden then shifts to the non-movant to "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. Before finding that no genuine issue for trial exists, the court must first be satisfied that no rational trier of fact could find for the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment in favor of the movant is proper if, after adequate time for discovery, the non-movant fails to establish the existence of an element essential of her case and as to which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23. "[T]he substantive law will

8

identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The non-movant must show that the evidence is sufficient to support a resolution of the factual issue in her favor. *Id.* at 249. While all of the evidence must be viewed in a light most favorable to the non-movant, *id.* at 255, neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO ALL CLAIMS

### A.  The Wrongful Termination Claim Should Be Dismissed

Count I—the wrongful termination claim—fails for at least three reasons, each of which independently warrants dismissal. First, Woods conceded that nobody employed by MHMHP— neither her supervisor Dr. Clayton Ramsue, nor anyone else—asked that she take any illegal action. Second, the action Woods purportedly refused to commit is not illegal, proving fatal to her claim. And third, the irrefutable evidence reveals that MHMHP did not terminate Woods's employment because she refused to commit a crime or violate public policy but rather because she lacked the security clearance necessary to enter MCCF.

Woods alleges that "MHMHP caused [her] employment to be terminated because of [her] efforts to provide for the serious medical needs of prisoners." [Dkt. 108 at ¶ 20]. She charges that MHMHP terminated her employment because she refused to deprive prisoners at MCCF of adequate medical care and be willfully indifferent to their serious medical needs. [Dkt. 108 at ¶¶ 26, 27]. She also alleges that her termination violated "Mississippi public policy." [Dkt. 108 at ¶ 28].

"Mississippi long has adhered to the common-law rule of terminability at will . . . ." *Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971, 974 (Miss. 1992) (citing *Perry v. Sears Roebuck and Co.*, 508 So. 2d 1086, 1088 (Miss. 1987)). An employee may be terminated for "good reason, bad reason, or no reason at all." *Slatery v. N.E. Miss. Contract Procurement*, 747 So. 2d 257, 259 (Miss. 1999). But limited and narrow exceptions do exist. In *McArn v. Allied Bruce-Terminix Co.*, 626 So. 2d 603 (Miss. 1993), the Mississippi Supreme Court carved out two exceptions to Mississippi's common law at-will employment doctrine. The *McArn* court held that

> an employee who refuses to participate in an illegal act . . . shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer . . . [and] an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

*Id.* at 607. Notwithstanding the exceptions created by *McArn*, Mississippi courts "zealously appl[y] the employment-at-will doctrine . . . ." *Swindol v. Aurora Flight Scis. Corp.*, 194 So. 3d 847, 852 (Miss. 2016).

Employers are also prohibited from terminating employees for reasons that the Mississippi legislature has independently declared legally impermissible. In 2016, the Mississippi Supreme Court decided *Swindol*, which concerned a wrongful termination claim in which the employee asserted he was discharged for having a firearm inside his locked vehicle in the employer's parking lot. Citing a Mississippi statute that prohibited a public or private employer from "establish[ing], maintain[ing], or enforc[ing] any policy or rule that has the effect of prohibiting a person from transporting or storing a firearm in a locked vehicle in any parking lot," MISS. CODE ANN. § 45-9-55(1), the employee brought a wrongful termination claim. In response to a certified question from the Fifth Circuit, the Mississippi Supreme Court explained

10

that "[e]mployers may not fire employees for one of the public-policy reasons detailed in *McArn*, nor may they fire employees for reasons 'independently declared legally impermissible.'" *Swindol*, 194 So. 3d at 852. The Mississippi Supreme Court concluded that "[t]he Legislature has 'independently declared' via Section 45-9-55 that terminating an employee for having a firearm inside his locked vehicle is 'legally impermissible.'" *Swindol*, 194 So. 3d at 854.

The Fifth Circuit recently applied *Swindol* in *Simmons v. Pac. Bells, L.L.C*, 787 F. App'x 837 (5th Cir. 2019). In *Simmons*, the plaintiff was fired because he served on a jury. The Fifth Circuit concluded that because a Mississippi statute prohibited employers from taking adverse employment action due to an employee's jury service, the plaintiff could bring a cause of action for being terminated due to his jury service. *Id.* at 842.

Taken together, it is clear that the relevant statutes in *Simmons* and *Swindol* "independently declared" that terminating an employee for having a firearm inside his locked vehicle on company property and terminating an employee for jury service were legally impermissible actions. *Id.* at 841 ("the Mississippi legislature independently declared via § 13-5-35 that terminating an employee for jury service is legally impermissible"); *Swindol*, 194 So. 3d at 854 (stating that "[t]he Legislature has 'independently declared' via Section 45-9-55 that terminating an employee for having a firearm inside his locked vehicle is 'legally impermissible'"). *See Hicks v. Martinrea Auto. Structures United States*, No. 1:19-CV-191-SA-DAS, 2020 U.S. Dist. LEXIS 191572, at *23 (N.D. Miss. Sep. 23, 2020) ("*Swindol* and *Simmons* both involved instances where the Mississippi Legislature had enacted statutory prohibitions specifically directed toward employers' relationship with their employees.").

Unlike in *Simmons* and *Swindol*, Woods has not cited a specific statutory prohibition that was violated by her termination. She therefore must proceed under the *McArn* exceptions, which

11

"remain the only two recognized [exceptions] so far." *Swindol*, 194 So. 3d at 849 (quoting *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 521 (5th Cir. 2015)).

But Woods does not present a viable *McArn* claim.

### 1. *Woods Concedes That MHMHP Did Not Ask Her to Commit a Crime*

The wrongful termination claim fails because Woods has acknowledged that her employer never asked her to commit a crime. To invoke the first *McArn* exception, the request to engage in illegal activity must originate from the employer or its agents. *See Buchanan v. Ameristar Casino Vicksburg, Inc.*, 852 So. 2d 25, 27 (Miss. 2003) (upholding the grant of summary judgment where the employee failed to allege "that she was terminated for refusing to participate in illegal acts *at the request of [her employer]*" (emphasis added)); *Senseney v. Miss. Power Co.*, 914 So. 2d 1225, 1228 (Miss. App. 2005) (stating *McArn*'s first exception "allow[s] an employee fired for refusing to follow the *employer's* directive to do illegal activity . . . to bring a wrongful termination action" (emphasis added)); *see also Dancer v. Bryce Corp.*, No. 1:04CV306-D-D, 2006 U.S. Dist. LEXIS 16955, at *9 (N.D. Miss. Apr. 4, 2006) (describing the first *McArn* exception as applying when "an employee [is] fired for refusing to follow an *employer's* directive to do illegal activity" (emphasis added)).[1]

Woods testified that her supervisor, Ramsue, never instructed her to do something illegal. Exhibit G, Woods Dep. at 13:10-15. In fact, Woods responded in the negative when asked "Did *anyone* from MHM[HP] tell you specifically to do anything illegal?" *Id.* at 13:23-25 (emphasis added). By Woods's own account, neither her supervisor nor anyone at MHMHP instructed her

---

[1] The Fifth Circuit has acknowledged, in the context of the second *McArn* exception, that it applies only when the employee reports the *employer's* illegal act. *Senter v. Cingular Wireless, LLC*, 228 F. App'x 505, 506 (5th Cir. 2007) ("The *McArn* exception applies only when employees report the illegal acts of the *employer*. Because [discharged employee] does not allege that she was discharged for reporting the illegal acts of her employer, her claim fails.").

to do something illegal. Count I therefore fails because the alleged request to commit a criminal act did not originate from MHMHP.

### 2. *Woods Was Not Asked, nor Did She Refuse, to Commit a Crime*

Count I also fails because Woods was never asked or directed to commit a crime. Nor did she refuse any instruction to commit a crime.

"The *McArn* exceptions only apply where the activity complained of is actually illegal[.]" *Obene v. Jackson State Univ.*, 233 So. 3d 872, 876 (Miss. App. 2017). An employee is not protected "under *McArn* simply because he reasonably believed what he was asked to do by his superiors was criminal." *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 404 (5th Cir. 2005). "[T]he act itself must be criminal to implicate the exception[,] rendering the subjective intent or belief of the plaintiff irrelevant." *Id.*

The amended complaint cites one state and one federal statute for the proposition that the action Woods purportedly refused to take was criminal: Miss. Code Ann. § 47-1-27 and 18 U.S.C. § 242.

The first, Miss. Code Ann. § 47-1-27, can be easily rejected. Chapter One of Title 47 of the Mississippi Code is entitled "County and Municipal Prisons and Prisoners." It prohibits "an official, or guard, or other employee, having the custody of any *county prisoner*, or any official or employee of the county having custody of any *county prisoner*" from mistreating or abusing "such convict." MISS. CODE ANN. § 47-1-27 (emphasis added). Its criminal exposure is consequently circumscribed to officials and employees having custody of "county prisoners." *See Jones v. Diamond*, 594 F.2d 997, 1008 (5th Cir. 1979) (describing the impetus of the statutory scheme that places "additional duties on the shoulders of local officials"). MCCF houses state—not county—offenders. Exhibit D, B. McMullen Dep. at 6:20-21. Because Woods

did not have custody of any *county* prisoner, she could not violate § 47-1-27.

Nor was Woods asked to violate 18 U.S.C. § 242. Section 242 "prohibits an individual acting under color of law from willfully depriving any person of rights protected by the Constitution or laws of the United States." *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004). To convict someone of violating § 242, the United States must prove that the person "(1) willfully; (2) deprived another of a federal right; (3) under color of law." *United States v. Moore*, 708 F.3d 639, 645 (5th Cir. 2013). "[A]n element of any § 242 offense is deprivation of a federal right." *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003). As the Supreme Court has stated, § 242 "incorporate[s] constitutional law by reference . . . ." *United States v. Lanier*, 520 U.S. 259, 265 (1997).

Woods alleges that she refused to violate the Eighth Amendment. *See* [Dkt. 108 at ¶ 27]. But she concedes that MHMHP never asked her to commit an illegal act. And the undisputed evidence establishes that neither the State of Mississippi nor MDOC asked her to commit an illegal act.

> To establish an Eighth Amendment deprivation, a prisoner must satisfy two elements:
>
> First, he must demonstrate that the alleged deprivation was objectively serious, exposing him to a substantial risk of serious harm and resulting in the denial of the minimal civilized measure of life's necessities. Second, an inmate must prove that the official possessed a subjectively culpable state of mind in that he exhibited deliberate indifference to serious medical needs.
>
> Deliberate indifference is an extremely high standard to meet. A prison official displays deliberate indifference only if he (1) knows that inmates face a substantial risk of serious bodily harm and (2) disregards that risk by failing to take reasonable measures to abate it. Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. Rather, an inmate must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.

14

*Arenas v. Calhoun*, 922 F.3d 616, 620-21 (5th Cir. 2019) (citations and internal quotation marks omitted). The Fifth Circuit has held that "in order to maintain a viable claim for delayed medical treatment there must have been deliberate indifference, *which results in harm*." *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) (emphasis added).[2]

At no point did anyone demand that Woods be deliberately indifferent to the prisoners' medical needs by refusing to treat them, ignoring their complaints, treating them incorrectly, or evincing a wanton disregard for their serious medical needs. *See Arenas*, 922 F.3d at 621. Woods conceded that "nobody told [her] to do anything illegal as related to" the inmate whose ear was wounded. Exhibit G, Woods Dep. at 149:10-11.

Woods cites the examples of several inmates' medical care for the proposition that she refused to be willfully indifferent to their serious medical needs. [Dkt. 108 at ¶¶ 21(a), 21(b)]. With respect to the two inmates mentioned in the amended complaint, Woods concedes that she was not even present at MCCF when the prisoners were brought to the medical clinic. *See* Exhibit G, Woods Dep. at 143:3-10 (testifying she was called and told what happened about the inmate whose ear was wounded); *id.* at 132:19-20 (testifying she had already left the facility when the prisoner alleged that he had been sexually assaulted). She also did not testify that anyone demanded she deny all medical care to the prisoners. In all instances, the prisoners had access to on-site medical services where medical personnel were present.

It is undisputed that the inmates referenced "ultimately received . . . the medical care that they needed." Exhibit G, Woods Dep. 222:8-9; *see also id.* at 100:12-15 (testifying that the inmate "ultimately got taken to the emergency room"); *id.* at 138:12-17 (testifying that another

---

[2] "A delay in medical treatment is not actionable unless the defendants were deliberately indifferent to a serious medical need and their indifference resulted in substantial harm." *Uzomba v. Univ. Health Sys.*, 558 F. App'x 474, 474 (5th Cir. 2014) (citing *Mendoza*, 989 F.2d at 195).

inmate "ultimately . . . was taken" from the ER to a plastic surgery consult). Woods instead disagreed with the timeframe during which the prisoners were transported. *See* Exhibit G, Woods Dep. at 221:23-222:9; *id.* at 154:21-23 (testifying that with other inmates "it was more of a concern with the timeliness of getting them [to the medical clinic]"). "In cases which arise from allegations of delayed medical attention rather than a clear denial of medical treatment, a [prisoner] must demonstrate that he suffered substantial harm from the delay in order to state a claim under the Eighth Amendment." *Olivas v. Corr. Corp. of Am.*, 408 F. Supp. 2d 251, 258 (N.D. Tex. 2006) (citing *Mendoza*, 989 F.2d at 193)). There is no evidence that any prisoners suffered substantial harm from the delays. Woods's disagreement with the timing does not give rise to an Eighth Amendment violation.

Simply put, no reasonable jury could conclude that Woods was asked to be deliberately indifferent to the medical needs of the inmates she served. Woods cannot point to any evidence that she was asked to violate their Eighth Amendment rights. And as a result, she cannot show that she was asked to commit a crime. This Court should therefore dismiss Woods's wrongful termination claim.

Perhaps acknowledging the reality that no one asked her to commit a crime, Woods claims that her termination is actionable because she refused to violate the "public policy of the State of Mississippi and of the United States of attending to the serious medical needs of prisoners." [Dkt. 108 at ¶ 27]. The fired-for-refusing-to-violate-public-policy theory lacks basis in law.

The Mississippi Supreme Court has recently held that its "expression of the at-will doctrine recognizes creating exceptions is a legislative task." *S. Farm Bureau Life Ins. Co. v. Thomas*, 299 So. 3d 752, ___ (Miss. 2020). Aside from the two *McArn* exceptions, Mississippi

courts "have deferred to the legislative process to create exceptions to the at-will doctrine." *Id.* Woods fails to cite any statute prohibiting employers for terminating employees based on the employees' alleged refusal to attend to state prisoners' medical needs. The Court should reject Woods's theory because case law forecloses its recognition.[3]

And it should also reject this theory due to the grave consequences adopting it would portend. Accepting Woods's theory would drastically expand the narrow exceptions *McArn* created and expose Mississippi employers to liability based on an amorphous and undefined "public policy" that Woods does not even completely describe or define.

### 3. *The Wrongful Termination Claim Fails for Lack of Causation*

Third and finally, the Court should dismiss Woods's wrongful termination claim because the undisputed evidence demonstrates her employment concluded solely because she lacked security clearance to enter MCCF and do her job.

In order to wrench a wrongful termination claim from these facts, Woods must establish a causal connection between the alleged refusal to engage in an illegal act and the resulting termination. *See Crawford v. Bannum Place*, 556 F. App'x 279, 285 (5th Cir. 2014) (noting plaintiff "did not sufficiently establish a causal nexus 'between the reporting of the alleged misconduct and the decision process resulting in the discharge.'" (quoting *Dismuke v. City of Indianola*, No. 01-60475, 2002 U.S. App. LEXIS 29643, at *15 (5th Cir. 2002))). In other words, she must present evidence that she was terminated *because* she refused to engage in an illegal activity or because of a legally impermissible reason. *See Hust v. Forrest Gen. Hosp.*, 762 So. 2d 298, 301 (Miss. 2000) (stating *McArn* "allows an employee at-will to sue for wrongful discharge where the employee is terminated *because* of (1) refusal to participate in illegal activity")

---

[3] To the extent Woods seeks to rely on *Swindol* or *Simmons*, she must identify a statutory prohibition. *See Hicks*, 2020 U.S. Dist. LEXIS 191572, at *23.

(emphasis added); *cf. Nicholson v. Rotech Healthcare, Inc.*, No. 1:06cv15, 2007 U.S. Dist. LEXIS 40496, 2007 WL 1657412, at *2, 4 (N.D. Miss. June 4, 2007) (granting summary judgment where the plaintiff merely showed that she refused the request of a co-employee, who lacked any managerial authority, to violate Medicare regulations).

This requirement makes good sense because in order for a termination to be wrongful, it must be done "for one of the public-policy reasons detailed in *McArn* . . . [or] for reasons 'independently declared legally impermissible.'" *Swindol*, 194 So. 3d at 852. If an employer discharges an employee for another reason—a good reason, bad reason, or no reason at all—then the employment termination is not wrongful and therefore not actionable.

In cases like this, where the terminated employee acknowledges that her employer did not direct her to commit a crime, and indeed if the employer never becomes aware of the alleged request to commit a crime, the employer should not be held responsible for discharging an employee *because* the employee refused to commit a crime. *See Schuh v. Town of Plantersville*, No. 1:13CV101-SA-DAS, 2014 U.S. Dist. LEXIS 117174, at *31-32 (N.D. Miss. Aug. 22, 2014) ("There is no evidence that the Board of Aldermen, the undisputed decision-making body of the Town of Plantersville, requested that Schuh participate in illegal acts or had knowledge of the alleged request for criminal conduct. … Accordingly, Plaintiff has failed to put forth evidence of a causal connection between his alleged refusal to commit a purported criminal activity and his termination."). This is precisely the case here. There is no evidence that Woods's supervisor, Ramsue, or Meggs knew that Woods was asked or that she refused to commit a purported criminal action with respect to these inmates Woods cites.

The undisputed evidence reveals that Woods's termination resulted from an entirely appropriate and lawful reason: she lost her security clearance. *See* Exhibit Q, K. Huff Sworn Statement at ¶ 13; Exhibit N, A. Meggs Sworn Statement at ¶ 9.[4]

Woods's wrongful termination claim is without merit, and the Court should dismiss it.

### B.  The First Amendment Claim Fails as a Matter of Law

Somewhat contradictorily, Woods also claims her termination resulted from the perceived exercise of her First Amendment rights. In Woods's novel and legally dubious First Amendment claim, she contends that MHMHP violated her rights under the First Amendment by terminating her "employment because [it believed] she had talked to a state legislator concerning lack of staffing sufficient to provide adequate medical care for prisoners." [Dkt. 108 at ¶ 38].

MHMHP is a private company. "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). Section 1983 provides a cause of action against any person who, "under color of" state law, deprives another of her "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was *committed by a person acting under color of state law*." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added; citation omitted).

"'[M]ere[] private conduct, no matter how discriminatory or wrongful', is excluded from § 1983's reach." *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (quoting *Richard v. Hoechst Celanese Chem. Group, Inc.*, 355 F.3d 345, 352 (5th Cir. 2003), *cert. denied* 543 U.S. 917 (2004)).  For a private actor's conduct to be actionable by acting under

---

[4] Warden Williams testified that he did not revoke her security clearance because she allegedly refused to do some illegal act. *See* Exhibit E, Warden Williams Dep. at 121:14-18.

color of state law, the "alleged infringement of federal rights [must be] fairly attributable to the State[.]" *Cornish*, 402 F.3d at 549 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). "Deciding whether a deprivation of a protected right is fairly attributable to the State begins by identifying the specific conduct of which the plaintiff complains." *Id.* at 550. Here, that conduct is taking an adverse employment action.

"When considering whether a private entit[y's] conduct can be fairly attributable to the State, the Supreme Court utilizes a number of tests." *Hall v. Smith*, 497 F. App'x 366, 375 (5th Cir. 2012) (citing *Cornish*, 402 F.3d at 549 (describing the public function test, state compulsion or coercion test, the nexus test, and joint action test)).[5]

To prevail on a First Amendment retaliation claim, Woods must show that (1) she suffered an adverse employment decision; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the defendant's interest in promoting efficiency; and (4) her speech motivated the adverse employment decision. *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001).

Woods's third amended complaint appears to invoke multiple tests. First, it alleges that MHMHP acted under color of state law since it was "carrying out an exclusive[] state function." [Dkt. 108 at ¶ 40]. Second, she suggests MHMHP acted under color of state law because it acted according to an agreement with a state actor to terminate Woods's employment. [Dkt. 108 at ¶ 40]. In other words, according to Woods, MHMHP acted "jointly with an agent of the MDOC[.]" [Dkt. 108 at ¶ 39]. Finally, she alleges that MHMHP's decision to terminate Woods's

---

[5] Some courts have categorized this as three tests; others describe it as four. *Compare Doe v. United States*, 831 F.3d 309, 314 (5th Cir. 2016) (using four tests) *with Doe v. Steward Health Care Sys. LLC*, No. 4:18-CV-00394, 2018 U.S. Dist. LEXIS 152247, at *14-15 (S.D. Tex. July 31, 2018) ("The Fifth Circuit recognizes three avenues by which private conduct may be fairly attributed to the state . . . .").

employment resulted from "an informal rule or direction of a state employee of the MDOC which did not allow employees, such as Dr. Woods, to talk with a state representative on matters of public concern." [Dkt. 108 at ¶ 40].

Woods's termination is not attributable to the state under any theory.

### 1. *Whether Woods Shared Information With Rep. Kinkade is Not Material*

Woods has testified that she did not share information concerning the inner workings of MCCF with Rep. Kinkade. *See* Exhibit G, Wood Dep. at 16:8-11; *id.* at 67:6-12. But whether Woods did or did not share internal information with Rep. Kinkade is immaterial to the resolution of her First Amendment claim. The Supreme Court has held that government action designed to punish a government employee for engaging in political speech, even if the employee did not, in fact, speak, is actionable under the First Amendment. *See Heffernan v. City of Paterso*n, 578 U.S. ___, ___, 136 S. Ct. 1412, 1418 (2016). Specifically, the *Heffernan* Court held that, with respect to a First Amendment retaliation claim, the "reason for [taking adverse action against the employee] is what counts here." *Id.* And when an employer acts "out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. §1983—even if . . . the employer makes a factual mistake about the employee's behavior." *Id.*

So too, here. While Woods may dispute whether she spoke to Rep. Kinkade about MCCF, that does not alter the reason for the alleged adverse action. Nor does it affect the outcome of Woods's First Amendment claim. Therefore, this fact is not material and does not preclude the grant of summary judgment. *See Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) ("Material facts are facts that might affect the outcome of the suit under the governing law."); *id.*

21

n.7 (observing that factual disputes that are not "material or necessary to the case . . . [do] not preclude summary judgment").[6]

### 2. *Woods's Termination is Not Fairly Attributable to Mississippi*

Woods's attempt to attribute her termination to Mississippi under any test proves unsuccessful.

#### a. Employing and Terminating Woods Is Not a Public Function

Woods's first theory—that MHMHP acted under color of state law since it carried out an exclusive state function—falls flat right out of the gate.

"According to the public function test, a private entity acts under color of state law when the entity performs a function which is 'exclusively reserved to the state.'" *Richard v. Hoechst Celanese Chem. Grp., Inc.*, 355 F.3d 345, 352 (5th Cir. 2003) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157-58 (1978)). "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros., Inc.*, 436 U.S. at 158.

That MHMHP provided medical services to prisoners does not render MHMHP's personnel decision state action. MHMHP's role as Woods's employer is not an exclusive state function. *See, e.g.*, *Jones v. City of Faith Prison Ministries*, No. 05-1675, 2006 U.S. Dist. LEXIS 105311, at *6 (W.D. La. Mar. 6, 2006) (noting the role of an employer is "a traditionally non-exclusive state function"); *Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1375 (S.D. Fla. 2002) (holding that personnel actions "do not satisfy the public function test for state action").

---

[6] *See Anderson*, 477 U.S. at 248 (stating a dispute is only material if it "might affect the outcome of the suit").

b.  Terminating Woods's Employment was Not Joint Action

Woods's second theory of state action—joint state action—similarly fails. Under this test, private actors are "considered state actors where they are 'willful participants in joint action with the State or its agents.'" *Cornish*, 402 F.3d at 550 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). In other words, the facts must reveal "an agreement or meeting of the minds between the state actor and the private actor to engage in a conspiracy to deprive the plaintiff of a constitutional right, and that the private actor was a willing participant in joint activity with the state or its agents." *Polacek v. Kemper Cty.*, 739 F. Supp. 2d 948, 952 (S.D. Miss. 2010). "This test generally requires a showing of a conspiracy between the private party and the state official." *Caleb v. Grier*, 598 F. App'x 227, 235 (5th Cir. 2015).

There is simply no evidence of a conspiracy, much less an explicit agreement, with a state official to terminate Woods's employment. Although Woods alleges that "MTC, Warden Williams, and MHMHP have agreed with a state actor, an agent of the MDOC, to cause [her] loss of employment," [Dkt. 108 at ¶ 39], the facts reveal no state actor exercised any input in MHMHP's decision to terminate Woods's employment. On the contrary, former MDOC Deputy Commissioner of Institutions Jerry Williams testified that he did not give any advice to Meggs about the medical personnel's employment status. Exhibit R, Deposition of Jerry Williams ("J. Williams Dep.") at 51:3-9.[7] He did not have any input into this person's termination. *Id.* at 51:13-18. Instead, because MHMHP was a contract company, he explained that it "hire[s] and fire[s]" employees without MDOC's intervention. *Id.* at 51:16-17.

This accords with MHMHP's understanding. Meggs testified that it is MHMHP's policy

---

[7] Jerry Williams was so unfamiliar with Woods that he could not recall, specifically, which MHMHP employee about whom he spoke to Meggs. Exhibit R, J. Williams Dep. 50:15-20. Rather, he testified that he had a conversation with Meggs about an "individual from medical." J. Williams Dep. 50:17.

to end an employee's employment once her security clearance is revoked. *See* Exhibit S, Deposition of April Meggs ("A. Meggs Dep.") at 33:9-12; *see also id.* at 34:1-3 (testifying that MHMHP's handbook and offer letter notes that employees must maintain security clearance). Meggs made the decision—without input from any state official—to terminate Woods's employment. And Woods cannot muster any evidence to support the allegation that MHMHP acted jointly with the MDOC to terminate Woods's employment. In fact, the evidence directly contradicts this assertion.

c. <u>The Termination Does Not Satisfy the State Compulsion Test</u>

Finally, the state compulsion test offers Woods no place to hide. Under the "state compulsion test," a private actor's conduct is attributable to the state when it exerts coercive power over the private entity or provides significant encouragement. *See Cornish*, 402 F.3d at 549. "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

The record demonstrates that Mississippi neither exercised coercive power nor provided any encouragement to terminate Woods's employment. Indeed, Jerry Williams averred that, because MHMHP was a contractor, it "hire[s] and fire[s]" employees without MDOC's intervention. Exhibit R, J. Williams Dep. at 51:16-17. Jerry Williams testified that he, as the Deputy Commissioner of Institutions, did not possess the "authority to fire, you know, the nurse or the doctor, especially like if they're contract employees. That falls on the contractor that the agency contracted with, so I don't have that authority." Exhibit R, J. Williams Dep. at 24:23-25:3; *see id.* at 51:16-18 (testifying that the contractors "hire and fire"). Jerry Williams did not

24

recommend that MHMHP terminate Woods. *See id.* at 25:5.

Neither do the regulations governing MDOC employees' and MDOC contractors' conduct render Woods's termination attributable to Mississippi. Woods alleges that "the decision for Woods to lose her employment was based upon an informal rule or direction of a state employee of the MDOC which did not allow employees, such as Dr. Woods, to talk with a state representative on matters of public concern." [Dkt. 108 at ¶ 40].

Not so. That MDOC promulgated rules applicable to contractors does not render her termination state action. Courts—including the Ninth Circuit—have rejected similar arguments.

MDOC policy prohibits employees and "contractors" from disseminating "[i]nformation pertaining to offenders and obtained under the color of office . . . ." Exhibit T, Mississippi Department of Corrections Policy on General Standards of Professional Conduct Policy Number 03-01. The fact that MDOC policy applies to contractors does not render the termination attributable to the state. "The imposition of state regulation does not necessarily turn the actions of a private entity into those of the state." *Barnes v. Lehman*, 861 F.2d 1383, 1385 (5th Cir. 1988). Even where a state possesses the right to ultimately dismiss a contract employee, the employee's termination is not state action. *George v. Pac.-CSC Work Furlough*, 91 F.3d 1227, 1231 (9th Cir. 1996) (holding that termination was not state action even though the state "retain[ed] the right to dismiss" the employee, because the state had "neither legally regulated nor contractually specified the manner in which [the private actor] disciplines or terminates its own employees"). MDOC policy did not direct MHMHP to discharge Woods. The undisputed evidence establishes that MDOC was not involved in the termination.. For these reasons, the termination fails to satisfy the state compulsion test.

### C. The Civil Conspiracy Claim Should Be Dismissed

Woods's mere conjecture and supposition are insufficient to sustain her unfounded civil conspiracy claim. Woods's belief that Day and Warden Williams disliked her does not satisfy the burden necessary to prevail on a civil conspiracy claim. *See* Exhibit G**,** Woods Dep. at 116:12-13. After months of discovery, there is no evidence to support Woods's speculative belief regarding Day's and Warden Williams's opinion of her. And there is certainly no evidence of any conspiracy to terminate her employment.

The elements of a civil conspiracy claim are "(1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damage to the plaintiff as a proximate result." *Rex Distrib. Co. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quoting *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013)). "[T]here must be a 'meeting of the minds on the object or course of action.' Additionally, the alleged conspirators 'must be aware of the fraud or wrongful conduct at the beginning of the agreement.'" *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 495 (5th Cir. 2019) (first quoting *S. Health Corp. of Hous. v. Crausby*, 174 So. 3d 916, 920 (Miss. Ct. App. 2015) (internal quotation marks and citation omitted) then quoting *Bradley*, 117 So. 3d at 339)). "[I]t is the duty of the court to withdraw the case from the jury if the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 981 (Miss. 2004) (citation omitted).

This Court should grant summary judgment on the civil conspiracy claim because Woods lacks any evidence that MTC, Warden Williams, or anyone associated with MHMHP conspired or reached any agreement to terminate Woods's employment. Even assuming the three

defendants agreed to terminate Woods's employment—which they did not—the civil conspiracy claim nonetheless fails because her termination was neither unlawful nor accomplished unlawfully.

The evidence instead reveals that Day informed Warden Williams about Woods's conversation with the state representative, and Warden Williams acted independently to revoke Woods's security clearance. Exhibit E, Warden Williams Dep. at 105:5-7. Day testified that he expected his email to Warden Williams regarding his interaction with Woods would provoke "a conversation between [him], the warden, Dr. Woods, and [his] supervisor . . . ." Exhibit I, T. Day Dep. at 24:20-21. Day also testified that Warden Williams's action was "a knee-jerk reaction"— not part of a concocted scheme. *Id.* at 25:19. Meggs then acted independently of both Warden Williams and MTC in terminating Woods's employment. Far from any conspiracy or agreement, Woods's employment ended solely because she lost her security clearance. Exhibit N, A. Meggs Sworn Statement at ¶ 9. Accordingly, the civil conspiracy claim fails as a matter of law.

### V. <u>CONCLUSION</u>

Each claim against MHMHP can and should be dismissed via summary judgment. Woods's wrongful termination does not fall within the extremely narrow category of terminations actionable under Mississippi law. Nor can MHMHP—a private company—be held liable for retaliating against Woods due to perceived communications with a state legislator. MHMHP's decision to terminate her employment is not fairly attributable to the state. And Woods's specious First Amendment claim should be dismissed. Finally, because Woods's termination was lawful, and because none of the individuals involved in her termination conspired to have her terminated, the civil conspiracy claim fails as a matter of law.

Dated: October 26, 2020

/s/ Elizabeth R. Hadley
Elizabeth Hadley
MS Bar No.:  99662
hadleye@gtlaw.com
**GREENBERG TRAURIG LLP**
300 West 6th Street
Suite 2050
Austin, TX 78701
(512) 320-7227 *Telephone*
(512) 233-5265 *Facsimile*

David Long-Daniels*
Georgia Bar No. 141916
Long-DanielsD@gtlaw.com
Jacob R. Dean*
Georgia Bar No. 180545
deanj@gtlaw.com
**GREENBERG TRAURIG, LLP**
Terminus 200, Suite 2500
3333 Piedmont Road, N.E.
Atlanta, Georgia 30305
(678) 553-2100 *Telephone*
(678) 553-2212 *Facsimile*

* *admitted pro hac vice*
*Attorneys for MHM Health Professionals, LLC*

*ACTIVE 52806378v15*

28