# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION


DR. AMY R. WOODS                                              PLAINTIFF

VS                      CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9                                             DEFENDANTS

---

ZOOM DEPOSITION OF JESSE WILLIAMS

---


Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On August 3, 2020

At 12:31 p.m.



REPORTED BY:  SHARRON F. ALLEN, CSR, RPR
              CSR NO. 1144

```
 1                    JESSE WILLIAMS,
 2   having first been duly sworn, was examined and
 3   testified as follows:
 4                     EXAMINATION
 5   BY MR. WAIDE:
 6        Q.   Sir, would you state your name, please.
 7        A.   Jesse Williams.
 8        Q.   What city do you live in, Mr. Williams?
 9        A.   Memphis, Tennessee.
10        Q.   Have you ever lived in Mississippi?
11        A.   No, sir.
12        Q.   Where do you consider your home to be?
13        A.   Florida.
14        Q.   Is that where you were born?
15        A.   No, sir.
16        Q.   What state were you born in?
17        A.   Ohio.
18        Q.   Where are you employed?
19        A.   MTC.
20        Q.   When did you start doing corrections
21   work?  What year?
22        A.   Let's see.  1989.
23        Q.   Other than corrections work, have you
24   ever had any law enforcement experience?
25        A.   Just corrections.
```

1   you information, what information did
2   Mr. Williams furnish to you?  What did
3   Mr. Williams tell you that she had done wrong?
4       A.   We had dialogue about information
5   pertaining to the operation of the Marshall
6   County Correctional Facility being given to
7   individuals outside of the facility, if you
8   will, and had an understanding that that
9   information was being given to those individuals
10  from individuals in the medical department from
11  Centurion.
12      Q.   Here's my question:  What is it that
13  Mr. Williams told you -- I don't need, you know,
14  "We had discussions," but just tell me what
15  Mr. Williams told you that had been done wrong.
16  What did he tell you that Dr. Woods has done
17  that's wrong?
18      A.   He stated to me that information
19  pertaining to, again, institutional operations
20  in terms of security numbers, various things
21  within the institution that is, again, in line
22  with prison operations, was being shared with
23  individuals outside of our facility.
24      Q.   When did Mr. Williams tell you that?
25      A.   The exact date I do not remember.

1  in the manner in which it did.
2       Q.   Well, what manner do you think it ought
3  to go outside the facility?
4       A.   It's a way, the chain of command that
5  should have been followed in my mind.
6       Q.   All right.  Had you not in the past had
7  any conversations with Dr. Woods about y'all's
8  shortage of security and not being able to get
9  prisoners over to see her?  Had you not had
10 problems with her about that?
11           MR. LONG-DANIELS:  Objection to form.
12 BY MR. WAIDE:
13      Q.   Let me start that over.  Had Dr. Woods
14 not told you that she was concerned about not
15 getting the prisoners over to see her for
16 medical care?  Had she not told you that?
17      A.   She's voiced that opinion before, yes.
18      Q.   So that's what you had a problem with.
19      A.   No, sir, not at all.
20      Q.   Well, is that not the same thing she
21 told the state -- that you believe she told the
22 state legislator?
23      A.   That's part of some of the things that
24 I believe she said to the state legislator.
25      Q.   But you don't have a problem with her

1  telling the state legislator, then, about the
2  fact that y'all had inadequate security up there
3  and, as a result, y'all weren't getting
4  prisoners over for medical attention.  You
5  didn't have a problem with that?
6      A.   I have a problem with that type of
7  vernacular of prison operations being discussed
8  outside the facility.
9      Q.   In other words, you don't think the
10 state legislator should be able to learn that a
11 doctor up there who's providing medical
12 treatment for prisoners is concerned about the
13 lack of security so that she could get the
14 prisoners over to see her?  You don't think she
15 should be able to tell the legislator about
16 that?
17              MR. PEEPLES:  Object to the form.
18              MR. LONG-DANIELS:  Form.
19              MR. PEEPLES:  You can answer.
20     A.   I have -- again, I have no problem with
21 the legislator learning and knowing any of that.
22 Again, my problem comes down to how the
23 information was given because it's a -- it's
24 problematic as you deal with prison operations.
25

```
 1    BY MR. WAIDE:
 2         Q.   I need to know specifically what you're
 3    talking about.  How should she have told the
 4    legislator about it?
 5         A.   She has a chain of command she could
 6    have followed through the company which she
 7    works with.
 8         Q.   All right.  So in answer to the
 9    question, she should not have directly talked to
10    the legislator?
11         A.   Your question was how should she have
12    done it.  My answer is she should have gone
13    through her chain of command.
14         Q.   Well, the legislator was not in her
15    chain of command.  Correct?
16         A.   Not to my knowledge, she is not.
17         Q.   Therefore, she should not have talked
18    to a member of the legislature.
19         A.   That's her choice.  I'm just telling
20    you how I feel and the way I viewed it.
21         Q.   And that's the reason you took her
22    security clearance away.  Correct?
23         A.   The security -- the authorization for
24    entrance was pulled because of prison operations
25    and information being given to folks outside of
```

1    the facility.
2        Q.   Who did she give it to other than the
3    legislator in your opinion?
4        A.   That's all the information that I have.
5        Q.   All right.  So, then, it's your opinion
6    that she should not have talked to the
7    legislator.
8        A.   No, sir --
9            MR. LONG-DANIELS:  Objection to form.
10       A.   -- that's not what I'm saying.
11   BY MR. WAIDE:
12       Q.   Sir?
13       A.   No, sir, that's not what --
14       Q.   Your counsel was saying something.  I
15   didn't hear what your counsel said.
16            MR. PEEPLES:  I didn't say anything.
17         David objected to the form of your
18         question.  I didn't say anything.  He
19         looked at me to ask if he could answer.  I
20         told him to go ahead.
21       A.   No, sir.  My problem is just, again,
22   prison operation information being distributed
23   outside of the institution.
24   BY MR. WAIDE:
25       Q.   Well, specifically, all you've told us

1     It was your decision to revoke
2  Ms. Woods' access to the security compound.
3  Correct?
4     A.  Yes, sir.
5     Q.  And that was your decision and yours
6  alone.  Correct?
7     A.  It was, indeed, my decision; and I did
8  confer through my chain of command with my
9  regional vice president, and I also had --
10    Q.  Go ahead.  I'm sorry.
11    A.  I'm sorry.  I also had dialogue with
12 Centurion folks, being Travis Day and April
13 Meggs, before making the final decision.  And,
14 again, not to say is it okay with them, to
15 inform them of the direction in which I was
16 going.
17    Q.  In other words, you decided, and then
18 you told them.  Correct?
19         MR. WAIDE:  Object to the form as
20    leading.
21         MR. LONG-DANIELS:  I'm allowed to
22    lead.  He's not my witness.
23 BY MR. LONG-DANIELS:
24    Q.  Warden, you made the decision, and you
25 told them of your decision.  Correct?

```
 1        Q.   Your job is not just violence, though,
 2   of inmates; it's violence, security of your
 3   officers and the public.  Right?
 4        A.   Very much so, sir.
 5        Q.   You guys have pretty violent people in
 6   your prison?
 7        A.   Yes, sir.
 8             MR. WAIDE:  Object to the form.  It's
 9        leading.
10   BY MR. LONG-DANIELS:
11        Q.   Tell us the most violent level of
12   prisoner that you have there.
13        A.   Well, I have zero inmate at my facility
14   that are there for jaywalking.  I can assure you
15   of such.  Some of the most violent inmates that
16   I have are what we call "long-term segregation
17   offenders" or maximum security offenders.  Some
18   of these offenders are housed in Mississippi
19   Department of Corrections at Marshall for
20   violent crimes -- murder, rape, ag murder,
21   burglary -- but they are classified as long-term
22   segregation offenders because, while they've
23   been incarcerated, they've seriously assaulted
24   staff or other offenders.  That has raised their
25   security level from medium or close to long-term
```

1     A.   That's correct, sir.

2     Q.   Was that Inmate Kelly that you were
3 referring to earlier --

4     A.   Yes, sir.

5     Q.   -- that you were doing the
6 investigation on?

7     A.   Yes, sir. I asked Dr. Woods questions;
8 I asked my investigator questions. I looked at
9 video. During the use of force segment of what
10 we do, every staff member that was involved with
11 the use of force would be interviewed and have
12 to give a written document of their accounts of
13 what happened as well.

14     Q.   And if it's true, that the inmate had
15 choked your security person to the point that
16 she was unconscious --

17     A.   Yes, sir.

18     Q.   -- and then tried to rape her?

19     A.   Yes, sir.

20     Q.   You have dangerous people in your
21 facility. No dispute about that?

22     A.   Yeah, I have some -- I have some guys
23 that are very dangerous.

24     Q.   Now let's go to Exhibit 11 and talk
25 about that exhibit for a moment. If you will

1  decision to revoke the access on your own using
2  what God has given you between your ears?
3      A.   That would be correct, sir.
4      Q.   Nobody from Centurion told you to
5  revoke her access, did they?
6      A.   No, sir, they did not.
7      Q.   In fact, the folks from Centurion sort
8  of asked you to reconsider if you'll do it.
9  Right?
10     A.   I do not remember that conversation
11 with Centurion in terms of reconsidering
12 bringing her -- or revoking the authorization
13 for entrance.
14     Q.   Clearly, you didn't revoke her security
15 clearance because she refused to do something
16 illegal with respect to the patient's health?
17     A.   No.  Her authorization was not pulled
18 for that at all.
19     Q.   It did not have a thing to do with any
20 reservation on her providing care to patients,
21 did it?
22     A.   That would be correct, sir.
23     Q.   This all stemmed from her not following
24 the chain of command as you articulated to
25 Mr. Waide?

```
1       A.   Yes, sir.  Just our prison operations
2  being violated by her to outside sources.
3       Q.   And you say "prison operations," but
4  what you're really saying in everyday layman
5  terms is you don't want somebody telling --
6  anybody in the prison telling folks outside
7  what's going on with inmates because that could
8  affect security.  Right?
9            MR. WAIDE:  Object to the form as
10      leading.
11      A.   Yes, sir.
12 BY MR. LONG-DANIELS:
13      Q.   I don't care if his name is state
14 representative or state senator or the governor,
15 if you start telling folks about what's going on
16 in the prison, it could impact the security of
17 everybody.  Right?
18      A.   Very much so.
19           MR. LONG-DANIELS:  That's all the --
20      that's all the questions I've got for you.
21      Thank you so much for participating.
22           THE WITNESS:  Yes, sir.
23           MR. WAIDE:  I have some -- I have
24      some follow-up questions unless counsel --
25      Tim, do you have any questions?
```