# Exhibit G

1        UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2              OXFORD DIVISION

3

4

5  DR. AMY R. WOODS                        PLAINTIFF

6

7  v.          CIVIL ACTION NO.: 3:19-00234-NBB-RP

8

9  MHM HEALTH PROFESSIONALS, LLC
   D/B/A CENTURION PROFESSIONALS,
10 MANAGEMENT & TRAINING CORPORATION,
   JESSE WILLIAMS, INDIVIDUALLY,
11 AND JOHN DOES 1-9,                      DEFENDANTS

12

13

14

15      VIDEOTAPED DEPOSITION OF DR. AMY WOODS

16

17

18

19  Taken at the instance of the Defendant at Waide &
     Associates, P.A., 332 N. Spring Street, Tupelo,
20 Mississippi on Monday, June 22, 2020, beginning at
                 10:11 a.m.

21

22

23

24      LORI W. BUSICK, CVR-S, CCR #1677

25 Job #31830

1    Clinic.

2         Q.    Where is Sterling Medical?

3         A.    Sterling is a company that's based in

4    Ohio, I believe.  But they service multiple VA

5    contract facilities, outpatient contract facilities.

6    I've never been to their headquarters.

7         Q.    Do you have an address for them?

8         A.    I do.

9         Q.    What's the address?

10        A.    It's in the information that I submitted.

11   I don't know the address off the top of my head.

12             MR. LONG-DANIELS:  Do you have that

13   particular information?

14             MRS. WAIDE:  Not with me right now, but I

15   can get it to you.

16             MR. LONG-DANIELS:  Okay.

17        Q.    (By Mr. Long-Daniels) And where are they

18   located generally?  In Ohio you say?

19        A.    I believe it's Cincinnati.

20        Q.    Cincinnati, Ohio.

21             And how much do you make as a physician?

22        A.    My annual salary from Sterling is $240,000

23   a year.

24        Q.    Okay.  Anything else compensation-wise

25   that you get?

 1   Mississippi, which is operated by MHM I presume was

 2   the statewide medical director.

 3          Q.    So he was your direct supervisor?

 4          A.    Correct.

 5          Q.    Dr. Ramsue a good guy?

 6          A.    Generally good guy as far as I -- my

 7   interaction with him.

 8          Q.    He never told you to do anything illegal,

 9   did he?

10          A.    Dr. Ramsue?  He didn't tell me specific

11   instructions of anything to do that were legal.

12          Q.    Yes, ma'am.  I'm just asking just a plain

13   ole simple question.  Did Dr. Ramsue ever tell you

14   to do something illegal?

15          A.    No.

16          Q.    As far as you know as you sit here today

17   on your oath, no one else at MHM asked you to do

18   anything illegal?

19          A.    Well, there were implied pressures.

20          Q.    All right.  First --

21          A.    From Centurion.

22          Q.    First, I want to deal with what they said.

23                Did anyone from MHM tell you specifically

24   to do anything illegal?

25          A.    No.

1  believe of 2019.  And the incident where I was fired

2  occurred in June 25th.  So less than a month.

3      Q.   Less than a month.

4          And you did tell Mr. Day that you had

5  talked to a state representative about the prison,

6  didn't you?

7      A.   I did not tell him that.

8      Q.   Now on your oath, did you ever talk with

9  the state representative about what was going on at

10  the prison?

11     A.   I did not.

12     Q.   Did someone do it on your behalf?

13     A.   Someone did it on their own behalf not on

14  my behalf.

15     Q.   And who was the person that did it?

16     A.   I know multiple people at the facility

17  that worked there, specifically the dental

18  assistant.

19     Q.   First, let's identify the state

20  representative; who was that?

21     A.   The one I believe you're referencing is

22  Bill Kincaid.

23     Q.   And who is Mr. Bill Kincaid?

24     A.   He is the Marshall County House of

25  Representatives Legislature.  But I believe he also

1   serves part of DeSoto County as well, the seat that

2   he sits in.

3          Q.   Have you ever talked with him?

4          A.   I've talked with him, yes, in the past

5   about other things.

6          Q.   Have you ever talked with him -- are you

7   friends with him?

8          A.   I know him peripherally.  I wouldn't call

9   us friends.

10         Q.   Well, tell me what you mean by

11  peripherally.  That's a big word.

12         A.   So he's from -- he lives in Marshall

13  County and so do I.  I know -- I make it a point to

14  know all the legislators where I live.  So he is a

15  legislator and I have met him previously.

16         Q.   How many times you meet him?

17         A.   Like have I seen him face-to-face?

18         Q.   Yes, ma'am.

19         A.   In my lifetime?

20         Q.   Yes, ma'am.

21         A.   That's a hard question because we kind of

22  live in the same area so I probably run into him at

23  places.  I'm going to say 15 to 20 times.

24         Q.   Fourteen to twenty times total?

25         A.   Fifteen to 20.

1        Q.    It's just a special part --

2        A.    Yes.

3        Q.    -- of that facility?

4        A.    Correct.

5        Q.    Okay.  Let me ask about these other --

6              You say on your oath you didn't talk to

7    Mr. Kincaid, representative --

8        A.    About staffing numbers, no.

9        Q.    About anything --

10       A.    No.

11       Q.    -- relating to the prison?

12       A.    Correct.

13       Q.    And the other representatives, you didn't

14   talk to any of them?

15       A.    I did not.  Not about anything related to

16   the prison.  I volunteered as Doctor of The Day at

17   some point at the capital through the State Medical

18   Association.  And, you know, you -- generally one of

19   your representatives introduces you.

20       Q.    Yes, ma'am.

21       A.    And Kevin Blackwell introduced me --

22       Q.    Yes, ma'am.

23       A.    -- the day that I was there.

24       Q.    Did you encourage any of the other

25   personnel at MHM to talk to their representatives?

1    mean, yes, some kind of number you can call with a

2    complaint that hasn't been resolved.

3         Q.    Have you seen the handbook before?

4         A.    I'm sure when I started it was given to

5    me.

6         Q.    Yes, ma'am.  And the reason companies have

7    those policies is so that you can have multiple ways

8    to communicate a problem, right?

9         A.    Right.

10        Q.    And that's designed to let the company

11   deal with its problems first, right?

12        A.    I'm sure.

13        Q.    And if you jump over and talk to other

14   folks you don't give the company a chance, do you,

15   to fix the problem?

16        A.    Right.

17        Q.    So it's important that you follow that,

18   right?

19        A.    Yes.

20        Q.    You said earlier that getting patients to

21   medical was more difficult after the violent

22   incidents.  Tell me what you mean by that.

23        A.    So the whole time that I worked there, it

24   was always difficult to get patients to medical.

25        Q.    Meaning a specific type patient or all

```
 1        A.    So he -- he actually, when I was in the
 2   room with him, he never said the words "I'm pulling
 3   your security clearance."  What he said was, "I
 4   don't feel comfortable with you coming in and out of
 5   my facility."  And he said, "Whatever happens with
 6   you after this is up to Centurion and Mr. Day."
 7        Q.    That's right.
 8        A.    And so I went back to the medical unit
 9   with Mr. Day.  We called Centurion, Dr. Ramsue and
10   April and told them what had happened.  And April
11   said, "We don't want there to be any kind of drama.
12   You need to clock -- leave the facility and write a
13   statement about what happened and send it to us."
14        Q.    Yes, ma'am.  But when the warden told you
15   that he didn't feel comfortable with you being in
16   his facility --
17        A.    I took that as he was pulling my security
18   clearance.  And then I understand by email,
19   Dr. Ramsue emailed me back and said, "Did he pull
20   your security clearance?" after I sent the email
21   statement.  And I said, "I believe so."  I said, "He
22   didn't say that exactly, but I believe so."  And
23   then the next day, I believe that he sent a formal
24   email to Mr. Day, the warden did, saying that my
25   security privileges had been pulled.
```

1  questions and I was voicing my concerns and maybe he

2  would voice his and would go on about our day.

3       Q.   And it may be that he thought you were

4  more capable than -- maybe he thought a lot of your

5  capabilities?

6       A.   I don't know.

7       Q.   Thought you could handle stuff?

8       A.   You know, he didn't make me feel that way.

9  He made me feel like he was questioning, you know,

10  why I needed to send someone off site when they

11  clearly needed to go.

12       Q.   And he'd send them out?  He may question

13  you but he'd send them out, wouldn't he?

14       A.   So we had instances where he didn't take

15  them when I advised.

16       Q.   Not when you advised, but ultimately they

17  went?  They just didn't go when you wanted them to

18  go?

19       A.   They were time-sensitive medical issues is

20  my main concern.  So he made the decision, he's not

21  medically trained as far as I know, to override my

22  medical decision and determine when it was okay to

23  take the inmate off site.

24       Q.   Was his concern about the safety?  Whether

25  he had security people to go with the inmate?

1  father-in-law you were shocked, you were shocked

2  because it was you that got terminated as opposed to

3  someone else?

4      A.   I was shocked that that's just where this

5  whole thing was.  Because even in my mind, you know,

6  no, I didn't go to Bill Kincaid.  But it was well

7  within anyone's rights who worked in that facility

8  to go to their state representative, who was also

9  the Chair of the Correctional Committee.

10          And I felt like, they are pinning this on

11  me because they want me out of that facility.  I'm a

12  thorn in their side.  Travis Day didn't like me.  I

13  made his job hard.  Warden Williams didn't like me.

14  I, you know, was demanding that these inmates get

15  brought to medical and it was a daily occurrence.

16  It wasn't just like one day I said, hey, I really

17  want my inmates to come today.  It was an every day

18  thing.

19          And I think both of them together thought

20  we can get this doctor out of here and this is how

21  we're going to do it.  We're going to pin this on

22  her.

23      Q.   Now that's what your opinion is, but you

24  don't have any facts that support that, do you?

25      A.    Well, the email.  I mean, there is an

1        Q.    Transferred to Marshall County.  What unit
2   was he on, the green/white, black/white?
3        A.    He was a red and white.  So he would have
4   been a Delta.  He was a red and white.
5              So he reported to the nurse initially that
6   he had been raped.
7        Q.    That he had continuously been raped over
8   several days?
9        A.    Several days.
10       Q.    Some as many as four days, four or five
11  days before then, right?
12       A.    I think the first incident, right.  And
13  then he said it occurred again and then occurred the
14  day prior to him coming and reporting it to medical.
15       Q.    And he reported it to the nurse and then
16  you saw him, right?
17       A.    So he reported it to a nurse.
18       Q.    Yes.
19       A.    This was like at night.  We had already
20  left the facility.
21       Q.    Right.
22       A.    Okay.  So the nurse called Nurse
23  Practitioner Cox because she was on call that night.
24  Relayed to her what the inmate was reporting.
25       Q.    Uh-huh.

1      Q.    You thought it went away?

2      A.    Certainly in five years you could contract

3  HIV.

4      Q.    Right.  But my point is, he told you he

5  was HIV positive and it turns out he was not?

6      A.    Correct.  Correct.  He did.  He said, they

7  told me at the last facility.  Which I think he

8  really confused because he was Hep-C positive.  I

9  think that's what he maybe was confusing the two

10  issues.  But he was Hep-C positive.  But yes, he did

11  say HIV because I put it in my note.

12      Q.    Right.  He ultimately got the care, didn't

13  he?

14      A.    He ultimately got taken to the emergency

15  room, but it was not in a time, you know --

16      Q.    It was the next morning?

17      A.    It was the next day.

18      Q.    Yeah, it was the next morning, right?

19      A.    It was the next day.

20      Q.    I mean, it was at night --

21      A.    So if you're worried about DNA evidence,

22  which a rape most people would be concerned about

23  that, it's time sensitive.  You need to get them

24  there.  You need to evaluate them and bring them

25  back.

```
 1        A.    So kind of like this here (indicating).

 2        Q.    Okay.

 3        A.    And so I was called.  This happened -- the

 4   incident happened at night around, you know,

 5   probably like eleven o'clock.  They called me

 6   initially, the RN who was on that night and told me

 7   what had happened.  I made the decision to send him

 8   out.  Again, it was to Baptist Oxford.  That's one

 9   of the closest bigger hospitals to us that can

10   manage things like that.

11        Q.    He did go, didn't he?

12        A.    They took him.

13        Q.    Okay.

14        A.    They took him.  He did go, so he was seen

15   at Baptist Oxford.

16        Q.    Was he treated at Baptist?

17        A.    So I don't know exactly what they did

18   other than maybe just clean it at Baptist Oxford

19   because the ER doctor was very concerned about it.

20   The ER doctor said it was something that they could

21   not manage in Oxford.  He felt like they needed to

22   see a plastic surgeon.

23        Q.    Yes, ma'am.

24        A.    He said that he called Tupelo, he called

25   the plastic surgeon in Oxford, this being a weekend
```

1  mean, it probably took hours of my sleep that night.

2      Q.   I understand.  He did get treated.  He was

3  not denied his treatment.  He got to see a plastic

4  surgeon as an inmate, correct?

5      A.   He did.  He got his ear addressed.  And,

6  you know, if I hadn't been there and hadn't fought

7  for it, it wouldn't have happened.

8      Q.   But nobody told you to do anything

9  illegal, did they?

10     A.   So nobody told me to do anything illegal

11  as related to that.

12     Q.   Right.

13     A.   Other than argue with me and said they

14  weren't going to bring him.  Which it's illegal to

15  not give inmates their medical care that they need.

16     Q.   Not to give them when you say they have to

17  have it or not to give it to them period?

18     A.   If you ignore their serious medical needs.

19     Q.   Now, but they didn't ignore them because

20  they sent him to the emergency room and took him

21  there, right?

22     A.   After significant pressure from me, which

23  cost me my job.

24     Q.   I understand that's your opinion and

25  you're entitled to that.

1      Q.   We talked about the people that didn't get

2  seen timely.  And one of the things I asked you is

3  can identify one and we then started talking about

4  the two identified in your complaint.

5      A.   We talked about -- right.

6      Q.   Is there anyone else?

7      A.   Those are the two main cases that I wanted

8  to talk about.  I can't think of specifics right now

9  that I had major concerns about.

10     Q.   Can you think of any that you had major

11  concerns about other than those two?

12     A.   Like ones that you want me to give names

13  for?

14     Q.   Uh-huh (affirmative response).

15     A.   No.

16     Q.   Can you think of any that you can identify

17  without giving names?

18     A.   Just the ones that we had that we didn't

19  get brought that we would have to reschedule over

20  and over.  Like one day they were on our list and we

21  continued to reschedule them.  And I guess it was

22  more of a concern with the timeliness of getting

23  them there.

24     Q.   They ultimately got seen?

25     A.   Right.

1  didn't start work until October.

2       Q.   You didn't start work until October?

3       A.   Right.  Because I had to get credentialed

4  and it's a credentialing through -- even though I'm

5  employed by Sterling, you're credentialed through

6  the VA.  And they're generally not in a really big

7  hurry to complete credentialing.  And so fast as

8  they could get me credentialed and to start work was

9  in October.  So there were several months that I was

10 out of employment.

11      Q.   So you were out July --

12      A.   July, August, September and the beginning

13 of October.  I started I believe on October 7.

14      Q.   So three months?

15      A.   Yes, sir.

16      Q.   You were making roughly $209,000 at MHM?

17      A.   Roughly, yes.

18      Q.   So on an average month what was your

19 take-home pay?

20      A.   So we got paid every two weeks and -- I

21 know that's in all the information I submitted.

22 About -- I want to say about seven or $8,000.

23      Q.   Every two weeks?

24      A.   Uh-huh (affirmative response).

25      Q.   So average about 16,000 a month?

1  warden and you and Day and others had had a

2  conversation?

3        A.   So the conversation was on Tuesday and the

4  call from Kristie Huff was on Friday.

5              (Exhibit 78 marked for identification.)

6        Q.   Show you what's marked as 78.  Get you to

7  take a look at this document.

8        A.   Okay.

9        Q.   Have you ever seen that before?

10       A.   Yes, I have.

11       Q.   Tell me what this is.

12       A.   This is a statement from the nurse who was

13 working the night that the inmate who said he had

14 been sexually assaulted, that, you know, took care

15 of him.  That is a statement from her.

16       Q.   Did you have this in your possession?

17       A.   This was on an email as well.  It was from

18 an email that I believe I was forwarded or cc'd on

19 from Grace Owens, one of the administrative

20 assistants.

21       Q.   So this was in your cloud account, too?

22       A.   Yes.

23       Q.   Did you ever write a statement about your

24 termination about your meeting with Mr. Williams?

25       A.   There's a statement, yes, the afternoon

1  that I got home on the 25th that I wrote.

2      Q.   Do you remember what you said?

3      A.   I was sending it to April and Dr. Ramsue

4  and Kristie Huff.  And it said that, you know, at

5  approximately 3:30 I was called into Warden

6  Williams' office in the presence of Beverly McMullen

7  and HSA Day.  Warden Williams stated that he had on

8  good authority that I had shared MTC staffing

9  numbers with people outside of the facility.  And he

10  told me he didn't feel comfortable with me coming in

11  and out of the facility anymore and that the rest

12  was up to Centurion and Mr. Day.  And then I went on

13  to say that I clocked out at approximately 1600 and

14  went home.

15      Q.   So you clocked out about 30 minutes after

16  the meeting --

17      A.   Yes, approximately.  It was a brief

18  meeting.

19      Q.   And you clocked out immediately

20  thereafter?

21      A.   Right.  Went back to the medical unit.  We

22  did call Centurion first and then I clocked out and

23  left.

24          (Exhibit 70 marked for identification.)

25      Q.   Show you a copy of that which is marked as

```
 1  medical evaluation.

 2          And I was in Grace Owens' office in the

 3  medical unit and the warden did call back to the

 4  medical unit and asked to speak with me and I got on

 5  the phone.  And he asked me why I was sending

 6  Mr. Foster offsite.  And I told him my concern about

 7  fever and the weight loss and that we had done

 8  everything to evaluate him that we could.

 9          And he did say something to the effect of,

10  well, I'm no doctor, but I don't see why someone

11  with fever needs to go outside of this facility for

12  evaluation.  And I said, again, explained my

13  concerns to him.  And we did get the inmate

14  transferred outside of the facility for evaluation

15  and he had a extensive hospital stay.

16          So that's the only thing that I can think

17  of at this point pertinent that I wanted to mention.

18      Q.   Okay.  And that seems to be the

19  reoccurring theme.  Your perception, as I understood

20  it -- and this question and others, if I say

21  something that you disagree with, you tell me.

22  Okay?

23          But my impression from your testimony was

24  that your perceived that he was opposed to sending

25  people out, but at the end of the day those folks
```

1  got sent out. Maybe not in the timeframe that you

2  wanted, but they got sent out; is that fair?

3      A.   Yes, that is a fair statement.

4       I felt like it was an undo burden on me to

5  continually push to get the inmates the care that

6  they needed. And I guess that's my concern.

7       But yes, the ones that we've gone over

8  ultimately received the care, the medical care that

9  they needed.

10     Q.   Would you agree that he was in a difficult

11  situation coming into the jail when he did with

12  staffing levels where they were, just everything

13  going on at the jail?

14     A.   Right. It was not a well-run facility.

15     Q.   Number six is Deputy Warden Beverly

16  McMullen.

17     A.   Okay.

18     Q.   And I don't know that we've really

19  discussed her. I know that your counsel has asked

20  to take Ms. McMullen's deposition.

21       What does she know, to your knowledge?

22     A.   Okay. So Ms. McMullen was present during

23  the meeting where Warden Williams called me into his

24  office in the presence of Travis Day on June 25th.

25  So she was a witness to that discussion.