# Exhibit R

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF MISSISSIPPI
                   OXFORD DIVISION


DR. AMY R. WOODS                                    PLAINTIFF

VS                    CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9                                  DEFENDANTS
```

---

### ZOOM DEPOSITION OF JERRY WILLIAMS

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On September 21, 2020

At 11:05 a.m.

REPORTED BY:  SHARRON F. ALLEN, CSR, RPR
              CSR NO. 1144

repetitive, but sometimes I do that. So let me just ask you: As best you can, tell me what you told Warden Williams about what you had been told by Representative Kinkade.

A. I had been contacted by Representative Kinkade and advised that they were having staff shortages and inmates were not being able to be seen in the clinic as required. I asked him to address that issue, along with making sure that he covers our policy as it relates to confidentiality and use of the chain of command.

Q. All right. So did you feel like whoever had told -- a nurse as you believe -- did you feel like the nurse who had told Representative Kinkade about this had done something wrong or something in violation of your policies?

A. I felt like some awareness need to have been brought to her about the chain of command and the issues we have at the facility.

Q. Did you tell him she needed to be fired?

A. No. No. And I don't have that authority to fire, you know, the nurse or the doctor, especially like if they're contract

1  employees.  That falls on the contractor that
2  the agency contracted with, so I don't have that
3  authority.
4       Q.   All right.
5       A.   Nor did I make the recommendation.
6       Q.   Did you tell the warden that whoever
7  had talked to the representative should have her
8  security clearance revoked?  She shouldn't be
9  allowed back on the premises?
10      A.   No.
11      Q.   Y'all didn't have any discussion like
12 that?
13      A.   No.
14      Q.   Am I correct?
15      A.   I advised the warden to have a meeting
16 with the nurse -- because that's what I assumed
17 then.  And Representative Kinkade wanted to meet
18 with him as well.  He said he tried to set up a
19 meeting but was unable to do so.
20      Q.   The warden said he tried to set up a
21 meeting with whom?
22      A.   I think Representative Kinkade, along
23 with the nurse.
24      Q.   To the best of your knowledge, you told
25 him it was a nurse you were talking about as

1   You testified earlier that April Meggs
2   called you.  Is that correct?
3       A.  Correct.  She and I talked.  April and
4   I talked ongoing in particular with appointments
5   as they relate, you know, to offenders missing
6   appointments.
7       Q.  Okay.  And did she ever call you about
8   Dr. Woods?
9       A.  No, she didn't call me about Dr. Woods.
10  I think we had a conversation, and I told her
11  that the warden had some concerns.
12      Q.  Okay.  Did she ever ask you about
13  trying to reinstate Dr. Woods' security
14  clearance?
15      A.  No, sir.  Well, let me go back.  I
16  don't recall Dr. Woods.  I want that for the
17  record.  It was an individual from medical.  I
18  can't recall -- I can't recall Dr. Woods.  I'm
19  not saying who it was.  I don't recall who it
20  was.
21      Q.  You're not saying it didn't happen.
22  You're just saying you don't recall?
23              MR. WAIDE:  Object to the form.  I
24      think he testified that -- well, I don't
25      think that's what he said.  I object to

1            the form.
2   BY MR. DEAN:
3       Q.    Mr. Williams, during your conversation
4   with April Meggs about the person from Marshall
5   County, did you ever give any advice about what
6   to do with that person's employment status?
7       A.    No.  I just reminded her about the
8   chain of command and the things, you know, as it
9   relates to our confidentiality.
10      Q.    And did you encourage her to terminate
11  that person's employment?
12      A.    No, sir.  No, sir.
13      Q.    Did you have any sort of input into
14  that person's employment status?
15      A.    No, sir.  Like I said, that's a
16  contract company.  You know, who they hire and
17  fire, you know, that's, you know, up to the
18  contractor.
19      Q.    And is April Meggs -- other than April
20  Meggs, did you speak to anybody else at
21  Centurion about Dr. Woods' employment status?
22      A.    No, sir.  No, sir.
23           MR. DEAN:  Give me one second.
24           I think that's all we have.  I think
25      that's it from us.