UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

| | |
|---|---|
| DR. AMY R. WOODS, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: 3:19-00234-NBB-RP |
| ) | |
| MHM HEALTH ) | |
| PROFESSIONALS, LLC D/B/A ) | |
| CENTURION PROFESSIONALS, ) | |
| MANAGEMENT & TRAINING ) | |
| CORPORATION, ) | |
| JESSE WILLIAMS, ) | |
| INDIVIDUALLY, AND ) | |
| JOHN DOES 1-9, ) | |
| ) | |
| DEFENDANTS. ) | |

**MHM HEALTH PROFESSIONALS, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF DR. EDMUND A. MILLER**

Far from assisting the trier of fact in understanding the evidence, Plaintiff Dr. Amy R. Woods's proposed expert's report and testimony will only confuse and mislead the jury. Dr. Edmund A. Miller's opinions regarding proper inmate care rely on insufficient evidence, incorrect factual assumptions, and a dearth of facts and data. His ultimate opinion is the product of this faulty data and methodology. What's more, Dr. Miller purports to explain the decision-making authority in prisons for the transportation of inmates despite having no experience with or training in prisons. At a minimum, the Court should strike the improper legal opinion Dr. Miller offers in his report, an opinion that has been roundly rejected as beyond the purview of *any* expert, much less an expert without legal experience and training.

I. **RELEVANT PROCEDURAL BACKGROUND**

On August 5, 2020, Woods designated Dr. Miller as an expert witness. [Dkt. 102]. That same day, Dr. Miller provided a four-page report detailing his findings and listing the material on which he based his opinions. *See* Exhibit A, Expert Report of Dr. Edmund Miller.[1] MHMHP first deposed Dr. Miller on October 8, but his deposition was continued until October 19 to afford Dr. Miller time to produce all of the material on which he relied. *See* [*Id.* & Dkt. 125]. Dr. Miller's deposition concluded on October 19.

A. **Background of Case**

The basis of Count I—the wrongful termination claim—is that Woods was terminated "because of [her] efforts to provide for the serious medical needs of prisoners." [Dkt. 108 at ¶ 20]. Woods alleges that she refused to "depriv[e] prisoners at [Marshall County Correctional Facility] of adequate medical care and refused to be willfully indifferent to the serious medical needs of prisoners." [*Id.* at ¶ 26]. Woods's allegation that she refused to deprive certain prisoners of adequate medical care appears to revolve around three specific prisoners. And Dr. Miller's report addresses all three. To protect the prisoners' privacy, MHMHP will refer to them by pseudonyms—Inmate A, Inmate B, and Inmate C.

Woods's third amended complaint addresses Inmate A and Inmate B. Specifically, in paragraph 21(a), Woods makes allegations concerning the provision of care afforded to Inmate A. And in paragraph 21(b), Woods alleges certain facts concerning Inmate B's care. The amended complaint does not include any allegations regarding Inmate C, but Woods has produced certain discovery concerning his alleged provision of care in the form of an email.

---

[1] To protect their privacy, MHMHP redacted the names of the individuals Dr. Miller identified in his report. MHMHP inserted the assigned pseudonyms of the individuals for the Court's ease of reference.

### B. Dr. Miller's Lack of Experience in Prisons

Dr. Miller is a medical doctor who graduated from the University of Mississippi Medical Center in 1979. Exhibit A at ARW-000006. Although he has held multiple roles and positions, Dr. Miller has never worked in a prison. Exhibit B, Deposition of Dr. Edmund Miller ("Dr. Miller Dep.") at 9:22-10:5.[2] Rather, his involvement with correctional health care has been limited to his role as a Medical Advisor to the Clay County, Mississippi jail from 1994 to present. Exhibit A at ARW-000006. Dr. Miller has not testified as an expert witness during the past decade. *Id.* at ARW-000004.

### C. Dr. Miller's Primary Opinions

Dr. Miller's report contains at least three primary opinions. First, Dr. Miller opines that "Dr. Woods's decisions as to necessary care and as to referral to an outside facility were final and should have been treated as such." Second, Dr. Miller offers certain opinions with respect to the provision of each inmate's care. His basic conclusion with respect to Inmate A and Inmate C is that each inmates' injuries necessitated outside emergency treatment. With respect to Inmate B, Dr. Miller wrote that his injuries required specialty consultation and care. Third, Dr. Miller posits that Woods would have engaged in criminal conduct had she not obtained outside medical treatment for the inmates.

### II. LEGAL OVERVIEW

Pursuant to the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Moore v. Ashland*

---

[2] Dr. Miller acknowledged the differences between jails and prisons. "My understanding now is that the definition of a prison is a facility that is run by the State of Mississippi and definition of jails are those facilities that are run by the various counties and...I guess by the counties of the state." Exhibit B, Dr. Miller Dep. at 39:7-11.

*Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). The Federal Rules of Evidence permit an expert witness with "scientific, technical or other specialized knowledge" to testify if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Courts, as "gatekeepers," are tasked with making a preliminary assessment whether expert testimony is both reliable and relevant. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). Woods, as the party offering the expert, must prove by a preponderance of the evidence that Dr. Miller's testimony satisfies Rule 702. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

To be reliable, a proposed expert's opinion must be "supported by appropriate validation" and not be based on the purported expert's "subjective belief or unsupported speculation." *Moore*, 151 F.3d at 275. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "Incorrect assumptions critical to an expert's opinion make that opinion unreliable." *Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 816-817 (S.D. Tex. 2007) (citing *Moore*, 151 F.3d 269).

While an expert witness is permitted to give his opinions on an "ultimate issue" of fact, assuming he is qualified to do so, he is not permitted to make credibility determinations or offer conclusions of law. FED. R. EVID. 704; *see Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir.

4

2009) ("[A]n expert may never render conclusions of law . . . nor, may an expert go beyond the scope of his expertise in giving his opinion.").

## III. DR. MILLER'S TESTIMONY SHOULD BE EXCLUDED

### A. Dr. Miller's Report Rests on Incorrect Assumptions and Facts

Dr. Miller's expert report relies heavily on erroneous facts. As a result, his ultimate conclusion—that Woods "would have been deliberately indifferent to these inmates' serious medical conditions by denying them access to outside medical treatment"—is unreliable.

"Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Guillory v. Domtar Industries Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). A jury should not be permitted to rely on an expert opinion that is premised on incorrect information. "[A]n opinion based on 'insufficient, erroneous information,' fails the reliability standard." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 3 (5th Cir. 2013) (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009)). Indeed, "Incorrect assumptions critical to an expert's opinion make that opinion unreliable." *Whitney Nat'l Bank*, 516 F. Supp. 2d at 817. And "When an expert's testimony is 'not based upon the facts in the record but on . . . speculation designed to bolster [a party's] position,' the trial court should exclude it." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 4 (5th Cir. 2013) (quoting *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1331 (5th Cir. 1996)).

Dr. Miller's expert report repeatedly suggests that each of the three inmates were denied "access to outside medical treatment." Exhibit A at ARW-000002; *see id.* ("Aside from mere medical decision making, it is my opinion that Dr. Woods would have engaged in criminal conduct had she not acted as she did in obtaining outside medical treatment for the inmates."). But that is

5

incorrect. Of the three inmates mentioned in Dr. Miller's report, one—Inmate B—already had access to outside medical treatment.

When Woods received a call from a Registered Nurse the evening when Inmate B's ear had been wounded, Woods decided to send Inmate B to an outside medical facility, a recommendation she acknowledges was promptly followed. Exhibit C, Deposition of Dr. Amy Woods ("Woods Dep.") 143:5-8. A medical provider at Baptist Memorial Hospital – Oxford was treating Inmate B when the medical provider determined he needed specialty care at another facility. *See* Exhibit D, Inmate B's Medical Records at MHMHP 0000269-270.[3] It's simply untrue to suggest Inmate B was denied access to all outside medical care.

Dr. Miller's deposition testimony also contradicts some of the conclusions posited in his report. Dr. Miller writes that Inmate C suffered acute unexplained testicular pain. He opines that Woods appropriately developed a strong clinical suspicion that he had a condition known as testicular torsion—meaning that the testicle twists in the scrotal sac and cuts off blood supply to the testicle. Dr. Miller then observed that Woods's referral that Inmate C be transported offsite for a scrotal ultrasound was "countermanded by the Warden." Exhibit A at ARW-000002. But in his deposition, Dr. Miller corrected that statement, testifying "And I think that that statement is probably incorrect. The warden certainly did not countermand the ordering of a testicular ultrasound." Exhibit B, Dr. Miller Dep. at 103:17-19.

Dr. Miller's report is replete with erroneous information. And his opinion is unreliable.

**B. Dr. Miller's Opinions Are Supported by Insufficient Information**

In addition to relying on misinterpretations of critical facts and incorrect assumptions to arrive at his opinion, Dr. Miller also supports his opinion with scant evidence.

---

[3] In accordance with Local Rule 79, MHMHP has not filed this exhibit.

As an initial matter, Dr. Miller failed to explain how he arrived at his conclusions related to the provision of care each prisoner required. He did not have access to (nor could he utilize) each prisoners' medical history. Nor did he personally examine the prisoners. And as for Inmate C, MHMHP is unaware of any document Dr. Miller reviewed that could conceivably be called a medical record. Rather, Dr. Miller based his opinion on a single email.

An expert's proponent must show that an expert's testimony "is reliable." *Paz v. Brush Engineered Materials Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Id*. The Fifth Circuit has held that Federal Rule of Evidence 703 requires courts to examine the reliability of an expert's sources to determine whether they satisfy the threshold established by the rule. *Slaughter v. S. Talc Co.*, 919 F.2d 304, 306-07 (5th Cir. 1990). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

The most obvious example of Dr. Miller's reliance on partial or incomplete medical records is his conclusion about Inmate C's medical care. Although Dr. Miller had access to certain medical records, *see* Exhibit E (Inmate A's Medical Records (MHMHP 0000191-222) and Exhibit D (Inmate B's Medical Records (MHMHP 223-294) (both to be filed under seal), no medical records regarding Inmate C were produced. That apparently did not stop Dr. Miller from stating that he reviewed "the medical records" and "formulated opinions regarding these inmates . . . ." Dr. Miller's report states that

> Inmate [G.] suffered acute severe unexplained testicular pain. Dr. Woods appropriately developed a strong clinical suspicion that this patient/inmate had developed a condition called testicular torsion, where the testicle actually twists in the scrotal sac and, in doing so, cuts off the blood supply to the testicle. This condition is acutely painful and abruptly endangers the viability of the testicle. This condition cannot be diagnosed at the bedside by clinical examination; it can only be suspected. The standard of care to diagnose this condition is a test called a scrotal ultrasound.

> As one can see from the medical records, that test was appropriately ordered. It was then countermanded by the Warden. The only treatment for said condition is emergency surgery. Here is the salient point: it is not important that the patient did or did not have the condition. The item of critical importance is that the condition was appropriately suspected and the following clinical decisions were excellent. This injury was a medical emergency for which a referral to outside emergency medical treatment and a scrotal ultrasound was required.

Exhibit A at ARW-000001-2. Dr. Miller did not cite to a specific medical record evidencing the purported "acute severe unexplained testicular pain." Record evidence regarding Inmate C includes a short email Woods sent to an official with the MDOC. Exhibit F, Email from Amy Woods to Joann Marshall (to be filed under seal). In the email, Woods noted that Inmate C "refused [to go to an appointment] last week due to a conflict with the transporting officer[.]" *Id.*

Dr. Miller's opinion about Inmate C's medical condition is lengthier than the email Dr. Miller relied on to form his opinion. Dr. Miller wrote that Inmate C's pain was both "acute" and "severe." He states—without evidentiary support—that the prisoner had a testicular torsion. And without any reference to Dr. Miller's experience, relevant medical literature, or the factual record,[4] Dr. Miller posits that the injury was "a medical emergency" requiring "outside emergency medical treatment[.]"

Courts have held that "A doctor need only one reliable source of information showing that a patient is ill; either a physical test or medical records will suffice for this." *Kannankeril v. Terminix Int., Inc.*, 128 F.3d 802, 807 (3rd Cir. 1997) (citing *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 762 (3d Cir. 1994)). While numerous courts have held that an expert need not personally examine someone in order to provide a medical opinion, those same courts note that, in the absence

---

[4] "Even the possession of a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Murphy v. Sandoval Cty.*, No. 17-CV-0585 SWS/MLC, 2019 U.S. Dist. LEXIS 229986, at *19 (D.N.M. Feb. 5, 2019).

of a personal examination, the expert must, at the very least, review pertinent medical records. *See Mendoza v. Lafarge N. Am., Inc.*, No. 15-1257, 2016 U.S. Dist. LEXIS 4301, at *8-9 (E.D. La. Jan. 13, 2016) (collecting cases). In the absence of a personal examination, courts routinely require that the physician have access and review medical records. *See, e.g.*, *Carroll v. Morgan,* 17 F.3d 787, 789-90 (5th Cir. 1994) (finding that expert's testimony was not impermissibly speculative and was grounded in the methods and procedures of science because it was based on thirty years of experience as a practicing, board-certified cardiologist and his review of the medical records); *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d at 762 (noting that "the doctor does need at least" medical records or a personal examination to form an admissible opinion). The scant evidence Dr. Miller reviewed in formulating his opinion of Inmate C can hardly be said to constitute a medical record.

Moreover, that Inmate C refused to travel for outside medical care belies the notion that the pain was either "acute" or "severe" as Dr. Miller suggests. Dr. Miller points the reader to no evidence of Inmate C's acute and severe pain other than his mere conjecture. Fifth Circuit case law is clear: "An expert's opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture." *Lewis v. Parish of Terrebone*, 894 F.2d 142, 146 (5th Cir. 1990). Because Dr. Miller's report relies so heavily on conjecture, he should not be permitted to testify.

**C. Dr. Miller Is Not Qualified to Render Opinions Concerning Authority to Transport Prisoners to an Outside Medical Facility**

Dr. Miller lacks experience in prison operations. He also lacks any experience and familiarity with the protocol for transporting prison inmates to outside medical facilities. He is therefore unqualified to speak to prison protocol.[5]

---

[5] Prisons and jails are plainly different. A "prison" is "a state or federal facility of confinement for convicted criminals, esp[ecially] felons[.]" Black's Law Dictionary (11th ed. 2019). By contrast, "jail" is a generic term, used to describe "a local government's detention center where

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). "[T]he witness's . . . specialized knowledge,' must be 'sufficiently related to the issues and evidence before the trier of fact that the witness's proposed testimony will help the trier of fact.'" *John C. Nelson Constr., LLC v. Britt, Peters & Assocs.*, No. 2:18-CV-222-KS-MTP, 2020 U.S. Dist. LEXIS 73444, at *7-8 (S.D. Miss. Apr. 27, 2020) (quoting *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013)).

Dr. Miller's correctional experience is limited to providing medical services to inmates in jails. When asked whether he has "ever served as a medical professional providing services to inmates in a prison," Exhibit B, Dr. Miller Dep. at 9:22-24, meaning a large state or federal facility, Dr. Miller responded that "the answer is no." *Id.* at 10:5. Marshall County Correctional Facility is a 1,000-inmate prison. *Id.* at 35:25-36:1. By contrast, Clay County jail houses "anywhere between 15 and 30" inmates—about 3% of MCCF's population. *Id.* at 286:24-287:2. State prisoners convicted of violent crimes—including murder, rape, and burglary—are incarcerated at MCCF. Exhibit G, Deposition of Beverly McMullen ("B. McMullen Dep.") at 6:20-21; Exhibit H, Deposition of Warden Jesse Williams ("Warden Williams Dep.") at 110:17-22. Dr. Miller possesses no training, lacks any experience, and has not authored any literature on the procedures for health care in *prisons*.[6] In fact, he has acknowledged that he is "not familiar with non-medical issues regarding the administration of a jail or prison." Exhibit B, Dr. Miller Dep. at 297:10-12.

---

persons awaiting trial or those convicted of misdemeanors are confined[.]" Black's Law Dictionary (11th ed. 2019).

[6] When asked how Dr. Miller would respond if the warden of Clay County jail overrode his decision regarding a medical decision about an inmate, Dr. Miller responded that he would tell the warden "to go to hell" and "if he has a problem with [a medical decision], he better call God." Exhibit B, Dr. Miller Dep. at 101:2-10. Later, when asked hypothetically whether MHMHP staff should transport a convicted murderer to the hospital without proper security, Dr. Miller testified

Dr. Miller opined that "Dr. Woods' decisions . . . as to referral to an outside facility were final and should have been treated as such." Exhibit A at ARW-000001. In his deposition, Dr. Miller was asked whether it was his opinion that "Dr. Woods was the sole arbiter of the timing of when a prisoner has to go to an outside facility. . . ." Exhibit B, Dr. Miller Dep. at 57:13-15. He responded that "Yes, that is exactly what I'm saying." *Id.* at 57:16. But Dr. Miller's opinion regarding the finality of Woods's decision and the authority to control and direct a prisoner's transportation does not find support in any literature he cites. Dr. Miller instead relies on his interpretation of the contract between the Mississippi Department of Corrections ("MDOC") and Centurion of Mississippi, LLC to formulate that opinion. *See* Exhibit B, Dr. Miller Dep. at 57:13-59:7. But Dr. Miller is "a physician, not a lawyer." *Id.* at 23:7.

Dr. Miller's opinion contradicts federal regulations governing Bureau of Prisons medical trips. Pursuant to 28 C.F.R. § 570.41, a medical trip occurs when a prisoner experiences a life-threatening "medical situation requiring immediate medical treatment not available at the institution." *Id.* § 570.41(a). Notably, the regulations provide that a recommendation for an out-patient medical trip is "prepared by medical staff . . . and then submitted to the Warden for review." *Id.* § 570.41(c). Only "[t]he Warden may approve an inmate for an out-patient medical escorted trip." *Id.* While not legally binding on Mississippi, this contrast demonstrates the perils associated with an expert offering opinions on topics with which he has no familiarity and for which he has no training.

Federal courts require more than just some training in a particular field for an expert to be considered qualified. For example, in *Houston-Hines v. Houston Indep. Sch. Dist.*, the proffered

---

that he "would have screamed and yelled and thrown a giant fit" to have the inmate transported. *Id*. at 220:4-7.

expert had twenty-nine years of experience in law enforcement and security experience; however, he did not have "experience or training in the unique challenges of law enforcement in a school setting," and thus was unqualified to provide an expert opinion regarding an arresting officer's performance in a school setting. No. CIV.A. H-04-3539, 2006 WL 897209, at *2-*3 (S.D. Tex. Apr. 4, 2006). The *Houston-Hines* court held that to qualify an expert witness, the proponent of the witness must demonstrate by a preponderance of the evidence that the expert testimony is admissible. *See id.* at *3; *see also Wilson v. Woods*, 163 F.3d 935, 938 (5th Cir. 1999) (excluding testimony of purported expert whose qualifications were insufficiently related to his proposed testimony). The court reasoned the proffered expert's experience, though extensive, was not sufficiently related to the particular issue on which he proposed to testify. *Id.* at *2-3.

Dr. Miller's medical experience does not qualify him to testify as to decision-making authority in prisons. And his opinion regarding the finality of Woods's decision to transport a prisoner offsite should be excluded.

### D. Dr. Miller's Report Contains Legal Conclusions That Must Be Stricken

In the event the Court does not exclude Dr. Miller's testimony entirely, this Court should strike portions of the report that improperly state legal conclusions.

One would be forgiven for thinking Dr. Miller possessed legal training. This is because his expert report is replete with legal conclusions. Dr. Miller writes that "Based on my review of the medical records of these inmates, it is my opinion that Dr. Woods would have been deliberately indifferent to these inmates' serious medical conditions by denying them access to outside medical treatment." Exhibit A at ARW-000002. He further writes that "it is my opinion that Dr. Woods would have engaged in criminal conduct had she not acted as she did in obtaining outside medical treatment for the inmates." *Id.* at ARW-000001.

12

Courts have roundly rejected experts' attempts to opine on whether certain conduct satisfies the legal definition of deliberate indifference.[7] The first reason courts exclude an expert's opinion that one acted with or without deliberate indifference is because "deliberate indifference" is a legal conclusion. *Nagle v. Gusman*, No. 12-1910, 2016 U.S. Dist. LEXIS 16934, at *17 (E.D. La. Feb. 10, 2016) ("[T]estimony regarding 'deliberate indifference' plainly constitutes a legal conclusion."). And "It is the responsibility of the court, not testifying witnesses, to define legal terms." *Bradley v. City of Ferndale*, 148 F. App'x 499, 508 (6th Cir. 2005). Such legal opinions should be excluded. *See, e.g.*, *Cutlip v. City of Toledo*, 488 F. App'x 107, 120-21 (6th Cir. 2012) (excluding an expert's opinion regarding "conscious indifference"); *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (excluding portions of an affidavit in which an expert opinion as to whether appellants acted with "deliberate indifference"); *Woods v. Lecureux*, 110 F.3d 1215, 1219-21 (6th Cir. 1997) (excluding expert's testimony on "deliberate indifference"); *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("allowing an expert to give his opinion on legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").

Another reason courts reject experts' attempts to opine on whether a person acted with deliberate indifference is because deliberate indifference depends on one's state of mind. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). And testimony on this topic gives the false impression that the expert knows another's mental state. *See Woods*, 110 F.3d at 1221 ("[W]hether a prison official

---

[7] "[T]he overwhelming weight of authority . . . proscribes against allowing an expert to opine as to whether certain conduct constitutes 'deliberate indifference' or any other opinions encompassing legal terms of art[.]" *Murphy*, 2019 U.S. Dist. LEXIS 229986, at *14; *see Nagle*, 2016 U.S. Dist. LEXIS 16934, at *17 (excluding an expert's "opinion on whether [a doctor] was deliberately indifferent.").

13

acted with deliberate indifference depends on that official's state of mind. Thus, by expressing the opinion that [the defendant] was deliberately indifferent, [the expert] gives the false impression that he knows the answer to this inquiry, which depends on [the defendant's] mental state."). Even Dr. Miller does not suggest he is qualified to express an opinion concerning Woods's mental state.

When pressed about the basis for his opinion that Woods would have committed a crime, Dr. Miller responded that his opinion rests on what he has been told. Specifically, Dr. Miller testified that "Per my experience in treating inmates in jails, I think that I have been instructed and told that I have a legal obligation to treat those patients to the best of my abilities and that indifference to their medical complaints could potentially constitute a criminal action." Exhibit B, Dr. Miller Dep. at 64:25-65:5. But Dr. Miller conceded that his personal lawyer and the lawyer who provided legal services to the Clay County jail told him that. *See id.* at 65:6-8. When asked whether he had any basis for this legal conclusion other than the two attorneys, Dr. Miller responded, "I believe that that is the extent of my knowledge." *Id.* at 66:7-8.

IV. **CONCLUSION**

For the foregoing reasons, the Court should exclude Dr. Miller's testimony and report in its entirety, pursuant to Federal Rule of Evidence 702. In the alternative, the Court should exclude and strike portions of the report that assert unsupported and improper opinions.

Dated: October 26, 2020

Respectfully submitted,

*/s/ Elizabeth R. Hadley*
Elizabeth Hadley
MS Bar No.: 99662
hadleye@gtlaw.com
**GREENBERG TRAURIG LLP**
300 West 6th Street
Suite 2050
Austin, TX 78701

14

(512) 320-7227 *Telephone*
(512) 233-5265 *Facsimile*

David Long-Daniels*
Georgia Bar No. 141916
Long-DanielsD@gtlaw.com
Jacob R. Dean*
Georgia Bar No. 180545
deanj@gtlaw.com
**GREENBERG TRAURIG, LLP**
Terminus 200, Suite 2500
3333 Piedmont Road, N.E.
Atlanta, Georgia 30305
(678) 553-2100 *Telephone*
(678) 553-2212 *Facsimile*

* *admitted pro hac vice*
*Attorneys for MHM Health Professionals, LLC*

15

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Court and that counsel of record, who are deemed to have consented to electronic service in the above-referenced case, are being served this 26th day of October, 2020, with a copy of the above-document via the Court's CM/ECF System.

>R. Shane McLaughlin
>338 North Springs Street
>Suite 2
>Post Office Box 200
>Tupelo, Mississippi 38802
>
>Rachel Pierce Waide
>Jim Waide
>Waide and Associates, P.A.
>Post Office Box 1357
>Tupelo, Mississippi 38802-1357
>
>Timothy Michael Peeples
>J. Caroline Johnson
>DANIEL, COKER, HORTON & BELL - Oxford
>P.O. Box 1396
>Oxford, MS 38655

This 26th day of October, 2020.

>*/s/ Elizabeth R. Hadley*
>*Attorney for MHM Health Professionals, LLC*