# Exhibit B

```
 1              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                     OXFORD DIVISION

 3    DR. AMY R. WOODS,

 4           Plaintiff,
                                    CIVIL ACTION FILE
 5    vs.                           NO.: 3:19-00234-NBB-RP

 6    MHM HEALTH PROFESSIONALS, LLC
      d/b/a CENTURION PROFESSIONALS,
 7    MANAGEMENT & TRAINING
      CORPORATION, JESSE WILLIAMS,
 8    INDIVIDUALLY, and JOHN DOES 1-9,

 9
             Defendants.
10    _____

11         VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF

12                     DR. EDMUND A. MILLER

13

14                     October 8, 2020

15                       3:30 p.m.

16

17

18

19    Shari L. Snow, CCR #B-2258

20

21

22

23

24

25    Job #32318
```

1  A  I believe that I have been paid
2  approximately $3,000, or $2500 so far.  I'm depending
3  on you to give me some more money here.
4  Q  Well, that's going to happen.
5      Now, tell me, what did you do today in
6  preparation for your testimony?
7  A  Today in preparation for my testimony?
8  Q  Yes, sir.
9  A  I have tried to read through all of the
10 requests and exhibits that y'all supplied, and I have
11 reread the Standards for Health Services in Jails and
12 Prisons, the books that are put out by the National
13 Commission on Correctional Health Care.
14 Q  You read the entire book?
15 A  Yes, sir.
16 Q  From cover to cover?
17 A  Yes, sir.
18 Q  That is, both books?
19 A  I actually focused on the Standards for
20 Health Services in Jails, but yes, I've read both
21 books, actually, cover to cover, that's correct.
22 Q  Have you ever served as a medical
23 professional providing services to inmates in a
24 prison?
25 A  I have provided -- I think the answer to

1   that is no, but that is dependent on how you would
2   define the word "prisons."
3        Q    Yes, sir.  I'm referring to large state or
4   federal prisons.
5        A    Then the answer is no.
6        Q    Have you ever... taken any courses on
7   constitutional law?
8        A    Yes.
9        Q    All right.  Tell me the courses you've taken
10  on constitutional law.
11       A    The course that I took on constitutional law
12  I took 41 years ago.
13       Q    Well, I'm surprised you still remember you
14  took it.
15       A    I remember taking the course.  I remember
16  the guy who taught the course later went to prison.
17       Q    He knows about constitutional law then,
18  doesn't he?
19       A    Yes, that's -- those are the main two things
20  I remember, so I've tried to avoid that.
21       Q    Now, when you took this wonderful course on
22  constitutional law 40-some years ago, tell me the
23  setting that you were in.
24       A    I was -- actually, I had graduated from
25  medical school but I had not yet gone into residency

```
 1      A    Other than familiarizing myself with the
 2   exhibits supplied, I did certainly review the rules
 3   and Standards for Health Care Professionals in Jails
 4   and Prisons.  I also reviewed the medical literature
 5   on standards for physicians in jails and prisons.  And
 6   I think that was -- I certainly did not look at the
 7   laws, as I'm a physician, not a lawyer.
 8      Q    Did you --
 9      A    That was the extent of my preparation.
10      Q    Did you have any discussions with any of the
11   persons identified that Miss Woods identified as
12   having knowledge of this case?
13      A    No, sir.
14      Q    You didn't talk to any nurses --
15      A    No, sir.
16      Q    -- that worked at --
17      A    No, sir.
18      Q    You didn't talk to any health professionals
19   that worked at the prison?
20      A    I've had multiple conversations with health
21   care professionals who work in both prisons and jails
22   over the last several years.  I have had no discussion
23   with any person regarding this case, as my
24   understanding is that would have been illegal.
25      Q    Well, I don't want you to explore the
```

```
 1   that even implies Dr. Woods should commit a crime?
 2        A    No, sir.
 3        Q    You understand that Dr. Woods worked in a
 4   prison in Marshall County, correct?
 5        A    Yes, sir, I understand that she was -- that
 6   she worked in that facility.  I'm a little bit unclear
 7   on the designation of prison versus jail.
 8        Q    All right.
 9        A    And I don't know how important that is, but
10   I will state that just for the sake of clarity.
11        Q    Yes, sir, thank you for that.
12             You don't know anything about the inmate
13   population served by that prison, do you?
14        A    (There was no response.)
15        Q    That served that population.
16        A    (There was no response.)
17        Q    The prison that served that population.
18        A    I do know.  There are some things that I do
19   know --
20        Q    Okay.
21        A    -- from my research and reading.
22        Q    Okay.  Well, tell me anything else you know
23   from your research and reading that you haven't
24   already told me.
25        A    My understanding is that that facility
```

1  houses a little over a thousand inmates.
2      Q    Okay.
3      A    That it is a state facility, that persons
4  convicted of federal crimes are not housed there.  And
5  I don't immediately remember other specific
6  information other than newspaper reports and
7  unsubstantiated claims about the quality of care at
8  the facility itself, which I don't think are important
9  to or germane to my opinions, which are medical.
10     Q    When you say newspapers, is there any
11 particular newspaper reports you remember reading
12 about this case?
13     A    No, no particular citations or references
14 that I can give you.  However, again, I think I can
15 produce a few of those just from having Googled
16 information on the facility itself.
17     Q    Were there any particular newspaper reports
18 that you recall?
19     A    The particular newspaper reports that I
20 would recall are those that are already provided in
21 the exhibits, and I think that those were provided by
22 Dr. Woods.
23     Q    And do you remember what they pertain to?
24     A    I remember one pertaining to prison guards
25 being assaulted by the inmate population.  And I

1  A   I wanted to relook at the Standards for
2  Health Care Services in Prisons, and the Standards for
3  Health Care Services in Jails, and make sure that you
4  and I were both on the same page as per the definition
5  of "prison" versus the definition of "jail."
6  Q   Well, what did you find out?
7  A   My understanding now is that the definition
8  of a prison is a facility that is run by the State of
9  Mississippi and definition of jails are those
10 facilities that are run by the various counties and...
11 I guess by the counties of the state.
12 Q   Okay.  I think we're on the same page.
13 A   Okay, great.
14 Q   Now, did you familiarize yourself with any
15 other laws pertaining to prisons?
16 A   No, sir.  I just wanted to be sure that we
17 were, as you said, on the same page regarding the
18 definition of prison.
19 Q   All right.  Now, you've told me already that
20 this document labeled "Statement of Opinions"
21 articulates all of your opinions in this case,
22 correct?
23 A   No, sir.  No, sir.  I think I told you a
24 little bit different.  You asked me if I had any other
25 opinions that were based on the exhibits and

```
 1      A    That also is correct.
 2      Q    All right.  Prior to this case, you had not
 3 read that provision, had you?
 4      A    Yes, sir, I've read that provision many
 5 times.
 6      Q    All right.  What experience have you had
 7 with that provision in those many times that you've
 8 read it?
 9      A    My experience has been in defining and
10 clarifying my role in giving health care to inmates in
11 jails.
12      Q    In jails, okay.
13           You're not saying that Dr. Woods was the
14 sole arbiter of the timing of when a prisoner has to
15 go to an outside facility, are you?
16      A    Yes, that is exactly what I'm saying.
17      Q    So let us assume that the staffing of a
18 prison was limited, and the prisoner needed to go to a
19 facility outside the prison walls, is it your opinion
20 that if Dr. Woods ordered a prisoner to go off the
21 facility, they had to do so at the exact instance in
22 which she ordered it?
23      A    (There was no response.)
24      Q    Even though they didn't have staff there to
25 provide security?
```

1   A   Per my reading of the contract -- this is a
2   separate document -- of the contract between Centurion
3   and the State of Mississippi, Centurion guaranteed, by
4   contract, the availability of appropriate transport of
5   prisoners 24 hours a day, seven days a week in the
6   event that the facility itself was unable to provide
7   timely transfer.
8       So by my reading of the documents provided
9   to me, transport of prisoners should have never been
10  an issue.
11  Q   So are you saying that they had to provide
12  the vehicle or they had to provide the security guards
13  to transport from the prison?
14  A   Who is the "they" in your question?
15  Q   The "they" is Centurion.  Are you saying
16  that it was Centurion's responsibility under its
17  contract to provide the security services to go with
18  the prisoner to an off-site facility?
19  A   Now, once again, I am a physician, and I am,
20  I think, appropriately nervous about giving nonmedical
21  opinions based on reading of contracts.
22      Per my reading of that contract, it appears
23  that Centurion was responsible to give appropriate
24  transport 24 hours a day, seven days a week in the
25  event that the facility itself was unable to provide

1  appropriate transport due to staffing issues.
2      Q    So you just offered an opinion that's a
3  legal opinion.  You're talking about your opinion of a
4  contract, right?
5      A    Yes, sir, per my reading of the contract.
6  And I did try to qualify that before I gave it so that
7  you wouldn't yell at me.
8      Q    I'm not going to yell at you.  I wouldn't do
9  that.  But I am perplexed that you would say with
10 essentially very little legal training what a contract
11 requires of Centurion.
12     A    I think that that contract was written by
13 lawyers for general readership by -- readership by
14 non-lawyers.  And so per that reading, I think the
15 contract is quite clear and does not require a lawyer
16 to interpret it.
17          It's not a law, is it?
18     Q    Are you saying then that you're perfectly
19 well suited as a physician to interpret the State of
20 Mississippi's contract with Centurion because the
21 lawyers had in mind that lay people ought to read it
22 and understand it?
23     A    Yes, sir, that's, that is the -- that's what
24 I'm testifying to.  That is my opinion.
25     Q    Yes, sir.  And you don't have any

1   A   Yes, in terms of a contract, I think that
2   requires agreement by two parties.
3       Q   And you know that based upon --
4       A   Excuse me?
5       Q   And it was -- and that is based upon your
6   understanding of the law?
7       A   I think that's based on my understanding of
8   agreements between parties.  It is not exactly based
9   on my understanding of the law.
10      Q   Okay.  All right.  Then you go on in the
11  next paragraph to state -- in the same paragraph to
12  state:  Aside from the medical decision-making, it is
13  my opinion that Dr. Woods would have engaged in
14  criminal conduct had she not acted as she did in
15  obtaining outside medical treatment for the inmates.
16          In that sentence, the inmates you refer to
17  are the three you've identified in the first
18  paragraph, correct?
19      A   Yes, sir.
20      Q   REDACTED
21  REDACTED
22      A   Yes, sir.
23      Q   And what is the basis for your opinion that
24  she would have engaged in criminal conduct?
25      A   Per my experience in treating inmates in

1　jails, I think that I have been instructed and told
2　that I have a legal obligation to treat those patients
3　to the best of my abilities and that indifference to
4　their medical complaints could potentially constitute
5　a criminal action.
6　　　　Q　Now, who told you that?
7　　　　A　My lawyer and the lawyer that is
8　occasionally employed by the jail where I see inmates.
9　　　　Q　And what is his name?
10　　　　A　His name, I haven't talked to in years, I'm
11　not sure who that is right now.  But I will supply
12　that to you, and I can certainly supply you my
13　lawyer's name.
14　　　　Q　All right.  And what is your lawyer's name?
15　　　　A　Mr. Jim Helveston, James Helveston.
16　　　　Q　And when was the last time you addressed
17　this issue with your lawyer?
18　　　　A　It's been several years.  I have supplied
19　health care to the inmates at the Clay County Jail for
20　about 25 or 26 years now.
21　　　　Q　Are you the medical director for that
22　facility?
23　　　　A　Yes, sir.
24　　　　Q　You're the sole medical director?
25　　　　A　Yes, sir.

1  Q   Okay.  Other than what your lawyer told you
2  and what a lawyer you cannot identify told you, any
3  other basis for your conclusions that she would have
4  engaged in criminal conduct had she not acted as she
5  did in obtaining outside medical treatment for the
6  inmates?
7  A   I believe that that is the extent of my
8  knowledge.
9  Q   Okay.  Now, you go on to illustrate in the
10 next paragraph, for example, REDACTED ... I think
11 you have his name down as REDACTED but it's not clear
12 from this paragraph, I think it's REDACTED suffered a
13 partial severed ear.
14 A   Yes, sir, I believe that that is -- that's
15 an REDACTED suffered a partially severed ear,
16 yes, sir.
17 Q   You say it would have been grossly
18 inadequate care to attempt to repair the ear with
19 stitches, correct?
20 A   Yes, sir.
21 Q   And is that the criminal conduct that you
22 say Dr. Woods would have engaged in had she not sent
23 him to an outside facility, if she had repaired it
24 with stitches?
25 A   If she was indifferent to this patient's

```
 1   objecting to one of my orders, for even one second.
 2        Q    Yes, sir.  But have you -- my question is,
 3   have you ever overridden a warden's decision about an
 4   inmate?
 5        A    No, I've never even had to do that.
 6   Although I certainly would override the director of a
 7   jail's decision.  If they were attempting to make a
 8   medical decision, I would tell them to go to hell,
 9   this is what's going to happen, and if he has a
10   problem with that, he better call God.
11        Q    Okay.  Well, he might call God or he might
12   say to you:  You just disobeyed a directive about an
13   inmate that I'm charged with responsibility, and so
14   that's inappropriate, wouldn't he?
15        A    Yes, sir.  That's what's so hard for me
16   about the reading of this case, is I'm -- under these
17   circumstances I think I would have tried to have the
18   warden arrested on the spot.  I think he was
19   committing a criminal act.
20        Q    Hauled into jail?
21        A    Yep, and hopefully not raped.
22        Q    Allegedly raped.
23        A    Allegedly raped.  My bad.
24        Q    Now, let's go back to your third one, which
25   is  [REDACTED]     You say in the paragraph, on the last
```

```
 1        Q    Oh, I'm sorry.
 2        A    Yeah.
 3        Q    Scrotal sac.
 4        A    It's quite all right.  I'll pronounce the
 5   medical words and you pronounce the legal ones.
 6        Q    Okay.  We got an agreement.
 7        A    And cuts off the blood supply to the
 8   testicle.
 9        Q    Then you go on to describe how painful it
10   is.  And then the last sentence on this page says:
11   The standard of care that diagnosed this condition is
12   a test called a scrotal ultrasound.
13        A    That is correct.
14        Q    And as one can see from the medical records,
15   the test was appropriately ordered, it was
16   countermanded by the warden.
17        A    And I think that that statement is probably
18   incorrect.  The warden certainly did not countermand
19   the ordering of a testicular ultrasound.
20             Are we still there?
21        Q    Yep.
22        A    Okay.
23        Q    It was the patient that countermanded the
24   decision of the ultrasound, right?
25        A    No, sir, not --
```

1    Q    You wouldn't have snatched a murderer who
2    says he's been raped and take him to the hospital,
3    would you --
4    A    I would have screamed and yelled and thrown
5    a giant fit and made sure that this patient got to the
6    place he needed to be and received the care that he is
7    required to have under the Eighth Amendment.
8    Q    Let's assume with me that she screamed and
9    yelled and the warden said he can't go tonight.
10   You've done your job then, right?
11   A    I don't know.
12   Q    You wouldn't haul him off to the emergency
13   room yourself without security --
14   A    No.  No, I wouldn't break the law.  But I
15   don't have a lot of experience with people not paying
16   attention when I start screaming and yelling, so I'm
17   not sure... you know, I'm not sure how I would
18   approach that but I think I would have wanted to be
19   relentless in my requirement that this patient be
20   treated the way that he's required to be treated under
21   the law.
22   Q    And that's what Dr. Woods and the nurse
23   practitioner ordered --
24   A    They ordered very appropriately.  The
25   initial intake nurse -- and we've noted this -- I

```
 1   for --
 2        A    Yes.
 3        Q    -- postponing these appointments?
 4        A    Right.  Right.  Just as a impartial reader
 5   of medical records over the years, and a frequent
 6   criticizer of quality of care and of the quality of
 7   medical records, when you see something that is just
 8   recurrent over and over again, this person is using
 9   the same frickin' excuse, at some point you got to
10   start sort of suspecting:  What's going on here?  I
11   mean, if this is a recurring problem, why hasn't it
12   been solved?
13        Q    Let me ask you about the Clay County, is it
14   the detention center?  I don't know what you refer to
15   it as, the jail where you're the --
16        A    Oh, yeah.
17        Q    -- consulting physician.
18        A    Yeah.  That was -- I refer to it as a jail.
19        Q    Okay.  The Clay County Jail?
20        A    Right.
21        Q    Run by the, I guess, the sheriff's office
22   over there?
23        A    That's correct.
24        Q    How large of a facility is that, how many
25   inmates do they typically have?
```

1   A   Anywhere, I think anywhere between 15 and
2   30.  They get a lot of overflow from -- well, we have
3   in the past gotten a significant amount of overflow
4   from Parchment and some of the other facilities.
5       Q   What type of offenses do the inmates that
6   are housed on more than just a temporary basis
7   typically have over there?
8       A   Most of them are drugs, but up to murder.
9   Every possible offense I've come across.
10      Q   Is there an in-house medical department over
11  there?
12      A   Yes.  Or it's not really a medical
13  department, there's an in-house infirmary.
14      Q   And is that full-time staffed by medical
15  personnel?
16      A   There is a full-time nurse at that facility.
17      Q   There's not a medical doctor on site all the
18  time?
19      A   No.
20      Q   Or even on -- go ahead.
21      A   I am constantly within striking distance for
22  immediate needs.  And I will brag and say that I've
23  been very good about responding over the years to the
24  perception of emergencies.  They do say it's a sorry
25  dog that won't wag his own tail.

1    A    I think that's a reasonably accurate
2    statement.
3    Q    You've never been involved with establishing
4    protocols for transporting inmates to outside medical
5    appointments, have you?
6    A    No, sir, I have not.
7    Q    Or even the protocols for sending inmates
8    within the prison context back to medical for sort of
9    in-house appointments?
10   A    Other than in my small jail.  And no, I'm --
11   I mean... I am not familiar with non-medical issues
12   regarding the administration of a jail or prison.
13   Q    Have you reviewed any Mississippi Department
14   of Correction rules or protocols or procedures on
15   safety?
16   A    I actually think that I have, and I think
17   that some of that information is included in the
18   documents that I supplied.  But I would not under any
19   circumstance purport to claim expertise in that area.
20   Q    Do you have any knowledge about the
21   application of inmate counts within the correctional
22   facility setting?
23   A    I do.  I have a superficial understanding of
24   that process.
25   Q    What is -- just that it's done or do you