IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS                                    PLAINTIFF

VS                    CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9                              DEFENDANTS

---

## ZOOM DEPOSITION OF SARA REVELL

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On October 29, 2020

At 10:30 a.m.

REPORTED BY:   SHARRON F. ALLEN, CSR, RPR
                  CSR NO. 1144

**EXHIBIT "O"**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS                                    PLAINTIFF

VS          CIVIL ACTION NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONALS, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION
JESSE WILLIAMS, INDIVIDUALLY;
AND JOHN DOES 1-9                                   DEFENDANTS

---

ZOOM DEPOSITION OF SARA REVELL

---

Taken at the Instance of the Plaintiff

With All Parties Appearing by Zoom Videoconferencing

On October 29, 2020

At 10:30 a.m.

REPORTED BY:  SHARRON F. ALLEN, CSR, RPR
              CSR NO. 1144

---

2

APPEARANCES:

JAMES D. WAIDE III, ESQUIRE
RACHEL PIERCE WAIDE, ESQUIRE
Waide & Associates, P.A.
Post Office Box 1357
Tupelo, Mississippi 38802

    REPRESENTING THE PLAINTIFF

TIMOTHY M. PEEPLES, ESQUIRE
Daniel Coker Horton & Bell, P.A.
Post Office Box 1396
Oxford, Mississippi 38655

    REPRESENTING MTC & JESSE WILLIAMS

DAVID LONG-DANIELS, ESQUIRE
JACOB R. DEAN, ESQUIRE
Greenberg Traurig, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305

ELIZABETH ROSS HADLEY, ESQUIRE
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

    REPRESENTING MHM HEALTH PROFESSIONALS, D/B/A
    CENTURION PROFESSIONALS

ALSO PRESENT:  DR. AMY WOODS

---

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

3

TABLE OF CONTENTS

Style ................................................... 1
Appearances ............................................. 2
Table of Contents ....................................... 3
Examination by Mr. Waide ................................ 4
    Exhibit 1 - E-Mail String Williams/Revell/Molina
                with Memo from Jesse Williams ........... 5
Deposition Concluded ................................... 34
Certificate of Court Reporter .......................... 35

SHARRON ALLEN & ASSOCIATES
Post Office Box 1731
Jackson, Mississippi 39215
(601) 825-6339

---

4

                SARA REVELL,
having first been duly sworn, was examined and
testified as follows:
                EXAMINATION
BY MR. WAIDE:
    Q.   Ma'am, your name is Sara Revell?
    A.   That's correct.
    Q.   Where do you live?
    A.   Blountstown, Florida.
    Q.   By whom are you employed?
    A.   Management & Training Corporation.
    Q.   How long have you worked for Management
& Training Corporation?
    A.   Twenty-five months.  I started
September 17, 2018.
    Q.   Do you have a background in
corrections?
    A.   I do.
    Q.   How many years of experience do you
have in corrections?
    A.   Working on my 36th.
    Q.   What's your educational level?
    A.   I attended -- well, I have a bachelor's
degree in social work, and I studied at the
University of Kentucky at the School of Social

Page 5

1  work in the master's program.
2          (EXHIBIT 1 MARKED)
3  BY MR. WAIDE:
4      Q.  You have some exhibits there.  Did we
5  send you some exhibits?
6      A.  I do.
7      Q.  If you would, look at the first one
8  that you have there.  It's an e-mail from
9  yourself to Sergio Molina.
10     A.  Yes.
11     Q.  First of all, as of June 27, 2019, what
12 was your position with Management & Training
13 Corporation?
14     A.  Regional vice president, Region 4.
15     Q.  To whom did you report?
16     A.  To Bernie Warner, senior vice
17 president.
18     Q.  Who were your immediate subordinates?
19     A.  My immediate subordinates would be
20 Warden Jesse Williams at Marshall.  At the time
21 it would have been Jody Bradley, the warden at
22 Wilkinson.  Also Jerry Buscher, the warden at
23 Gadsden Correctional Facility in Florida, and
24 Frank Robin Williams, who is the regional
25 director for Region 4.  And I think I've covered

Page 6

1  it.
2      Q.  Who is Sergio Molina?
3      A.  Sergio Molina is another senior vice
4  president of marketing.  I'm going to say
5  marketing development and partnership roughly is
6  his title.
7      Q.  Are y'all in equivalent positions?  Are
8  y'all on the same level?
9      A.  No, he's a superior.  He is a senior
10 vice president; I'm a vice president.
11     Q.  All right.  The subject of this e-mail
12 is an e-mail that y'all had gotten from Warden
13 Williams relating to Amy Woods.  Am I correct?
14     A.  That's correct.
15     Q.  Did y'all discuss -- other than
16 discussing this with Mr. Sergio Molina, did you
17 discuss this with anybody else in the company,
18 this incident with Ms. Woods?
19     A.  Warden Williams.
20     Q.  Anybody else?
21     A.  With Warden Williams.  I don't know if
22 I had a conversation with . . .
23     Q.  I'm sorry.  I didn't understand you.
24     A.  I'm not -- I don't know if I had a
25 conversation about this with my immediate

Page 7

1  supervisor.  I don't recall.
2      Q.  I take it you did not discuss it with
3  Dr. Woods.
4      A.  That's correct.
5      Q.  As a superior of Warden Williams, I
6  would assume you had the authority to overrule
7  his decisions if you wanted to?  Am I right or
8  wrong?
9      A.  I would at the end of the day.  I would
10 have that authority.  But I very rarely overrule
11 wardens' decisions.  I try to support them
12 whenever possible.
13     Q.  All right.  I want to just get you to
14 explain what you mean by the e-mail, and then
15 I'm going to have a few more questions for you.
16     A.  Sure.
17     Q.  First of all -- I'll let you put this
18 in your own words if you don't think this is
19 fair, but you say here, "Please see document
20 from Warden Williams."
21         And what you're talking about is an
22 e-mail that Warden Williams received from an
23 employee of Centurion in which the Centurion
24 employee makes allegations that Dr. Woods has
25 been talking to a state legislator about staff

Page 8

1  shortages.  Is that fair, or do you want to
2  recharacterize that?
3      A.  The only thing that I would clarify is
4  that it sounded like you said that he forwarded
5  me an e-mail from a staff member.  When I read
6  this e-mail, I assumed the document was written
7  by Warden Williams.
8      Q.  I think it is.  I think you're right.
9  But that was the subject of the document that
10 Warden Williams wrote.  I described that
11 correctly.  Right?
12     A.  Yes, sir.
13     Q.  Am I correct in saying that this
14 communication that came from the Centurion
15 employee, a man named Travis Day, am I correct
16 in saying that that communication from Travis
17 Day is the event that ultimately led to the
18 termination of Dr. Woods -- I sorry -- not to
19 the termination, to the revocation of her
20 ability to come onto the facility?
21         MR. LONG-DANIELS:  Objection to form.
22     A.  Yes, sir.
23 BY MR. WAIDE:
24     Q.  So far as you know, was Mr. Day acting
25 properly?  I mean, was he doing anything

Page 9

1  improper so far as his job duties at Centurion
2  were concerned in sending this e-mail, so far as
3  you know?
4      MR. LONG-DANIELS: Objection to form.
5   A.  No, sir.
6  BY MR. WAIDE:
7   Q.  It's kind of strange about these.
8  Lawyers will be objecting, but there's not a
9  judge here, so just ignore the objections and go
10 ahead and answer since there's no judge here.
11 Okay?
12  A.  That's not my -- that's not my -- that
13 isn't my experience, but okay.
14  Q.  Okay.
15     MR. PEEPLES: Sara, just for
16     clarification: Unless I tell you not to
17     answer, you can go ahead and answer.
18     THE WITNESS: Okay.
19     MR. PEEPLES: David or I might object
20     to the form; but unless somebody tells you
21     not to answer, you can go ahead and
22     answer.
23     THE WITNESS: Yeah. You want to make
24     sure the objection is on the record. I
25     understand.

Page 10

1      MR. PEEPLES: Yes. Thank you.
2      MR. WAIDE: She knows more about this
3      than we do, Tim.
4      MR. PEEPLES: I told her she did,
5      yes. She's been through it more than I
6      have.
7      MR. LONG-DANIELS: He's a tricky
8      lawyer, so be careful with him.
9  BY MR. WAIDE:
10  Q.  Who do you understand Travis Day was?
11 What was his position with Centurion?
12  A.  The hospital administrator. HSA we
13 normally call them. House services
14 administrator.
15  Q.  All right. What did you understand his
16 job was? What did you understand he was doing?
17  A.  Well, my understanding --
18  Q.  Mr. Day's job.
19  A.  -- in general about health services
20 administrators is that they oversee the
21 operations of the medical department at the
22 facility, as well as supervise staff at times.
23 I don't know the exact chain of command
24 and/or -- well, I should say organizational
25 structure. But chain of command normally is

Page 11

1  that everybody in the medical department answers
2  to the HSA.
3   Q.  All right. Would it be your
4  understanding he was acting according to his job
5  duties or acting pursuant to his job duties when
6  he communicated with your company, with MTC?
7      MR. LONG-DANIELS: Objection to form.
8   A.  Yes.
9  BY MR. WAIDE:
10  Q.  All right. Do you have any reason to
11 think he was not -- you know what the phrase
12 "course and scope of employment"? Do you know
13 what that phrase means?
14  A.  Yes, sir, I do.
15  Q.  So far as you knew, was Mr. Day acting
16 in the course and scope of his employment when
17 he told y'all whatever it is -- when he told
18 Warden Williams here whatever it is he told him?
19     MR. LONG-DANIELS: Objection to form.
20  A.  That would be my understanding.
21 BY MR. WAIDE:
22  Q.  Let me go back to the e-mail. Do you
23 know -- as we sit here today, do you have any
24 information as to whether or not Mr. Day was
25 telling the truth when he said Ms. Woods had

Page 12

1  been talking to the state representative? Do
2  you know one way or the other?
3   A.  Do I know one way or the other? No.
4   Q.  All right. Have you received
5  information since then that the state legislator
6  whom he claims he was talking to says that's not
7  true, that he in fact had not talked to her?
8  Were you aware of that? Are you aware of that?
9   A.  I am not.
10  Q.  Okay. Do I understand, then, that
11 you -- at least you personally -- have not ever
12 investigated the issue of whether or not what
13 Mr. Day said was true or false?
14  A.  I have not.
15  Q.  And to your knowledge, has anybody from
16 your company ever investigated that?
17  A.  Not to my knowledge. Well, I should
18 say -- yeah, I guess "not to my knowledge" is
19 the right way to say that.
20  Q.  All right. I'm not talking about any
21 investigation made after the suit was filed.
22 I'm really talking about before this suit was
23 filed.
24  A.  Well, I certainly -- again, I certainly
25 take the experience and the integrity of the

13

1  warden to heart when he relays a conversation
2  and a decision. You know, that is substantial
3  in, you know, whether or not I support a
4  decision or not by the individual that operates
5  a correctional facility.
6      Q.  However, in this case, though, what
7  Warden Williams was acting on was based on what
8  Mr. Day had said, was it not?
9           MR. LONG-DANIELS:  Objection to form.
10     A.  That's correct.
11 BY MR. WAIDE:
12     Q.  And you don't know Mr. Day.
13     A.  I think we've met once, or we had met
14 once.
15     Q.  Without making some investigation of
16 this, then, such as, say, by talking to
17 Dr. Woods or by talking to the state legislator
18 involved, you wouldn't have any way of knowing
19 whether what Day said was true or not.
20          MR. PEEPLES:  Object to the form.
21          You can answer.
22          MR. LONG-DANIELS:  Same objection.
23     A.  That's correct.
24 BY MR. WAIDE:
25     Q.  All right.  Let me go ahead, and the

14

1  second sentence is, I guess, one of the main
2  things I want to ask you to explain.
3          It says "I would ask that we don't
4  forward."  Tell me what are you talking about
5  and what are you not wanting forwarded?
6      A.  We don't forward documents that discuss
7  personnel information.
8      Q.  Who would normally -- now, forward to
9  whom?  Who did you have in mind you didn't want
10 it forwarded to?
11     A.  Well, I was aware that Sergio had had a
12 conversation with a state representative.  And
13 obviously internal personnel documents, internal
14 personnel matters we don't, you know, forward
15 communications that are -- that deal with
16 personnel matters.  That's simply what that
17 meant.
18     Q.  All right.  Let me see if I understand
19 that.  Sergio, your employee, he had been
20 talking to a --
21     A.  He's not my employee.  He's a superior.
22     Q.  I mean your company's employee.  I'm
23 sorry.
24         Your superior had told you that he had
25 talked to a state representative?

15

1      A.  Yes.
2      Q.  What representative did he talk to?
3      A.  I believe it was Bill Kinkade, although
4  I don't have anything that would say that for
5  certain.
6      Q.  All right.  And what did he relay to
7  you he talked to Bill Kinkade about?
8      A.  About Dr. Woods's termination.
9      Q.  All right.  What was the substance of
10 it?  Was Kinkade wanting her terminated or not
11 wanting her terminated?
12     A.  My understanding is that Kinkade was
13 inquiring as to the circumstances surrounding
14 her.  And "termination" is the wrong word
15 because MTC did not terminate Dr. Woods, but our
16 disallowing her from continuing to practice at
17 the Marshall Correctional Facility.
18     Q.  All right.  Was it your understanding
19 that Representative Kinkade wanted her to be
20 able to stay on at the facility or did not want
21 her to stay on, or did you have any
22 understanding one way or the other?
23     A.  I didn't.  I did not have any
24 understanding one way or the other.
25     Q.  So is what you're saying about this is

16

1  it was Kinkade that you didn't want to tell?
2  You didn't want Kinkade to know about this
3  e-mail that Warden Williams had sent?
4      A.  Again, we would not forward personnel
5  information to anyone, to include Kinkade or
6  anybody else that may have had interest in it
7  outside of the company.
8      Q.  Would that be -- even though this is a
9  matter about staff shortage at the prison, you
10 wouldn't want a state representative to know
11 about that?
12          MR. PEEPLES:  Object to the form.
13     A.  There are definite ways that are proper
14 for state representatives to know about the
15 conditions at correctional facilities.
16 BY MR. WAIDE:
17     Q.  All right.  You would not want the
18 state representative to get his information from
19 Dr. Woods, then.  Is that what you're saying?
20     A.  That's correct.  Or any other staff
21 member, sir, other than by proper channels,
22 which may be through the warden's office if the
23 warden properly asked for permission to share
24 that information.
25     Q.  So in substance, then, if a staff

17

1 member believes there are staff shortages and
2 that that staff shortage is jeopardizing
3 prisoner safety, you would not want that
4 communicated to a state representative. I'm
5 sorry. You would not want the employee to
6 communicate that information to a state
7 representative. Am I correct?
8    A.   There are proper channels for -- that's
9 a security, an internal security issue. It's
10 normally not just about staff shortages. If the
11 state representative, for example, says, "Are
12 you short of staff?" and the staff member says,
13 "Yes, we're short of staff," and that's the
14 entire context of the conversation, that's one
15 thing; but that's not what is alleged here. And
16 internal security discussions, there are ways
17 for those things to be communicated.
18    Q.   All right. Look at the --
19    A.   And there are folks that really should
20 be communicating them, and it's not a contract
21 physician at the facility.
22    Q.   All right. If you would, describe for
23 me what is it that Dr. Woods said that you would
24 not want communicated to a state representative.
25 What is it allegedly said that you would not

18

1 want communicated to a state representative?
2    A.   By her. There is all sorts of
3 information that state representatives are privy
4 to; but it isn't about necessarily whether or
5 not the state representative has issue or has
6 the ability to get this information, it's how
7 it's requested, who communicates it. There are
8 proper channels to do that.
9    Q.   Here's my question: Turn over to the
10 next page, page 41, and it describes here -- as
11 well as page 43 -- those describe what it is
12 that Dr. Woods had allegedly said. And my
13 question --
14    A.   Yes.
15    Q.   My question to you is: What is it
16 specifically that Dr. Woods allegedly said that
17 she should not be saying to a state
18 representative? What did she say that was
19 improperly communicated to a state
20 representative -- or allegedly did she say?
21    A.   So when you talk about the number of
22 folks that are on shift or the number of folks
23 that aren't on shift, that's internal security
24 information, and internal security information
25 should not be articulated by folks that are not

19

1 in a position to have the authority to do so.
2    Q.   All right. Other than the number of
3 people working on a shift, is there anything
4 else that she allegedly said that she should not
5 have said?
6         MR. PEEPLES: Object to the form.
7      That's a mischaracterization of what she
8      just said.
9         MR. WAIDE: I thought the only thing
10      she described was the number of people on
11      a shift.
12 BY MR. WAIDE:
13    Q.   What other information --
14    A.   Well, if you look at what was
15 articulated in paragraph 1 of the exhibit, again
16 the --
17    Q.   Tell me what page number you're looking
18 at.
19    A.   Well, the memo.
20    Q.   You mean Bates No. 41?
21    A.   Paragraph 1. It's not what it says on
22 mine; but, okay, I believe you there.
23    Q.   Look at the bottom. The number's on
24 the bottom there.
25    A.   Okay. Yep, there it is.

20

1         So the cumulative of that
2 information -- number of cars in the parking
3 lot, the number of security employees at work on
4 various shifts and days, along with sharing
5 information -- excuse me -- not having enough
6 staff on given days.
7    Q.   Read the whole thing.
8    A.   That is not appropriate.
9    Q.   The rest of that sentence was ". . . on
10 given days to escort offenders to medical." Do
11 you see that?
12    A.   Yes.
13    Q.   All right. So far as you're concerned,
14 would Dr. Woods, if she had made a statement
15 that there was, quote, not having enough staff
16 on given days to escort offenders to medical,
17 would that statement be improper?
18    A.   Yes.
19    Q.   What do you think the first amendment
20 of the United States Constitution means?
21         MR. PEEPLES: Don't answer that.
22      That calls for a legal conclusion. She's
23      not going to answer legal questions.
24         MR. WAIDE: Well, under the rules,
25      now, they're not supposed to refrain from

21

1   answering a question unless you're
2   claiming a privilege. Is she taking the
3   Fifth Amendment? What's going on here,
4   Tim?
5       MR. PEEPLES: She can answer it, but
6   she's not a lawyer. That's an unfair
7   question for a lay witness to ask. She's
8   not here to give you answers to legal
9   questions. You can ask her any kind of
10  fact question you want. I don't know how
11  you expect her to answer that. She's not
12  a lawyer.
13  BY MR. WAIDE:
14      Q. Do you not agree with me that a person,
15  even though they're an employee, has a right to
16  express their opinions on matters of public
17  concern? Do you agree with that or disagree
18  with it?
19      MR. PEEPLES: Same objection as
20  before. It's a recharacterization of your
21  last question.
22      Sara, if you understood and are able
23  to answer, you can.
24  BY MR. WAIDE:
25      Q. Let me rephrase it. Do you agree with

22

1   me that a person, even though they may be
2   working for you, has the right as a citizen to
3   express their opinions on matters of public
4   concern?
5       MR. PEEPLES: That's literally the
6   same question, just rephrased. Same
7   objection.
8       You can answer, Sara.
9       A. Restate the question, please.
10  BY MR. WAIDE:
11      Q. Do you agree that, even though
12  Dr. Woods may be working for -- well, not for
13  you, but working for Centurion -- nevertheless
14  she has a right to express her opinion on
15  matters of public concern? Do you agree with
16  that or do you not agree with that?
17      MR. PEEPLES: Object to the form of
18  the question.
19      A. Not when it endangers the safety of
20  inmates and staff at a correctional facility.
21  No, I don't agree with that.
22  BY MR. WAIDE:
23      Q. So making the statement they have a
24  shortage of staff in your opinion endangers
25  safety?

23

1       A. It can in specific context, yes, and
2   when shared along with -- and when shared along
3   with other information.
4       Q. What other information?
5       A. Well, she just -- the only thing that
6   was said was that -- that was not the only thing
7   said, was that there was a shortage of staff.
8       Q. Let me go back to your e-mail on Bates
9   page 40. The last sentence says "If we need to
10  return her to duty, we will certainly do so."
11      What did you mean by that?
12      A. That if the -- I worked for the federal
13  government for 36 years. Sometimes we made
14  decisions, and they had to be reversed because
15  of the political whims. And so in this case,
16  that's simply what I meant -- was that if either
17  anyone in the company of higher authority
18  believed that we needed to have her reinstated,
19  that we would do so. And normally the only, you
20  know, reason that would happen was because we
21  felt that it was politically wise to do so.
22      Q. I see. You might reinstate her if you
23  thought it was politically wise to reinstate
24  her? Is that what you're saying?
25      A. If folks with a higher pay grade than

24

1   myself thought it was, yes. I was supporting
2   the warden's decision; but if I was told to
3   reinstate her, I would follow the rules. I
4   would follow the direction given to me.
5       Q. I see. Did Mr. Sergio ever respond
6   then? Your superior, did he ever respond as to
7   whether to reinstate her?
8       A. He did not change my decision to
9   support the warden.
10      Q. Did he e-mail you back?
11      A. I don't believe so.
12      Q. What did he tell you after you sent him
13  this e-mail?
14      A. "Thank you." And, you know, again, if
15  he would have thought that we needed to reverse
16  the decision, I would have been told to do so.
17      Q. You don't remember what -- do you
18  remember what he said after you sent him this
19  e-mail?
20      A. I do not.
21      Q. Did either one of y'all ever check with
22  Centurion to find out about how this was going
23  to jeopardize medical care for prisoners if you
24  fired the doctor?
25      A. It goes without saying that whenever

25

1  you have a vacancy that you want to fill it as
2  soon an possible. Again, I understand that
3  wholeheartedly, having served as a warden for
4  eight years at three different facilities. When
5  you have a vacancy in any department, you want
6  to fill it as expeditiously as possible.
7      Q.  My question, though, doesn't relate to
8  filling the vacancy; it relates to whether you
9  should create the vacancy.
10         Did you or, to your knowledge, anybody
11 else in your company ever confer with Centurion
12 about whether they needed Dr. Woods in order to
13 promote prisoner safety?  Prisoner health and
14 safety.
15         MR. LONG-DANIELS:  Objection to the
16    preamble.
17     A.  No, because when -- when the behavior
18 of the individual hampers security and/or, you
19 know, is something that is against, you know,
20 what is allowed to do -- having conversations
21 about security issues outside of the chain of
22 command and outside of what's allowed -- you
23 know, you deal, then, with the operational
24 issues that you have as a result.
25

26

1  BY MR. WAIDE:
2      Q.  The question of whether or not having
3  Dr. Woods banned from the facility would be
4  harmful to efforts to protect the patients'
5  health and safety never arose, never came up,
6  and was never considered.  Am I correct?
7         MR. PEEPLES:  Object to the form.
8      A.  Not by myself.
9  BY MR. WAIDE:
10     Q.  Did anybody from Centurion ever talk to
11 you about the effect of your banning Dr. Woods
12 and whether or not they needed Dr. Woods so as
13 to provide medical treatment for prisoners?
14     A.  No.
15     Q.  What about Jerry Williams?  To your
16 knowledge, did Jerry Williams from the
17 Mississippi State Department of Corrections have
18 any involvement in this?
19        MR. LONG-DANIELS:  Object to form.
20     A.  My understanding is that Warden
21 Williams may have had a conversation with him
22 about it, but not with myself.
23 BY MR. WAIDE:
24     Q.  Is it your understanding --
25     A.  Because Warden Williams would have

27

1  notified MDOC of his decision, as I believe he
2  indicates that he did in his e-mail.
3      Q.  Did Warden Williams have the authority
4  to veto this decision if he wanted to, to your
5  knowledge?
6      A.  Yes.
7      Q.  And he knew about it and did not veto
8  it.  Am I correct?
9         MR. LONG-DANIELS:  Objection to form.
10     A.  Do you mean Jerry Williams?  You said
11 "Warden Williams."
12 BY MR. WAIDE:
13     Q.  You're so right.  I'm sorry to get you
14 confused.  I'm so sorry.  Or get myself
15 confused.
16        Did Jerry Williams know about this
17 decision and approve of it?
18        MR. LONG-DANIELS:  Objection to form.
19     A.  That's my understanding.  And it says
20 so in the e-mail, that Warden Williams spoke
21 with Jerry Williams, the DCI.  And that would be
22 his normal course of communication on all
23 matters such as this.
24 BY MR. WAIDE:
25     Q.  Here's my question:  To your knowledge,

28

1  Jerry Williams would have known that Dr. Woods
2  was in the process of being banned from the
3  facility?  Had been banned or was in the process
4  of being banned?
5         MR. LONG-DANIELS:  Object to the
6    form.
7      A.  That's my understanding.
8  BY MR. WAIDE:
9      Q.  And as the person to whom y'all
10 reported at the Department of Corrections, could
11 Jerry Williams have vetoed that decision if he
12 wanted to?
13     A.  You know, I don't know the answer to
14 that question.
15     Q.  Is it your understanding that y'all did
16 consult with Jerry Williams, though, before the
17 decision was final?
18     A.  Yes, but it wouldn't have been to ask
19 permission; it would have been to inform.
20     Q.  Okay.  Well, you may have answered
21 this, and I apologize if you have:  Is it your
22 understanding that Jerry Williams, if he
23 disagreed with this decision, could veto it and
24 could have told y'all "We don't want y'all to
25 jeopardize prisoner safety by firing the doctor

29

1  down there"?
2      MR. PEEPLES: Object to the form.
3      A. You know, I don't know the answer to
4  that question. Obviously Centurion contracted
5  with MDOC, not MTC. So, technically, I don't
6  know the answer to that question.
7  BY MR. WAIDE:
8      Q. Well, we're not talking about firing --
9  I didn't mean firing her; I meant banning her
10 from coming onto the prison facility.
11     MR. LONG-DANIELS: Object to the
12       form.
13     A. I don't know the answer to that
14 question.
15 BY MR. WAIDE:
16     Q. Okay. Would you have approved this
17 decision if you had known that Travis Day was
18 lying and in fact Dr. Woods never talked to the
19 state representative about the shortage of
20 staff?
21     MR. LONG-DANIELS: Object to the
22       form.
23 BY MR. WAIDE:
24     Q. If you had known he was lying about it,
25 would you have still fired her anyway -- I mean

30

1  still banned her from the facility anyway?
2      MR. LONG-DANIELS: Objection to form.
3      A. That's a hypothetical.
4  BY MR. WAIDE:
5      Q. On what basis would you -- assuming Day
6  was lying, on what basis would you have
7  terminated her from the facility? Why would you
8  terminate her -- why would you keep her off the
9  facility if you had known Day was lying?
10     MR. LONG-DANIELS: Objection to form.
11     A. Again, that's a hypothetical because I
12 don't -- I don't have any information that Day
13 was lying.
14 BY MR. WAIDE:
15     Q. Nobody's ever told you that the
16 representative said he never did talk to Woods
17 about this? Nobody has ever told you that?
18     A. No, sir, and I think I answered that
19 question earlier.
20     Q. Okay. Well, let's assume
21 hypothetically that Day was lying. Would you
22 then approve the decision of Williams to
23 terminate Dr. Woods?
24     MR. LONG-DANIELS: Objection to form.
25     A. That's a hypothetical question. I

31

1  don't . . . That's not the information I had.
2  That's not the information I had.
3  BY MR. WAIDE:
4      Q. Who told you Day was telling the truth?
5      A. The warden. The warden represented --
6      Q. How did he know?
7      A. I can't answer for how would a warden,
8  you know . . .
9      Q. Well, he's not a mind reader as far as
10 I know, is he? He's not a prophet or anything.
11     As far as you know, he just relied on
12 what Day told him and said, "Okay, let's ban her
13 from the facility because Day wants her banned."
14     MR. LONG-DANIELS: Objection to form.
15     MR. PEEPLES: Object to form.
16 BY MR. WAIDE:
17     Q. Am I correct? Is that what happened?
18     MR. LONG-DANIELS: Objection to form.
19     A. That's truly not a question.
20 BY MR. WAIDE:
21     Q. The question is: Do you have any
22 information that she was banned for any reason
23 other than that Day told Williams that she had
24 been talking to the representative?
25     A. That's my understanding.

32

1      Q. Do you think there was something
2  behind -- do you have any information there was
3  something behind getting rid of Dr. Woods other
4  than the fact that Day had said she had been
5  talking to Williams about staff shortages?
6      A. I have no reason to believe that.
7      MR. LONG-DANIELS: Objection to form.
8  BY MR. WAIDE:
9      Q. You didn't know she had been
10 complaining about there not being adequate
11 treatment for prisoners' health needs, that
12 there had been a delay in getting them over so
13 they could be treated for their medical needs?
14 You didn't know anything about that?
15     A. No, sir.
16     Q. Would you want to have an employee --
17 I'm sorry. Would you want somebody on your
18 premises who was complaining about your company
19 not taking prisoners over to care for their
20 medical needs?
21     MR. LONG-DANIELS: Objection to form.
22     A. I as a warden always wanted to know
23 what staff thought about operations, which is
24 why I encouraged staff to use proper chain of
25 command in communicating concerns. I always

33

1 wanted to know.
2 BY MR. WAIDE:
3     Q.  Don't y'all have to file reports with
4 the State Department of Corrections about the
5 number of medical appointments that have been
6 missed because your company didn't transport the
7 prisoners? Don't y'all have to make reports
8 about that?
9     A.  We do.
10     Q.  And aren't those in the form of
11 spreadsheets, monthly spreadsheets?
12     A.  There are different formats, depending
13 on the facility, how they transfer them to the
14 MDOC. And the compliance manager for the state
15 normally has involvement in that as well.
16     Q.  Who's the person from your company
17 that's supposed to transmit that information to
18 the state?
19     A.  I don't know that. For each specific
20 institution it's different. I don't know who
21 does it for each facility.
22     Q.  Have you ever seen any information your
23 company was falsifying those reports and not
24 accurately transmitting to the state the number
25 of appointments being missed?

34

1     A.  No, sir.
2     MR. WAIDE: That's all I have.
3     MR. LONG-DANIELS: I have no
4 questions.
5     MR. PEEPLES: I have no questions.
6     MR. WAIDE: Thank y'all very much.
7     MR. PEEPLES: Thank you, Sara.
8     THE WITNESS: Thank you.
9     MR. WAIDE: Y'all have a good day.
10 Tim, do you want to read and sign?
11     MR. PEEPLES: Yeah.
12     Sharron, will you send it to me, and
13 I'll get it to her.
14     COURT REPORTER: Yes.
15     (DEPOSITION CONCLUDED AT 11:03 A.M.)
16     * * * * * *

35

1          CERTIFICATE OF DEPONENT
2     I, SARA REVELL, deponent in the deposition
3 taken in the herein styled and numbered cause,
4 certify that I have examined the foregoing 34 pages,
5 being the total number of pages relating to my
6 testimony, as to the correctness thereof, and that
7 after reading said pages, and subject to any
8 corrections I may have attached hereto as a
9 Deponent's Corrections Sheet, I find them to contain
10 a full, true, and correct transcript of the
11 testimony as given by me.
12     This the _____ day of _____, 2020.
13
14                   _____
15                        SARA REVELL
16 STATE OF MISSISSIPPI
17 COUNTY OF _____
18
19     SUBSCRIBED AND SWORN TO BEFORE ME, the
20 undersigned authority, on this the _____ day of
21 _____, 2020.
22
23                   _____
                       NOTARY PUBLIC
24 My Commission Expires:
25

36

1          DEPONENT'S CORRECTION SHEET
2
3 PAGE    LINE         CORRECTION
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14
15                   _____
                       SARA REVELL
16
17 STATE OF MISSISSIPPI
18 COUNTY OF _____
19     SWORN AND SUBSCRIBED TO BEFORE ME, this the
20 _____ day of _____, 2020.
21
22                   _____
                       NOTARY PUBLIC
23
24 My Commission Expires:
25

```
                                              37
1                CERTIFICATE OF COURT REPORTER
2           I, SHARRON F. ALLEN, Certified Shorthand
3    Reporter and Notary Public in and for the State of
4    Mississippi at large, hereby certify that the
5    foregoing 36 pages contain a full, true, and correct
6    transcript of the proceedings as taken by me at the
7    time and place heretofore stated in the
8    aforementioned matter by stenotype and later reduced
9    to typewritten form by me to the best of my skill
10   and ability by means of computer-aided
11   transcription.
12          I further certify that I placed the witness
13   under oath to truthfully answer all questions in
14   this matter under the authority vested in me by the
15   State of Mississippi.
16          I further certify that I am not in the
17   employ of or related to any counsel or party in this
18   matter and have no interest, monetary or otherwise,
19   as to the final outcome of this proceeding.
20          WITNESS MY SIGNATURE AND SEAL, this the
21   29th day of October, 2020.
                                  *Sharron F. Allen, CSR, RPR*
22          .                     ─────────────────────────
                                  SHARRON F. ALLEN, CSR, RPR
23                                CSR NO. 1144
24   My Commission Expires:
25   November 5, 2023
```