```
1            IN THE UNITED STATES DISTRICT COURT FOR THE
                    NORTHERN DISTRICT OF MISSISSIPPI
2                            OXFORD DIVISION

3

     DR. AMY R. WOODS                                     PLAINTIFF
4

     VS.                       CAUSE NO. 3:19-CV-00234-NBB-RP
5

     MHM HEALTH PROFESSIONAL, LLC, D/B/A
6    CENTURION PROFESSIONALS;
     MANAGEMENT & TRAINING CORPORATION;
7    JESSE WILLIAMS, INDIVIDUALLY; AND
     JOHN DOES 1-9                                       DEFENDANTS
8

9


10   **************************************************************

11
                    DEPOSITION OF REPRESENTATIVE BILL KINKADE
12


13   **************************************************************

14

15

16

17              TAKEN AT THE INSTANCE OF THE PLAINTIFF
                         VIA ZOOM VIDEOCONFERENCE
18          ON OCTOBER 7, 2020, BEGINNING AT 2:44 P.M.

19

20

21

22

23                  GENA MATTISON GLENN, CSR 1568
                          Glenn-Henry Reporting
24                        Post Office Box 492
                     Amory, Mississippi  38821-0492
25                       gena.glenn@gmail.com
                            (662) 315-2613
```

**EXHIBIT "Q"**

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DR. AMY R. WOODS                                             PLAINTIFF

VS.                             CAUSE NO. 3:19-CV-00234-NBB-RP

MHM HEALTH PROFESSIONAL, LLC, D/B/A
CENTURION PROFESSIONALS;
MANAGEMENT & TRAINING CORPORATION;
JESSE WILLIAMS, INDIVIDUALLY; AND
JOHN DOES 1-9                                               DEFENDANTS

**************************************************************

DEPOSITION OF REPRESENTATIVE BILL KINKADE

**************************************************************

TAKEN AT THE INSTANCE OF THE PLAINTIFF
VIA ZOOM VIDEOCONFERENCE
ON OCTOBER 7, 2020, BEGINNING AT 2:44 P.M.

GENA MATTISON GLENN, CSR 1568
Glenn-Henry Reporting
Post Office Box 492
Amory, Mississippi 38821-0492
gena.glenn@gmail.com
(662) 315-2613

## Page 2

APPEARANCES:

WAIDE & ASSOCIATES
P.O. Box 1357
Tupelo, MS 38802-1357
For the Plaintiff
BY: JIM D. WAIDE (Via Zoom Videoconference)
    RACHEL P. WAIDE (Via Zoom Videoconference)

GREENBERG TRAURIG
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305-1780
For the Defendant Centurion
BY: DAVID LONG-DANIELS (Via Zoom Videoconference)

GREENBERG TRAURIG
300 West 6th Street, Suite 2050
Austin, TX 78701-4236
For the Defendant Centurion
BY: ELIZABETH ROSS HADLEY (Via Zoom Videoconference)

DANIEL COKER HORTON & BELL
P.O. Box 1396
Oxford, MS 38655-1396
For the Defendant Management & Training Corporation
BY: TIMOTHY M. PEEPLES (Via Zoom Videoconference)

Reported by: GENA MATTISON GLENN, CSR 1568
             GLENN-HENRY REPORTING

## Page 3

TABLE OF CONTENTS

WITNESS                                              PAGE

REPRESENTATIVE BILL KINKADE
Examination by Mr. Jim D. Waide                       6
Examination by Mr. Timothy M. Peeples                15
Examination by Mr. David Long-Daniels                37
Examination by Mr. Jim D. Waide                      47

EXHIBIT
NO.   DESCRIPTION                                    PAGE

      (No Exhibits)

## Page 4

   REPRESENTATIVE BILL KINKADE,
first being duly sworn, was examined and
   testified as follows, to-wit:

           EXAMINATION
BY MR. WAIDE:
   Q. Sir, you are Bill Kinkade?
   **A. Yes, sir.**
   Q. Where do you live, Representative Kinkade?
   **A. I am -- my home is [redacted] in Byhalia.**
   Q. In Marshall County?
   **A. In Marshall County, yes, sir, Mississippi.**
   Q. And I believe you're a member of the Mississippi legislature?
   **A. I am, sir.**
   Q. How long --
   **A. I'm in my third term with the legislature.**
   Q. What counties does your district encompass?
   **A. I represent Marshall and DeSoto Counties. The east section of DeSoto, and 70**

Page 5

1  percent of my district is in Marshall County.
2      Q.  Do you have -- do you work outside of
3  your legislative duties?  Do you have other
4  work?
5      A.  I do.  I'm in my office now in
6  Memphis.  I have a sports marketing company in
7  Memphis and have for the past 40 years.
8      Q.  At one time, you were chairman of the
9  Corrections Committee of the House of
10 Representatives; am I correct?
11     A.  That's correct.  That's correct.
12     Q.  Is the Mississippi legislature the
13 entity that funds the Department of Corrections?
14     A.  Well, the legislature funds the DOC,
15 yes, sir.
16     Q.  Tell me, generally, how many member --
17 well, what years were you the -- on the
18 Department of Corrections committee in the
19 legislature?  What years was that?
20     A.  I was chairman -- I was on -- I've
21 been on the committee since 2012 through 2016
22 and became chairman '16 to 2020.  And I'm
23 currently the Chairman of Wildlife Fisheries and
24 Parks.
25     Q.  So you left the corrections committee

Page 6

1  in 2020?
2      A.  Yes, sir.  In January I was resigned
3  to another chairmanship.
4      Q.  In 2000 -- specifically in the spring
5  of 2019, do you recall anybody complaining to
6  you about staff shortages at the correctional
7  facility in Marshall County?
8      A.  In fact, I do.  I believe it was a
9  Friday on my way home from Jackson, I had a
10 physician -- or it might have been a dentist;
11 I'm not quite clear on the detail -- but had
12 called me and expressed concern that there
13 weren't enough guards to staff properly, and
14 that -- this is the second time he had let me
15 know that.
16         But he was very concerned at this
17 point saying that, you know, there wasn't enough
18 cars in the parking lot.  He was aware of -- he
19 knew the guards.  He knew, you know, what they
20 should be -- who should be there, and they were
21 not there.
22         I subsequently listened to him.  I
23 called Jerry Williams with DOC, which is my
24 point of contact for facilities, and expressed a
25 concern had been -- had been given to me by this

Page 7

1  doctor.  And I said, Just look into it, Jerry.
2  I want to make sure that we're safe.  And he
3  said, Well, I'm on it right now, and he'd report
4  back to me any -- any investigations that they
5  may have had.  Which I never heard back from him
6  on that particular case.
7      Q.  All right.  Was this a male or a
8  female who had expressed this concern to you?
9  You said it was a doctor.
10     A.  It was a male doctor.  It was --
11 seemed to be a senior male doctor, or it could
12 have been a dentist.  I'm not -- again, I wish I
13 would have been paying attention to that detail.
14     Q.  Okay.
15     A.  But it was an older gentleman that
16 called me.  And, actually, that was the second
17 time he had indicated to me he was concerned
18 about the safety and the short-staffing.  And so
19 the first time, I may have just not reacted to
20 it.  But the second time, I thought it warranted
21 somebody from DOC looking into it.
22     Q.  Were you aware in general, other than
23 through this male doctor or dentist, that there
24 was a problem with staff shortages at the
25 Marshall County correctional facility?

Page 8

1      A.  Not any more so than any other
2  facility.  Certainly we have the same -- as
3  chairman, I was aware of staff shortages that
4  were going on in various facilities.
5          Now, those are DOC facilities.  This
6  happened to be a private prison, a private
7  contract, and that's why it triggered some, you
8  know, concern that I needed to investigate that
9  since we have a contracted minimum.
10     Q.  And I don't want you to guess because
11 I know you're not a committee party.  Do you
12 remember the name of the corporation that had
13 the contract?
14     A.  Management Training Corporation, I
15 believe.
16     Q.  And do you remember the name of the
17 company that employed the doctors and nurses up
18 there to provide medical care?  Do you remember
19 the name of that company?
20     A.  I believe it was Centurion.
21     Q.  So did you say you never did hear back
22 from Mr. Williams, from Jerry Williams, after
23 you brought that to his attention?
24     A.  You know, I spoke to Jerry sometime
25 afterward, and it could have been three to four

Page 9

1   weeks later, and asked him if he looked into it.
2   And he said, in fact, he had, and they were
3   trying to audit some staffing situation.
4           It was a short time of that when they
5   had a prison issue in Marshall County that
6   proved to be, in large part, due to short
7   staffed. They had some violence in the
8   facility. And so that initiated another
9   conversation with Jerry as, Hey, this has been a
10  longstanding issue, was this part of that cause.
11  That was -- that was the extent of the
12  conversation with Jerry Williams.
13      Q.  All right. And you mentioned a male
14  doctor or dentist. Other than that, do you
15  recall anybody else that worked at the Marshall
16  County correctional facility contacted you to
17  complain about the staff shortage or to bring to
18  your attention the staff shortage?
19      A.  No, I didn't have anybody, really,
20  ever talk to me about staff shortages or prison
21  condition. I did have a pastor's wife -- and I
22  didn't -- I never talked to her, but I spoke to
23  the pastor -- that had expressed some concern
24  that his wife had indicated that, you know, it
25  wasn't -- that there was new management, there

Page 10

1   was a new warden, and things weren't smooth.
2   The transition was difficult. And I believe
3   that that pastor's name was Stephen Bittick.
4       Q.  Bittick?
5       A.  Uh-huh. And I believe his wife worked
6   at the facility, but I never spoke directly with
7   any of the staff there.
8       Q.  Do you know Dr. Amy Woods?
9       A.  I do.
10      Q.  How do you know her?
11      A.  Well, I know her through the Chamber
12  of Commerce, which, you know, I served Chamber
13  of Commerce as president for the last 20 years.
14  I've been involved in the Chamber. And, of
15  course, Amy is -- was a devout church member.
16  She's a neighbor to the Chamber and a very
17  active part of the community.
18          I know her husband rather well. I
19  know Dr. Woods because -- just because she was a
20  doctor. She's well respected. I know a lot of
21  the Woods family.
22          And I happened to visit on an open
23  house at the Marshall County facility. And this
24  was probably in '17, I guess. 2017. Could have
25  been '18, but an open house. And I was touring

Page 11

1   the facility and happened to see her in there.
2   And we spoke and -- because I was not even aware
3   she worked there.
4           But that's the only time I had ever
5   spoken to her in or about the facility.
6       Q.  Did you ever talk to her about the
7   staff shortages at the -- or alleged staff
8   shortages at the facility to Dr. Woods?
9       A.  No, sir, not until one point she
10  contacted -- well, it was actually her family
11  contacted me after she was terminated, and they
12  proceeded to chastise me -- or the oper -- the
13  overall situation. And I wasn't aware that she
14  had been let go. But I had talked to her after
15  she was let go, and I was, you know, frankly
16  shocked.
17      Q.  Why were you shocked?
18      A.  I never spoke --
19      Q.  Why were you shocked she was let go?
20      A.  Because as I was -- as it was
21  indicated to me, that there was come conflict
22  that she supposedly had talked to me about the
23  condition of the jail, which never had I even
24  had a conversation with her. And never about
25  the facility until after she was terminated;

Page 12

1   and, frankly, it shocked me.
2       Q.  All right. What was your -- in
3   general, what was your opinion of her character
4   so far as her honesty is concerned?
5       A.  She's very stand-up. I mean, she's
6   very forthright. She had no blame for me. She
7   was deeply saddened. She asked me if she had
8   done anything inappropriate where I was
9   concerned, and to my knowledge, no. So, you
10  know, that was my shock, is that she had been
11  terminated based on that premise and which was
12  not so.
13      Q.  All right. Did you ever -- did you
14  ever call the warden, Warden Williams, at the --
15  at Management Training Corporation to ask him
16  about -- about her being terminated?
17      A.  Never.
18      Q.  You never did talk to Warden Williams?
19      A.  Never.
20      Q.  Did he ever call you?
21      A.  I've never spoken to Warden Williams.
22      Q.  So do you know Warden Williams?
23      A.  No, sir, I don't. As Chairman of
24  Corrections, my job is to work with the
25  commissioner, and it stops and starts in Central

Page 13

1  Office, you know. And I don't talk to
2  employees, staff, wardens, guards, security
3  personnel. Just, that's not -- that's not
4  correct protocol. I work with commissioner and
5  the commissioner's staff, which is constituent
6  services. Those are the three people that I
7  worked with.
8       Q. So at no time did you talk with
9  Williams about whether or not Dr. Woods should
10 be reinstated or whether she was -- she
11 wrongfully left her position -- wrongfully lost
12 her position?
13      A. No, sir.
14      Q. You never had a conversation like
15 that?
16      A. No, sir.
17      Q. And what about with anybody from
18 Centurion? Did you talk to anybody from
19 Centurion?
20      A. No, sir.
21          (Video and audio interruption.)
22          There we go. I'm sorry.
23          No. Once again, my job was to work
24 specifically with the Central Office of
25 Department of Corrections and not any contracted

Page 14

1  personnel.
2          I did speak to Centurion in the
3  capitol when they came in. It was the
4  management team out of their office in Utah, I
5  think. Just -- they were lobbying, I guess, for
6  the contract. Never anything about specifics of
7  any personnel or facility.
8       Q. All right. Did you -- well, I'm not
9  going to put words in your mouth. But when this
10 doctor or dentist, whatever he -- whichever one
11 he was, talked to you about the staff shortages,
12 did you consider that he was doing anything
13 wrong? Did you believe he was doing anything
14 wrong by talking to you?
15      A. No, not at all. I think that -- no,
16 it never occurred to me that he was breaking any
17 kind of rule. He was genuinely concerned with
18 the safety of the facility. And -- and, again,
19 on his second inquiry, I sized up that he was
20 probably correct and then reported that to Jerry
21 Williams.
22          And I will say that Jerry Williams is
23 the only one that I really spoke to about this.
24 I never spoke to the commissioner about it,
25 Pelicia Hall. I never spoke to anybody else.

Page 15

1  And Jerry Williams was my point of contact
2  because he was the director of facilities. And
3  that's his primary responsibility, so, you know,
4  it was between him and I. I never reported any
5  past him.
6       Q. Give me just one second, please, sir.
7  That's all I have.
8          MR. LONG-DANIELS: Tim, have you got
9  anything?
10         MR. PEEPLES: Go ahead, if you've got
11 anything. I'll look through my notes while
12 you're doing that.
13         MR. LONG-DANIELS: I really don't have
14 anything, Tim.
15         MR. PEEPLES: All right. Then I'll
16 proceed.
17         THE WITNESS: And who am I speaking
18 with?
19
20              EXAMINATION
21 BY MR. PEEPLES:
22      Q. Hey, Mr. Kinkade. I'm Tim Peeples. I
23 don't know if you can see me well enough.
24      A. Hey, Tim. How are you?
25      Q. I'm doing well. I'm counsel for

Page 16

1  Management & Training Corporation.
2       A. The Oxford office.
3       Q. Yes, sir. I'm down here in Oxford,
4  not too far away from you.
5       A. At the belly of the beast.
6       Q. Yes, that's right.
7          Let's back up. You mentioned that you
8  had spoken to someone in Dr. Woods' family about
9  her being terminated, right?
10      A. I believe it was her -- it was her
11 father-in-law that actually first told me about
12 the situation.
13      Q. Okay.
14      A. About, in his estimation, and
15 paraphrasing it -- again, this was sometime
16 ago -- paraphrasing it, he just said he was very
17 disappointed that they that had decided to let
18 Amy go at Washington County Correctional. And
19 when I inquired why, he said, Well, apparently,
20 she had supposedly talking -- talked to me.
21         And I was very -- I was -- you know --
22         (Video and audio interruption.)
23      A. I'm sorry. But I believe it was her
24 father-in-law, Pat Woods, was the only one I
25 spoke to.

Page 17

1  BY MR. PEEPLES:
2    Q. Okay. And I guess he called you on
3  the phone?
4    A. No. I think I saw him in town. And,
5  again, I know the Woods family rather well.
6  They have the feed & seed store. Obviously, I'm
7  one of the ole boys that shop at the feed & seed
8  store, so I know Amy's husband, Patrick, pretty
9  well.
10       And, you know, Patrick, he didn't
11 really make much of it, but, you know, just said
12 it was a shame.
13   Q. Okay. What church do you go to?
14   A. Fellowship Baptist.
15   Q. Okay. And you don't -- you don't
16 know --
17   A. What's that got to do with anything?
18   Q. Well --
19   A. I think the Woods family attends the
20 Methodist church, if that's your direction.
21   Q. I'm asking you if you know -- I mean,
22 it could be -- well, we'll move on.
23       Did you know Pastor Bittick before --
24 before all this, where he mentioned to you that
25 there were issues at the facility?

Page 18

1    A. I know Pastor Bittick because we're
2  brothers in the Lion's Club.
3    Q. Okay.
4    A. I know he was very active in the
5  community and the schools. I know he was a --
6  mentored some young people in town. And as the
7  chamber director, we crossed paths several
8  times. So I knew -- I knew Reverend Bittick
9  reasonably well.
10       I only met his wife once or twice and
11 his daughter maybe once or twice at a dinner,
12 but I really never discussed anything with them.
13   Q. Okay. And you didn't discuss anything
14 with Ms. Bittick about her work at the jail
15 facility?
16   A. No. You know, they invited me to come
17 down, I think, and I believe it was Stephen that
18 invited me, actually. And I failed -- I failed
19 to go, but I was invited to, you know, a lunch
20 at the facility when the new warden had taken
21 over. But, again, I never attended that
22 luncheon.
23   Q. Again, who gave you that invitation?
24   A. Well, it was put out by the DOC for my
25 committee members. And then Reverend Bittick is

Page 19

1  the one that called and asked me if I was going
2  to make the luncheon. And, you know, it was
3  just if I could, I could. If not, I couldn't.
4  But I believe it was Stephen that said, Hey, I
5  hear they're having a luncheon; are you going to
6  go.
7    Q. After you talked to, I think it was,
8  Pat Woods -- is that who you said --
9    A. Right.
10   Q. -- Amy's father-in-law?
11   A. Father-in-law.
12   Q. Yes, sir. Did you -- what did you do
13 after you spoke to him?
14   A. Nothing to do.
15   Q. Did you call Jerry Williams?
16   A. I expressed -- I did -- I think I did
17 call Jerry and ask him, you know, why that
18 happened. But, I mean, I don't have much
19 recollection about the conversation. Again,
20 when an employee is terminated, I didn't think
21 it was going to go anywhere else, so I didn't
22 pursue it. But I believe I did speak to Jerry
23 and -- or, I mean, Commissioner Williams and ask
24 him if he knew about it.
25   Q. What did --

Page 20

1    A. I don't really remember the basis of
2  the conversation. I know there was some
3  discussion about it, but it wasn't anything, in
4  my mind, that was vital.
5    Q. So even though -- but you didn't do
6  anything beyond that even though you said you
7  were shocked, right?
8    A. I was just shocked by it.
9    Q. Was Jerry Williams shocked in your
10 opinion?
11   A. Again, it was a telephone call, so, I
12 mean, I really can't read into how Jerry took
13 that. I mean, I just asked if he knew about it,
14 and he said he knew that he was aware that there
15 were some changes in staff. I don't think that
16 he was shocked, no.
17   Q. Okay. Did -- did you ask Jerry or did
18 Jerry express to you his -- his opinion about
19 what had occurred or what was alleged to have
20 occurred?
21   A. No.
22   Q. Did he ever tell you he agreed with
23 the decision to revoke Dr. Woods' clearance?
24   A. Again, I'll tell you, Tim, you know,
25 Dr. Woods didn't work for DOC, and DOC is the

Page 21

1  only concern that I had, not -- not a
2  contractor.  So I didn't see it my place to
3  question what a contractor did.
4     Q.  Okay.
5     A.  You know, I was just simply inquiring
6  with my -- my point of contact at Central Office
7  to something I had heard.  And, again, I didn't
8  pay much attention to it obviously, but I don't
9  think there was a lot of meat in that
10 conversation.
11    Q.  Did -- did you -- did Jerry Williams
12 ever express to you that Warden Williams was
13 willing to meet with you and Dr. Woods about the
14 decision to revoke her clearance?
15    A.  No.  No.
16    Q.  If you had of been made aware of --
17 let's just say, Warden Williams would have met
18 with you and Dr. Woods, is that something you
19 would have done?
20    A.  Absolutely not.
21    Q.  Why not?
22    A.  Again, I start -- I start and stop
23 with the Department of Corrections.  I don't --
24 I don't get into the contractor services or the
25 contractor rules.  My service is simply for the

Page 22

1  State of Mississippi, to be chairman of the
2  Department of Corrections in the House.  So I
3  wouldn't take a meeting outside of that.
4     Q.  Okay.  When you called Jerry Williams,
5  did you consider yourself to be simply asking a
6  question, or were you advocating in any way for
7  Dr. Woods?
8     A.  Just inquiring.
9     Q.  Okay.  And you -- and you -- I guess
10 to be clear, you've never spoken to the warden
11 about anything?  You've never spoken to him at
12 all?
13    A.  I don't think I've spoken to him at
14 all.
15    Q.  Okay.  Have you spoken to wardens in
16 any of the other facilities that are run by
17 Management & Training Corporation?
18    A.  Certainly.
19    Q.  And what about?
20    A.  What about?
21    Q.  Yes.
22    A.  Oh, you know, at our DOC luncheons,
23 employee luncheons, wardens would come and I'd
24 speak to them, you know, in a luncheon format.
25 I mean, not about anything specific other than,

Page 23

1  Thank you, we appreciate you.  And I did that
2  with the warden prior to Mr. Williams.  I just
3  never had the opportunity to get with the new
4  warden Williams.
5     Q.  Have you ever gone to any of the --
6  well, there's only -- there's only a couple, but
7  have you gone to any of the facilities run by
8  Management & Training Corporation to sit down
9  with the wardens on-site to discuss operations
10 or staffing or anything like that?
11    A.  Never.  I met with -- I met with a
12 group out of Tallahatchie County with the
13 commissioner one time.  We were looking at
14 trying to contract some overflow from Parchman,
15 but I was with the commissioner just as support.
16 I wasn't -- you know, I never met with any
17 warden.
18        Now, I have met with DOC wardens in
19 the past, those that directly work for our
20 department, but never -- never an outside
21 entity.
22    Q.  Okay.
23    A.  Again, I think that's a violation,
24 really.  I don't think it's protocol to do that.
25    Q.  Explain that to me.  What do you mean

Page 24

1  by that?
2     A.  Well, I just think anytime you go out
3  of your area of jurisdiction, you're breaking a
4  certain protocol.  And, you know, I work with
5  DOC, and that is where it start and stops.  I
6  don't -- I don't work with any other entities.
7  Not the health-care contractors, not the
8  maintenance contractors, not the -- you know, no
9  other contractor I would have any business to
10 meet with.  It would be to work through Central
11 Office, which I made it a policy to do.
12    Q.  That's really, sort of, your chain of
13 command in a way?
14    A.  That's the way it should be.
15    Q.  Yeah.  The dentist that you mentioned,
16 or possibly doctor, the older gentleman, was
17 that -- to your understanding, was that just a
18 private physician, or was that person employed
19 by Centurion or MTC?
20    A.  Well, I didn't know him at all.  He
21 called me on my cell phone en route when I was
22 coming home one day, and this is the second time
23 he had done it.  Prior to that, he left me a
24 voicemail.  But -- on the first occasion.  On
25 the second occasion, he did get me on the phone

Page 25

1  and told me that he was a physician or a
2  dentist, or whatever he was, and that I should
3  be very concerned about the staffing situation.
4  He was -- he was concerned for some of the staff
5  and some of the inmates. And, you know, he just
6  wanted to make sure that it was reported to the
7  proper people.
8      So, you know, I didn't really say much
9  to him other than, Thank you for letting me
10 know, and I called Jerry Williams immediately on
11 that same trip home and communicated the
12 information. But that's really the only
13 conversation I ever had about this, is from him,
14 with Jerry, on one occasion.
15     Q. And then you had -- and then Jerry, I
16 think you said he followed up with you a couple
17 of weeks later?
18     A. I think I asked Jerry a couple of
19 weeks later if he ever heard anything -- did he
20 hear that an employee had been terminated. And,
21 you know, again, I don't think there was a whole
22 lot of response there. I didn't hear any
23 concern.
24     Q. In your role on this corrections
25 committee, you know, are you familiar with how

Page 26

1  jail facilities are run?
2      A. Rephrase.
3      Q. Do you -- I mean, you're -- are you
4  familiar with, sort of, the operations of
5  correctional facilities through your involvement
6  on this committee?
7      A. Most definitely.
8      Q. Okay. I would assume you were. I
9  mean, sometimes lawyers ask questions of
10 witnesses --
11     A. Right. I understand. Yes, sir, very
12 much. When I'm chairman of corrections, I
13 thrust myself into that position to learn every
14 detail about how to -- how to make sure that the
15 funding was there and that I did everything that
16 I needed to do to support that.
17     Q. Okay.
18     A. So, yes, I did know. I did understand
19 operations.
20     Q. And would that have included
21 operations -- or, I guess, it would also include
22 -- part of that is providing care within the
23 facility to inmates, right?
24     A. Only in DOC facilities. Once the
25 they're contracted, no, I didn't -- I didn't

Page 27

1  really dissect how a private corporation runs
2  their prison.
3      Q. Well --
4      A. Especially when I didn't visit many.
5      Q. Okay. But would you agree with the
6  general principal that -- let's take Parchman,
7  right? It's an MDOC --
8      A. Feel free to. Feel free to.
9      Q. Yeah. You can't -- you can't give
10 that away.
11     A. Right.
12     Q. But you would agree with me that,
13 first of all, inmates are entitled to health
14 care, right?
15     A. Absolutely.
16     Q. But that has to be done in a safe
17 manner, correct?
18     A. Correct.
19     Q. That's for the safety of the guards;
20 it's for the safety of other inmates; it's for
21 the safety of the health-care providers, and
22 even the inmate himself?
23     A. The only way to document it is through
24 systematic application, exactly.
25     Q. And that also applies, maybe even more

Page 28

1  so, when an inmate is taken outside the facility
2  for health care. Would you agree with that?
3      A. That there's a greater deal of
4  concern?
5      Q. Well, they're at least equal if not
6  greater concern.
7      A. There is a heightened awareness of
8  security when an inmate leaves the facility to
9  go to any health care, certainly.
10     Q. Okay. They don't allow inmates at
11 Parchman to just go down the street in Ruleville
12 to the doctor, do they, on their own?
13     A. Not on their own.
14     Q. Right. Okay. Did you -- did you do
15 anything before today to get ready for your
16 deposition? Look at any documents?
17     A. I looked at this calendar about 20
18 minutes after 2:00 and thought, uh-oh, I don't
19 see the Zoom. So I'm not -- I don't know.
20 Generally -- generally, no, sir, I haven't read
21 anything. I don't -- I almost forgot, frankly.
22     Q. Okay. Did you -- did you meet either
23 by phone or in person with Mr. Waide or Rachel
24 Waide before today?
25     A. I had a phone call from Mr. Waide

Page 29

1  about three weeks ago to set up a deposition
2  date.  That's the only conversation we really
3  had.
4      Q.  Did he ask you -- did he or anyone
5  from his staff or his office ask you the same
6  kind of questions he asked you earlier on that
7  phone call?
8      A.  No, sir.
9      Q.  Have you talked to anybody else about
10 this lawsuit?
11     A.  I may have told my daughter three
12 weeks ago when I was you called -- contacted to
13 give a deposition.  I think my daughter came
14 over for a glass of wine, and I may have
15 mentioned it.  I don't know how harmful that is,
16 but she's -- she's fairly trustworthy.
17     Q.  All right.
18     A.  I'd vouch for her, anyway.
19     Q.  There you go.  And there's nobody else
20 that has any affiliation with that facility that
21 you've spoken to about specifically staff
22 shortages that you haven't covered?
23     A.  No.  No.  Again, I stated as well as I
24 could is that I don't go outside of protocol to
25 discuss operational things with anybody other

Page 30

1  than the agency responsible.  It wouldn't be
2  appropriate.
3      Q.  Okay.  Do you have an understanding of
4  what Ms. Bittick's job is at the facility?
5      A.  I have no idea.
6      Q.  Okay.  When you talked to Pastor
7  Bittick, you didn't get -- did you get the
8  impression that she worked in medical or worked
9  in corrections or one way or the other?
10     A.  You know, that would have been a great
11 question for me to ask, and I guess, Tim, you're
12 now exposing the fact that I really wasn't
13 overly concerned.  But I knew that Pastor
14 Bittick's wife worked at the facility, and
15 that's the extent of it.  I don't know what
16 capacity.
17     Q.  Okay.  And --
18     A.  I'm kind of ashamed of that
19 personally, but that's frankly where I'm at.
20     Q.  All right.  And then I didn't take
21 good notes, but what -- do you remember, as best
22 you can, what was the concern or what was the
23 issue that the pastor mentioned to you?
24     A.  I mean, he called me.  He asked me
25 several things about the facility.  One is that

Page 31

1  he was involved with prison ministry, and that
2  he wanted to try to get some other people
3  qualified to have other ministry to support it.
4  I know we had a conversation regarding that,
5  Kairos.  Are you familiar with Kairos?
6      Q.  No.
7      A.  Well, Kairos is a ministry, prison
8  ministry.
9      Q.  Okay.
10     A.  And all of our faith-based
11 institutions, we try to participate in the
12 Kairos programs.  So I think he asked me about
13 what the protocol was to get somebody qualified.
14 That was a conversation.
15         We had a conversation about how great
16 he thought that the Ole Miss instructors were
17 providing service down there.  We have some
18 professors in the facility teaching.  I mean,
19 there's a myriad of things we probably talked
20 about that really were of no -- nothing, you
21 know, degrading or nothing that negative.
22         I mean, obviously, prison is a dark
23 place, Tim.  You understand that, right?
24     Q.  Yeah.
25     A.  There's not a lot of great things to

Page 32

1  say about it.
2      Q.  Okay.
3      A.  And, really, I don't recall any
4  (inaudible) at all that he said.  I think he
5  said -- he asked me about if I was going to go
6  to the luncheon one time, but, again, these are
7  just passing conversations at the Piggly Wiggly.
8  I mean, they're not meetings.
9      Q.  Yeah.  And that's more what I'm
10 getting at.  Did he ever say, My wife has said
11 there's not enough staff?  My wife has
12 complained about A, B, and C?  That's more of
13 what I'm getting at.  Did he ever -- was there a
14 discussion along those lines?
15     A.  You know, I can't -- I can't verify
16 that he did or he didn't.  Again, I didn't pay
17 it that much attention.  And he may have said
18 something to that effect, but I can't make a
19 statement about that.
20     Q.  Do you recall talking to Jerry
21 Williams at all about anything the pastor may
22 have said to you?
23     A.  No, not that pastor.  The only time I
24 really talked to Jerry was -- over this
25 situation was the fact that this medical

Page 33

1  professional, whoever it was, had indicated that
2  he had a genuine concern, and that this was the
3  second time he had called to let me know that.
4  And I just thought it was incumbent for me to
5  report that to the facility manager, Jerry
6  Williams.
7      Q.  And to be clear, that's the only --
8  the dentist is the only person, whatever he is,
9  doctor, whatever, that stands out in your mind
10 that called you --
11     A.  That's the only --
12     Q.  -- (inaudible) --
13     A.  That's the only thing that stands out
14 in my mind that I had a concern about.
15         The only other time that it has come
16 to my mind, and nobody complained, but that's
17 when I -- you know, Channel 5 is showing a fire
18 in my prison and a guard getting beat, and we've
19 all seen that.  And that was in the Marshall
20 County facility, and that was subsequently
21 probably three months after this happened.
22         So, you know, that -- that kind of
23 validated the point to me.  I didn't have that
24 discussion with anybody, but certainly that --
25 you know, that was pretty relevant, don't you

Page 34

1  think?
2      Q.  Would you --
3      A.  I'm not -- I tell you, I just -- as
4  chairman of corrections, I thought it was very
5  relevant.
6      Q.  Sure.  I'm sure.  When you said it's
7  not uncommon, I mean, all -- there's an issue
8  throughout this state, frankly across the
9  country, with getting qualified individuals who
10 are willing to work for the wages that are paid
11 in these jails, right?  Would you agree with
12 that?
13     A.  I would.
14         MR. WAIDE:  Excuse me.  Excuse me.
15     Object.  I don't think that's an
16     appropriate question.
17         MR. PEEPLES:  Okay.
18         MR. WAIDE:  It has nothing to do with
19     this case.
20         MR. PEEPLES:  All right.  Well, you
21     keep talking about staff shortages, so I'm
22     going to ask him about it.
23     A.  Well, I'm not a DOJ professional, so
24 maybe that's where you need to go with that
25 conversation.

Page 35

1  BY MR. PEEPLES:
2      Q.  Well, you're the chairman of the
3  corrections committee for the Mississippi
4  legislature, and you're familiar with the fact
5  that there is -- there have been staff shortages
6  in, frankly, all the jails in Mississippi?
7      A.  There's a lot of improvement that
8  could be made in the Department of Corrections,
9  as well as a lot of other agencies we've had
10 problems with.
11         Specifically our staffing -- our
12 hiring rate has not been equitable for our
13 neighboring states.  Same as teachers, same as
14 health-care professionals.  It's just, you know,
15 in the Department of Corrections, it was a
16 concern.
17     Q.  Sure.
18     A.  And my job was to go get
19 appropriation.  That was my job.
20     Q.  Right.  And you had mentioned -- I
21 mean, there is a requirement of -- a staffing
22 level requirement in the MTC-run facilities,
23 right?
24     A.  There is a contractual staffing
25 minimum, yes.

Page 36

1      Q.  Yeah.  And MTC -- MTC still has a
2  contract to run the Marshall County facility,
3  correct?
4      A.  I'm no longer chairman, Tim.  You'll
5  have to direct that --
6      Q.  Okay.
7      A.  -- to Counselor Kevin Horan and ask
8  him that.
9      Q.  All right.  As of -- as of the time
10 you left that committee, you understood MTC was
11 still running the Holly Springs facility, right,
12 Marshall County --
13     A.  I did.
14     Q.  -- facility?
15     A.  I did.
16     Q.  All right.  I don't have anything
17 else.  Thank you.  Thank you, Mr. Kinkade.
18     A.  Thank you, Tim.
19         MR. LONG-DANIELS:  And I'll follow up
20     just a little bit.
21         THE WITNESS:  (Inaudible) I'd be glad
22     to.
23
24
25

Page 37

1　　　　　　EXAMINATION
2　BY MR. LONG-DANIELS:
3　　Q.  Well, first, let me introduce myself.
4　I'm David Long-Daniels, and I represent
5　Centurion.
6　　　　And I looked at your resume.  Did you
7　go -- did you grow up in Orange County --
8　　A.  I did.
9　　Q.  -- California?
10　　A.  I did.
11　　Q.  Wow.
12　　A.  I graduated from Orange High School in
13　1975.
14　　Q.  Fantastic.  You have been on the
15　committee -- chair of committee for the
16　Department of Corrections for the state
17　legislature, right?
18　　A.  Yes, sir, in the House.
19　　Q.  In the House.  And thank you for that.
20　During the deposition, we mentioned two names.
21　You mentioned Jerry.  Jerry refers to whom?
22　　A.  Jerry Williams was the deputy
23　commissioner, and he was in charge of
24　facilities.
25　　Q.  Okay.

Page 38

1　　A.  There's two people I worked with at
2　DOC, Jerry Williams and Kevin -- Lord, have
3　mercy, I drew a blank.  Facilitation services.
4　　Q.  Okay.  Now --
5　　A.  Kevin -- excuse me, Kevin Jackson.
6　Those are the two people I spoke to.
7　　Q.  Okay.  Now, there's a warden named
8　Jesse Williams.  You never spoke with Jesse
9　Williams, did you?
10　　A.  No, sir.
11　　Q.  Okay.  You mentioned during the course
12　of our discussion that there's important
13　protocols that have to be followed.
14　　A.  Well, they're self-imposed.  They're
15　just things that I find that are necessary to
16　run a smooth operation, and that's follow a
17　certain specific chain.
18　　Q.  Right.  And you think it's important,
19　at least with respect to your duties, to follow
20　that chain, right?
21　　A.  Uh-huh.
22　　Q.  If you've got a problem, you're going
23　to go to deputy commissioner, not down to the
24　warden level, are you?
25　　A.  Absolutely.  I went to the deputy

Page 39

1　commissioner.
2　　Q.  Okay.  You don't think it's
3　appropriate for you to interfere or be involved
4　in employee issues at a local prison, correct?
5　　A.  That's right.
6　　Q.  That's outside of your purview?
7　　A.  That's -- that's something I just
8　won't do.
9　　Q.  Okay.  And you won't do it for a
10　reason, right?
11　　A.  Right.
12　　Q.  It's good for the order and discipline
13　of the prison that everybody follow the chain of
14　command, right?
15　　A.  Well, I've never spent a lot of time
16　in prison, David.
17　　Q.  And I don't mean to imply that you
18　have.
19　　A.  I can tell you, from a legislative
20　standpoint, that it's necessary to keep clean
21　lines of communication between the leadership
22　and the legislature.
23　　Q.  Yes, sir.
24　　A.  And any violation of that clouds the
25　water.

Page 40

1　　Q.  It clouds the water and can interfere
2　with the chain of command, right?
3　　A.  Those are your words.
4　　Q.  Okay.  You do agree that prisons are
5　dangerous places?
6　　A.  Can be.
7　　Q.  If you had an inmate that's murdered
8　somebody, you want to make sure he stays in
9　prison and not out of prison, right?
10　　A.  That's right.
11　　Q.  And you want to make sure that the
12　safety of the people who work there, as well as
13　the other prisoners, are paramount, right?
14　　A.  Right.
15　　Q.  That's important from a public concern
16　standpoint, right?
17　　A.  That's a point for a public safety
18　concern.  Primarily public safety.
19　　Q.  You don't want a prisoner going out to
20　a hospital late at night without a sufficient
21　number of guards to ensure the public safety,
22　right?
23　　A.  David, are we on a different -- are we
24　on a different subject?
25　　Q.  No, we're just on a good subject.  I

Page 41

1  just --
2     A.  Now we're getting inmates visiting --
3  visiting doctors in the middle of the night.
4     Q.  Not doctors.
5     A.  To your point, if they're -- you know,
6  regardless day or night, if an inmate needs
7  medical attention, MDOC's job is to provide
8  that.
9     Q.  Yes, sir.
10    A.  And whatever and however that needs to
11 happen, we make sure it's secure where we do it.
12    Q.  And that's my point.  It has to be
13 done in a secure way, right?
14    A.  That's right.
15    Q.  You don't -- whether it's day or
16 night, you don't want to have an inmate that may
17 have raped or killed somebody going to visit a
18 hospital without enough guards to ensure the
19 public safety, right?
20    A.  David, I'm not going to comment on
21 your direction.  I mean, let's -- I mean, again,
22 you're talking about the what-if scenarios of
23 the world, and I don't want to get into
24 what-ifs.  Let's talk about specifics.
25    Q.  All right.  Well, my specific is that

Page 42

1  the warden is in charge of the prison and to --
2  and his job is to ensure the safety of the
3  prison, inmates, and the people working there,
4  right?
5     A.  Chief administrator, yes, sir.
6     Q.  And the warden is cloaked with
7  authority to do that, isn't he?
8     A.  That's in his -- that's in his
9  purview, I would imagine, yes.
10    Q.  All right.  Have you ever served in
11 the military?
12    A.  I have.
13    Q.  What branch did you serve?
14    A.  Air Force.
15    Q.  So did I.
16    A.  Absolutely.
17    Q.  You understand the chain of command,
18 don't you?
19    A.  Which is why I'm probably as rigid
20 about that as I am.
21    Q.  That's probably me too.  But you
22 understand the chain of command and how
23 important it is, right?
24    A.  Yes, I do.
25    Q.  And if people don't follow the chain

Page 43

1  of command, things get a little gray, a little
2  fuzzy, don't they?
3     A.  Again --
4        MR. WAIDE:  Object to the form of the
5  question.
6     A.  -- you're going down a rabbit hole
7  here.  I don't know where you're going with it.
8  BY MR. LONG-DANIELS:
9     Q.  Well, just -- just follow me a little
10 bit.  I'm not going to go very long.
11    A.  I know we're not.
12    Q.  But I want to make sure that you and I
13 agree that the chain of command is important.
14    A.  Absolutely.
15    Q.  All right.  Now --
16    A.  E-4, by the way.  I don't know if you
17 were a lieutenant or not, but I'm E-4.
18    Q.  I was a lowly captain and got out
19 before I got too badly hurt.
20    A.  We probably made jokes some about
21 that.  Not in the chain -- not outside the chain
22 of command, that is.
23    Q.  That's right.  That's right.  You
24 mentioned earlier that Ms. Waide -- Ms. Woods
25 had been terminated, right?

Page 44

1     A.  I was report -- it was reported to me
2  after the fact that she had been terminated.
3     Q.  All right.  And did they tell you who
4  -- whether it was related to her -- her security
5  clearance at the prison?
6     A.  No, sir.
7     Q.  You agree that in order to work at a
8  prison, you have to have proper security
9  clearance, right?
10    A.  Yes, I would -- yes, I would agree
11 with that.
12    Q.  And if a person doesn't have a
13 security clearance, it's not a whole lot they
14 can do working there at the prison, is it?
15    A.  Again, I don't want to speculate on
16 what it takes to cut grass in prison, but, you
17 know.
18    Q.  But you want everybody there to be --
19 properly pass security, right?
20    A.  Right.
21    Q.  That's important for the good order of
22 the prison and the good order of the community,
23 right?
24    A.  Right.
25    Q.  And you don't know -- I think by your

Page 45

1  testimony, you don't know whether Ms. Woods'
2  security clearance had been revoked?
3      A. That never was reported to me in any
4  -- in any regard.
5      Q. Okay.
6      A. It was reported to me that she was
7  terminated because she knew -- supposedly
8  somebody said she knew me, and that's what was
9  shocking to me.
10     Q. Nobody ever reported to you that her
11 security clearance had been revoked --
12     A. No.
13     Q. -- by the prison?
14     A. No.
15     Q. You wouldn't have got yourself
16 involved in a security clearance matter for a
17 warden of a private prison, would you?
18        MR. WAIDE: Object to the form of the
19     question.
20     A. I don't get myself involved with
21 specifics in prison at all.
22 BY MR. LONG-DANIELS:
23     Q. Okay. And as you sit here today,
24 without that knowledge, you really can't
25 criticize her termination, can you?

Page 46

1      A. I don't have any --
2         MR. WAIDE: Object to the form of the
3      question.
4      A. -- (inaudible).
5         MR. LONG-DANIELS: You've got to let
6      him answer, Mr. Waide.
7  BY MR. LONG-DANIELS:
8      Q. What were you about to say?
9         MR. WAIDE: I'm not -- I'm just
10     objecting to the form here. You have to go
11     ahead and answer the question. I don't
12     think any of these questions have anything
13     to do with this case, but you can --
14     A. What is your question?
15        MR. WAIDE: But, regardless --
16     regardless, if he asks, you've got to
17     answer under the rules. I'm sorry, but I
18     didn't make the rules.
19     A. Counselor, ask your question.
20 BY MR. LONG-DANIELS:
21     Q. He's got me confused now.
22        MR. LONG-DANIELS: Can you read my
23     question back? Mr. Waide has a tendency to
24     do that.
25        THE REPORTER: Hold on one second.

Page 47

1         As you sit here today --
2      A. (Inaudible.)
3         THE REPORTER: -- without that
4      knowledge, you can't really criticize her
5      termination, can you?
6      A. I don't have an opinion one way or the
7  other. I mean --
8  BY MR. LONG-DANIELS:
9      Q. All right.
10     A. -- you know, again, my report -- my
11 reporting has to do with Central Office. And
12 what a contractor chooses to do, they choose to
13 do.
14        Now, on the grounds they did it, I --
15 I don't have an opinion about it. I just know
16 what's real and what's not real.
17     Q. That's all I've got.
18        MR. WAIDE: All right. I've got a few
19     follow-up questions.
20
21        FURTHER EXAMINATION
22 BY MR. WAIDE:
23     Q. You were asked a whole bunch of
24 questions, hypothetical questions, about the
25 chain of command by both attorneys, basically,

Page 48

1  correct?
2      A. Yes, sir.
3      Q. All right. When this either doctor or
4  dentist talked to you, did you ever tell him you
5  thought he was violating the chain of command by
6  bringing to your attention alleged staff
7  shortages? Did you tell him that?
8      A. No, sir, I did not.
9      Q. Did you think he was violating the
10 chain of command by telling you about those --
11     A. At that point, I sensed a genuine need
12 of urgency in his voice and a genuine concern,
13 and I responded to that. So, no, I didn't
14 second guess what anybody else would think. I
15 simply took that information and reported it
16 where I felt like it should be reported.
17     Q. Do you agree or disagree that it's a
18 matter of genuine public concern, if there is a
19 staff shortage of guards to make prisons safe
20 for both -- both for the people that work there
21 and for the inmates, do you agree that's a
22 matter of genuine public concern?
23     A. It's paramount. It's the most
24 important thing.
25     Q. Was that of concern to you as a

Page 49

1  legislator? Was that of concern to you as a
2  legislator?
3      A.  That concerned me as a legislator and
4  it also concerned me as a citizen with this --
5  with a prison in my -- in my county.
6      Q.  Is that -- is that the reason why you
7  called the Deputy Commissioner Williams to tell
8  him about it or express that concern?
9      A.  I heard -- I heard a genuine sense of
10 urgency and concern from this individual. And,
11 again, he had left a message prior to that and I
12 didn't respond to it. But I heard -- when I
13 spoke to him, I heard a genuine sense that he
14 was concerned about the overall safety of the
15 prison, the guards, the staff, the inmates, and
16 that I needed to look into it. And so I simply
17 reported that to the appropriate source.
18     Q.  Okay. Did you -- you mentioned in
19 your direct, and I'm not sure that I followed
20 exactly how this came about. Did he make a
21 comment to you about having driven through the
22 facility and seeing the number of cars that --
23 indicating the number of people working there at
24 night, or --
25     A.  Yeah, there was a comment from him

Page 50

1  that I expressed to Jerry that -- that normally
2  he saw a certain number of staff cars in the lot
3  and that it was noticeably different on that day
4  he reported it.
5          And so when he said that he expressed
6  concern for the staff shortage, he said he could
7  validate it for the lack of cars that were in
8  the parking lot.
9      Q.  And so when you -- when you went to
10 the deputy commissioner to make -- to pass along
11 to him what -- the information you had received,
12 why did you do that? Why did you go to the
13 deputy commissioner to tell him that?
14     A.  Because that's where -- he's in charge
15 of facilities. That's his bottom line
16 responsibility. He's the one that manages the
17 contractors. He's the one that manages the
18 facilities. He's the one that assigns MDOC
19 inmates. So he is the bottom line decision
20 maker, so I thought he was the appropriate
21 source.
22     Q.  All right. That's all I have.
23         MR. WAIDE: Does anybody else have
24 follow-up after that?
25         MR. PEEPLES: No.

Page 51

1          MR. LONG-DANIELS: Thank you so much,
2  Representative Kinkade. Good to meet a
3  fellow soldier.
4          (Deposition concluded at 3:33 p.m.)

Page 52

                    C E R T I F I C A T E
STATE OF MISSISSIPPI )
COUNTY OF MONROE     )
RE: DEPOSITION OF REPRESENTATIVE BILL KINKADE
        I, Gena Mattison Glenn, CSR 1568, a
Notary Public within and for the aforesaid
county and state, duly commissioned and acting,
hereby certify that the foregoing proceedings
were taken before me at the time and place set
forth above; that the statements were written by
me in machine shorthand; that the statements
were thereafter transcribed by me, or under my
direct supervision, by means of computer-aided
transcription, constituting a true and correct
transcription of the proceedings; and that the
witness was by me duly sworn to testify to the
truth and nothing but the truth in this cause.
        I further certify that I am not a
relative or employee of any of the parties, or
of counsel, nor am I financially or otherwise
interested in the outcome of this action.
        Witness my hand and seal on this 19th day
of October, 2020.
                    _____
My Commission Expires:    CSR 1568
July 19, 2023             Notary Public