1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF MISSISSIPPI

3

4   DR. AMY R. WOODS,                )
                                     )
5          Plaintiff,                )         CAUSE NO. 3:19CV234
                                     )
6          VS.                       )
                                     )
7   MHM HEALTH PROFESSIONALS, LLC.)
    D/B/A CENTURION PROFESSIONALS;)
8   MANAGEMENT & TRAINING            )
    CORPORATION;                     )
9   JESSE WILLIAMS, INDIVIDUALLY; )
    AND JOHN DOES 1-9,               )
10                                   )
           Defendants.               )
11  _____

12

13          EXCERPT OF THE TRIAL TESTIMONY OF TRACI COX
       BEFORE UNITED STATES SENIOR DISTRICT JUDGE NEAL B. BIGGERS
14                    MONDAY, MARCH 21, 2022
                      OXFORD, MISSISSIPPI

15

16
    FOR THE PLAINTIFF:
17
          Waide & Associates, PA
18        JIM WAIDE, ESQ.
          RACHEL PIERCE WAIDE, ESQ.
19        Post Office Box 1357
          Tupelo, Mississippi 38802
20

21  FOR THE DEFENDANT MHM:

22        Squire Patton Boggs (US) LLP
          DAVID W. LONG-DANIELS, ESQ.
23        AUSTIN HARRISON, ESQ.
          M. ALLYSON LUMPKIN, ESQ.
24        1201 W. Peachtree Street NW, Suite 3150
          Atlanta, Georgia 30309
25

```
 1  FOR THE DEFENDANTS MTC AND MR. WILLIAMS:

 2      Daniel, Coker, Horton, & Bell - Oxford
        TIMOTHY MICHAEL PEEPLES, ESQ.
 3      Post Office Box 1396
        Oxford, Mississippi 38655

 4

 5
    Proceedings recorded by official stenographic court reporter.
 6  Transcript produced with computer-aided transcription.

 7  _____

                        RITA DAVIS, FCRR, RPR, CSR #1626
 8                   FEDERAL OFFICIAL COURT REPORTER
                   911 JACKSON AVENUE EAST, SUITE 369
 9                      OXFORD, MISSISSIPPI  38655

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     TABLE OF CONTENTS

2

3

4    Style and Appearances......................................1

5    Table of Contents.........................................2

6    Direct Examination by Mr. Waide...........................5

7    Cross-Examination by Mr. Long-Daniels....................21

8    Cross-Examination by Mr. Peeples.........................25

9    Redirect Examination.....................................28

10   Court Reporter's Certificate.............................30

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (BEGINNING OF THE TRIAL TESTIMONY OF TRACI COX)

2              THE COURT:  All right.  Is the plaintiff ready to

3     proceed?

4              MR. WAIDE:  Yes, sir.

5              THE COURT:  Who do you call?

6              MR. WAIDE:  Traci Cox.

7              MRS. WAIDE:  Your Honor, may I retrieve Ms. Cox?

8     And, also, may we invoke the rule, Your Honor?

9              THE COURT:  Yes.

10             MR. LONG-DANIELS:  We agree to that, Your Honor.

11             THE COURT:  Okay.  I see no one in the courtroom who

12    is planning on being a witness; so, if anybody sees somebody

13    come in who's a witness, you can let me know.

14             MR. WAIDE:  (Nodding head).

15             THE COURT:  Now, these witnesses who testify, ladies

16    and gentlemen of the jury, will have that shield over their

17    face.  The reason for that being is that you as jurors are the

18    judges of the truthfulness, the credibility of these witnesses.

19    And we figured for you to be able to do that well you need to

20    see their faces as they testify.

21          And the mask covers up.  You don't know if they're

22    laughing or smirking or what.  So, with these shields, you can

23    get an idea of how they're looking when they testify.

24       (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

25             THE COURTROOM DEPUTY:  And, if you would, please

DIRECT BY MR. WAIDE                                                    5

1    state and spell your first and last name for the record.

2                THE WITNESS:  Traci Cox.

3                THE COURTROOM DEPUTY:  Will you spell that for us,

4    please?

5                THE WITNESS:  T-r-a-c-i.  C-o-x.

6                THE COURT:  All right, sir.

7                    TRACI COX, PLAINTIFF'S WITNESS, SWORN

8                         DIRECT EXAMINATION

9    BY MR. WAIDE:

10   Q.    Ma'am, you're Traci Cox?

11   A.    Yes, sir.

12   Q.    What is your profession?

13   A.    I'm a nurse practitioner.

14   Q.    Where do you live?

15   A.    I live in Pontotoc.

16   Q.    Where do you work today?

17   A.    I work at Marshall County Correctional Facility in Holly

18   Springs.

19   Q.    Who runs the Marshall County Correctional Facility today?

20   A.    Well, on the security side, the State runs it.  But, on

21   the medical side, it's VitalCore Health Strategies.

22   Q.    All right.  So the company Centurion no longer provides

23   health services there; is that correct?

24   A.    No, sir.

25   Q.    And the company known as MTC no longer runs the prison

1  there?

2  A.    They do not.

3  Q.    It's run by the State?

4  A.    Yes, sir.

5  Q.    Let me take you back to when you were first hired there.

6  When were you first hired at Marshall County?

7  A.    In around June of 2016.

8  Q.    And who was the health-care provider that hired you at

9  that time?

10  A.    It would have been Centurion.

11  Q.    When you were hired in '16, was there a doctor hired

12  there?  Was there a doctor working on the health care?

13  A.    Yes, sir.  There was a doctor there.  And I forgot there

14  was also a nurse practitioner there that was quitting.

15  Q.    So you had two nurse practitioners and a doctor?

16  A.    Well, they hired me to replace her because she was

17  quitting.

18  Q.    So how long did that doctor stay there?

19  A.    He interviewed me around the middle of May.  And, at that

20  point, he said, "Who is going to be your collaborator?  Because

21  they know that I'm leaving."  And that prevented me from

22  starting right away.  But, when I started, the nurse

23  practitioner there was leaving in a couple of weeks; and the

24  doctor had already gone.

25  Q.    So was there, or was there not, a doctor, then, when you

1  began working?

2  A.    No.   There was a nurse practitioner there but not a

3  doctor.

4  Q.    So was it -- do I understand the nurse -- was it you and

5  another nurse practitioner, or were you the only nurse

6  practitioner there?

7  A.    Well, she -- I was there with her for a couple of weeks

8  because she was quitting.   And she kind of trained me what to

9  do when I would be taking that position over when I had a

10  doctor.

11  Q.    So did you then become the nurse practitioner for the

12  facility at that time?

13  A.    Well, I couldn't because I didn't have a doctor.   So I

14  actually just worked as an RN until Dr. Woods came and signed

15  on with me around 4 months -- 4 or 5 months later.

16  Q.    So, for the first 4 or 5 months while you worked there, do

17  I understand that there was neither a doctor or nor a nurse

18  practitioner who could work as a nurse practitioner there?

19  A.    No, sir.   There was not.

20  Q.    There was not.   So how did y'all -- how did you handle,

21  say, hepatitis C patients?   How would you treat hepatitis C?

22  A.    Well, that would be considered a chronic care patient;

23  and, if any of those people were seen, they would have been

24  seen by Dr. Brazier from telehealth.   We did telehealth maybe

25  one day a week, or tried to.   And he would have seen them --

1  Q.    One day a week?

2  A.    Yes, sir.

3  Q.    In your opinion, was it creating a problem so far as

4  medical care not to have a doctor there at that facility,

5  working at the facility?

6  A.    Oh, yes.  Abs -- yes.

7             MR. LONG-DANIELS:  Your Honor, may I object?

8  Relevancy.  This is before Dr. Woods even got there.

9             THE COURT:  Overruled.

10 BY MR. WAIDE:

11 Q.    What was the nature?  Why would it create a problem for

12 them not to have a doctor there?

13 A.    Well, there's nobody to see patients that needed to be

14 seen.  There was nobody there to see those thousand inmates

15 that have medical problems.

16 Q.    How bad a backlog did you have with patients needing to

17 see a doctor when Dr. Woods first came?

18 A.    I think we were backlogged maybe -- I want to say

19 200-and-something, 300, may -- it was a lot.

20 Q.    Would you -- about when did Dr. Woods start to work there,

21 approximately when was that?

22 A.    Well, she didn't start to work until about January.  But

23 she signed on with me as my collaborating physician in

24 November.  So I got to start seeing patients -- actually seeing

25 patients in November because I had her as my collaborating

1  doctor.

2  Q.    And when did she actually start working as a doctor there?

3  A.    It was in January, probably first, second week of January.

4  Q.    Of what year?

5  A.    That would have been 2017.

6  Q.    Did you have occasion to work with her or work under her

7  then?

8  A.    Oh, yes.

9  Q.    Did you have occasion to observe her treating the

10 patients?

11 A.    Every day.

12 Q.    Would you describe for the jury what kind of doctor she

13 was?  How would you describe her?

14 A.    She was a phenomenal doctor.  She was kind and caring and

15 cared about the inmates, and she cared about all of us.  But

16 she -- and she expected us to work.  She let you know when you

17 were doing something wrong.  And she was quick to let you know

18 when you were doing stuff right too, which is always

19 appreciated.  She treated them with respect and kindness, and

20 they still ask about her.

21 Q.    So did you ever get -- do you know Warden Williams, or

22 former Warden Williams, the warden that was there at that time?

23 A.    Yes, sir, I do.

24 Q.    Did you ever get to observe his attitude toward the

25 inmates there?

1  A.    I mean, not that I -- I mean, not really.  Not -- I mean,

2  I was so busy with other things.  If he was dealing with an

3  inmate, I really didn't --

4  Q.    Okay.  Did you ever hear him make any comments about what

5  his attitude was toward inmates?

6  A.    I mean, an inmate told me once that you never knew how to

7  take him; that sometimes he would be really nice, and then the

8  next time he would jump on them as an inmate, you know.  But, I

9  mean, I didn't see that.

10  Q.    Oh, you didn't see that; you didn't observe that?

11  A.    No, sir.

12  Q.    Before Dr. Woods left, in the several months before

13  Dr. Woods left, can you tell the jury about whether or not you

14  had a shortage in staff, security staff, there at the prison

15  and especially as it related to y'all's medical area?

16  A.    Well, yes, sir.  We had trouble getting patients to

17  medical.  And, usually, the reason was -- that we got was,

18  well, there's only one officer in A Dorm; or there's nobody in

19  the dorm; or that person's tied up doing something else because

20  they're the only person in that dorm.

21  Q.    So do you know whether or not Dr. Woods ever complained to

22  anybody about the lack of security staff to get patients to

23  medical?

24  A.    Yes, sir.  She -- she complained to, of course, our

25  administrator, who has to go and try to get that situation

DIRECT BY MR. WAIDE                                    11

 1   resolved.  And she told our -- she told Centurion, the people

 2   at Centurion.

 3   Q.    All right.  When you say your "administrator," you mean

 4   the administrator that works for Centurion; or do you mean the

 5   warden who works for the prison?

 6   A.    Our administrator that works for Centurion, the medical

 7   administrator.  And I know she went to the warden; I just

 8   wasn't there for those meetings.

 9   Q.    I see.  All right.  Who was the administrator that worked

10   at Centurion before Travis Day came; who was that?

11   A.    His name was Hunter Williamson.

12   Q.    And he was employed by who?

13   A.    Centurion.

14   Q.    And, when Mr. Williamson was there and when complaints

15   would be made to him about not getting patients down to medical

16   care, what was his attitude about it?

17   A.    Well, he'd start making phone calls.  And he would get up

18   out of the office.  Because they have a lot of administrative

19   stuff to do.  So he would come out of his office and start

20   making calls and trying to get -- you know, calling the

21   captains and the shift captains or talking to the warden or

22   whoever trying to get patients -- trying to get us patients to

23   medical.

24   Q.    In your opinion, was Williamson -- when he was there

25   working for Centurion, was he cooperative and helpful in trying

1  to get the patients to medical?

2  A.    Absolutely, yes, sir.

3  Q.    And who -- did he get replaced as the administrator?

4  A.    He did.

5  Q.    And who replaced him?

6  A.    Travis Day.

7  Q.    Can you give us an approximate date about when Mr. Day

8  took over as the administrator?

9  A.    I think it was around Memorial Day in May, somewhere --

10  Q.    Would this be 2019?

11  A.    2019.  Yes, sir.

12  Q.    And just, if you would, describe in your own words and

13  tell the jury what did you observe about Travis Day, especially

14  so far as doing his job in getting inmates out to medical, to

15  see medical.

16  A.    I mean, I could never -- I mean, he was hard to find.

17  Sometimes he wasn't at work.  Sometimes he wasn't in his

18  office.  If I told him, you know, I've got 20 patients on my

19  schedule; and I've seen one, he would say, well, I've notified

20  Dr. Ramsue; and I've notified April Meggs; and everybody knows

21  it; and we're doing the best we can.

22        You know, sometimes I'll go back there; and there would be

23  women all in his office.  At one point, I walked back there;

24  and there was a woman -- an officer that give him a massage.

25  And ever -- you know, I just walked way.

1   Q.    Did you say a lot of times he wasn't there, and he wasn't

2   present?

3   A.    Yes, sir.  I couldn't find him, or he wasn't at work; or

4   he'd come in late or leave early or not come at all, you know.

5   Q.    Did you know -- do you know whether or not Dr. Woods, Amy

6   Woods, continued to -- or complained to Day about not getting

7   the prisoners over to medical?

8   A.    Yes, sir.  We all complained.  Everybody complained.  To

9   him.

10  Q.    To him?  To Day?

11  A.    Yes, sir.

12  Q.    In your opinion, who was the proper person to complain

13  too?

14  A.    Well, I mean, for me --

15          MR. LONG-DANIELS:  Objection, Your Honor.

16          THE COURT:  Objection sustained.

17  BY MR. WAIDE:

18  Q.    From your observation, from your work there, who -- based

19  on your own personal observations, who did you think you should

20  complain to?

21  A.    Well, I had to go to the administrator, to our

22  administrator, Mr. Day or Mr. Williamson.

23  Q.    Mr. Day?

24  A.    Right.  And Dr. Woods.  I told her and -- that's what they

25  told me to do when I started.  If you have a problem getting

1  patients, you go to the administrator and the medical director.

2  And that's what I did.

3  Q.    How severe a problem was it in getting patients?  How --

4  just describe that.  Do you mean getting patients over to the

5  medical area, or do you mean getting patients to outside

6  appointments?

7  A.    Well, to the medical area.  You know, some days it was a

8  lot worse than others like anywhere.  But, I mean, what I had

9  to do is I had an appointment list of 20 to 25 people that I

10  had to see just like she did.  And my first place that I had to

11  go to was the nurses.

12       And I would say, "Have y'all called for these patients?"

13  And they would say, Well, we called A Dorm and nobody answered;

14  or we called B Dorm, and they're busy.  We called C, and

15  they're going to get theirs up here as soon as they can.

16       So, in 15 or 20 minutes, if I still didn't have a patient,

17  I went to my officer.  We had a medical officer.  And I would

18  ask her -- you know, here's my list.  The nurses have done

19  this.  Am I going to get any patients?  And, from that, they'd

20  say, Well, I called A Dorm; and they didn't have but one

21  officer, you know.  Or I called B Dorm and didn't get an

22  answer.

23       I mean, so, after that, if I still didn't get patients, I

24  went to the administrator and Dr. Woods and said, you know,

25  hey, I've been here for five hours or two hours; and I've got

1  25 people to see; and I've seen two or one or none or whatever.

2  Q.    Do you remember how you learned that Dr. Woods had lost

3  her job?  How did it come about you learned that?

4  A.    She called me.

5  Q.    Just tell me about that.  She called you.  And, first of

6  all, what kind of state was she in when she called you?

7            MR. LONG-DANIELS:  Objection, Your Honor.  Hearsay.

8            THE COURT:  Sustained.

9  BY MR. WAIDE:

10 Q.    If you would, from your observation, how did her voice

11 sound when you talked to her?  Don't tell me what she said.

12 But how did her voice sound?

13 A.    She sounded teary.  And Dr. Woods doesn't cry.  She is not

14 somebody to get that upset.

15 Q.    Did she give you any explanation about why she was no

16 longer there?

17           MR. LONG-DANIELS:  Objection, Your Honor.

18           MR. WAIDE:  Your Honor, it's not for the truthfulness

19 of it.  It's just to show the scenario leading up to the facts.

20 How she lost her job is not the question.

21           MR. LONG-DANIELS:  I think --

22           THE COURT:  Sustained.

23 BY MR. WAIDE:

24 Q.    Don't tell me what was said.  But, when she first called

25 you, did she know any -- did you learn any specifics about why

DIRECT BY MR. WAIDE                                    16

1   she was no longer -- any specifics about it?

2   A.    Yes, sir.

3   Q.    Okay.  When she first called you, do you know whether she

4   had actually been terminated or had she only lost her security

5   clearance?

6   A.    She had only lost her security clearance when she first

7   called me.

8   Q.    Okay.  After she left, was there a doctor there to take

9   her place?

10  A.    No, sir.

11  Q.    How long did y'all go without a doctor?

12  A.    We had a doctor that came every couple of weeks on

13  Thursday and helped out.  But we ended up getting a doctor --

14  shortly before I left in February of '20, they hired a doctor.

15  But he wasn't there but a couple of weeks, and he had to be let

16  go for some reason.  I don't really know why.

17  Q.    And when did you leave?

18  A.    I left in February of 2020.

19  Q.    And she left in June of '19, I believe; is that correct?

20  A.    Yes, sir.

21  Q.    All right.  So, from June of '19 until you left in

22  February -- did you say February of 2020?

23  A.    2020.

24  Q.    During that entire time, how much of that time did y'all

25  have a doctor actually working there on site?

DIRECT BY MR. WAIDE

1   A.    Twice a month.

2   Q.    A doctor would come twice a month?

3   A.    Yes, sir.  You know, give or take.  I mean, he was

4   supposed to come twice a month; that's what they were trying to

5   get him to come, is twice a month.

6   Q.    Okay.  Where did he live?

7   A.    He lived in Jackson, if I'm not mistaken.

8   Q.    All right.  Now, you say you were a nurse practitioner.

9   Did he then become your proctor?

10  A.    No, sir.  Dr. Ramsue was my collaborating doctor when Dr.

11  Woods left.

12  Q.    Where did Dr. Ramsue live?

13  A.    Dr. Ramsue lived in Atlanta, Georgia, I think.  But I'm

14  not -- I think he lived in Georgia, but his practice was in

15  Jackson.

16  Q.    Did he have -- do you know whether he had an office in

17  Jackson?

18  A.    That would have just been with Centurion.

19  Q.    How far is it from the Marshall County prison to Jackson,

20  Mississippi?

21  A.    Maybe 150 miles, 200.  I'm not sure.

22  Q.    Now, you say you're a licensed practitioner?

23  A.    Yes, sir.

24  Q.    And do you know the rules about how close your property is

25  suppose to be to you if you're working as a nurse practitioner?

DIRECT BY MR. WAIDE

1  A.   At the time, it was, I think, 75 miles.

2  Q.   Seventy-five miles?

3  A.   Uh-huh.

4  Q.   And was he farther or closer than 75 miles?

5  A.   I suppose his office would have been farther.

6  Q.   Okay.  From Jackson to Marshall County.

7  A.   Right.

8  Q.   How often did Dr. Ramsue come up and actually see patients

9  before you left, actually see patients at the clinic -- I'm

10 sorry -- at the prison?

11 A.   He didn't see patients at all.

12 Q.   How often did he come up and review your charts?

13        MR. LONG-DANIELS:  Your Honor, object to relevancy.

14 Dr. Woods --

15        MR. WAIDE:  It's relevant what kind of medical care

16 they were providing there, Your Honor.

17        MR. LONG-DANIELS:  Your Honor, this is (inaudible)

18 Dr. Woods.

19        THE COURT:  All right.  The objection's overruled.

20 But let's move on through this pretty quickly.

21        MR. WAIDE:  All right.

22 BY MR. WAIDE:

23 Q.   How often would he come and have you to -- or review your

24 charts?

25 A.   I think he came --

 1              THE COURT:  Now, we're not interested in what you

 2    think.  Either you know or you don't know.

 3    BY MR. WAIDE:

 4    Q.    If you don't know, that's fine.  You're not -- you don't

 5    remember?

 6    A.    I know it was twice.

 7    Q.    Twice?

 8    A.    Yes, sir.

 9              MR. WAIDE:  May I have just a moment?

10              THE COURT:  All right.

11    (Pause)

12              THE COURT:  Okay.  Let's move on.  You've got a

13    witness.

14    BY MR. WAIDE:

15    Q.    Do you remember -- do you remember April Meggs coming to

16    the prison participating in giving Dr. Woods an award because

17    of her assistance in getting -- in helping a guard who was

18    being assaulted?  Do you remember that?

19    A.    Yes, sir.

20    Q.    Who was the guard that was assaulted?

21    A.    It was Mrs. Mildred Burgess.

22    Q.    And did that happen in the medical area?

23    A.    Yes, sir.

24    Q.    Was that assault of the guard related to the shortage of

25    staff?

1   A.      Yes.   When she went back there, she went by herself; and

2   there was no other officers.   And he was a close-custody

3   inmate, which meant he was a little more dangerous.   And she

4   walked by herself, and there's supposed to be two of them; and

5   he attacked her.

6   Q.      And you say you remember Dr. Woods getting some sort of

7   award because of whatever she did regarding that assault?

8   A.      It was, like, a leadership or recognition award of some

9   kind.

10  Q.      Do you remember while Miss -- Ms. Meggs is the lady that

11  was sitting over here at counsel table representing Centurion,

12  right?

13  A.      Yes, sir.

14  Q.      Do you recall whether or not at that time Dr. Woods

15  brought to Ms. Meggs' attention the problem they had in the

16  shortage of security in getting prisoners over to medical?

17  A.      I don't remember that, but we were shook.   So I don't

18  remember that specifically being said.   I don't mean it wasn't;

19  I just don't remember it.

20          MR. WAIDE:   All right.

21      Thank you, Your Honor.

22          THE COURT:   Okay.

23      Centurion may cross-examine.

24          MR. LONG-DANIELS:   Thank you, Your Honor.   We're

25  going to be brief.

1                    CROSS-EXAMINATION

2  BY MR. LONG-DANIELS:

3  Q.    Ms. Cox, you work for Centurion?

4  A.    Yes, sir.

5  Q.    And I want to make sure, for the jury, we get the

6  reporting structure correct.  Your supervisor was Dr. Woods,

7  correct?

8  A.    Yes.  Yes.

9  Q.    She was the person that you were responsible to, correct?

10 A.    For medical, yes, sir.

11 Q.    She was in your chain of command, correct?

12 A.    Yes, sir.

13 Q.    Now, did you do a good job when you were working there at

14 Centurion?

15 A.    I mean, I felt I did; but that's me, though.

16 Q.    Yes, ma'am.  I understand.  Did Dr. Woods do a good job

17 taking care of inmates when she was there?

18 A.    Dr. Woods did a wonderful job.

19 Q.    No one at Centurion ever overturned any decision you made

20 about how to treat patients, did they?

21 A.    Not that I know of, no.

22 Q.    And, to your knowledge, nobody, including Dr. Woods, ever

23 told you to do anything illegal with respect to a patient's

24 care, did they?

25 A.    No.  Not anything illegal, no.

CROSS BY MR. LONG-DANIELS

```
1   Q.    And you wouldn't have done it if they had, would you?

2   A.    No.

3   Q.    And, to your knowledge, nobody told Dr. Woods to do

4   anything illegal while she was working as the medical director

5   at that facility in Marshall County?

6   A.    As far as I know, no, sir.

7   Q.    That just didn't happen, did it?

8   A.    That they -- no.

9   Q.    You spoke a minute about Dr. Ramsue.  You know Dr. Ramsue,

10  correct?

11  A.    Yes, sir.

12  Q.    You told this fine jury that he was your collaborator

13  after Dr. Woods left?

14  A.    Yes.

15  Q.    And my fine counsel asked a question about whether he

16  reviewed your medical records, correct?

17  A.    Yes, sir.

18  Q.    And you said, no, he never came.  Correct?

19  A.    He came twice that I know of and reviewed records.

20  Q.    But the records of Centurion were electronic records; were

21  they not?

22  A.    Right.

23  Q.    He could have reviewed those records from anywhere,

24  couldn't he?

25  A.    Well, I mean, I sent him charts to review; but there was
```

CROSS BY MR. LONG-DANIELS

1 quarterly reviews we did too, like quarterly meetings we did

2 with the doctor.

3  Q.    Yes, ma'am.

4  A.    But, yes, sir, I sent charts to him to review.

5  Q.    Yes, ma'am.  But all of the records for Centurion were

6 electronic records, correct?

7  A.    Yes, sir.

8  Q.    He didn't have to be at Marshall County reviewing the

9 records, did he?

10 A.    Oh, no.

11 Q.    He could have reviewed them from anywhere, couldn't he?

12 A.    Yes.

13 Q.    And you can't say under your oath today whether he

14 reviewed any of those records, can you?

15 A.    I sent records to him, so --

16 Q.    Yes.

17 A.    -- I don't know if he reviewed them or not.

18 Q.    That's my point.

19 A.    Right.

20 Q.    You can't say to this jury on your oath that Dr. Ramsue

21 did not review records, can you?

22 A.    Right.

23 Q.    That's just not something within the purview of your

24 knowledge?

25 A.    Right.  I don't know if he looked at them or not, what I

1  sent.  I don't know.

2  Q.    Now, you mentioned something when my friend Mr. Waide was

3  cross-examining you about whether Travis Day told April Meggs

4  or Dr. Ramsue something.  Now, I want you to be clear with this

5  jury.  You were not present when Travis Day told Dr. Ramsue

6  anything related to any complaints, were you?

7  A.    No.  He just told me he'd relayed it to him.

8  Q.    So, just to be factual, you're repeating what he said.

9  You wasn't there.

10  A.    No, no.

11  Q.    You didn't hear.

12  A.    No.

13  Q.    You didn't observe it.

14  A.    No.

15  Q.    And you can't say on your oath today that he ever told

16  April Meggs anything, can you?

17  A.    No.

18  Q.    And you can't say on your oath today that he ever told Dr.

19  Ramsue anything, can you?

20  A.    No.

21  Q.    Finally, let me just ask you, you're friends with

22  Dr. Woods, aren't you?

23  A.    I mean, I consider her a friend.  But we don't get

24  together and go places and do things and that kind of stuff if

25  that's what you mean, no.

CROSS BY MR. PEEPLES                                        25

1  Q.    But y'all are friends?

2  A.    Yeah.  I consider her a friend of mine.

3  Q.    Did y'all talk about this case today when y'all were

4  together?

5  A.    A little bit.

6          MR. LONG-DANIELS:  That's all I have, Your Honor.

7          THE COURT:  All right.

8      The Defendant Management may cross-examine.

9          MR. PEEPLES:  Thank you, Your Honor.

10                   CROSS-EXAMINATION

11  BY MR. PEEPLES:

12  Q.    Hi, Ms. Cox.  I'm Tim Peeples.

13  A.    Hello.

14  Q.    Nice to meet you.  Centurion trained you in the chain of

15  command, correct?

16  A.    Yes, sir.

17  Q.    And you understood that you were expected to follow that,

18  right?

19  A.    Right.

20  Q.    And it sounds like from your testimony that you did in

21  fact follow the chain of command.

22  A.    I feel like I did.

23  Q.    You would either go -- I think you told us you would go to

24  the nurses to ask about patients.  If that didn't work, you'd

25  go to Dr. Woods, the has, maybe even the security staff, right?

CROSS BY MR. PEEPLES

1  A.     Right.

2  Q.     And all of that was acceptable.  That's within your chain

3  of command to do, right?

4  A.     Uh-huh.

5  Q.     Would you say yes for the record?

6  A.     Yes, sir.

7  Q.     Yes, ma'am.  And I don't mean to correct you, it's just --

8  A.     I know.  I understand.

9  Q.     Sure.  No problem.  And you understood that teamwork and

10  collaboration and working together, that's important in a

11  prison.  Would you agree with that?

12  A.     Yes, sir.

13  Q.     Because there are some very dangerous people, right?

14  A.     Yes.

15  Q.     And you're -- you're a nurse practitioner.  You're

16  essentially a doctor without the doctor's certificate.  I know

17  that's a half joke.  But that's fairly accurate.  Would you

18  agree with that?  You -- you're a medical person.

19  A.     I can write -- yes.  I can do a lot of things a doctor can

20  do, but I'm not a doctor.

21  Q.     You're a very qualified medical person.  Would you agree

22  with that?

23  A.     Yes, sir.

24  Q.     Okay.  And you're not a -- you're not a corrections

25  officer or a sergeant or anybody who actually does security,

1   correct?

2   A.    I'm not.

3   Q.    Don't hold yourself out as somebody who has expertise in

4   that field, do you?

5   A.    No.

6   Q.    Okay.  Don't want to do that job.  It's a tough job.

7   Would you agree?

8   A.    I don't want to do it.

9   Q.    Yeah.  Just like -- just like being a nurse practitioner

10  in a jail is; I'm sure.  Same -- it's tough, right?

11  A.    It's tough.

12  Q.    Because people do bad things to get to jail.  And, then,

13  when they get in jail, they do bad things there too, right?

14  A.    Sometimes.

15  Q.    And you mentioned the incident with Mrs. Burgess, right?

16  That was a concern for you, correct?

17  A.    Yes.

18  Q.    You're not aware of, being a medical person, whether she

19  violated any of her protocols that she was supposed to follow

20  as a corrections officer, are you?

21  A.    No.  That was not my specialty.

22  Q.    Right.  You just know it was a bad incident that -- I

23  think you said it shook you, right?

24  A.    Yes.

25          MR. PEEPLES:  All right.  That's all I have, Your

1    Honor.  Thank you.

2              THE COURT:  All right.

3         Any rebuttal?

4              MR. WAIDE:  Yes, sir, I do.

5                        REDIRECT EXAMINATION

6    BY MR. WAIDE:

7    Q.    All right.  First, regarding protocols, do you know

8    whether or not there was a protocol there that they were

9    supposed to have at least one other security officer with her

10   when she treated that Level 4 patient and got assaulted?

11   A.    Right.

12   Q.    Did MTC violate that protocol by not having a security

13   guard --

14   A.    There was not another officer with Mrs. Burgess when she

15   went to check on that inmate.

16   Q.    And counsel -- I think both counsels asked you.  I believe

17   counsel for Centurion first asked you about your being a good

18   doctor and good -- I mean, a good nurse practitioner and being

19   good at what you did?

20   A.    Yes, sir.

21   Q.    Would you tell the jury whether or not when you first

22   began work you notified Centurion that you had a problem doing

23   sutures?

24   A.    Yes, sir, I did.  I told them when they hired me that I

25   could not do that.

1  Q.    How common is it for the prisoners to need sutures?

2  A.    It's common.  It happens a lot.

3  Q.    When Amy came, how good was she at doing sutures?

4  A.    Ex -- I mean, she could probably do it blindfolded.  She

5  was very good.

6  Q.    When you worked there without a doctor on premises and

7  when -- and after Dr. Woods had been fired, was there an issue

8  in getting sutures properly done?

9  A.    Yes.  I had to send them to the ER.

10           MR. WAIDE:  That's all, Your Honor.

11           THE COURT:  All right.  You may step down.

12              (END OF THE TRIAL TESTIMONY OF TRACI COX)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Rita Davis, Federal Official Realtime Court

5    Reporter, in and for the United States District Court for the

6    Northern District of Mississippi, do hereby certify that

7    pursuant to Section 753, Title 28, United States Code that the

8    foregoing is a true and correct EXCERPT of the transcript of

9    the stenographically reported proceedings held in the

10   above-entitled matter; and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13

14

15              Dated this 22nd day of May, 2022.

16

17

18

19              /s/ Rita Davis _____
                RITA DAVIS, FCRR, RPR, CSR #1626
20              Federal Official Court Reporter

21

22

23

24

25