1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF MISSISSIPPI

3

4  DR. AMY R. WOODS,              )
                                  )
5          Plaintiff,             )        CAUSE NO. 3:19CV234
                                  )
6             VS.                 )
                                  )
7  MHM HEALTH PROFESSIONALS, LLC.)
   D/B/A CENTURION PROFESSIONALS;)
8  MANAGEMENT & TRAINING          )
   CORPORATION;                   )
9  JESSE WILLIAMS, INDIVIDUALLY;  )
   AND JOHN DOES 1-9,             )
10                                )
           Defendants.            )
11 _____

12

13      EXCERPT OF THE TRIAL TESTIMONY OF BILL KINKADE
   BEFORE UNITED STATES SENIOR DISTRICT JUDGE NEAL B. BIGGERS
14               MONDAY, MARCH 21, 2022
                 OXFORD, MISSISSIPPI
15

16

   FOR THE PLAINTIFF:
17
        Waide & Associates, PA
18      JIM WAIDE, ESQ.
        RACHEL PIERCE WAIDE, ESQ.
19      Post Office Box 1357
        Tupelo, Mississippi 38802
20

21 FOR THE DEFENDANT MHM:

22      Squire Patton Boggs (US) LLP
        DAVID W. LONG-DANIELS, ESQ.
23      AUSTIN HARRISON, ESQ.
        M. ALLYSON LUMPKIN, ESQ.
24      1201 W. Peachtree Street NW, Suite 3150
        Atlanta, Georgia 30309
25

1  **FOR THE DEFENDANTS MTC AND MR. WILLIAMS:**

2        Daniel, Coker, Horton, & Bell - Oxford
         TIMOTHY MICHAEL PEEPLES, ESQ.
3        Post Office Box 1396
         Oxford, Mississippi 38655

4

5

   Proceedings recorded by official stenographic court reporter.
6  Transcript produced with computer-aided transcription.

7
                    **RITA DAVIS, FCRR, RPR, CSR #1626**
8               FEDERAL OFFICIAL COURT REPORTER
                911 JACKSON AVENUE EAST, SUITE 369
9                  OXFORD, MISSISSIPPI  38655

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **TABLE OF CONTENTS**

2

3

4   Style and Appearances......................................1

5   Table of Contents.........................................2

6   Direct Examination by Mr. Waide...........................4

7   Cross-Examination by Mr. Peeples.........................14

8   Cross-Examination by Mr. Long-Daniels....................25

9   Redirect Examination.....................................32

10  Court Reporter's Certificate.............................36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (BEGINNING OF THE TRIAL TESTIMONY OF BILL KINKADE)

2              THE COURT:  All right.  Who does the plaintiff call

3  next?

4              MR. WAIDE:  The plaintiff calls Bill Kinkade, Your

5  Honor.

6              THE COURT:  All right.

7       You may come up and be sworn.

8              THE COURT SECURITY OFFICER:  Come up and be sworn in,

9  sir.

10     (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

11             THE COURTROOM DEPUTY:  And, if you will, state your

12  first and last name for the record.

13             THE WITNESS:  My name is William Kinkade.

14             THE COURTROOM DEPUTY:  Will you spell your last name,

15  please?

16             THE WITNESS:  K-i-n-k-a-d-e.

17            WILLIAM KINKADE, PLAINTIFF'S WITNESS, SWORN

18                        DIRECT EXAMINATION

19  BY MR. WAIDE:

20  Q.   All right.  Sir, you're Bill Kinkade?

21  A.   Bill Kinkade, yes, sir.

22  Q.   What county do you live in, sir?

23  A.   I live in Byhalia, Mississippi.

24  Q.   And that'd be Marshall County?

25  A.   Marshall County.

DIRECT BY MR. WAIDE                                    5

1   Q.    Are you a member of the state legislature?

2   A.    I am.

3   Q.    From the years 2016-2020, were you chairman of the

4   Corrections Committee of the Mississippi House of

5   Representatives of the Mississippi Legislature?

6   A.    I was.

7   Q.    Is the Mississippi Legislature the entity that

8   appropriates money for the State Department of Corrections?

9   A.    Among other things.  But our primary responsibility is to

10  appropriate funding for the agency, yes, sir.

11  Q.    All right, sir.  To your knowledge, does the State

12  Department of Corrections delegate out some of its functions to

13  private prisons?  Does it do that, pay contracts to private

14  prisons?

15  A.    Yes, sir.  We do have our state-run facilities; but there

16  are, I think, four private-run facilities within the system.

17  Q.    All right, sir.  As of the time when you were chairman of

18  the Department of Corrections, do you know whether a company

19  named Centurion also had contracts with the State Department of

20  Corrections to provide medical services to prisons?

21  A.    I am familiar with Centurion, yes, sir.

22  Q.    Am I right or wrong in saying they no longer have a

23  contract with the State?

24  A.    Well --

25  Q.    Do you know?

DIRECT BY MR. WAIDE                                                6

1   A.    I -- I couldn't verify that.  I no longer am corrections

2   chairman, so I stopped saying grace over that.

3   Q.    All right, sir.  Are you aware, back when you were

4   chairman of the Corrections Committee, that a company known as

5   MTC, Mississippi Training Corporation --

6   A.    It's Management Training Corporation.

7   Q.    Management Training Corporation.

8   A.    Yes, sir, I am.

9   Q.    All right, sir.  Do you know Dr. Amy Woods?

10  A.    I know of Dr. Woods, yes.

11  Q.    How is it that you know Dr. Woods?

12  A.    Dr. Woods lives in a small community.  Our little hamlet

13  of Byhalia is a very small town.  And she's a leader in our

14  community, so I know her through our community.

15  Q.    I believe -- do you know some of her family also, her

16  husband?

17  A.    Once again, in our community -- the Woods family are

18  certainly leaders in our community and operate the seed and

19  feed store.  So, if you're in my community, you use the feed

20  and seed store.  So, yes, sir, I know the family quite well.

21  Q.    All right, sir.  At any time -- can you tell the jury

22  whether at any time -- I'm going to refer you specifically to

23  the time period around spring 2019.

24        But, anytime, did Dr. Woods ever come to you making any

25  complaints or statements about the staff shortage or lack of

DIRECT BY MR. WAIDE                                                  7

1   ability to take patients to medical care at the Marshall County

2   Correctional Facility?  Did that ever happen?

3   A.    Dr. Woods and I never discussed anything prison related

4   that I can recollect one on one.  The only time I ever spoke

5   with Dr. Woods about the facility was in the facility at a

6   visit.  I was shocked even to know she worked there; I

7   didn't -- I wasn't even familiar with it.  But I happened to

8   see her working there, and that's the only moment we had.  So,

9   no, sir, we didn't have any conversation about her working in

10  the facility.

11  Q.    Can you tell the jury whether there were other people who

12  had some connection with the Marshall County Correctional

13  Facility who did in fact talk to you about staff shortages or

14  violence at a facility and things of that nature?

15  A.    Okay.  The Marshall County Correctional Facility located

16  in Holly Springs employed a lot of people in my community.

17  And, you know, there was -- nothing really comes to mind; but,

18  yeah, there were some casual conversations about people that

19  worked there or wanted to work there or the possibility of

20  getting a job there; or could I use my influence to help them

21  get a job there or -- so, when you ask the question, have I had

22  conversations with the community, yeah, I mean, it comes in the

23  conversation.  I did not discuss operational issues with

24  anybody in the community, however.

25  Q.    Do you recall an occasion -- do you, or do you not, recall

DIRECT BY MR. WAIDE                                                8

1   an occasion when a dentist, a male dentist, called you to

2   express concerns about staff shortages at the prison, something

3   of that sort?

4   A.    In fact, I do.

5   Q.    You do recall that?

6   A.    I do.

7   Q.    All right.  Tell us about that call.

8   A.    This happened to be the second occasion, I believe, this

9   male dentist -- and -- dentist or doctor.  I'm not clear.  And

10  I should have been a little bit more detail driven.  But it

11  was -- it was a voice mail on my return home one Friday.  I

12  check my voice mails on the return home.

13       And I heard a message that the male doctor was reporting

14  to me that he was concerned about some staff shortages and

15  concerned about security in the facility.  He didn't really go

16  into a lot of detail; he just wanted to report to me to make

17  sure I was on top of it.

18       I didn't really heed that warning very well until about

19  three weeks later.  On my return home on that Friday, he

20  happened to call and get me on the phone.  And I spoke to him

21  one on one.  Presumably, it's the same doctor.  It was a male,

22  older gentleman.  I'm not -- didn't get the name.  Because,

23  again, I was driving, you know; and I didn't write anything

24  down.

25       But, from recollection, he was telling me that, you know,

1  he was concerned about his -- I think, specifically, that

2  second shift.  And he didn't see -- that he was familiar with

3  the staff that normally worked in there, and he was concerned

4  with security and the lack of personnel that were there.

5        And, when I asked, you know, how did you determine that?

6  He said, well, he knew for a fact how many cars stayed in that

7  parking lot and how many people drove in there.  And he knew by

8  the number of cars there wasn't enough personnel in the

9  facility.

10       And, so, we had a -- we had a talk.  And I understand that

11  he was -- I sensed that he was -- had a little urgency in his

12  voice.  And I took it serious.  So I subsequently got off the

13  phone, and I reported to the Department of Corrections.

14       My contact, at that point, was the deputy commissioner of

15  facilities, which was Jerry Williams.  And I called him on the

16  phone immediately following that conversation and said, "Jerry,

17  I've got this report for the second time; and I need to look

18  into it.  This is troublesome.  And, obviously, it's something

19  believable.  And I need to investigate where we're at."  And he

20  assured me that he would begin to look at an audit on

21  personnel.

22  Q.   Based on the representative of the State Department of

23  Corrections --

24  A.   This was the deputy commissioner of corrections.

25  Q.   You mentioned -- you said -- I thought you said a dentist

DIRECT BY MR. WAIDE                                           10

1  or a doctor.  Do you remember whether it was a dentist or a

2  doctor that you talked to?

3  A.    Once again, sir, I was driving.  And I didn't write --

4  take any notes.  I know he was in the medical field; he was

5  with the facility.  And I couldn't testify whether he was a

6  doctor or a dentist.  All I can really recall is he was in the

7  medical side of the facility, of servicing the facility.  So,

8  again, I wish I had stopped to pull over and take notes; but I

9  just didn't.

10 Q.    Do you recall whether or not you received a call along the

11 same lines from a person who was a pastor and was complaining

12 about concerns about his wife's safety; that she worked at the

13 prison, same type of complaint?

14 A.    No, sir.  I don't recall a phone call to that nature.  But

15 I do recall a conversation to that nature.

16 Q.    Oh.  A person-to-person conversation?

17 A.    Yes, sir.

18 Q.    All right.  Who was the pastor?

19 A.    Well, that would be -- that would be Reverend Stephen

20 Bittick.  If you would allow me to --

21 Q.    Yes, sir.  You can explain who it was.

22 A.    Once again, in a small hamlet such as Byhalia, the Piggly

23 Wiggly is where we run into our neighbors.  And I happened to

24 be there one afternoon; and Reverend Bittick saw me, which was

25 not uncommon.

DIRECT BY MR. WAIDE                                              11

1      And we talked about young people in the community.  We

2  talked about a lot of things going on in our community.  He was

3  the pastor of the United Methodist Church.  We talked about

4  community things.  But it did -- it did lend itself to he was

5  concerned with some things going on in the facility.  His wife

6  worked there.  And he was concerned about issues that were

7  going on in the facility.

8      Understanding there was a new warden hired and I was

9  not -- I'd never met him.  And that, specifically, he had

10 invited me to a luncheon.  They were having a luncheon for the

11 new -- I guess to introduce the new warden.  And he

12 specifically invited me to come to that.

13     And, you know, it was just one of those things that I'd

14 said I would if I could, you know; it'd just depend on the

15 schedule.  As it worked out, I didn't.  But, yes, he did share

16 with me that he was concerned about security and staffing and

17 the general attitude in the facility.

18 Q.   All right.  And you mentioned they were having a new

19 warden.  Do you happen to remember whether that was Warden

20 Williams, or do you happen to remember what the new warden's

21 name was?

22 A.   I believe it was Warden Williams.  I never met the

23 gentleman, but I believe it was Warden Williams.

24 Q.   All right.  Did Warden Williams -- at any time, did Warden

25 Williams ever call you and express any concerns to you about

DIRECT BY MR. WAIDE                                              12

1  what Dr. Amy Woods had allegedly said to you?  Did that ever

2  happen?

3  A.    No, sir.

4  Q.    To your knowledge, have you ever talked to Warden

5  Williams?

6  A.    No, sir.

7  Q.    Do you know whether you ever met Warden Williams?

8  A.    I wouldn't know if I did.  I don't believe I've ever met

9  him.

10  Q.    Let me ask you this, Representative Kinkade, as a state

11  representative, is it common or uncommon for your constituents

12  to come to you about problems that they see that might relate

13  to the state government?  Is that common or uncommon?

14  A.    Well, I would submit to you that I work for the people;

15  and the House of Representatives is the closest thing to the

16  people.  And, so, I invite any and all of my constituents to

17  have access to me to voice their concern.

18       Now, I don't, as a chairman -- acting chairman of a

19  committee, you know, I don't always take an official role in

20  how I respond to that.  But I always listen to it.  Everybody's

21  got access to their representative, yes, sir.

22  Q.    Did you see anything wrong with the pastor or the dentist

23  or doctor, or whoever he was, calling to express concerns about

24  the prison -- the alleged staff shortage at the prison?

25  A.    Can you rephrase that question?

1  Q.    Did you see anything wrong -- did you see anything wrong

2  or out of sorts or immoral or illegal about this pastor -- this

3  dentist or doctor and this pastor talking to you about what

4  they perceived to be the problems at the Marshall County

5  Correctional Facility?  Did you see anything wrong with that?

6            MR. LONG-DANIELS:  Your Honor, I object on the

7  grounds of relevancy and the legal term (inaudible).

8            MR. WAIDE:  It's highly relevant, Your Honor.

9  They're claiming it's doing something wrong by going outside of

10  the chain of command.

11            MR. LONG-DANIELS:  It might be.  But he's not a

12  person to say what's legal; that's you, Your Honor.

13            MR. WAIDE:  I didn't ask him -- excuse me.  I didn't

14  ask him whether it was legal.  I asked him whether he saw

15  anything wrong with it.

16            MR. LONG-DANIELS:  He said illegal (inaudible).

17            THE COURT:  As long as you -- overruled.  You may

18  answer the question.

19            THE WITNESS:  No, sir.  I don't think there's any

20  problem with somebody saying they agree or don't dis -- agree

21  with what's going on.  I don't think there's anything wrong in

22  voicing his opinion.  I think there was something wrong with

23  the facility, and I reported that.  So I -- I embraced that

24  same idea.

25        And, if I may add, subsequently, about three weeks after

1  that report, we had an issue in the facility from, for all

2  practical purposes, a lack of security.  We had a fire.  We had

3  a guard that was assaulted.  And it was just subsequently right

4  after that reported incident.  So it proved itself to be true.

5           MR. WAIDE:  All right, sir.

6       That's all I have, Your Honor.

7           THE COURT:  Centurion, cross-examination?

8           MR. LONG-DANIELS:  I reserve mine, Your Honor.  I

9  think Mr. Peeples may have some.

10          THE COURT:  Very well.

11      Mr. Peeples?

12          MR. PEEPLES:  Sure.

13                        CROSS-EXAMINATION

14  BY MR. PEEPLES:

15  Q.    Mr. Kinkade --

16  A.    Yes, sir.

17  Q.    -- how are you doing today?

18  A.    I'm blessed.  Thank you.

19  Q.    Good.  Now, you testified you know Dr. Woods' family,

20  right, from living in Byhalia?

21  A.    Yes, sir.

22  Q.    Right.  And you're familiar with Dr. Woods because you're

23  involved in the Chamber of Commerce as well?

24  A.    She lives next door to our chamber office, yes, sir.

25  Q.    Okay.  And she is very active in the community that you

CROSS BY MR. PEEPLES

1   live in?

2   A.      Right.

3   Q.      Would you agree with that?  Yes?  Okay.  You shop at her

4   husband's and father-in-law's store, the seed and feed, Woods

5   Farm Supply, right?

6   A.      And the hardware store.

7   Q.      And the hardware store.  Okay.  And you're the state rep

8   for District 52, correct?

9   A.      Yes, sir.

10  Q.      Who held that seat before you?

11  A.      That would be Mr. Tommy Woods.

12  Q.      Okay.  And that's Mrs. Woods' grandfather-in-law, I guess,

13  correct?

14  A.      I think that's accurate.

15  Q.      I'm not good with --

16  A.      I think that's accurate.

17  Q.      Okay.  So somebody in her family had your seat before you

18  took it over.  What year did you take that over?

19  A.      I was elected in 2012.  I've served since 2013.

20  Q.      Okay.  In 2019 -- I think you testified to this -- you

21  were the chair of the corrections committee in the legislature,

22  correct?

23  A.      That's right.

24  Q.      Okay.  And you would agree with me that there is a

25  partnership of sorts between MDOC and the state legislature?

CROSS BY MR. PEEPLES

16

1  Would you agree with that?

2  A.    A partnership, I'd -- you'd have to define what you're

3  talking about.

4  Q.    Yeah.  Well, legislature -- your position --

5  A.    It's an agency in the -- it's a state of Mississippi

6  agency, yes, sir.

7  Q.    Okay.  And your committee worked together with MDOC,

8  correct?

9  A.    Yes, sir.

10  Q.    Okay.  And the idea was you worked together -- maybe

11  partnership's not the right word, but you had to work with

12  those folks to try to improve the prisons and all the other

13  issues that come along with operating prisons in the state,

14  right?

15  A.    Yes, sir.

16  Q.    Okay.  And you agree that in order to do that you got to

17  collaborate; you got to work as a team?  Do you agree with

18  that?

19  A.    Please clarify *collaborate*.

20  Q.    Well, you've got to -- you've got to -- you've got to talk

21  to the folks at MDOC.  You've got to figure out what the issues

22  are.  There's a dialogue that you want, right, when you're on

23  that committee?

24  A.    I worked with the chief administration of the DOC.  I

25  didn't work with the agency; I worked with the chief

CROSS BY MR. PEEPLES                                            17

1  administration.

2  Q.    Okay.  But the chief, you -- you wanted to have a

3  dialogue --

4  A.    Right.

5  Q.    -- with the chief.  Would you agree with that?

6  A.    Right.

7  Q.    And that's so things could be improved where needed.

8  Would you agree with that?

9  A.    Right.

10 Q.    Okay.  And you're a big believer in chain of command,

11 aren't you?

12 A.    Absolutely.

13 Q.    Okay.  You're in the military.  You follow the chain of

14 command.  You believe that's important, don't you?

15 A.    I think we all do.

16 Q.    Your testimony, as I understand it, is that a dentist from

17 the facility -- to be clear, this person worked at the Marshall

18 County Correctional Facility, correct?  Dentist or doctor, that

19 person worked at the prison, right?

20 A.    That's my understanding, yes.

21 Q.    Okay.  And he called you a couple of times --

22 A.    Right.

23 Q.    -- to -- and then you spoke to Stephen Bittick, who is a

24 reverend, a Methodist minister, from Byhalia, correct?

25 A.    That's right.

CROSS BY MR. PEEPLES                        18

1  Q.    Okay.  And his wife -- the reverend's wife worked at the

2  prison, correct?

3  A.    That's my understanding.

4  Q.    Okay.  Did you ever speak to her?  Do you know

5  Mrs. Cassie?

6  A.    Not really directly.  I mean, I had met Mrs. Cassie at a

7  luncheon.  We didn't really discuss prison issues.  We

8  discussed, you know, church things.  But I didn't have a one on

9  one with her about specifics.

10 Q.    Okay.  And you reported the phone call that you had with

11 this dentist or doctor -- you reported that to Jerry Williams

12 at MDOC?

13 A.    Absolutely.

14 Q.    Okay.  And he advised you he was going to look into the

15 issue, correct?

16 A.    That's right.

17 Q.    Now, after Dr. Woods had her clearance revoked and was

18 terminated from the jail, Mr. Pat, who is her father-in-law,

19 contacted you, didn't he?

20 A.    Well, I don't know what the time line was; but I wasn't

21 involved in the security or the termination, so I don't know

22 what happened first.  I know that I saw Mr. Pat Woods, and he

23 was just disappointed that the decision had been made to let

24 her go.  And that was the first I'd heard about it.

25 Q.    Did you talk to him by phone, or did you talk to him in

CROSS BY MR. PEEPLES                                    19

1   person?

2   A.    I talked to him in person.

3   Q.    Okay.  And describe that conversation.

4   A.    As I said, I was at the feed and seed; and he was just

5   disappointed that that had been done.  And, again, it was news

6   to me.  I had no knowledge of it.

7   Q.    Did Mr. Pat tell you the reasons that Dr. Woods was no

8   longer working at the prison?

9   A.    He wasn't clear on it.

10  Q.    Okay.

11  A.    He just asked me if I knew about it.

12  Q.    Okay.  And you also talked to Dr. Woods after all of this

13  happened, right?  Didn't she call you?

14  A.    I think I did have a conversation about it, and I may have

15  called and asked and -- and asked if there was anything I could

16  do.  And I felt bad about it.  I'd come to understand somehow

17  that her termination was somehow due to me in some way, and I

18  didn't understand why.

19  Q.    You understood the accusation was that she had been

20  talking to you outside of the jail, correct?

21  A.    Well, I understood that -- or what I've come to understand

22  is that she was a whistleblower of some kind; or she was

23  accused to do that, which was very disappointing.

24  Q.    Because your testimony is that that didn't occur, right?

25  A.    It never occurred.

CROSS BY MR. PEEPLES

1  Q.    Okay.  Did you tell her, look, the dentist from the clinic

2  is actually who called me?  Did you tell her that?

3  A.    I may have.  I mean, I didn't know if he was a dentist or

4  a doctor.  I don't know who he was.  All I knew he was a male

5  staffer in the medical field from the prison.

6  Q.    Okay.  Did you contact Jerry Williams at MDOC about

7  Dr. Woods losing her job?

8  A.    I said that was very disappointing to hear that Dr. Woods

9  had been terminated.

10 Q.    Okay.  So you -- I'm not sure I followed you.  You did

11 contact Jerry Williams?

12 A.    I told him I was very disappointed to hear that she was

13 terminated.

14 Q.    Okay.  Did you explain to him that Dr. Woods is not the

15 person who actually called you?

16 A.    No.  I didn't know the root cause of what got her

17 terminated.  I didn't know -- I didn't know the details of it.

18 Q.    Okay.  You didn't ask?

19 A.    No.

20 Q.    That wasn't important to you to know why she was

21 terminated?

22 A.    I'd heard that she'd been terminated for talking to me,

23 and I knew that was false.

24 Q.    Right.  And you didn't make any effort with Jerry Williams

25 to try to clear that up with him?

CROSS BY MR. PEEPLES

1  A.    She didn't work for DOC.

2  Q.    That's not my question, sir.  My question is, you didn't

3  make any effort with Jerry Williams to try to clear up the fact

4  that Dr. Woods had not been talking to you?

5  A.    You know, from recollection, I don't think I did.  I mean,

6  you're asking me to recall issues that I didn't really find

7  important at the moment.  So I didn't make any note of whether

8  I did or I didn't.  I could have talked to Jerry about, you

9  know, it was disappointing that she was terminated.

10      But, once again, as I've said, I start and stop with the

11  Department of Corrections, not with a contractor or any outside

12  entity.  So I can't say grace over any of that.

13  Q.    You don't think that would be within your chain of

14  command, in other words?

15  A.    Well, you've used the word "chain of command" a couple of

16  times if I may address that.

17  Q.    Sure.  Yes, sir.

18  A.    Chain of command, when you're in the legislature, is not

19  appropriate.  I am -- once again, am a -- in the House of

20  Representatives.  And I serve the 26,000 people that put me

21  there.  And it makes me closest to the people.

22      And, so, that chain of command is all 26,000 of those

23  people are all equal.  And, so, there's not one better than the

24  other or one voice louder than the other.  And, so, that chain

25  is -- is not a militaristic chain.

1    When we're reporting issues from an agency standpoint,

2  then, yes, sir, we follow a chain of command.  Or I -- I do.

3  It's not a protocol.  It's nothing we're required to do.  But,

4  just from my upbringing, my disciplines are to follow chain of

5  command.

6  Q.    Okay.  You have to follow that in your business and that

7  sort of thing?

8  A.    That's just my personal opinion.

9  Q.    Yes, sir.  Fair enough.  But Dr. Woods is one of your

10  constituents, right; she lives in your district?

11  A.    That's right.

12  Q.    And you didn't see the need to talk to Jerry Williams to

13  try to clarify this issue about who's actually talking to you?

14  A.    Once again, she didn't work for Jerry Williams.

15  Q.    All right.  She worked under Jerry Williams in a sense,

16  didn't she?

17  A.    No.

18  Q.    Her company had a contract with MDOC; did it not?

19  A.    She worked for a health-care provider who was a

20  contractor.  So, to address your question directly, no, I

21  didn't.

22  Q.    Did Jerry Williams ever tell you that the warden would be

23  willing to sit down with you to discuss these issues?

24  A.    No, sir.  When I followed up with Jerry Williams about

25  this issue, he simply said it was under investigation; and he

CROSS BY MR. PEEPLES

1  couldn't comment.

2  Q.    Okay.  Did you ever try to follow back up with him on

3  Dr. Woods' behalf or just for your own knowledge; did you ever

4  do that?

5  A.    Again, when I followed up with Jerry about all of those

6  issues about the reported staff shortage or anything I would

7  ask him about, he said we have a -- it's under an in-house --

8  it's under investigation.  We have an internal investigation

9  ongoing.  And, so, he had no comment.

10  Q.    If Jerry had advised you -- if Mr. Williams had advised

11  you that the warden would be willing to meet with you and

12  Dr. Woods to discuss these issues, would you have done that?

13  A.    Well, that's a woulda, coulda, shoulda, now, isn't it?

14  We're past that, aren't we?

15  Q.    I don't think we are.  I think that you were advised that

16  the warden would be willing to do that.

17  A.    Well, we didn't do it.

18  Q.    Okay.  And I think you testified in your deposition that

19  if you'd been asked to do that you wouldn't have done it

20  anyway.

21  A.    Well, again, I work with the Department of Corrections.

22  And, if the Department of Corrections wanted to sit down with

23  the warden, then I possibly would have.  But I wouldn't have

24  sit -- I wouldn't have taken it upon myself to sit down with

25  the warden, no, sir.

1  Q.    Okay.

2  A.    As I would at any other facility.

3  Q.    Did you make any effort to try to contact Jesse Williams

4  about any of these incidents or --

5  A.    No, sir.

6  Q.    Okay.  And do you recognize -- Jesse Williams is sitting

7  right over here.  Do you recognize him at all?

8  A.    No, sir.

9  Q.    No?  You've never met Jesse Williams, have you?

10  A.    (Witness shaking head).

11  Q.    Never spoken to Jesse Williams, have you?

12  A.    No, sir.

13  Q.    Did he contact you when he first took the position as a

14  warden to try to talk to you about corrections issues in the

15  jail?

16  A.    I don't believe so.

17  Q.    Okay.  Did you reach out to anyone at Centurion to try to

18  clear up this, as you've testified, misconception about

19  Dr. Woods talking to you?

20  A.    No, sir.

21  Q.    Have you ever taken a photograph with Dr. Woods?

22  A.    Lord have mercy.

23          THE COURT:  What was that?

24          THE WITNESS:  Lord have mercy.  I -- I --

25  BY MR. PEEPLES:

CROSS BY MR. LONG-DANIELS

1  Q.    And you've probably taken a lot of photographs.  I'll give

2  you that.

3  A.    Who knows.  Possibly.

4  Q.    Possibly.  Okay.  You don't know for sure one way or the

5  other.  Okay.  All right.

6  A.    I don't know.

7         MR. PEEPLES:  That's all I have, Your Honor.  Thank

8  you.

9         THE COURT:  Mr. Long?

10         MR. LONG-DANIELS:  Yes, sir.  Thank you.

11                        CROSS-EXAMINATION

12  BY MR. LONG-DANIELS:

13  Q.    Good afternoon, Representative Kinkade.

14  A.    Young man, how are you?

15  Q.    I am great.  Great to see you again.  Just a few follow-up

16  questions.  You -- you believe that security clearances are

17  important for the good of the order (inaudible)?

18  A.    You don't like that mask, do you?

19  Q.    I hate it.  But I'm going to try to (inaudible).

20  A.    Do I think a security clearance is important in this --

21  Q.    For the -- for the good of the order.

22  A.    Yeah.  I think a security clearance is good in any

23  organization at some level.

24  Q.    You and I were both soldiers.  We know what security

25  clearances are for, right?

CROSS BY MR. LONG-DANIELS

1  A.     Absolutely.

2  Q.     And, if you don't have a security clearance, then you

3  can't get in the place that's secure, correct?

4  A.     Depends on the level you need.

5  Q.     Yes, sir.  But, assuming you need a top secret security

6  clearance, if they take it, you no longer have access to the

7  top secret information, right?

8  A.     I -- that would seem appropriate.

9  Q.     Yes, sir.  And you would agree with me, wouldn't you, as

10  two old soldiers, that the chain of command is important in any

11  organization?

12  A.     Well, these are disciplines that we have as old soldiers.

13  They're not required by the general public, but we maintain

14  those.

15  Q.     Yes, sir.  Because, if you have a company, then you would

16  want somebody in your company to bring something to your

17  attention before they talk to somebody outside the company,

18  wouldn't you?

19  A.     That's right.

20  Q.     Because you would want a chance to deal with it first,

21  wouldn't you?

22  A.     That's right.

23  Q.     And you would be disappointed if they went outside and

24  talked to somebody before they talked to you and gave you a

25  chance to fix it, right?

CROSS BY MR. LONG-DANIELS                                   27

1  A.    I presume you're right.

2  Q.    That's just for the good of the order, right?  Now, you

3  mentioned that you serve this wonderful district --

4  A.    Fifty-two.

5  Q.    Fifty-two.  26,000 people.  The Marshall County

6  Correctional Facility is in that district, correct?

7  A.    No, sir, it's not.

8  Q.    It's not?

9  A.    No, sir.

10 Q.    Is it close to that district?

11 A.    It's in Holly Springs, so it's in the adjacent district.

12 Q.    Adjacent district.  Okay.

13 A.    South of my district.

14 Q.    Okay.  But you never stopped by to have a word with the

15 warden?

16 A.    Oh, certainly.  I stopped by that facility on a couple of

17 occasions.  I haven't since the new warden has taken position;

18 I haven't had an opportunity to do that.

19 Q.    Did you ever take the opportunity to do that?

20 A.    Once again, as I said, I've done it two or three

21 occasions; but I haven't had an occasion to do it since the new

22 warden has been assigned.

23 Q.    You mentioned the conversation with Dr. Woods'

24 father-in-law after she was terminated.

25 A.    In passing, yes.

CROSS BY MR. LONG-DANIELS

1  Q.    Well, you say in passing; but y'all sat up and say hello

2  to each other and greet each other and then talk about it?

3  A.    I was going to buy fertilizer.

4  Q.    Were you going to buy fertilizer from his store?

5  A.    Probably some fertilizer, yes.

6  Q.    And, while you were there --

7  A.    He saw me out there on the dock; and, while somebody was

8  loading my truck, we usually talk about the weather or

9  whatever.  This day it happened to be that.

10  Q.    This day it happened to be his daughter-in-law, Dr. Woods.

11  And you then had a conversation with Jerry Williams at the

12  Department of Corrections, correct, about Dr. Woods?

13  A.    Again, I've stated that I wasn't real clear on that

14  conversation.  But I did mention to Jerry that I was

15  disappointed that I'd heard that she was terminated.

16  Q.    And you dropped that little nugget --

17  A.    It was not immediate.

18  Q.    And you dropped that little nugget for a reason, didn't

19  you?

20  A.    Well, the reason was that she was my constituent.

21  Q.    And you wanted him to know that she was your constituent,

22  right?

23  A.    (Nodding head).

24  Q.    And you expected some action from him, didn't you?

25  A.    He's the deputy director of corrections in facility

1  management.

2  Q.   Yes, sir.

3  A.   I simply reported to him that I was disappointed.  I

4  didn't request action.

5  Q.   You didn't have to because you were the chair of the

6  Corrections Committee that funded them, right?

7  A.   I indicated my disappointment.

8  Q.   Yes, sir.  And you expected him to do something, didn't

9  you?

10  A.   That's your words.

11  Q.   Yes, sir.  I'm asking yours.  Did you want him to do

12  something to help Dr. Woods?

13  A.   Let me go slow here.  I told him I was disappointed.  You

14  take it as you like it.

15  Q.   Right.  I used to be a politician too.  When my

16  constituents told me that they were disappointed, that usually

17  meant they wanted me to do something.

18  A.   Well, you're not a politician anymore.  How about that?

19  Q.   I'm glad, but I -- if I can't sit in your seat; but could

20  you answer my question, please?

21  A.   Yes, sir.  I indicated to Mr. Williams that I was

22  disappointed.  I didn't require a comment.

23  Q.   Disappointed.  Enough said with, "I'm disappointed."

24  A.   It doesn't require an action, doesn't require a comment.

25  Q.   But then you follow up with him about it.  Right?

CROSS BY MR. LONG-DANIELS

1 A.    I followed up about security at the facility.

2 Q.    You followed up with him about Dr. Woods, right?

3 A.    As well.

4 Q.    And, when you followed up with him, what did you say to

5 him?

6 A.    He said, "It's under investigation."

7 Q.    And you left it at that?

8 A.    I did.

9 Q.    Let's just be candid for this jury.  You wanted Dr. Woods

10 to get her security clearance back, didn't you?

11 A.    I never -- I never asked for it back.

12 Q.    No, sir.  I didn't ask what you asked.  I want to know

13 what you wanted.  Did you want her to get her security

14 clearance back?

15 A.    I thought we were dealing with facts, not with what I

16 want.

17 Q.    Well, sometimes I don't know what's fact and what's

18 fiction; but I want an answer to my question.  Did you want

19 Jerry Williams to do something to help Dr. Woods?

20 A.    I didn't want Dr. Woods to lose her job because something

21 was wrong.

22 Q.    Now we're cooking with grease.  And the fact of the matter

23 is, despite your inquiry to the Department of Corrections as

24 the chair of the Corrections Committee, they didn't help her

25 get her job back, did they?

CROSS BY MR. LONG-DANIELS

1    A.    Well, frankly, I didn't ask for it back.

2    Q.    Well, the truth of the matter is, she sits today here

3    because she didn't get that security clearance back so she

4    could go back to work?

5    A.    And I feel horrible about that.

6    Q.    Yes, sir.  As the head of the Corrections Committee, you

7    couldn't change the direction that boat was headed, could you?

8    A.    Well, I'm the House chair now.  We got a set of chairs as

9    well.  So, when you come to the head, don't forget the other

10   side.

11   Q.    Well, I -- I --

12   A.    You were there.

13   Q.    Maybe I overstated your power.

14   A.    Okay.

15   Q.    But, as the head of the House Committee, Corrections

16   Committee, you couldn't get that boat turned around.  She

17   stayed terminated, didn't she?

18   A.    I did not use my influence for that action, if that's what

19   you're stating.

20   Q.    No, sir.  I'm just saying --

21   A.    I did not use my influence to change the direction of

22   this, if that's what you're stating.

23   Q.    No, sir.  I'm -- I'm simply saying --

24   A.    Right or wrong, I did not use my influence to change the

25   decision.

```
 1   Q.    Yes, sir.  I understand that.  My simple question is,

 2   nothing changed after you made that inquiry, did it?

 3   A.    Do you feel like I should have used my influence?

 4   Q.    Well, I'm not asking about everybody.

 5   A.    It's a straight question.

 6   Q.    My question's about change.  Nothing changed after you

 7   made that inquiry, did it?

 8   A.    Not to my knowledge.

 9         MR. LONG-DANIELS:  Thank you, Judge.

10         THE COURT:  All right.

11   You may redirect.

12                         REDIRECT EXAMINATION

13   BY MR. WAIDE:

14   Q.    Sir, first of all, as a member of the legislature, do you

15   feel like you have an obligation to your constituents if

16   something happens to a constituent to at least look into it or

17   to examine her concerns?  Do you feel like you have that

18   obligation?

19   A.    Yes, sir.  You know, I have daily -- I have constituents

20   call me that ask about their tax returns.  They're not getting

21   them back in time.  Or their homestead exemptions; they're not

22   being filed properly; or any myriad of concerns.  And they're

23   entitled to call their state legislator, and my job's to follow

24   up.

25   Q.    Based upon Dr. Woods' reputation in the community as a
```

1  doctor and knowing her family as you did, did you have concerns

2  about her being terminated from that position at Marshall

3  County Correctional Facility?

4  A.    I certainly did.

5  Q.    Is the Department of Corrections an entity with which you

6  normally deal as a legislator when you were committee chairman,

7  and you were working with the prison?  Is Mr. Jerry Williams at

8  the Department of Corrections the person who you normally

9  talked to?

10 A.    I dealt with Pelicia Hall.  She's the commissioner.  She's

11 ultimately the one -- the commissioner.  Her deputy

12 commissioner over facilities, which is where Holly Springs fell

13 under, would be Jerry Williams.  And then, you know, one level

14 beyond that would be constituent services.  That was in

15 Jackson.  But that's the levels that I dealt with at the

16 Department of Corrections.

17 Q.    All right.  At the time you talked to deputy commissioner

18 Williams, Jerry Williams, did you know any of the details about

19 what reasons that either Centurion was claiming that they fired

20 her or MTC was claiming they revoked her security clearance?

21 Did you know what claims they were making about why they did

22 that?

23 A.    When I talked to Jerry, I had already found out through

24 her father-in-law; and, I think, I probably talked to Amy at

25 that point and found out that somehow they had indicated that

1   I -- she was a whistleblower, or somebody had talked to me.

2   And it instigated some investigation because she had --

3   apparently, had talked to me.  Or it was put to me that way.

4   And that's what I told Jerry, "This is not correct.  That's not

5   right."

6   Q.    Okay.  You told him it's not correct that she talked to

7   me, is what you told Jerry?

8   A.    Right.

9   Q.    Okay.  And his statement to you was he would look into it?

10  A.    "It's under investigation."

11  Q.    Okay.  To your knowledge, you don't know whatever became

12  of it after that?

13  A.    I followed up about three weeks later amongst other

14  things, and he said it was under investigation.  And, so, when

15  it's under investigation, he really -- that was his way out of

16  making any comment.

17  Q.    Okay.  Do you feel today that you did anything wrong when

18  you talked to Commissioner Williams -- Assistant Commissioner

19  Williams?

20  A.    No, sir.  Not at all.

21  Q.    And do you think you did anything wrong by talking to

22  those employees down there at the facility?

23  A.    No, sir.  Not at all.

24  Q.    Were you doing your job as a legislator?

25  A.    I'll continue to do it.

```
1              MR. WAIDE:  That's all I have.

2              THE COURT:  Okay.

3      Mr. Kinkade, thank you.  You're now excused.

4              THE WITNESS:  Thank you, Judge.

5              THE COURT:  Drive careful.

6              THE WITNESS:  Let's go to Jackson.

7              (END OF THE TRIAL TESTIMONY OF BILL KINKADE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4             I, Rita Davis, Federal Official Realtime Court

5 Reporter, in and for the United States District Court for the

6 Northern District of Mississippi, do hereby certify that

7 pursuant to Section 753, Title 28, United States Code that the

8 foregoing is a true and correct EXCERPT of the transcript of

9 the stenographically reported proceedings held in the

10 above-entitled matter; and that the transcript page format is

11 in conformance with the regulations of the Judicial Conference

12 of the United States.

13

14

15                 Dated this 22nd day of May, 2022.

16

17

18

19                 /s/ Rita Davis _____
                  RITA DAVIS, FCRR, RPR, CSR #1626
20                  Federal Official Court Reporter

21

22

23

24

25